# United States Court of Appeals for the Eighth Circuit

**Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown,**

Plaintiff-Appellees,

v.

**Michael Howe, in his official capacity as Secretary of State of North Dakota,**

Defendant-Appellant.

APPEAL FROM DECISION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NORTH DAKOTA (No. 3:22-cv-00022)

**SECRETARY HOWE'S MOTION FOR STAY OF JUDGMENT PENDING APPEAL AND MOTION TO EXPEDITE**

Pursuant to Fed. R. App. Proc. 8(a)(2), the Secretary of State of North Dakota (the "Secretary"), moves for an order staying the district court's judgment pending appeal and through the November 2024 election cycle. Because the State needs finality on what election map will be used for the 2024 elections no later than Sunday, December 31, 2023, the Secretary respectfully requests that the Court render a decision on this motion for a stay no later than **Friday, December 29, 2023.**

1

## BACKGROUND

Appellees allege North Dakota's 2021 state legislative redistricting plan dilutes Native American voting strength in violation of Section 2 of the Voting Rights Act ("VRA") (codified at 52 U.S.C. § 10301). The basis for Appellees' "dilution" allegation is a preference for racially gerrymandering the election map to join two distinct Native American tribal reservations within a single elongated legislative district—despite the fact those different tribal reservations have never been joined together into one legislative district in State history. The district court found Appellees had a private right of action under 42 U.S.C. § 1983.

On November 17, 2023, more than five months after the conclusion of a bench trial—and weeks before the 2024 election map must be fixed with finality—the district court issued a judgment concluding the State's redistricting plan "prevents Native American voters from having an equal opportunity to elect candidates of their choice in violation of Section 2 of the VRA" and enjoining the Secretary from "administering, enforcing, preparing for, or in any way permitting the nomination or election" of candidates in several legislative districts. R.Doc. 126 at 2. The district court also set a schedule by which the Secretary and Legislative Assembly[1] shall have until December 22 to adopt a remedial plan, the Appellees shall have until

---

[1] The State Legislative Assembly was not a party to the underlying action at the time of the district court's judgment, though it has since moved to intervene. R.Doc. 137. That motion to intervene was denied by the district court. R.Doc. 153.

Appellate Case: 23-3655     Page: 2     Date Filed: 12/13/2023 Entry ID: 5344314

January 5 to object to any such remedial plan, and the Secretary shall have until January 19 to reply in support of any such remedial plan. *Id.*[2]

As discussed further *infra*, administering a statewide election in North Dakota requires the 2024 election map to be finalized no later than December 31, 2023. That is the date by which counties must fix precinct boundaries (with other requirements building off that). And it is also the date after which candidates begin petitioning to be on the ballots in their respective districts (with a limited window for doing so). Changing the district boundaries after that date will risk substantial confusion, cost, hardship, and unfairness for candidates, voters, and election administrators alike.

The Secretary timely filed a notice of appeal and moved for a stay of judgment pending appeal in the district court, emphasizing the State needs finality on what election map will be used no later than December 31, and that compliance with the Court's order was not possible without imposing significant cost, confusion, and hardship. R.Doc. 131. The district court denied the motion to stay on December 12, 2023. R.Doc. 153.[3] It also denied a motion by Appellees to accelerate the remedial deadlines ahead of December 31 and a motion by the Legislative Assembly to intervene, both on the basis the notice of appeal deprived it of jurisdiction. *Id*.

The Secretary now moves this Court for a stay of the district court's judgment

---

[2] Copies of the district court's order and final judgment are attached as Exhibits 1 and 2, respectively.

[3] The district court's order denying the motion for stay is attached as Exhibit 3.

pending appeal and through the 2024 election cycle. This Court's recent decision in *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, —F.4th—, 2023 WL 8011300 (8th Cir. Nov. 20, 2023), *pet. for rehearing filed* (Dec. 11, 2023), strongly supports concluding the district court erred when it found Appellees had a private right of action under 42 U.S.C. § 1983, R.Doc. 30,[4] and the Secretary has a sound basis for seeking appellate review of the district court's judgment.

But the timing of the District Court's order means the Secretary cannot receive meaningful appellate review before the deadline by which the 2024 election map must be fixed with finality. Moreover, the district court's order deprives the State Legislative Assembly of a reasonable opportunity to adopt a remedial plan before one is imposed by a Federal court, and it cannot be complied with without risking significant confusion, cost, and disruption for the 2024 elections.

The Secretary asks this Court to preserve the status quo pending appeal and allow the State's legislatively enacted map to remain in place through the 2024 elections while this litigation plays out in the appellate courts.

## LAW & ARGUMENT

Because the district court's injunction was entered with insufficient time to seek meaningful appellate review without disrupting the State's 2024 election, a stay

---

[4] A copy of the district court's order denying the Secretary's motion to dismiss and finding the Plaintiffs had a private right of action is attached as Exhibit 4.

4

of the Court's injunction pending appeal and through the 2024 election cycle is appropriate under the Supreme Court's *Purcell* analysis for staying injunctions that disrupt upcoming elections.

Alternatively, even if the Court finds a *Purcell* analysis is inapplicable, a stay pending appeal should be granted under a traditional stay analysis.

## A. Injunctions Likely to Disrupt Scheduled Elections Are Subject to the Supreme Court's *Purcell* Analysis

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm*., 140 S. Ct. 1205, 1207 (2020). "Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). This principle comes from *Purcell v. Gonzalez*, where the Supreme Court explained courts should not change election rules proximate to an election when doing so could create problems for administering the election. *See* 549 U.S. 1, 4 (2006) ("Court orders affecting elections … can themselves result in voter confusion and consequent incentive to remain away from the polls.").

When a State's ability to efficiently administer an upcoming election is threatened, the framework for assessing an injunction is adjusted and federal courts must "weigh, in addition to the harms attendant upon issuance or nonissuance of an

injunction, considerations specific to election cases and its own institutional procedures." *Id*. at 4. And "when a lower court … alters the election rules so close to the election date, our precedents indicate that this [c]ourt, as appropriate, should correct that error." *Republican Nat'l Comm*., 140 S. Ct. at 1207.

Importantly, this principle considers not only the date of the election itself, but also the deadlines and requirements that must be met for the election to proceed in an organized and transparent manner. *Merrill,* 142 S. Ct. at 880 (Kavanaugh, J., concurring) ("Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. … Nor do incumbents know if they now might be running against other incumbents … On top of that, state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials …").

The Supreme Court has not fully delineated when a *Purcell* analysis is required; however, Justice Kavanaugh's concurrence in *Merrill* is instructive. The *Merrill* case involved several challenges to Alabama's congressional electoral maps, wherein the plaintiffs alleged vote dilution in violation of the VRA, and the Alabama Secretary of State was enjoined by the district court from conducting elections based on the existing redistricting plan. Even though the primary election was still "about four months" away at the time the case came before the Supreme Court, 142 S. Ct.

6

at 888 (Kagan, J., dissenting), the Supreme Court stayed the district court's injunction pending appellate review. *Id*. at 879.

Justice Kavanaugh, joined by Justice Alito, wrote separately to concur with the stay of the injunction. *See Merrill,* 142 S. Ct. at 879–82 (Kavanaugh, J., concurring). Citing the *Purcell* principle, the concurrence explained, "[t]he stay order follows this Court's election-law precedents, which establish (i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when, as here, lower federal courts contravene that principle." *Id.* at 879. Justices Kavanaugh and Alito further explained "the *Purcell* principle is probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Id.* at 881. The heightened standard when an injunction is likely to disrupt an election has four elements:

(i) the underlying merits are entirely clearcut in favor of the plaintiff;

(ii) the plaintiff would suffer irreparable harm absent the injunction;

(iii) the plaintiff has not unduly delayed bringing the complaint to court; and

(iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id.* This modified test for stays in election cases has been applied by district courts in the Eighth Circuit. *See Walen v. Burgum*, 2022 WL 1688746, at *5 (D.N.D. May 26, 2022) ("Justice Kavanaugh's framework provides helpful guidance for addressing the *Purcell* issue"); *see also Berry v. Ashcroft*, 2022 WL 2643504, at *2–3 (E.D. Mo. July 8, 2022); *Lower Brule Sioux Tribe v. Lyman Cnty.*, 625 F. Supp. 3d 891, 933–35 (D.S.D. 2022). And this modified standard has been expressly applied by the Eleventh Circuit. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022) ("we agree with Justice Kavanaugh that *Purcell* only (but significantly) 'heightens' the standard that a plaintiff must meet to obtain injunctive relief that will upset a state's interest in running its elections without judicial interference"); *see also Grace, Inc. v. City of Miami*, No. 23-12472, 2023 WL 5286232, at *2–3 (11th Cir. Aug. 4, 2023).

**B.    A Stay Pending Appeal Should be Granted Under the Modified *Purcell* Analysis**

Under the modified *Purcell* analysis, this Court should grant a stay of the district court's judgment pending appeal and allow preparation for the November 2024 elections to continue under the State's duly enacted map.

### (i)  The District Court's Order Threatens Significant Cost, Confusion, and Hardship for North Dakota's 2024 Elections.

Taking the last element first, the fourth element is whether the changes in question are feasible before the election without significant cost, confusion, or

hardship. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). The district court's schedule for proposing and objecting to remedial maps goes until January 19, 2024, which is 144 days (about 4.7 months) before the June 11, 2024 primary election. N.D.C.C. § 16.1-11-01. But even more pressingly, the district court's schedule extends past the December 31 deadline by which counties need to establish their precinct boundaries and candidates petitioning to be on the ballot need to know what district they are in.  N.D.C.C. § 16.1-11-15; N.D.C.C. §§ 16.1-04-01.

What qualifies as "too close" to election deadlines under *Purcell* varies depending on "the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Merrill* 142 S. Ct. at 881 n.1 (2022) (Kavanaugh, J., concurring). The ability of the State to seek meaningful appellate review of the election-impacting injunction also factors into a *Purcell* analysis. *See Walen v. Burgum*, 2022 WL 1688746, at *6 (D.N.D. May 26, 2022) (*Purcell* "direct[s] courts to weigh the opportunity for appellate review").

Courts have applied the *Purcell* principle to prevent election-disrupting injunctions on similar timeframes as the present case. For example, in *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042 (N.D. Fla. 2022), the district court denied a stay of its order on *Purcell* grounds on the basis the closest election was still roughly five months away. *Id.* at 1172–73. But the Eleventh Circuit granted a stay of the order, finding that while "the Supreme Court has never specified

9

precisely what it means to be 'on the eve of an election' for *Purcell* purposes …
[w]hatever *Purcell*'s outer bounds, we think that this case fits within them." *League of Women Voters*, 32 F.4th at 1371. And in *Merrill*, the Supreme Court granted a stay even though the primary election was still "about four months" away from the date of Supreme Court's stay—and even longer from the district court's injunctions. *See Merrill*, 142 S. Ct. at 879, 888 (Kagan, J., dissenting).[5]

Here, it is not feasible for the North Dakota Legislative Assembly to adopt a remedial plan by the district court-ordered deadline of December 22, 2023. And even if a remedial plan could be adopted in time, the district court's order doesn't provide finality on what map must be used until January 19, 2024 (and perhaps longer), well after important scheduled election activities have already commenced, inevitably causing confusion and hardship among voters, election officials, and candidates.

### (a) *Cost, confusion, and hardship to the Legislative Assembly*

The district court's judgment gave the Secretary and Legislative Assembly until December 22 to adopt a remedial plan, and directed that any such a plan would be subject to Appellees' objections, a reply by the Secretary no later than January

---

[5] The district court's rejection of the *Purcell* principle in this case on the basis there is "no imminent election" (R.Doc. 153 at 2) was thus in error, and failed to account for the fact that redistricting-related injunctions are significantly more disruptive than other election-related injunctions.

10

19, and presumably the district court's approval (or rejection) of the proffered remedial plan sometime thereafter. R.Doc. 126, Exh. 2, at 2.

The Supreme Court "has repeatedly held that redistricting and reapportioning … is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978); *see also Miller v. Johnson*, 515 U.S. 900 (1995) ("Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions."). Therefore, "whenever practicable," federal courts should provide state legislatures "a reasonable opportunity" to adopt remedial plans before imposing one. *Wise*, 437 at 540.

However, the district court did not give the Legislative Assembly a reasonable opportunity to adopt a remedial plan. The district court gave the Legislative Assembly just 35 days (November 17, 2023 to December 22, 2023) to adopt a remedial plan. But North Dakota does not have a full-time legislature, and its 2023 biennial session was already adjourned by the date of the judgment. Furthermore, the window provided by the district court falls over the winter holiday period, compounding logistical difficulties. Consequently, the Legislative Assembly indicated in its motion to intervene that the district court's deadlines do not provide it with a reasonable opportunity to adopt a remedial plan. R.Doc. 138 at 7-8.[6]

---

[6] Through this motion, the Secretary does not purport to speak for or on behalf of the Legislative Assembly.

Appellate Case: 23-3655      Page: 11      Date Filed: 12/13/2023 Entry ID: 5344314

*(b) Cost, confusion, and hardship with respect to the 2024 elections*

Even if the Legislative Assembly was able to adopt a remedial plan by December 22, the schedule set by the district court to review and approve the remedial plan—extending until at least January 19, 2024, and potentially later—will delay the finalization of the State's election map until it is too late to carry out the 2024 election cycle without significant cost, confusion, and hardship. While the judgment directs that the first elections in the remedial district(s) shall occur in the November 2024 general election (R.Doc. 126, Exh. 2, at 2), the final map must be in place for the June 11, 2024 primary election. N.D.C.C. § 16.1-11-01. But even before that, the final map must be in place by no later than December 31, 2023, which is the date by which counties must fix precinct boundaries and after which candidates begin petitioning to be on the ballots in their respective districts. Consequently, for a variety of reasons to be discussed *infra*, the district court's judgment is likely to cause significant confusion, cost, and hardship.

First of all, it must be noted that while the injunction only expressly applies to Districts 9 and 15 and Subdistricts 9A and 9B, the complexity of district line crafting ensures that those are not the only districts that will be impacted by the district court's judgment. Changing district boundaries cannot happen in a vacuum. Due to constitutional and statutory requirements that legislative districts have substantial population equality (N.D. Const., art. IV, § 2; N.D.C.C. § 54-03-01.5(5)),



Appellate Case: 23-3655 Page: 12 Date Filed: 12/13/2023 Entry ID: 5344314

changes to the boundaries of Districts 9 and 15 will necessarily require changing at least the adjacent districts, and potentially cascading further throughout the State. Therefore, under the district court's judgment, it potentially will not even be known which districts are subject to being altered until sometime after January 19, 2024.

But beyond uncertainty over which districts will be impacted, a significant problem of timing relates to collecting signatures for ballot access. Candidates running by petition are required to get "signatures of at least one percent of the total resident population of the legislative district." N.D.C.C. § 16.1-11-06(1)(b)(3)(d). Candidates only have from January 1 until April 8 to gather the required number of signatures. N.D.C.C. §§ 16.1-11-06, 16.1-11-15. Unless the maps are fixed with finality before January 1, candidates could begin gathering signatures only to later learn some or all of the signatures they gathered no longer qualify. Consequently, any delay in establishing a final redistricting map directly—and unfairly—impacts candidates' ability to meet the requirements to be placed on the ballot.

In addition to the signature gathering issues, the candidates themselves may find out after a remedial plan is adopted by the district court that they no longer reside within the district in which they are running. The North Dakota Constitution requires that State legislators live in the district they represent. N.D. Const., art. IV, § 5. But candidates cannot make an informed decision about whether they should run for a seat in the Legislative Assembly until the district boundaries established,

and delaying some candidates' ability to make that decision will risk introducing significant confusion and unfairness into the election.

Additionally, the district court's schedule for reviewing an adopted remedial plan makes it impossible for county commissions to timely comply with their election duties. The board of county commissioners for each of North Dakota's 53 counties is required to divide the county into precincts and establish the precinct boundaries for the 2024 elections no later than December 31, 2023. N.D.C.C. §§ 16.1-04-01(1)(a), 16.1-04-01(3). North Dakota law prohibits a single precinct from encompassing more than one legislative district. N.D.C.C. § 16.1-04-01(1)(a). And county commissions must establish their precincts in a properly noticed public meeting, in accordance with N.D.C.C. ch. 11-11.

This deadline to set precincts is very important to the administration of the election because establishing precincts is necessary for county auditors to begin the extremely detailed and time-consuming process of updating the data for the Street Master, discussed at length at trial by State Elections Director Erika White (Tr. Transcript, Vol. III at p. 202) and the Elections Systems Administration Manager Brian Nybakken (Tr. Transcript, Vol. IV at pp. 11-24).[7] The Street Master is tied to the Central Voter File and identifies highways, roads, lanes, and boulevards within a precinct, allowing election officials to determine whether a particular house

---

[7] Excerpts of the Trial Transcript cited in this motion are attached as Exhibit 5.

14

number resides within a particular precinct. Tr. Transcript, Vol. IV at p. 11. The Street Master ties an address to a precinct, to a ballot style, and ultimately to the voter to ensure that the voter is receiving the correct ballot at the polling location with the correct candidates, contests, and ballot measures. Tr. Transcript, Vol. III at p. 202. It is crucial that the Street Master is properly updated so that voters are given the correct ballot, and they are not voting on candidates from the wrong district, or, for example, voting on bond measures they will not be paying for. *Id.*

These types of hardships and uncertainties are recognized as the basis for staying an election-disrupting injunction. As Justice Kavanaugh noted in *Merrill*: "Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. Indeed, at this point, some potential candidates do not even know which district they live in. Nor do incumbents know if they now might be running against other incumbents in the upcoming primaries." 142 S. Ct. at 880 (Kavanaugh, J., concurring). Moreover, "state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Id.*

The District Court was therefore mistaken when it stated the State isn't injured by its order because the missed deadlines only "concern the opening date for candidate signature gathering." R.Doc. 153, Exh. 3, at 3 (emphasis original). The

15

disruption goes much deeper than that (even assuming it wouldn't introduce manifest unfairness for some candidates to have smaller windows for gathering signatures than other candidates). The district court's judgment should thus be stayed pending appeal and through the 2024 election to prevent undue cost, confusion, and hardship.

### (ii) The Underlying Merits Are Not Entirely Clearcut in Favor of The Appellees

The next factor under a *Purcell* analysis is whether the merits are "entirely clearcut" in support of the injunction. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring); *see also League of Women Voters*, 32 F.4th 1363 at 1372 ("Whatever the precise standard, we think it clear that, for cases controlled by *Purcell*'s analysis, the party seeking injunctive relief has a 'heightened' burden.").

In this action, the district court denied a motion to dismiss by finding 42 U.S.C. § 1983 provides a private right of action for violations of Section 2 of the VRA. R.Doc. 30, Exh. 4, at 6. That finding has been cast into serious doubt by this Court's recent holding that Section 2 of the VRA lacks a private cause of action because it was "intended to place enforcement in the hands of the [Attorney General], rather than private parties." *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *5.

As the Secretary will establish on appeal, Section 1983 cannot be used to bring a Section 2 VRA claim for at least two reasons: (1) Section 2 confers group—not

16

individual—rights; and (2) the fact the VRA expressly assigns enforcement authority to the Attorney General precludes private enforcement under Section 1983.

### (a) *Section 2 of the VRA confers aggregate—not individual— rights*

The first question in deciding whether a statute can be enforced by private litigants under Section 1983 is whether the "statute confers an individual right." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002) ("§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere"). Importantly, that right must be individual, not aggregate. *Id.* at 275 (where statutes "have an 'aggregate' focus, they are not concerned with whether the needs of any particular person have been satisfied, and they cannot give rise to individual rights"); *see also, e.g., Does v. Gillespie*, 867 F.3d 1034, 1041-42 (8th Cir. 2017) ("a statute that speaks to the government official" empowered by a statute "'does not confer the sort of *individual* entitlement that is enforceable under § 1983'") (emphasis original) (quoting *Gonzaga*, 536 U.S. at 287).

Section 2 of the VRA contains two subsections—subsections (a) and (b). *See* 52 U.S.C. 10301. On a glance, it could seem as if subsection (a) describes an individual right; it forbids voting practices that "result[] in a denial or abridgement of the right of ***any citizen*** … to vote on account of race or color … as provided in subsection (b)." 52 U.S.C. 10301(a) (emphasis added); *Cf. Arkansas State Conf. NAACP*, 2023 WL 8011300, at *4 (noting subsection (a) appears to contain elements

17

of both individual and aggregate rights, but declining to resolve the question because Section 2 lacks a private remedy). However, subsection (b), added in 1982, explains and clarifies that subsection (a) is a <u>group</u> right. Subsection (b) provides "[a] violation of subsection (a) is established if … the political processes leading to nomination or election ... are not equally open to participation by ***members of a class of citizens*** protected by subsection (a) in that ***its members*** have less opportunity than other members of the electorate to participate in the political process…." 52 U.S.C. 10301(b) (emphasis added).

Congress's addition of the language in subsection (b) de-individualizes the Section 2 right. Indeed, unlike ordinary antidiscrimination statutes, proving that any specific individual voter suffered discrimination or a dilution of his or her voting power does not prove a Section 2 violation. Instead, the *Gingles* test provides that Section 2 plaintiffs must prove a "minority group" has "distinctive minority group interests" in the form of candidates they collectively prefer. *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). The ultimate question is therefore whether, in the aggregate, "the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Id.* at 48 n.15. The electoral success of any individual minority

18

voter's preferred candidate is immaterial to the Section 2 analysis; what matters is the preference of the "minority group." *See id.* at 51.[8]

Because Section 2 protects group rights within a particular area, not any specific individual's rights, it follows that it does not create private rights that individual plaintiffs can enforce under Section 1983. "Statutes with an 'aggregate,' rather than an individual, focus 'cannot give rise to individual rights.'" *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1200 (8th Cir. 2013) (internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 288).

In rejecting the Secretary's motion to dismiss for lack of a private right of action, the district court misstated and mis-applied the test. The test is not simply whether Section 2 of the VRA "confers a right" in a generalized sense. *Cf.* R.Doc. 30, Exh. 4, at 10. Instead, the test is whether Section 2 of the VRA creates an individual, non-aggregated right that could be enforced through Section 1983. *See Gonzaga*, 536 U.S. at 284-85; *Does v. Gillespie*, 867 F.3d at 1041-42.

---

[8] In their opposition to the Secretary's motion to stay before the district court, Appellees argued that *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) categorically held that the Section 2 right is an individual one. But Appellees extrapolate too much from the language of *Shaw*. *Shaw* was addressing whether all minorities in a state are geographically interchangeable, such that a state could leave a minority-dilution district in one part of the state if it created a new minority-empowered district elsewhere. The Court rejected such geographic interchangeability. 517 U.S. at 918. Within a "particular area," however, the right against vote dilution still belongs to the minority group, and under the *Gingles* framework it can only be understood in that context.

19

(b) _The fact the VRA expressly assigns enforcement authority to the Attorney General precludes private claims under Section 1983_

Additionally, even when a federal statute creates individual rights, Section 1983 claims are precluded when the enforcement scheme provided in the underlying statute demonstrates congressional intent to preclude the remedy of a private lawsuit under Section 1983. _Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n_, 453 U.S. 1 (1981). The State may show Congress "shut the door to private enforcement … impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." _Gonzaga_, 536 U.S. at 285.

Section 12 of the VRA provides for a comprehensive enforcement scheme by the Attorney General of the United States. 52 U.S.C. § 10308. This includes a right of the Attorney General to seek an injunction, fines up to $5,000, and/or imprisonment for up to five years. _Id._ And with respect to Section 2, the plain language of the Voting Rights Act provides for enforcement by the Attorney General only, not by private parties. _Arkansas State Conf. NAACP_, 2023 WL 8011300, at *5 ("If the text and structure of § 2 and § 12 show anything, it is that 'Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties.'") (citation omitted); _see also, e.g., City of Rancho Palos Verdes, Cal. v. Abrams_, 544 U.S. 113, 122 (2005) (noting "ordinary inference that the remedy provided in the statute is exclusive," absent textual evidence it was intended "to complement, rather than supplant, § 1983").

20

In its order denying the Secretary's motion to dismiss, the district court stated: "Tellingly, the VRA itself seems to anticipate private litigation, as it contains a provision allowing for court-ordered attorneys' fees for 'the prevailing party, other than the United States.'" R.Doc. 30, Exh. 4, at 11 (quoting 52 U.S.C. § 10310(e)). But the district court's statement does not support its holding. Section 10310(e), by its text, refers only to attorney's fees for actions to "enforce the Fourteenth and Fifteenth Amendments"; dilution claims under Section 2 are _**not**_ actions to enforce the Fourteenth and Fifteenth Amendments, as this Court recently re-affirmed. *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *7 n.3 ("By focusing solely on the discriminatory impact [under Section 2], not intentional discrimination, the advocacy groups are not attempting to 'enforce the voting guarantees of the fourteenth or fifteenth amendment.'*"); see also Allen v. Milligan*, 599 U.S. 1, 10-11 (2023) (explaining the current form of Section 2 was enacted in response to the Court's holding the Fifteenth Amendment only applies to discriminatory intent, not discriminatory effect). The district court's reasoning was thus in error.

In its order denying the Secretary's motion to dismiss, the district court also pointed to the fact that Section 2 VRA claims have previously been successfully brought by private litigants. R.Doc. 30, Exh. 4, at 11-12. But none of those cases actually analyzed the question of whether a private right of action exists under Section 1983 to enforce Section 2 violations, and such cases do not control the

analysis in a case where the question is actually presented. *See Arkansas State Conf. NAACP*, 2023 WL 8011300, at *9-11 (noting prior cases allowing a private right of action for Section 2 claims "were *just* background assumptions—mere dicta at most"). The district court's reasoning on this point was thus again in error.

In short, for at least two reasons, Appellees' likelihood of success for asserting a private right of action under Section 1983 for alleging a VRA Section 2 claim is not "entirely clearcut." *Merrill,* 142 S. Ct. at 881 (Kavanaugh, J., concurring).

### (iii) Appellees Would Not Suffer Irreparable Harm Absent the Injunction

The next element of the modified test for stays in election cases is that the plaintiffs would suffer irreparable harm absent the injunction. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). However, as discussed above, Appellees did not have a private right of action available to them to commence this lawsuit in the first place. Moreover, while this litigation was pending before the district court, the November 2022 elections were already held using the challenged map.

### (iv) While Appellees Did Not Unduly Delay Bringing the Complaint, the Issuance of Judgment was Unfortunately Timed

The final element of the modified test for stays in election cases is whether the plaintiffs unduly delayed bringing the complaint to court. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). While the Secretary does not assert that Appellees

unduly delayed in bringing their original Complaint, there was nevertheless a critical delay in this case that brings it within the scope of a *Purcell* analysis.

The bench trial in this case was held from June 12-15, 2023. This trial date was specifically requested by the Secretary to account for the possibility that if Appellees were successful at trial the State may be ordered to perform a redistricting that could interfere with the November 2024 elections if delayed too long. R.Doc. 33 at 2. However, while the trial concluded on June 15, 2023, the district court did not issue its judgment until November 17, 2023, more than **five months later**.

The Secretary respectfully acknowledges that carefully weighing the evidence and adjudicating the dispute requires time. However, the fact remains that the judgment was not issued until the latter half of November, shortly before the Thanksgiving holiday and with insufficient time to seek appellate review before the election map needs to be finalized. This timing of the judgment—as well as the Court's schedule for creating and reviewing a remedial plan extending to at least January 19, 2024 (and potentially longer)—makes it impossible to seek meaningful appellate review, meet statutory deadlines, and carry out the 2024 elections without significant cost, confusion, hardship, and unfairness, as discussed *supra*.

**C.    A Stay Should be Granted Even if a Traditional Stay Analysis is Applied**

Even if this Court does not apply the modified test discussed above, a stay should nevertheless be granted based upon the traditional criteria for a stay pending

23

appeal: "(1) the likelihood that a party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 423 (8th Cir. 1996); *see also Nken v. Holder*, 556 U.S. 418, 426 (2009).

### (i) Secretary Howe is Likely to Prevail on the Merits of the Appeal

As discussed above, the Secretary's appeal is based on recent precedent from this Court which established there is no private right of action to enforce Section 2 of the VRA in this Circuit. That holding casts considerable doubt on district court's finding that Section 1983 can be used to bring a private cause of action under Section 2 of the VRA. The Secretary is likely to prevail on the merits of that challenge, and North Dakota should not be forced to adopt a court-ordered remedial plan until it has at least had the opportunity to have its arguments meaningfully considered in the appellate courts.

The district court's order denying the Secretary's motion to stay focused on the fact the Secretary's appeal challenges the district's legal finding of a private right of action rather than its fact-intensive conclusions under the *Gingles* factors. R.Doc. 153, Exh. 3, at 4. The basis for the district court's focus on this point is not entirely clear, because if the Secretary prevails in arguing the district court erred as a matter of law in finding a private right of action, then the district court's *Gingles* factor

24

findings were improperly reached and its judgment enjoining the use of North Dakota's duly enacted map is legally invalid. Moreover, the Legislative Assembly has indicated in its intervention filings that it intends to appeal the district court's *Gingles* factor conclusions. R.Doc. 148 at 3 & n.2.

### (ii) The State Will be Irreparably Harmed Absent a Stay

"[A]ny time a State is enjoined by a Court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Further, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989). Sovereign harms are magnified when the challenged law reflects "the State's policy judgments" about election-related matters. *Perry v. Perez*, 565 U.S. 388, 393 (2012). And "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (citation omitted).

As discussed in more detail above, the State's ability to conduct statewide elections in 2024 will be irreparably harmed absent a stay of the district court's injunction and judgment. The requirements and timeline laid out by the district court in its judgment cannot be feasibly incorporated into the 2024 election cycle without causing confusion and hardship among candidates, voters, and election officials

Appellate Case: 23-3655    Page: 25    Date Filed: 12/13/2023 Entry ID: 5344314

alike. Moreover, the timing of the district court's judgment irreparably injures the State because "absent a stay, the [State] would lack any meaningful right to appeal the [] injunction," given the impending election deadlines. *Pavek v. Donald J. Trump for President, Inc.,* 967 F.3d 905, 907 (8th Cir. 2020)

### (iii) The Public Interest is Best Served by Granting the Stay

As discussed above, Appellees will not be harmed by a stay of the district court's injunction pending appeal because they did not have a private right of action available to them to commence this lawsuit in the first place.

Likewise, the public interest would be served by a stay of the district court's judgment pending appeal, which would enable to 2024 elections to be properly administered without unnecessary confusion and hardship. The Secretary is appealing the district court's judgment; however, the district court was wrong as a matter of Supreme Court precedent when it stated "[c]oncerns as to the logistics of preparing for an election cycle cannot trump violations of federal law and individual voting rights." R.Doc.153, Exh. 3, at 4. To the contrary, that is empathetically what the Supreme Court has held. *E.g., Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid").

26

The public interest is also served by ensuring that the redistricting maps enacted by the peoples' elected representatives receive meaningful appellate review before they are struck down and replaced by the decree of a federal court. *See Chapman v. Meier*, 420 U.S. 1, 27 (1975) ("reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court"); *see also*, *e.g., Toomey v. Arizona*, 2021 WL 4915370, *3 (D. Ariz. Oct. 21, 2021) ("The public interest is served in preserving the integrity of the right to appellate review.") (citation omitted).

For those reasons, the public interest weighs in favor of staying the district court's injunction pending appeal and through the 2024 election.

## CONCLUSION

For the reasons set forth above, the Secretary respectfully requests that this Court grant stay of the district court's judgment pending appeal and through the 2024 elections. Because of impending deadlines and the State's need for finality on what map will be used for the 2024 election no later than December 31, the Secretary respectfully requests a decision on this motion no later than **December 29, 2023.** The Secretary further requests that the Appellees be directed to file any response to this motion no later than **December 20, 2023**, and that the Secretary be directed to file any reply no later than **December 22, 2023**.

27

Dated this 13th day of December, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General

By: _/s/ David R. Phillips_
David R. Phillips (ND Bar No. 06116)
Special Assistant Attorney General
dphillips@bgwattorneys.com
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
Telephone: (701) 751-8188

Philip Axt (ND Bar No. 09585)
Solicitor General
Email: pjaxt@nd.gov
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210

Counsel for Appellant Michael Howe, in his official
capacity as Secretary of State of North Dakota

28

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This motion exceeds the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). This brief contains 6,864 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(d)(2). Appellant has filed an Application to File an Overlength Motion.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in Time New Roman 14 point.

This brief has been scanned for viruses and the brief is virus-free.

<div align="right">

*/s/ David R. Phillips*
David R. Phillips

</div>

Appellate Case: 23-3655     Page: 29     Date Filed: 12/13/2023 Entry ID: 5344314

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2023, I electronically submitted the foregoing to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system and that ECF will send a Notice of Electronic Filing (NEF) to all participants who are registered CM/ECF users.

*/s/ David R. Phillips*
David R. Phillips

30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> Michael Howe, in his Official Capacity as Secretary of State of North Dakota, <br><br> Defendant. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Case No. 3:22-cv-22 |

Plaintiffs Turtle Mountain Band of Chippewa Indians ("Turtle Mountain Tribe"), Spirit Lake Tribe ("Spirit Lake Tribe"), Wesley Davis, Zachery S. King, and Collette Brown assert the State of North Dakota's 2021 legislative redistricting plan dilutes Native American voting strength by unlawfully packing subdistrict 9A of district 9 with a supermajority of Native Americans and cracking the remaining Native American voters in the region into other districts, including district 15—in violation of Section 2 of the Voting Rights Act of 1965. Defendant Michael Howe, the Secretary of State of North Dakota, denies the Section 2 claim, arguing the 2021 redistricting plan is lawful.

Section 2 of the VRA prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). It prohibits what the Tribes claim happened here—"the distribution of minority voters into districts in a way that dilutes their voting power." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. 1245, 1248 (2022) (citing Thornburg v. Gingles, 478 U.S. 30, 46 (1986)). In Gingles, the United States Supreme Court identified three preconditions that must be initially satisfied to proceed with a Section 2 voter dilution claim:

**Exhibit 1**

1.      The minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district;

2.      The minority group . . . is politically cohesive; and,

3.      The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate.

478 U.S. at 50-51. Failure to prove any of the three preconditions defeats a Section 2 claim. <u>Clay v. Bd. of Educ.</u>, 90 F.3d 1357, 1362 (8th Cir. 1996). If all preconditions are met, then there is a viable voter dilution claim, and the analysis shifts to determining whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b).

A four-day bench trial was held on June 12, 2023. After consideration of the testimony at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, what follows are my findings of fact and conclusions of law. And as explained below, the Tribes have established a Section 2 violation of the VRA.

# I.      <u>FINDINGS OF FACT</u>

## A.      The Parties

Two Tribes and three individual voters make up the Plaintiffs. For the Tribes, the Turtle Mountain Tribe is a federally recognized Tribe under 88 Fed. Reg. 2112 (2023), possessing "the immunities and privileges available to federally recognized Indian Tribes[.]" Jamie Azure is its Chairman. Doc. 117 at 10:25-11:4. The Turtle Mountain Reservation is located entirely within Rolette County in northeastern North Dakota and covers 72 square miles. A large portion of Turtle Mountain's trust land is also located in Rolette County. <u>Id.</u> at 13:12-14:23; <u>Id.</u> at 15:11-16:4. The Turtle Mountain Tribe has over 34,000 enrolled members, and approximately 19,000 members

live on and around the Turtle Mountain Reservation, including on Turtle Mountain trust lands in Rolette County. Id. at 13:12-14:23.

The second Tribe is the Spirit Lake Tribe, which is also a federally recognized Tribe. Douglas Yankton, Sr. is its former Chairman. He served as Chairman during the 2021 redistricting process. Doc. 115 at 45:12-22. The Spirit Lake Tribe is located on the Spirt Lake Reservation. The Spirit Lake Reservation covers approximately 405 square miles, primarily in Benson County in northeastern North Dakota. Id. at 47:10-48:2, 55:13-23. The Spirit Lake Tribe has approximately 7,559 enrolled members, with approximately 4,500 members living on or near the Spirit Lake Reservation. Id. at 47:10-48:2.

Three individual voters join the Tribes as Plaintiffs: Wesley Davis, Zachary King, and Collette Brown. Davis and King are enrolled members of the Turtle Mountain Tribe. They live on the Turtle Mountain Reservation, are eligible to vote, and plan to continue voting in elections. They currently reside in what is now Senate district 9 and House subdistrict 9A. Doc. 108 at 6. Brown is an enrolled member of the Spirit Lake Tribe. She lives on the Spirit Lake Reservation, is eligible to vote, and plans to continue voting in elections. She resides in district 15. Doc. 116 at 7:8-9:11.

The Secretary is sued in his official capacity as Secretary of State of North Dakota. Doc. 108 at 7. The Secretary is responsible for "supervis[ing] the conduct of elections," and "publish[ing] . . . a map of all legislative districts." N.D. Cent. Code §§ 16.1-01-01(1) & (2)(a).

### B.    North Dakota's 2021 Redistricting Plan

Article IV, Section 2 of the North Dakota Constitution requires the state legislature to redraw the district boundaries of each legislative district following the Census that happens every 10 years. The North Dakota Legislative Assembly ("Legislative Assembly") is required to

"guarantee, as nearly as is practicable, that every elector is equal to every other elector in the state in the power to cast ballots for legislative candidates." N.D. Const., Art. IV, Sec. 2. It is also required to "fix the number of senators and representatives and divide the state into as many senatorial districts of compact and contiguous territory as there are senators" and requires that the "senate must be composed of not less than forty nor more than fifty-four members, and the house of representatives must be composed of not less than eighty nor more than one hundred eight members. These houses are jointly designated as the legislative assembly of the state of North Dakota." Id., Sec. 1. So, one Senator and at least two House members are allocated to each district. Section 2 of Article IV allows the House members to be either elected at-large from the district or elected from subdistricts created within the district. Id., Sec. 2.

### 1.   North Dakota's Legislative Districts Before the 2021 Redistricting

Recall that the Tribes challenge changes made to districts 9 and 15. For the decade prior to the 2021 redistricting, district 9 was entirely within Rolette County. Doc. 108 at 3. It had a Native American voting age population ("NVAP") of 74.4%, did not contain any subdistricts, and contained the entirety of the Turtle Mountain Reservation, and its trust land located within Rolette County. Id. This map shows the pre-2021 legislative districts in the region:



4

Pl. Ex. 103.

## 2.   2021 Redistricting Process and Plan

As a result of the COVID-19 pandemic, the 2020 Census data was delayed. Doc. 116 at 149:18-150:2. While waiting for the new data, on April 21, 2021, Governor Burgum signed House Bill 1397. It established a legislative management redistricting committee ("Redistricting Committee") that was required to develop and submit a redistricting plan by November 30, 2021, along with implementation legislation. Doc. 108 at 1.

On May 20, 2021, then-Chairman Yankton sent a letter to the Redistricting Committee, requesting they schedule public hearings on each of the reservations located within North Dakota. Pl. Ex. 155. In response, the North Dakota Tribal and State Relations Committee held a joint meeting with the Tribal Council of the Turtle Mountain Tribe at the Turtle Mountain Community College on the Turtle Mountain Reservation. Def. Ex. 305; Doc. 108 at 2.

Redistricting was discussed at the joint meeting for roughly 30 minutes. Def. Ex. 418 at 17:18-21; Def. Ex. 305. Chairman Azure testified he became aware that redistricting had been added to the meeting agenda shortly before the meeting began. Doc. 117 at 29:21-31:24. He testified the Tribe had limited information about the 2020 Census population data and the discussion focused primarily on a population undercount. Id. at 29:21-31:24. One individual spoke in favor of subdistricts generally during the 30-minute discussion. Id. at 70:4-73:19.

Eventually, on August 12, 2021, the Census Bureau released redistricting data in legacy format (meaning the format used in specific redistricting software). Doc. 108 at 2. The Census data was released in a user-friendly format to the public on September 16, 2021. Id. at 2. The Redistricting Committee held public meetings in Bismarck on August 26, 2021, in Fargo on September 8, 2021, and again in Bismarck on September 15 and 16. Additional public meetings

of the Redistricting Committee were held in Bismarck on September 22 and 23, and September 28 and 29. Id. at 3.

Brown testified on behalf of the Spirit Lake Tribe at the August 26 Redistricting Committee meeting. She advocated for the Redistricting Committee to consider tribal input and for the use of single member districts to elect representatives to the House. Def. Ex. 327. Brown also encouraged the Redistricting Committee to comply with the requirements of the VRA. Id.

On September 1, 2021, the Tribal and State Relations Committee held a public meeting at the Spirit Lake Casino and Resort on the Spirit Lake Reservation and discussed redistricting. Doc. 108 at 2. Chairman Yankton testified that Spirit Lake may be interested in a legislative subdistrict to elect its House member. Def. Ex. 334. At subsequent meetings, representatives of Spirit Lake requested a subdistrict. Def. Ex. 351; Def. Ex. 398.

At its September 28 and 29 meetings, the Redistricting Committee released several proposals for creating two subdistricts in district 9. Def. Ex. 405. One proposal extended district 9 to the east to incorporate population from Towner and Cavalier Counties, created a subdistrict in district 9 that generally encompassed the Turtle Mountain Reservation, and placed Spirit Lake in an at-large district with no subdistrict. Def. Ex. 408.

About a month after that proposed plan was introduced, the Tribes each consulted their leadership, obtained an analysis of racially polarized voting, created a new proposal for district 9, and sent a letter to the Governor and legislative leaders with their proposal. Pl. Ex. 156 at 19-24; Doc. 115 at 77:5-79:18; Doc. 117 at 34:14-36:11. The letter stated that the Redistricting Committee's proposal as to district 9, which placed the Turtle Mountain Reservation in a subdistrict, was a VRA violation. It also stated that the Turtle Mountain Tribe did not request to be placed in a subdistrict. Pl. Ex. 156 at 19-24. Included in the letter was an illustration of an

alternative district map, where the Turtle Mountain and Spirit Lake Reservations were placed into a single legislative district with no subdistricts. Pl. Ex. 156 at 19-24; Doc. 108 at 4. Effectively, this alternative district combined Rolette County with portions of Pierce and Benson Counties, instead of combining Rolette County with portions of Towner and Cavalier Counties. Compare Pl. Ex. 156 at 19-24 with Def. Ex. 408. The letter stated that voting in the region is racially polarized, with Native American voters preferring different candidates than white voters. Id. at 19-24.

Then, at the November 8, 2021, Redistricting Committee meeting, Senator Richard Marcellais, who represented district 9 since his election in 2006, spoke in favor of the Tribes' proposed district. Def. Ex. 429 at 21-23. Representative Marvin Nelson from district 9 also spoke in favor of the proposal. Id. at 33-35. Representative Joshua Boschee moved for the adoption of an amendment to include the Tribes' proposal, but the amendment did not pass. Doc. 108 at 4. The Redistricting Committee passed and approved its final redistricting plan and report, which recommended passing the original proposal involving districts 9 and 15 (extending district 9 to the east to incorporate population from Towner and Cavalier Counties, creating a subdistrict in district 9 encompassing the Turtle Mountain Reservation, and placing Spirit Lake in an at-large district with no subdistrict).

The next day, the House of Representatives debated and passed House Bill 1504, the redistricting legislation accompanying the Redistricting Committee's final plan and report. Id. at 5. Then the Senate debated House Bill 1504. Senator Marcellais moved for an amendment (similar to the one he proposed to the Redistricting Committee), but it did not pass. Id. The Senate passed House Bill 1504, which was signed by Governor Burgum on November 11, 2021. Id.

### 3.     2021 Redistricting Plan As Enacted

As enacted, the 2021 redistricting plan created 47 legislative districts and subdivided district 9 into single-member House subdistricts 9A and 9B. Id. The plan extended district 9

7

eastward to include portions of Towner and Cavalier Counties, with the Towner County and Cavalier County portions included with parts of Rolette County in subdistrict 9B. Pl. Ex. 100. It also placed the Turtle Mountain Reservation into Senate district 9 and House subdistrict 9A and placed portions of Turtle Mountain trust lands located within Rolette County into House subdistrict 9B. Doc. 108 at 5. The plan placed the Spirit Lake Reservation in district 15. Doc. 108 at 5.

According to the 2020 Census, the NVAP of Rolette County is 74.4%. The NVAP of the portion of Towner County in district 9 is 2.7%. There is an NVAP of 1.8% in the portion of Cavalier County in district 9. Pl. Ex. 1 at 16. Subdistrict 9A has a NVAP of 79.8% and subdistrict 9B has a NVAP of 32.2%. Pl. Ex. 42 at 7; Doc. 115 at 134:13-19, 136:7-137:25. District 15 has a NVAP of 23.1%. Doc. 115 at 135:3-13; Doc. 108 at 4.

Voters in Senate district 9 and Senate district 15 each elect one Senator. Doc. 108 at 5. Voters in House subdistricts 9A and 9B each elect one representative to the House of Representatives. Id. Voters in district 15 elect two representatives at-large to the House of Representatives. Id. This is the 2021 plan's map of the legislative districts in northeastern North Dakota:



Pl. Ex. 101.

8

C.      The Tribes' Proposed Plans

In support of their Section 2 claim, the Tribes produced two proposed plans containing alternative district configurations that demonstrate the Native American population in northeast North Dakota is sufficiently large and geographically compact to constitute an effective majority in a single multimember district. This is the first proposed plan:



Pl. Ex. 105. And this is the second proposed plan:



9

Pl. Ex. 106. Both feature a district 9 that has a majority NVAP. The first proposed plan has a NVAP of 66.1%, and the second has a NVAP of 69.1%. Doc. 115 at 134:22-135:2, 135:14-17, 166:1-3.

### D.    Trial Testimony and Evidence on Section 2 Claim

At trial, former Chairman Yankton (Doc. 115 at 41-120), Collette Brown (Doc. 116 at 6-44), former Senator Richard Marcellais (Doc. 116 at 44-71), former House of Representatives member Marvin Nelson (Doc. 116 at 170-189), and Chairman Jamie Azure (Doc. 117 at 10-66) testified as fact witnesses for the Tribes. Erika White (Doc. 117 at 186-203) and Bryan Nybakken (Doc. 118 at 6-38), two representatives of the Secretary of State's office, testified as fact witnesses for the Secretary.

Four expert witnesses testified. Dr. Loren Collingwood (Doc. 115 at 120-201), Dr. Daniel McCool (Doc. 116 at 72-143), and Dr. Weston McCool (Doc. 116 at 144-170) testified as expert witnesses for the Tribes. Dr. M.V. Hood III (Doc. 117 at 72-182) testified as an expert witness for the Secretary.

Former Chairman Yankton testified to the shared representational interests, socioeconomic status, and cultural and political values of Turtle Mountain Tribal members and Spirit Lake Tribal members. Doc. 115 at 50:24-52:11, 52:24-73:9; Doc. 117 at 22:4-16-27:15, 28:18-25; 50:3-7; 52:23-53:1, 55:9-12. 115. He also testified as to the political cohesiveness of the Tribes, explaining that the voters who live on the Turtle Mountain Reservation and the voters who live on the Spirit Lake Reservation vote similarly. Doc. 115 at 52:12-53:25.

He also testified specifically as to the 2018 election (which is a key point of contention in this case), where Native American voter turnout was particularly high. He stated that there were unique circumstances that led to increased Native American voter turnout in 2018. Those

circumstances included the election being a high-profile race, a backlash by Native American voters (who perceived North Dakota as trying to block them from voting by imposing a residential address requirement to vote), and the significant national attention and resources that flowed into the Tribes following the decision allowing the address requirement to go into effect just before the election. He testified that those resources—and resulting high voter turnout among Native American voters—was unlike anything he had seen, before or since. Doc. 115 at 80:18-86:17.

Dr. Loren Collingwood testified next. Doc. 115 at 119. Dr. Collingwood is an Associate Professor of Political Science at the University of New Mexico. Id. at 120. He teaches statistical programming, along with American politics, among other things. He has published several papers on the VRA and is qualified as an expert on voting behavior, race and ethnicity, racially polarized voting, map drawing, electoral performance, and redistricting analysis. Id. at 128:7-17.

Dr. Collingwood's expert testimony was extensive. He opined on each of the three Gingles preconditions. He reviewed the statistical data and analysis he used in reaching his expert conclusions as to racially polarized voting, white bloc voting, and the NVAP in the as-enacted districts compared to the Tribes' proposed districts. His expert reports were also admitted and received as exhibits. Pl. Ex. 1, 42.

Dr. Collingwood concluded that all three Gingles preconditions were met in districts 9 and 15. He found that racially polarized voting is present in North Dakota statewide and specifically in districts 9 and 15. He also found that, in statewide elections featuring Native American candidates, white voters vote as a bloc to Native American voters in all of the elections analyzed. He opined on the NVAP percentages. He further opined that there is racially polarized voting in district 9, subdistricts 9A and 9B, and district 15. Doc. 115 at 144-45.

11

Dr. Collingwood also opined on white bloc voting. Id. at 153-66. After wide review of his statistical analysis, he concluded that the white voting bloc usually defeats the Native American-preferred candidate of choice in districts 9, 9B, and 15. Id.

As to the 2018 election, Dr. Collingwood testified that the election was "an anomalous election." Id. at 156. He noted that he had "never seen any turnout number like this, ever." Id. As a result, he gave the 2018 election results less probative value and less weight, though the results were still included in his analysis. Id. at 158.

Collette Brown testified next for the Tribes. Doc. 116 at 6. Brown is the Gaming Commission Executive Director for the Spirit Lake Gaming Commission. Id. at 8. She ran for the Senate seat in district 15 in the 2022 election. Id. at 9. She spoke about the need for Native American representation and some of the difficulties she faced in her election campaign. Id. at 14. Brown also testified about her involvement in the 2021 redistricting process. Id. at 23. She stated that the Tribes did not request the subdistricts in district 9A and 9B. Id. at 23.

Former Senator Richard Marcellais testified next. Marcellais is an enrolled member of the Turtle Mountain Tribe and was the elected state Senator for district 9 from 2006-2022. Id. at 45, 48. He testified that he lost the 2022 election, and that after his loss, there are no Native Americans serving in the North Dakota Senate. Id. at 53.

Dr. Daniel McCool then testified as the second expert witness for the Tribes. Dr. Daniel McCool is a political science professor at the University of Utah. He specializes in Native American voting rights and Native American water rights. Id. at 73. He opined on the presence of the Senate Factors in North Dakota and the impact of the 2021 redistricting plan on Native Americans. Id. at 81. He reviewed in detail his expert report and concluded that there was substantial evidence of all of the Senate Factors, except factors four and six. Id. at 89-126. He

12

concluded that, under the totality of the circumstances, Native Americans in North Dakota have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Id.

Dr. Weston McCool testified as the third expert witness for the Tribes. He is a National Science Foundation post-doctoral research fellow with the Anthropology Department at the University of Utah. Id. at 144. His expertise is in quantitative data analysis and analytical methods. Id. He opined specifically as to Senate Factor 5. He reviewed his statistical analysis of seven socioeconomic variables, including education, employment, and health. Id. at 161. He concluded that Native Americans in the counties at issue bear the effects of discrimination along the socioeconomic factors articulated by Senate Factor 5, and the disparities serve as obstacles to hinder Native Americans' ability to effectively participate in the political process. Id.

Next former Representative Marvin Nelson testified. Doc. 116 at 170. He testified as to his experience representing Rolette County from 2010 to 2022. Id. at 172.

The final witness for the Tribes was Turtle Mountain Tribal Chairman Jamie Azure. Doc. 117 at 11. He testified about the Turtle Mountain Tribe and its membership. Id. at 14. He also spoke about the legislative district make-up before the 2021 redistricting plan, relative to the Tribes' Reservations and trust lands. Id. at 17. And as to the 2021 redistricting plan, he testified about the Tribes sharing community interests and that the Tribes did not request the subdistricts as enacted in district 9. Id. at 19.

Chairman Azure also spoke at length about the 2018 election. Id. at 20. He discussed the record voter turnout that year because of concerns over a voter identification law. He noted there was "a lot of attention" and many national resources were directed at the Tribes. Id. He also said

he had never seen that level of Native American voter engagement in his life and has not seen it since. Id. at 21.

The first witness for the Secretary was expert witness Dr. M.V. Hood, III. He is a political science professor at the University of Georgia and director of the School of Public and International Affairs Survey Research Center. Doc. 117 at 72. Dr. Hood is an expert on American politics, election administration, southern politics, racial politics, and Senate electoral politics. Id. at 75:12-76:7.

Dr. Hood's expert testimony was extensive. He reviewed his expert report (Pl. Ex. 81) and opined on each of the three Gingles preconditions. Doc. 117 at 72:2-182:20. Notably, he testified that he agreed that the first precondition was met but questioned whether there was enough data to prove the second precondition. Id. at 89.

On the third precondition (white bloc voting), he reached a different result than Dr. Collingwood. Id. He analyzed the same elections as Dr. Collingwood (Doc. 117 at 83:14-18), though he statistically weighed the elections differently, and concluded that white bloc voting was not present in district 9 at-large and as-enacted. Id. at 86. He stated that "Gingles 3 is not met because the Native American candidate of choice is not typically being defeated by the majority white voting bloc." Id. at 89. Dr. Hood also testified that he did not review the 2022 election results. Id. at 162.

As to the 2018 election, Dr. Hood testified that the Native American turnout in 2018 was historically high and that the results should not necessarily be excluded from a performance analysis. Dr. Hood testified that those 2018 results "prove[] that Native American turnout can be that high" and that if "[i]t was that high in 2018," it could be that high again. Id. at 86:7-15.

14

Erika White, the North Dakota Election Director, testified next. She spoke about the role of the Secretary in North Dakota elections and the processes and deadlines that are imposed on state elections by statute. Doc. 117 at 192. She testified too about the redistricting process.

The Secretary's final witness was Brian Nybakken, the Elections Systems Administration Manager in the Secretary's Elections Office. Doc. 118 at 6-33. He testified about the elections systems in place in North Dakota, auditor training, voter identification requirements, and certain election issues pertaining to Native Americans in North Dakota. Id.

## II. <u>CONCLUSIONS OF LAW</u>

Section 2 of the VRA prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). A violation of Section 2 is established if it is shown that "the political processes leading to [a] nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Id. § 10301(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and white voters to elect their preferred candidates." <u>Bone Shirt v. Hazeltine</u>, 461 F.3d 1011, 1017-18 (8th Cir. 2006) (cleaned up).

Section 2 prohibits "the distribution of minority voters into districts in a way that dilutes their voting power." <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. 1245, 1248 (2022) (citing <u>Gingles</u>, 478 U.S. at 46). Recall that, under <u>Gingles</u>, three preconditions must be initially satisfied to proceed with a Section 2 voter dilution claim:

1.    The minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district;

2.      The minority group . . . is politically cohesive; and,

3.      The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate.

478 U.S. at 50-51. Failure to prove any of the three preconditions defeats a Section 2 claim. Clay v. Bd. of Educ., 90 F.3d 1357, 1362 (8th Cir. 1996).

If all preconditions are met, then there is a viable voter dilution claim, and the analysis shifts to determining whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b); see also Johnson v. De Grandy, 512 U.S. 997, 1011-12 (1994) (once the three preconditions are met, the totality of the circumstances is addressed). To assess the totality of the circumstances, the Court considers the factors identified in the Senate Judiciary Committee Majority Report accompanying the bill that amended Section 2 (also known as the "Senate Factors"). S. Rep., at 28-29, U.S. Code Cong. & Admin. News 1982, pp. 206-207; Gingles, 478 U.S. at 36. Two other factors are also relevant: (1) was there a significant lack of response from elected officials to the needs of the minority group, and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous. Gingles, 478 U.S. at 44; Bone Shirt, 461 F.3d at 1022.

The Senate Report stresses that these factors are "neither comprehensive nor exclusive." Gingles, 478 U.S. at 45. The extent to which voting is racially polarized (Senate Factor 2) and the extent to which minorities have been elected under the challenged scheme (Senate Factor 7) predominate the analysis. Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist., 894 F.3d 924, 938 (8th Cir. 2018); Bone Shirt, 461 F.3d

16

at 1022; Cottier v. City of Martin, 551 F.3d 733, 740 (8th Cir. 2008); Harvell v. Blytheville Sch.

Dist. No. 5, 71 F.3d 1382, 1390 (8th Cir. 1995).

A.     **The Gingles Preconditions**

1.     **Gingles 1: Sufficiently Large and Geographically Compact**

The first Gingles precondition requires a Section 2 plaintiff to demonstrate that the minority

group (here, Native Americans) is sufficiently large and geographically compact to constitute a

majority in a potential district.[1] Gingles, 478 U.S. at 50. This is also known as the "majority-

minority standard." Jeffers v. Beebe, 895 F. Supp. 2d 920, 931 (E.D. Ark. 2012). As explained in

Gingles, "unless minority voters possess the potential to elect representatives in the absence of the

challenged structure or practice, they cannot claim to have been injured by that structure or

practice." Gingles, 478 U.S. at 50. So, this precondition focuses on electoral potential—and

specifically here, whether Native American voters have the potential to constitute the majority of

voters "in some reasonably configured legislative district." See Cooper v. Harris, 581 U.S. 285,

301 (2017); see also Houston v. Lafayette Cnty., Miss., 56 F.3d 606, 611 (5th Cir. 1995). Hence

the analysis for the first precondition considers the proposed district(s) and not the existing district.

See, e.g., Bone Shirt, 461 F.3d at 1018.

As an initial matter, the Secretary argues the first precondition is not met because district

9, as-enacted, better reflects traditional redistricting criteria than the Tribes' proposed districts. He

also asserts that the first precondition is not met as to district 15. But a Section 2 claim is not a

competition between which version of district 9 better respects traditional redistricting criteria. See

---

[1] While the first precondition refers to a minority constituting a majority in a "single-member district," the analysis is done on a case-by-case basis, and the Gingles factors "cannot be applied mechanically and without regard to the nature of the claim." See Voinovich v. Quilter, 507 U.S. 146, 158 (1993).

Allen v. Milligan, 143 S. Ct. 1487, 1505 (2023) (noting Gingles 1 is not a "beauty contest" between plaintiffs' maps and the state's districts). The claim is not defeated simply because the challenged plan performs better on certain traditional redistricting criteria than the proposed plan. Id. (finding that plaintiffs' demonstrative plans were reasonably configured, even where the enacted plan arguably performed better on certain traditional redistricting criteria than the demonstrative plans).

With that issue resolved, the question is whether Native American voters have the potential to constitute the majority of voters in some reasonably configured legislative district. The parties agree that Native American voters have the potential to constitute the majority of voters in both proposed versions of district 9. The NVAP in the Tribes' first proposed plan is 66.1%. Doc. 15 at 134:22-135:2, 135:14-17, 166:1-3. The NVAP in the Tribes' second proposed plan is 69.1%. Id. So, the remaining issue is whether these proposed districts are "reasonably configured." See Johnson v. De Grandy, 512 U.S. 997, 1008 (1994).[2]

A district is reasonably configured "if it comports with traditional districting criteria, such as being contiguous and reasonably compact." Milligan, 143 S. Ct. at 1503. Courts may also consider other traditional redistricting criteria, including respect for political boundaries and keeping together communities of interest. Id. at 1505 (considering respect for political subdivisions and communities of interest as traditional redistricting criteria); Alabama Legislative Black Caucus v. Alabama, 575 U.S. 254, 259 (2015) (citing compactness and not splitting counties or precincts as examples of traditional redistricting criteria, amongst others).

The evidence at trial shows that the Tribes' proposed plans comport with traditional redistricting principles, including compactness, contiguity, respect for political boundaries, and

---

[2] De Grandy articulated this standard in the context of single-member districts. Here, given the comparison of subdistricts to multimember districts, it is more useful to consider the number of representatives that Native American voters have an opportunity to elect.

keeping together communities of interest.  First, as to contiguity and compactness, the proposed districts are made up of a contiguous land base (Pl. Exs. 105, 106) and contain no obvious irregularities as to compactness. Indeed, the evidence at trial demonstrated that the proposed districts did not appear more oddly shaped than other districts, and both proposed districts are reasonably compact. See Doc. 115 at 139:17-23, 141:4-8; Pl. Ex. 1 at 32, 39. The proposed plans are also comparatively compact when viewed against other districts in the 2021 redistricting plan. Pl. Ex. 1 at 32, 39. Statistically too, Dr. Collingwood testified the compactness scores of the proposed districts are within the range of compactness scores for other districts in the 2021 redistricting plan. See Doc. 115 at 139:17-140:5, 141:24-143:20; Pl. Ex. 1 at 32, 39; Pl. Ex. 42 at 9-11; Pl. Ex. 126, 128, and 129.

The Tribes' proposed plans also respect existing political boundaries, including Reservation boundaries, and keep together communities of interest. As to political boundaries, the proposed plans keep together the Turtle Mountain Reservation and its trust lands. Pl. Exs. 105, 106. The plans similarly preserve and keep together two communities of interest. Several witnesses testified that the Tribes represent a community of interest because of their geographic proximity and their members shared representational interests, socioeconomic statuses, and cultural values. Doc. 115 at 50:24-52:11, 52:24-73:9; Doc. 117 at 22:4-16-27:15, 28:18-25; 50:3-7; 52:23-53:1, 55:9-12. Chairman Azure and former Chairman Yankton persuasively testified to all those shared interests. Id. As to representational interests, the Tribes often collaborate to lobby the Legislative Assembly on their shared issues, including gaming, law enforcement, child welfare, taxation, and road maintenance, among others. See Doc. 115 at 56:12-61:18, 64:1-70:6; Doc. 116 at 21:11-21; Doc. 117 at 25:23-28:8. The residents on the Tribes' Reservations also have similar socioeconomic and education levels—levels that differ from the white residents in neighboring counties. Pl. Ex.73

19

at 513; Doc. 116 at 156:17-159:8; 161:13-161:24. Residents of the Tribes also participate in similar cultural practices and events and share cultural values. <u>See</u> Doc. 117 at 18:14-19:13.

All this evidence shows that the Tribes' proposed plans comport with traditional redistricting principles, including compactness, contiguity, respect for political boundaries, and keeping together communities of interest.[3] The proposed plans demonstrate that Native American voters have the potential to constitute the majority of voters in some reasonably configured legislative district. And as a result, the Tribes have proven by a preponderance of the evidence that the first <u>Gingles</u> precondition is satisfied.

## 2.     <u>Gingles</u> 2: Racially Polarized Voting and Political Cohesion

"The second <u>Gingles</u> precondition requires a showing that the Native American minority is politically cohesive." <u>Bone Shirt</u>, 461 F.3d at 1020. "Proving this factor typically requires a statistical and non-statistical evaluation of the relevant elections." <u>Id.</u> (citing <u>Cottier</u>, 445 F.3d at 1118). "Evidence of political cohesiveness is shown by minority voting preferences, distinct from the majority, demonstrated in actual elections, and can be established with the same evidence plaintiffs must offer to establish racially polarized voting, because political cohesiveness is implicit in racially polarized voting." <u>Id.</u>

The parties and their experts agree that voting in districts 9 and 15 (when voting at large) is racially polarized, with Native American voters cohesively supporting the same candidates. Doc. 108 at 6. Based on the evidence at trial, voting in subdistricts 9A and 9B is also racially polarized, with Native American voters cohesively supporting the same candidates. Pl. Ex. 13, 14; Doc. 115

---

[3] The Secretary expresses concern that the districts under the Tribes' proposed plans would be illegal racial gerrymanders. But even assuming race was the predominate motivating factor in drawing the districts, establishing (and then remedying) a Section 2 violation provides a compelling justification for adopting one of the proposed plans. <u>See</u> <u>Cooper</u>, 581 U.S. at 292.

20

at 145:23-146:2. Although subdistricts 9A and 9B do not contain enough precincts for a full statistical analysis, subdistrict 9A has an NVAP of 68.5%. Pl. Ex. 1 at 15. That, combined with the undisputed political cohesiveness of district 9 at-large, demonstrates that voters in subdistrict 9A are politically cohesive. Pl. Ex. 1 at 15; Doc. 115 at 149:7-150:25.

Dr. Hood agreed that Native American voters are politically cohesive in subdistricts 9A and 9B. Pl. Ex. 80 at 4-6; Doc. 117 at 139:19-140:16. He testified that his conclusion assumed that the vote distribution within in each subdistrict "mirrors the overall district." Doc. 117 at 140:1-16. Testimony from Chairman Azure and former Chairman Yankton confirms the statistical data. Both testified that voters living on the Turtle Mountain Reservation and Spirit Lake Reservation vote similarly. Doc. 116 at 16:5-19:19, 28:14-25; Doc. 115 at 52:12-53:25.

The statistical evidence, combined with the lay witness testimony, shows that the Native American minority is politically cohesive. The Tribes have proven by a preponderance of the evidence that the second <u>Gingles</u> precondition is met.

### 3.  <u>Gingles 3</u>: White Bloc Voting

With the first and second preconditions met, the analysis turns to the third precondition, which is the chief point of disagreement between the Tribes and the Secretary. The third <u>Gingles</u> precondition "asks whether the white majority typically votes in a bloc to defeat the minority candidate." <u>Bone Shirt</u>, 461 F.3d at 1020. "This is determined through three inquiries: (1) identifying the minority-preferred candidates; (2) determining whether the white majority votes as a bloc to defeat the minority preferred candidate, and (3) determining whether there were special circumstances . . . present when minority-preferred candidates won." <u>Id.</u> (cleaned up).

Not all elections are equally relevant in assessing white bloc voting. "Endogenous[4] and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate." Id. "Although they are not as probative as endogenous elections, exogenous elections hold some probative value." Id. In addition, "[t]he more recent an election, the higher its probative value." Id. There is no requirement that a particular number of elections be analyzed in determining whether white bloc voting usually defeats minority-preferred candidates. Gingles, 478 U.S. at 57 n.25. "The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances." Id.

In assessing the third precondition, courts look to the districts in which it is alleged that Native American preferred candidates are prevented from winning, not on neighboring "packed" districts. Bone Shirt, 461 F.3d at 1027 (Gruender, J., concurring) ("If the State's approach were correct, packing would be both the problem and the solution—i.e., having illegally packed Indians into one district, the State could then point out that Indians are sometimes able to elect their preferred candidate in the packed district"); De Grandy, 512 U.S. at 1003-04 (focusing on whether white voters vote as a bloc "to bar minority groups from electing their chosen candidates except in a district where a given minority makes up the voting majority"). Finally, courts must also consider whether "special circumstances . . . may explain minority electoral success in a polarized contest." Gingles, 478 U.S. at 57 & n.26. Special circumstances must be considered if "the election was not representative of the typical way in which the electoral process functions." Ruiz v. City of Santa Maria, 160 F.3d 543, 557 (9th Cir. 1998).

---

[4] An endogenous election is an election where a district (or subdistrict) is electing a direct representative for that district (or subdistrict), as opposed to an exogenous election, which in this case, are statewide elections.

22

i.      Subdistrict 9B

Starting with subdistrict 9B, the parties agree that a white bloc voting usually defeats Native American preferred candidates in subdistrict 9B when the three most probative election types are considered. And the evidence at trial supports that conclusion.

Because the challenged plan that created the subdistrict was enacted in 2021, the only endogenous election data available is from the 2022 election. Nonetheless, the data is highly probative. One of two state legislative elections in subdistrict 9B's boundaries was the district 9 at-large Senate election, which featured a Native American candidate,[5] who lost:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State Senate District 9 | Weston: 63.0% Marcellais*: 36.8% | Lose |

Pl. Ex. 1 at 21. The other endogenous election in subdistrict 9B featured two white candidates. The Native American preferred candidate, incumbent Marvin Nelson, also lost:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State House District 9B | Henderson: 56.5% Nelson*: 37.6% | Lose |

Id. Beyond the 2022 endogenous election data, there are four exogenous (or statewide) elections since 2016 that featured Native American candidates that voters in precincts within the boundaries of now-subdistrict 9B voted in.[6] In each of those contests, the Native American candidate lost:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 Public Service Commissioner | Fedorchak: 64.4% Moniz*: 35.3% | Lose |

---

[5] In all tables below, the Native American preferred candidates are marked with an asterisk.
[6] To account for the lack of subdistrict specific election data, this data is generated from collecting precinct data from those precincts now in subdistrict 9B.

23

| 2016 Insurance Commissioner | Godfread: 58.4%<br>Buffalo*: 41.6% | Lose |
|---|---|---|
| 2016 Public Service Commissioner | Fedorchak: 60.2%<br>Hunte-Beaubrun*: 32.4% | Lose |
| 2016 U.S. House | Cramer: 62.2%<br>Iron Eyes*: 32.9% | Lose |

Id. at 17-20.

The next set of data focuses on the most recent three election cycles, where special circumstances were not present—here, the 2022, 2020, and 2016 elections.[7] Per the table below, the defeat rate of the Native American preferred candidates was 100% for every election cycle:

| Election | Result | Native American Preferred Candidate Win or Lose | Defeat Rate for Native American Preferred Candidates |
|---|---|---|---|
| 2022 Agricultural Commissioner | Goehring: 70.9%<br>Dooley*: 28.9% | Lose | |
| 2022 Attorney General | Wrigley: 65.6%<br>Lamb*: 34.3% | Lose | |
| 2022 Public Service Commissioner (4 Year) | Haugen Hoffart: 65.4%<br>Hammer*: 34.3% | Lose | **2022 Defeat Rate: 100%** |
| 2022 Secretary of State | Howe: 57.1%<br>Powell*: 33.7% | Lose | |
| 2022 U.S. House | Armstrong: 61.4%<br>Mund*: 38.4% | Lose | |
| 2022 U.S. Senate | Hoeven: 60.6%<br>Christiansen*: 27.5% | Lose | |
| 2020 Auditor | Gallion: 59.8%<br>Hart*: 40.1% | Lose | |
| 2020 Governor | Burgum: 65.3%<br>Lenz*: 29.8% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 President | Trump: 60.8%<br>Biden*: 37.0% | Lose | |

[7] As discussed in detail below, the 2018 election involved special circumstances that made it atypical.

24

| | | | |
|---|---|---|---|
| 2020 Public Service Commissioner | Kroshus: 60.4%<br>Buchmann*: 39.8% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 Treasurer | Beadle: 58.6%<br>Haugen*: 41.2% | Lose | |
| 2020 U.S. House | Armstrong: 64.4%<br>Raknerud*: 33.4% | Lose | |
| 2016 Governor | Burgum: 61.7%<br>Nelson*: 35.8% | Lose | **2022 + 2020 + 2016 Defeat Rate: 100%** |
| 2016 President | Trump: 56.6%<br>Clinton*: 33.8% | Lose | |
| 2016 Treasurer | Schmidt: 53.6%<br>Mathern*: 39.8% | Lose | |
| 2016 U.S. Senate | Hoeven: 72.9%<br>Glassheim*: 22.1% | Lose | |

Pl. Ex. 1 at 17-20. This evidence establishes that white bloc voting usually—and always in the most probative elections—defeats the Native American preferred candidates in subdistrict 9B. As a result, the third precondition is met as to subdistrict 9B.

## ii.   District 15

The parties also agree that the same conclusion follows as to district 15. Again, the only endogenous election is the 2022 state legislative election, where two Native-American preferred candidates appeared on the ballot. Both were defeated:

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 State Senate District 15 | Estenson: 65.5%<br>Brown*: 33.8% | Lose |
| 2022 State House District 15 | Frelich: 41.6%<br>Johnson: 38.6%<br>Lawrence-Skadsem*: 19.7% | Lose |

Pl. Ex. 1 at 27. There have been no endogenous all-white elections in district 15. Four exogenous elections since 2016 have featured Native American candidates within the boundaries of district 15. In each of those contests—100% of the time—the Native American candidate lost:

25

Case 3:22-cv-00022-PDW-ARS   Document 125   Filed 11/17/23   Page 26 of 39

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2022 Public Service Commissioner | Fedorchak: 69.3% Moniz*: 30.6% | Lose |

| Election | Result | Native American Candidate Win or Lose |
|---|---|---|
| 2016 Insurance Commissioner | Godfread: 64.6% Buffalo*: 35.4% | Lose |
| 2016 Public Service Commissioner | Fedorchak: 63.8% Hunte-Beaubrun*: 27.6% | Lose |
| 2016 U.S. House | Cramer: 65.5% Iron Eyes*: 27.9% | Lose |

Pl. Ex. 1 at 17-20. As shown below, Native American preferred candidates have lost every exogenous all-white election in the record:

| Election | Result | Native American Preferred Candidate Win or Lose | Defeat Rate for Native American Preferred Candidates |
|---|---|---|---|
| 2022 Agricultural Commissioner | Goehring: 75.0% Dooley*: 24.9% | Lose | **2022 Defeat Rate: 100%** |
| 2022 Attorney General | Wrigley: 70.9% Lamb*: 29.0% | Lose | |
| 2022 Public Service Commissioner | Fedorchak: 69.3% Moniz*: 30.6% | Lose | |
| 2022 Public Service Commissioner (4 Year) | Haugen Hoffart: 70.4% Hammer*: 29.4% | Lose | |
| 2022 Secretary of State | Howe: 61.2% Powell*: 27.8% | Lose | |
| 2022 U.S. House | Armstrong: 62.8% Mund*: 37.1% | Lose | |
| 2022 U.S. Senate | Hoeven: 58.5% Christiansen*: 24.8% | Lose | |
| 2020 Auditor | Gallion: 65.4% Hart*: 34.5% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 Governor | Burgum: 67.6% Lenz*: 25.8% | Lose | |
| 2020 President | Trump: 64.3% Biden*: 33.0% | Lose | |

26

Appellate Case: 23-3655   Page: 56   Date Filed: 12/13/2023 Entry ID: 5344314

| | | | |
|---|---|---|---|
| 2020 Public Service Commissioner | Kroshus: 64.1% Buchmann*: 35.7% | Lose | **2022 + 2020 Defeat Rate: 100%** |
| 2020 Treasurer | Beadle: 63.2% Haugen*: 36.3% | Lose | |
| 2020 U.S. House | Armstrong: 68.7% Raknerud*: 28.1% | Lose | |
| 2016 Governor | Burgum: 71.1% Nelson*: 24.8% | Lose | **2022 + 2020 + 2016 Defeat Rate: 100%** |
| 2016 President | Trump: 57.6% Clinton*: 31.2% | Lose | |
| 2016 Treasurer | Schmidt: 59.5% Mathern*: 31.8% | Lose | |
| 2016 U.S. Senate | Hoeven: 75.7% Glassheim*: 18.5% | Lose | |

Pl. Ex. 1 at 27-30.

Again, like subdistrict 9B, all this evidence establishes that white bloc voting usually—and always in the most probative elections—defeats the Native American preferred candidates in district 15. As a result, the third precondition is met as to district 15.

### iii.    District 9

District 9 at-large presents a much closer call and is the central point of disagreement between the parties. The Secretary disputes whether the white vote bloc usually defeats the Native American preferred candidate in (as-enacted and at-large) district 9. But based on the evidence at trial, the Tribes proved by a preponderance of the evidence that a white bloc voting does usually defeat Native American preferred candidates in the as-enacted and at-large district 9.

Without question, and consistent with case law, the most probative election in district 9 at-large is the 2022 Senate election. The election featured each of the three factors that makes an election more probative—(1) it is an endogenous election, (2) it featured a Native American candidate, and (3) it is part of the most recent election cycle. Native American incumbent Senator Marcellais lost his bid for reelection despite Native American voters casting roughly 80% of their

27

ballots for him. Pl. Ex. 1 at 15; see Bone Shirt, 461 F.3d at 1021 (affirming finding that Gingles 3 was satisfied where "[i]n the only mixed-race endogenous election . . . the Indian-preferred candidate for state senate lost even though he received 70 percent of the Native-American vote"). As the 2022 election data shows, Senator Marcellais, the Native American candidate, was defeated by his opponent, the candidate of choice of white voters in the district:

| Election | Result | Native American Candidate Win or Lose |
|----------|--------|---------------------------------------|
| 2022 State Senate District 9 | Weston: 53.7% Marcellais*: 46.1% | Lose |

Pl. Ex. 1 at 17. Moving to the statewide exogenous elections since 2016, four have featured Native American candidates within the current boundaries of district 9. In those elections, the Native American candidate lost half of the elections:

| Election | Result | Native American Candidate Win or Lose |
|----------|--------|---------------------------------------|
| 2022 Public Service Commissioner | Fedorchak: 54.1% Moniz*: 45.7% | Lose |
| 2016 Public Service Commissioner | Fedorchak: 46.5% Hunte-Beaubrun*: 46.1% | Lose |
| 2016 Insurance Commissioner | Godfread: 43.2% Buffalo*: 56.8% | Win |
| 2016 U.S. House | Cramer: 46.9% Iron Eyes*: 49.3% | Win |

Pl. Ex. 1 at 17-20. When all contests featuring Native American candidates (whether endogenous or exogenous) are taken together, the defeat rate for Native American candidates is 60%.

Among exogenous all-white elections, Native American preferred candidates lost 100% of the 2022 elections, 67% of the 2022 and 2020 elections combined, and 56% of the 2022, 2020, and 2016 elections combined:

| Election | Result | Native American Preferred Candidate Win or Lose | Defeat Rate for Native American Preferred Candidates |
|---|---|---|---|
| 2022 Agricultural Commissioner | Goehring: 60.2% Dooley*: 39.6% | Lose | **2022 Defeat Rate: 100%** |
| 2022 Attorney General | Wrigley: 55.3% Lamb*: 44.6% | Lose | |
| 2022 Public Service Commissioner (4 Year) | Haugen Hoffart: 55.2% Hammer*: 44.6% | Lose | |
| 2022 Secretary of State | Howe: 47.5% Powell*: 42.3% | Lose | |
| 2022 U.S. House | Armstrong: 52.8% Mund*: 47.0% | Lose | |
| 2022 U.S. Senate | Hoeven: 51.3% Christiansen*: 36.4% | Lose | |
| 2020 Auditor | Gallion: 46.5% Hart*: 53.4% | Win | **2020 Defeat Rate: 33%** |
| 2020 Governor | Burgum: 52.8% Lenz*: 43.1% | Lose | |
| 2020 President | Trump: 47.2% Biden*: 50.8% | Win | |
| 2020 Public Service Commissioner | Kroshus: 46.4% Buchmann*: 53.4% | Win | |
| 2020 Treasurer | Beadle: 45.6% Haugen*: 54.2% | Win | |
| 2020 U.S. House | Armstrong: 50.6% Raknerud*: 47.0% | Lose | |
| 2016 Governor | Burgum: 48.3% Nelson*: 48.7% | Win | **2016 Defeat Rate: 25%** |
| 2016 President | Trump: 44.2% Clinton*: 45.1% | Win | |
| 2016 Treasurer | Schmidt: 41.6% Mathern*: 50.0% | Win | |
| 2016 U.S. Senate | Hoeven: 59.7% Glassheim*: 33.9% | Lose | |

Pl. Ex. 1 at 17-20. From this data, a pattern emerges: the more recent the election, the more likely the Native American preferred candidate is to lose. When averaged together, the total defeat rate

is 56%. Beyond that, even when the 2018 election results (which, as explained below, was an atypical election) are factored in, the 100% defeat rate for Native American candidates of choice in the most recent election is highly probative and compelling evidence of white bloc voting. Said another way, giving each election the appropriate weight per Eighth Circuit and Supreme Court case law, the evidence proves by a preponderance that Native American candidates of choice will not be successful over 50% of the time in as-enacted and at-large district 9.

### iv.    2018 Election and Special Circumstances

One of the key differences of opinion between Dr. Collingwood and Dr. Hood concerns the probative value and weight of the 2018 election. "Only minority electoral success in typical elections is relevant to whether a Section 2 majority voting bloc usually defeats the minority's preferred candidate." Ruiz, 160 F.3d at 557. So, a central issue is whether 2018 was a typical election, deserving equal weight as other elections, or whether it was an atypical election, deserving less weight than other elections. The Secretary argues that 2018 is a typical election deserving equal weight; the Tribes assert that the 2018 election was atypical and deserves less weight.

In 2018, a North Dakota voter identification law was upheld that required a residential address to vote. The voter identification requirement affected the number of Native Americans eligible to vote and resulted in significant national and regional attention to Native American voters and increasing voter turnout. Voter turnout did increase dramatically, as compared to years prior and since:

| Election | White Electorate Share | Native American Electorate Share |
|----------|------------------------|----------------------------------|
| 2014 | 67% | 33% |
| 2016 | 63% | 37% |
| 2018 | 50% | 50% |
| 2020 | 63% | 37% |
| 2022 | 60% | 40% |

Pl. Ex. 42 at 4-5. Because of the increase in Native American voter turnout, Native American preferred candidates also performed much better than in any other years, prior or since. Pl. Ex. 1 at 18.

Chairman Azure and former Chairman Yankton persuasively testified about the extraordinary resources that poured into North Dakota's Native American reservations in the lead up to the 2018 election. Doc. 115 at 80:18-86:17; Doc. 117 at 21:8-12. The voter identification law caused a backlash among Native American voters, which was aided by substantial financial resources promoting get-out-the-vote efforts on the reservations. Id. National celebrities gave concerts and performances on the reservations to promote turnout. Id. Both testified that the resources—and resulting turnout among Native American voters—was unlike anything they have seen before or since. Id.

That testimony is supported by the data. Native American turnout in 2018 was unusually high. Not only did it exceed statewide turnout and approach white turnout in district 9, but it inverted the normal pattern of lower turnout in midterm versus presidential elections:

31



Pl. Ex. 43.

With those facts in mind, the experts offer competing opinions on the probative value of the 2018 election. Dr. Hood concluded that the third precondition was not met in as-enacted and at-large district 9 because Native American preferred candidates were successful in over 50% of the elections he reviewed. To reach that conclusion and opinion, Dr. Hood reviewed the election data from Dr. Collinwood's report and added together the elections in at-large district 9 and subdistrict 9A and 9B. Pl. Ex. 81 at 4. He also included the election data from the 2018 election. Doc. 117 at 143. In other words, Dr. Hood considered all election data equally and gave no probative weight or value to any one election. Doc. 117 at 85:19-86:6. Also, and importantly, Dr. Hood did not consider the 2022 election results. Id. at 150.

Dr. Collingwood reached a different conclusion. He concluded the 2018 election presented special circumstances, including unprecedented voter turnout, that "warrant and counsel against mechanically interpreting" the results. Pl. Ex. 1 at 18. As a result, he gave the 2018 election less weight when calculating white bloc voting in district 9. He also did consider the 2022 election, weighed that election more heavily, and concluded that the Native American preferred candidate "lost every single contest." Pl. Ex. 1 at 21. Dr. Collingwood opined that the third precondition is met because "white voters are voting as a bloc to prevent Native Americans from electing

32

candidates of choice in recent elections, in endogenous elections . . , and in 60% of contests across all tested years in which the Native American preferred candidate was a Native American." Pl. Ex. 1 at 43.

Having heard the testimony by both experts at trial, along with having reviewed their respective reports, Dr. Collingwood's conclusions and analysis are more credible because they follow the general directives of the Eighth Circuit in weighing elections in VRA cases. Indeed, the Eighth Circuit has recognized that endogenous elections should be considered more probative than exogenous elections; elections with a Native American candidate are more probative than elections that do not feature a Native American candidate; and that more recent elections have more probative value than less recent elections. Bone Shirt, 461 F.3d at 1020-21. Dr. Hood gave all elections equal probative value and generally weighed all elections the same. But Dr. Collingwood's report and methodology more closely tracks the instruction from the Eighth Circuit in weighing election data in VRA cases, making it more credible and reliable. In addition, Dr. Hood's testimony at trial acknowledged that endogenous elections, elections featuring Native American candidates, and more recent elections are more probative. Doc. 117 at 142:9-143:7. He also testified that the 2022 endogenous election for the district 9 Senate seat was the "single most probative" election because it featured all three probative characteristics (id. at 143:12-17), but he did not consider the 2022 endogenous election in reaching his conclusions (id. at 150).

Substantively and statistically, Dr. Hood's conclusion on the third precondition rests on adding together all data from district 9 and subdistricts 9A and 9B. But recall that subdistrict 9A has a near 80% NVAP, and Native American preferred candidates win 100% of the time. A district with a packed minority population is not one where the defeat of minority preferred candidates is to be expected, and it should not be considered as part of the third Gingles precondition. See Bone

33

Shirt, 461 F.3d at 1027. And importantly, as Dr. Hood testified and acknowledged at trial, if subdistrict 9A was removed from his analysis, the Native American preferred candidates defeat rate is 59.5%. Doc. 117 at 148:16-24. That alone also satisfies the third Gingles precondition.

Having reviewed the testimony and evidence, giving the elections the appropriate weight consistent with Eighth Circuit case law, the Tribes have proven by a preponderance of the evidence that the white majority typically votes in a bloc to defeat the minority candidate in as-enacted and at-large district 9. As such, the third Gingles precondition is also established as to as-enacted and at-large district 9.

### B.    Totality of the Circumstances and the Senate Factors

With the Gingles preconditions met, the Section 2 analysis turns to the totality of the circumstances and analysis of the Senate Factors. The Senate Factors come from the Senate Committee report to the 1982 amendment to the VRA and directs courts to consider the following factors in determining whether the totality of the circumstances indicate a Section 2 violation:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

34

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.R. No. 97-417 at 28-29 (1982); <u>Gingles</u>, 478 U.S. at 44-45. Two additional factors are also probative in determining a Section 2 violation: (1) was there a significant lack of response from elected officials to the needs of the minority group; and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous. <u>Gingles</u>, 478 U.S. at 44. "[T]his list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. Furthermore, . . . there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." <u>Id.</u> at 45 (internal citations omitted).

### 1.    Senate Factors 2 and 7

"Two factors predominate the totality-of-circumstances analysis: the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme." <u>Bone Shirt</u>, 461 F.3d at 1022. As to Senate Factor 2, the extent of racially polarized voting, the record reflects a high level of racially polarized voting in districts 9 and 15 and subdistricts 9A and 9B. That evidence is largely undisputed and was discussed at length above. As to Senate Factor 7—the extent to which Native Americans have been elected—the only election under the 2021 redistricting plan in 2022 resulted in the loss of a Native American Senator (who had held the seat since 2006). Brown, a Native American, also lost the district 15 race. In effect, as a result of the 2021 redistricting plan, Native Americans experienced a net-loss of representation. Both factors weigh the totality of the circumstances towards a Section 2 violation.

35

### 2.      Remaining Senate Factors

This leaves factors one, three,[8] and five,[9] along with tenuousness, lack of response, and proportionality. As to the first Senate Factor, which considers historical discrimination practices, the Tribes offered expert testimony from Dr. Daniel McCool. He testified as to the long history of mistreatment of Native Americans in North Dakota and discussed evidence of contemporary discrimination against Native Americans, including many successful voting discrimination claims affecting Native Americans. Doc. 116 at 90-126. The evidence of discrimination in the democratic and political process against Native Americans in North Dakota is well-documented and undisputed by the Secretary. So, the first Senate Factor 1 weighs toward a Section 2 violation.

Next, as to the third Senate Factor, which considers discrimination through voting practices and procedures, the Tribes suggest that the 2021 redistricting plan itself is the best evidence of voting practices or procedures that enhance the opportunity for discrimination. But beyond that blanket assertion, there is no evidence that the Secretary used the 2021 redistricting plan to enhance the opportunity of discrimination against Native Americans. As a result, the third Senate Factor does not weigh toward finding Section 2 violation.

Senate Factor 5 considers the effects of discrimination against Native Americans more broadly, in such areas as education, employment, and health care. Dr. Weston McCool offered undisputed evidence as to the lower socio-economic status of Native Americans in North Dakota and that Native Americans continue to experience the effects of discrimination across a host of socioeconomic measures, which results in inequal access to the political process. Doc. 116 at 148.

---

[8] Senate Factor 4, which addresses candidate slating processes, is not applicable on these facts.
[9] The parties agree that Senate Factor 6 is not at issue.

And the Secretary did not challenge that evidence. Senate Factor 5 weighs toward a Section 2 violation.

The three remaining factors in the totality of the circumstances analysis are tenuousness, lack of response, and proportionality. Tenuousness looks at the justification and explanation for the policy or law at issue. "The tenuousness of the justification for the state policy may indicate that the policy is unfair." <u>Cottier v. City of Martin</u>, 466 F. Supp. 2d 1175, 1197 (D.S.D. 2006).

While the actions of the Legislative Assembly may not have ultimately went far enough to comply with Section 2 of the VRA, the record establishes that the Secretary and the Legislative Assembly were intensely concerned with complying with the VRA in passing the 2021 redistricting plan and creating the districts and subdistricts at issue. The justification by the Secretary for the 2021 redistricting plan is not tenuous, and this factor does not weigh in favor of a Section 2 violation.

The next factor is lack of response. The Tribes generally assert the Legislative Assembly was unresponsive to the needs of the Native American community. But the Secretary presented ample evidence of Tribal representatives and members generally advocating for subdistricts. Doc. 116 at 28, 32-33, 33-34, 134, 141. Again, the record is clear that the Legislative Assembly sought input from the Tribes and their members and attempted to work with the Tribes to comply with the VRA, even though the VRA compliance measures fell short. Also recall that the redistricting plan was developed under a truncated timeline because of the COVID-19 pandemic. On these facts, one cannot find a lack of response by the Secretary and the Legislative Assembly, and as a result, this factor does not weigh in favor of a Section 2 violation.

The final factor is proportionality. Based on their share of statewide VAP, Native Americans should hold three Senate seats and six House seats. However, under the 2021

redistricting plan, Native Americans hold zero seats in the Senate and two House seats. Either of the proposed plans would yield one Senate seat and three House seats. While certainly not dispositive, this obvious disparity as to proportionality is further evidence of vote dilution under the totality of circumstances.

All told, while a closer decision than suggested by the Tribes, the two most critical Senate Factors (2 and 7) weigh heavily towards finding a Section 2 violation. Those factors, together with the evidence on Senate Factors 1, 5, and proportionality, demonstrates that the totality of the circumstances deprive Native American voters of an equal opportunity to participate in the political process and to elect representatives of their choice, in violation of Section 2 of the VRA.

## III.   <u>CONCLUSION AND ORDER</u>

"Determining whether a Section 2 violation exists is a complex, fact-intensive task that requires inquiry into sensitive and often difficult subjects." <u>Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.</u>, 201 F. Supp. 3d 1006, 1082 (E.D. Missouri 2016). This case is no exception. It is evident that, during the redistricting process, the Secretary and the Legislative Assembly sought input from the Tribes and other Native American representatives. It is also evident that the Secretary and the Legislative Assembly did carefully examine the VRA and believed that creating the subdistricts in district 9 and changing the boundaries of districts 9 and 15 would comply with the VRA. But unfortunately, as to districts 9 and 15, those efforts did not go far enough to comply with Section 2.

"The question of whether political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." <u>Id.</u> (citing <u>Gingles</u>, 478 U.S. at 45). Having conducted that evaluation and review, the 2021 redistricting plan, as to districts 9 and 15 and subdistricts 9A and 9B, prevents Native

American voters from having an equal opportunity to elect candidates of their choice in violation of Section 2 of the VRA. The Secretary is permanently enjoined from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the North Dakota Legislative Assembly from districts 9 and 15 and subdistrict 9A and 9B. The Secretary and Legislative Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of Section 2. The Tribes shall file any objections to such a plan by January 5, 2024, along with any supporting expert analysis and potential remedial plan proposals. The Defendant shall have until January 19, 2024, to file any response. The first election for the state legislative positions in the remedial district shall occur in the November 2024 election.

**IT IS SO ORDERED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated this 17th day of November, 2023.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

39

Local AO 450 (rev. 1/23)

# United States District Court
### *District of North Dakota*

Turtle Mountain Band of Chippewa  Indians, et al.,

                         Plaintiffs,

     vs.

Michael Howe, in his Official Capacity as
Secretary of State of North Dakota,

                 Defendant.

JUDGMENT IN A CIVIL CASE

Case No.    3:22-cv-00022

---

☐ **Jury Verdict**.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☑ **Decision by Court**.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

☐ **Decision on Motion**.  This action came before the Court on motion.  The issues have been considered and a decision rendered.

☐ **Stipulation**.  This action came before the court on motion of the parties.  The issues have been resolved.

☐ **Dismissal**.  This action was voluntarily dismissed by Plaintiff pursuant to Fed. R. Civ. P.  41(a)(1)(ii).

## IT IS ORDERED AND ADJUDGED:

See attached.

Date:  November 17, 2023

KARI M. KNUDSON, CLERK OF COURT

by:  */s/ Pamela Bloomquist, Deputy Clerk*

**Exhibit 2**

Pursuant to the Order dated November 17, 2023, (Doc. 125), "Determining whether a Section 2 violation exists is a complex, fact-intensive task that requires inquiry into sensitive and often difficult subjects." Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist., 201 F. Supp. 3d 1006, 1082 (E.D. Missouri 2016). This case is no exception. It is evident that, during the redistricting process, the Secretary and the Legislative Assembly sought input from the Tribes and other Native American representatives. It is also evident that the Secretary and the Legislative Assembly did carefully examine the VRA and believed that creating the subdistricts in district 9 and changing the boundaries of districts 9 and 15 would comply with the VRA. But unfortunately, as to districts 9 and 15, those efforts did not go far enough to comply with Section 2.

"The question of whether political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." Id. (citing Gingles, 478 U.S. at 45). Having conducted that evaluation and review, the 2021 redistricting plan, as to districts 9 and 15 and subdistricts 9A and 9B, prevents Native American voters from having an equal opportunity to elect candidates of their choice in violation of Section 2 of the VRA. The Secretary is permanently enjoined from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the North Dakota Legislative Assembly from districts 9 and 15 and subdistrict 9A and 9B. The Secretary and Legislative Assembly shall have until December 22, 2023, to adopt a plan to remedy the violation of Section 2. The Tribes shall file any objections to such a plan by January 5, 2024, along with any supporting expert analysis and potential remedial plan proposals. The Defendant shall have until January 19, 2024, to file any response. The first election for the state legislative positions in the remedial district shall occur in the November 2024 election.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, et al., | **ORDER** |
| Plaintiffs, | Case No. 3:22-cv-22 |
| vs. | |
| Michael Howe, in his Official Capacity as Secretary of State of North Dakota, | |
| Defendant. | |

Defendant Michael Howe, the Secretary of State of North Dakota, moves to stay the remedial order and judgment pending appeal in this Voting Rights Act ("VRA") case. Doc. 131. Plaintiffs Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown move to amend or correct the remedial order, given the Secretary's motion to stay. Doc. 134. The Plaintiffs oppose the Secretary's motion (Doc. 142), and the Secretary opposes the Plaintiffs' motion (Doc. 140). The North Dakota Legislative Assembly also moves to intervene and moves for a stay. Doc. 137; Doc. 151. All four motions are denied.

**A.      Motion to Stay Judgment Pending Appeal**

The Secretary asks for a stay of the judgment finding a Section 2 violation after trial and a final decision on the merits. Tellingly though, the Secretary does not challenge the merits of the order and decision on the Section 2 claim. Instead, he argues (1) a stay of the judgment is appropriate per Purcell v. Gonzalez, 549 U.S. 1 (2006), and (2) that 42 U.S.C. § 1983 does not apply to the VRA.

**1.      Purcell Principle**

In his motion, the Secretary largely leans on Purcell to suggest a stay pending appeal is warranted. But Purcell does not apply on these facts. And even if it did, it is perhaps more troubling

**Exhibit 3**

to suggest that <u>Purcell</u> permits what the Secretary asks for here—that a federal court overlook and stay a proven Section 2 violation because it requires a state to correct the violation well before any election is ever scheduled to occur.

      <u>Purcell</u> and its progeny articulated a general principle "that lower federal courts should ordinarily not alter the election rules on the <u>eve</u> of an election." <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 589 U.S. ___, 140 S. Ct. 1205, 1207 (2020) (emphasis added). But the context is critical—<u>Purcell</u> and the majority of cases relying on and citing to it are cases involving <u>preliminary</u> injunctive relief, where there is no merits decision on a claim. <u>Purcell</u>, 549 U.S. at 4 (granting stay of preliminary injunction concerning voter identification procedures entered weeks before an election); <u>North Carolina v. League of Women Voters of N.C.</u>, 574 U.S. 927 (2014) (granting stay of preliminary injunction entered close to an election date); <u>Wise v. Circosta</u>, 978 F.3d 93, 103 (4th Cir. 2020) (denying preliminary injunction of new absentee ballot rule less than a month before election); <u>Veasey v. Perry</u>, 769 F.3d 890, 895 (5th Cir. 2014) (granting stay of preliminary injunction entered 9 days before election); <u>Genetski v. Benson</u>, No. 20-000216-MM, 2020 WL 7033539, at *2 (Mich. Ct. Cl. Nov. 2, 2020) (declining to grant preliminary injunction the day before an election). As explained in <u>Purcell</u>, there are "considerations specific to election cases" when deciding whether to <u>enjoin</u> an election law <u>in close temporal proximity to an election</u>. <u>Purcell</u>, 549 U.S. at 4. Also of chief concern in <u>Purcell</u> cases is the risk of voter confusion. <u>See Democratic Nat'l Comm. v. Wisconsin State Legislature</u>, 141 S. Ct. 28, 30 (2020) (Gorsuch, J., concurring) (stating, "Last-minute changes to longstanding election rules risk other problems too, inviting confusion and chaos and eroding public confidence in electoral outcomes.").

      This is not a preliminary injunctive relief case. This is a case where a Section 2 violation of the VRA was proven by evidence at trial. Beyond that, there is no imminent election, little risk

of voter confusion, and the final judgment was not issued on the "eve" of any election. It strains credibility to seriously suggest otherwise. As the Plaintiffs correctly point out, the deadlines cited by the Secretary concern the <u>opening</u> date for candidate signature gathering—for elections that are still months away. Indeed, the Secretary's concern is not as to voter confusion but rather the administrative burden of correcting the Section 2 violation. Because there is no imminent election and no order for preliminary injunctive relief enjoining an election rule, <u>Purcell</u> does not apply, and it does not support granting a stay pending appeal.

## 2.    Traditional Stay Pending Appeal Factors

Setting <u>Purcell</u> aside, in deciding whether to grant a stay pending appeal, courts consider four factors: (1) whether the stay applicant has made a strong showing that the applicant is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. <u>Chafin v. Chafin</u>, 568 U.S. 165, 179 (2013). "The most important factor is likelihood of success on the merits, although a showing of irreparable injury without a stay is also required." <u>Org. for Black Struggle v. Ashcroft</u>, 978 F.3d 603, 607 (8th Cir. 2020). Stays pending appeal are disfavored, even if the movant may be irreparably harmed. <u>Nken v. Holder</u>, 556 U.S. 418, 427 (2009).

First, the Secretary has not made a strong showing he is likely to succeed on the merits. Once again, nowhere in the Secretary's motion does he challenge (or even address) the merits of the Section 2 claim and the Court's finding of a Section 2 violation after trial. He instead focuses on a new legal theory that 42 U.S.C. § 1983 provides no cause of action for private plaintiffs to bring a Section 2 claim. This issue was addressed in an order denying the Secretary's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), though both

3

parties raise new arguments that were not raised during the initial briefing of that issue. No doubt this issue is ripe for appellate review given the Eighth Circuit's recent decision in <u>Arkansas State Conference of NAACP v. Arkansas Board of Apportionment</u>, __ F.4th __, No. 22-1395, 2023 WL 8011300 (8th Cir. Nov. 20, 2023). But simply because the issue is set for appellate review does not mean the Secretary has made a strong showing that he is likely to succeed on the merits. This seems particularly true when he does not challenge or address the merits of the substantive Section 2 claim at issue. So, the first factor does not weigh in favor of a stay pending appeal.

Next, the Secretary will not be irreparably injured absent a stay. The Secretary largely rehashes his <u>Purcell</u> analysis to show irreparable injury absent a stay. As noted above, <u>Purcell</u> does not apply, and the Court struggles to understand how the Secretary would be irreparably injured by complying with Section 2 of the VRA. And per <u>Nken</u>, even if the Secretary may be irreparably harmed, a stay pending appeal is not a matter of right. 556 U.S. at 433. The second factor does not weigh in favor of a stay pending appeal.

Third, granting a stay would substantially injure the Plaintiffs and all other Native Americans voting in districts 9 and 15. A stay would effectively allow an ongoing Section 2 violation to continue until a decision on the § 1983 issue is reached by a reviewing court. There is substantial harm inherent in the deprivation of the Plaintiffs' fundamental voting rights. <u>See Martin v. Kemp</u>, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018). As such, the third factor weighs heavily against a stay.

Finally, the public interest lies in correcting Section 2 violations, particularly when those violations are proven by evidence and data at trial. Concerns as to the logistics of preparing for an election cycle cannot trump violations of federal law and individual voting rights. This factor also weighs against a stay pending appeal.

Again, it is worth emphasizing that this motion for a stay pending appeal is <u>not</u> made in the context of any preliminary injunction, where there is no final decision on the merits of a claim. And it is <u>not</u> made in the context of any imminent election. Instead, it is a request for a stay after a full and final decision on the merits, after a trial, on a Section 2 claim—a merits decision the Secretary does not address or even challenge in his motion. In that context, the law and the four factors conclusively instruct that a stay pending appeal is inappropriate, and the Secretary's motion to stay is denied.

**B.      Motion to Amend or Correct Remedial Order and Motion to Intervene**

Turning to the Plaintiffs' motion to amend or correct the remedial order, the motion presents an issue of jurisdiction. The filing of a notice of appeal generally divests the district court of jurisdiction over the case, and the district court cannot reexamine or supplement the order being appealed. <u>See</u> <u>Griggs v. Provident Consumer Discount Co.</u>, 459 U.S. 56, 58 (1982); <u>Liddell v. Board of Educ.</u>, 73 F.3d 819, 822 (8th Cir. 1996). Here, the Plaintiffs ask the Court to reexamine the deadlines in the remedial order in response to the Secretary's <u>Purcell</u> concerns. But the Court cannot reexamine the remedial order because the Secretary filed his notice of appeal before the motion to amend or correct. The Court lacks jurisdiction to amend or correct the remedial order, and the motion (Doc. 134) is denied.

The same is true for the Legislative Assembly's motion to intervene and motion to stay. It is axiomatic that the motion to intervene is untimely per Federal Rule of Civil Procedure 24, but again, this Court lacks jurisdiction to reexamine or supplement the order and judgment on appeal. Adding the Legislative Assembly as a party at this late stage is a rather extraordinary request to supplement the order and judgment on appeal, and the motions (Doc. 137; Doc. 151) are denied.

5

**C.      Conclusion**

After a trial, and careful review of all of the evidence and data, the Court concluded the

2021 redistricting plan violated Section 2 of the VRA. Put simply, the facts and the law do not

support a stay of the remedial order and judgment pending appeal. The Secretary's motion to stay

pending appeal (Doc. 131) is **DENIED**. Because the notice of appeal divested this Court of

jurisdiction over this case, the Plaintiffs' motion to amend or correct the remedial order (Doc. 134)

and the Legislative Assembly's motion to intervene (Doc. 137) and motion to stay (Doc. 151) are

also **DENIED**.

**IT IS SO ORDERED**.

Dated this 12th day of December, 2023.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

Turtle Mountain Band of Chippewa Indians,
Spirit Lake Tribe, Wesley Davis,
Zachery S. King, and Collette Brown,

                      Plaintiffs,

      vs.

Alvin Jaeger, in his official capacity as
Secretary of State of North Dakota,

                  Defendant.

**ORDER DENYING**
**MOTION TO DISMISS**

Case No. 3:22-cv-22

Before the Court is the Defendant Secretary of State of North Dakota Alvin Jaeger's (the "Secretary") motion to dismiss for lack of jurisdiction and for failure to state a claim filed on April 15, 2022. Doc. No. 17. Plaintiffs Turtle Mountain Band of Chippewa Indians ("Turtle Mountain"), Spirit Lake Tribe ("Spirit Lake"), Wesley Davis, Zachery S. King, and Collette Brown (together, the "Plaintiffs") responded in opposition on May 13, 2022. Doc. No. 24. The Secretary filed his reply on May 27, 2022. Doc. No. 26. The United States also filed a Statement of Interest. Doc. No. 25. For the reasons below, the motion to dismiss is denied.

**I.    FACTUAL BACKGROUND**

Article IV, Section 2 of the North Dakota Constitution requires the state legislature to redraw the district boundaries of each legislative district following the census, which takes place at the end of each decade. Following the release of the 2020 Census results, North Dakota Governor Doug Burgum issued Executive Order 2021-17[1] on October 29, 2021. This Executive Order convened a special session of the Legislative Assembly for the purposes of "redistricting of

---

[1] N.D. Exec. Order No. 2021-17 (Oct. 29, 2021), available at: https://www.governor.nd.gov/executive-orders.

**Exhibit 4**

government." N.D. Exec. Order No. 2021-17 (Oct. 29, 2021). On November 10, 2021, the Legislative Assembly passed House Bill 1504, which provided for a redistricting of North Dakota's legislative districts. H.B. 1504, 67th Leg., Spec. Sess. (N.D. 2021). House Bill 1504 was signed into law by North Dakota Governor Doug Burgum on November 11, 2021. Id.

In this action, the Plaintiffs challenge the above redistricting plan passed by the North Dakota Legislative Assembly (i.e., House Bill 1504), and signed by the North Dakota Governor, under Section 2 of the Voting Rights Act ("VRA") ("Section 2"), 52 U.S.C. § 10301. Doc. No. 1. More specifically, the Plaintiffs bring a voter dilution claim and allege that the newly adopted redistricting plan dilutes the voting strength of Native Americans on the Turtle Mountain and Spirit Lake reservations, and in surrounding areas, in violation of Section 2 of the VRA. Id. at 29-31. In addition to the Section 2 challenge, the Plaintiffs also bring a claim under 42 U.S.C. § 1983 ("§ 1983"). Id. at 3. The Plaintiffs seek declaratory and injunctive relief prohibiting the Secretary from conducting elections under the allegedly dilutive redistricting plan and seek remedial relief from the State of North Dakota's failure to conduct elections under a plan that complies with the requirements of the VRA. Id. at 31. In lieu of an answer, the Secretary filed this motion to dismiss. Doc. No. 17.

## II.    LEGAL DISCUSSION

The Secretary's motion asks for dismissal on three grounds—first, that Turtle Mountain and Spirit Lake (together, the "Tribal Plaintiffs") lack standing to bring claims under the VRA. Id. at 8-13. Second, the Tribal Plaintiffs cannot allege a VRA claim because they are not "citizens" of the United States. Id. at 7-8. Finally, the Secretary argues that Section 2 of the Voting Rights Act does not provide a private right of action. Id. at 4-7. The Plaintiffs, for their part, argue the Tribal Plaintiffs have standing and that the citizenship requirement to bring a claim under the VRA has

been satisfied. Additionally, as to the private right of action, the Plaintiffs argue that when read and considered together, § 1983 provides a private remedy to enforce Section 2 of the VRA, and alternatively, Section 2 implies its own private right of action. The United States, in its Statement of Interest, similarly argues that Section 2 contains a private right of action, and alternatively, § 1983 provides a remedy that can be used to enforce Section 2 of the VRA. Doc. No. 25.

### A.    Standing

Turning first to the issue of standing, the Secretary argues that the Tribal Plaintiffs should be dismissed for lack of standing. The Tribal Plaintiffs respond that standing can be established through the individual Plaintiffs, the diversion of the Tribal Plaintiffs' resources, or the principles of organizational standing. The Court agrees that the Tribal Plaintiffs have standing.

### 1.    Applicable Law

Article III of the United States Constitution limits the subject matter jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. This jurisdictional limitation requires every plaintiff to demonstrate it has standing when bringing an action in federal court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." Warth v. Seldin, 422 U.S. 490, 518 (1975). The essence of standing is whether the party invoking federal jurisdiction is entitled to have the court decide the merits of the dispute. Id. at 498.

"[T]he irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an 'injury in fact' . . . Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant' . . . Third, it must be 'likely,' as opposed to merely

'speculative,' that the injury will be 'redressed by a favorable decision.'" <u>Sierra Club v. Robertson</u>, 28 F.3d 753, 757-58 (8th Cir. 1994) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)).

To show an injury-in-fact, a plaintiff must show "an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical." <u>Id.</u> Merely alleging an injury related to some cognizable interest is not enough; rather, a plaintiff "must make an adequate showing that the injury is actual or certain to ensue." <u>Id.</u> If a plaintiff lacks Article III standing, a federal court has no subject-matter jurisdiction over the claim and the action must be dismissed. <u>Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.</u>, 813 F.3d 1124, 1128 (8th Cir. 2016).

## 2.    Individual Standing

The Secretary does not dispute that the individual Plaintiffs in this matter have standing to bring this claim under Section 2. Instead, the Secretary's argument is focused on the Tribal Plaintiffs' lack of standing. When there are multiple plaintiffs, at least one of the plaintiffs must demonstrate standing for each claim and each form of relief being sought. <u>Spirit Lake Tribe v. Jaeger</u>, No. 1:18-CV-222, 2020 WL 625279, at *3 (D.N.D. Feb. 10, 2020). One plaintiff having standing to bring a specific claim generally confers standing to all plaintiffs on that claim. <u>See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.</u>, 429 U.S. 252, 264 (1977); <u>see also Jones v. Gale</u>, 470 F.3d 1261, 1265 (8th Cir. 2006). Here, the individual Plaintiffs' right to sue has not been challenged, and even if it had been, the argument would fail, as individuals residing in an allegedly aggrieved voting district have standing to bring a claim under the VRA. <u>See Gill v. Whitford</u>, 138 S. Ct. 1916 (2018); <u>see also Roberts v. Wamser</u>, No. 88-1138, 1989 WL 94513 (8th Cir. Aug. 21, 1989). Because the individual Plaintiffs have standing, there is no authority to

4

dismiss the Tribal Plaintiffs from the action due to lack of standing.

### 3.    Diversion of Resources

Moreover, even without the individual Plaintiffs, the Tribal Plaintiffs have standing to bring a Section 2 claim. As this Court noted in <u>Spirit Lake</u>, "[t]he Court can see no reason why a federally recognized Indian Tribe would not have standing to sue to protect the voting rights of its members when private organizations like the NAACP and political parties are permitted to do so." 2020 WL 625279, at *5. Here, just as in <u>Spirit Lake</u>, the Tribal Plaintiffs assert they have been forced to divert resources in response to the North Dakota Legislative Assembly's actions. Doc. No 1, ¶¶ 43-44. This is sufficient to establish standing. <u>See</u> <u>Spirit Lake Tribe</u>, 2020 WL 625279, at *4. Further, and consistent with <u>Spirit Lake</u>, because standing has been established in alternative ways, the Court need not examine the merits of associational standing or standing under *parens patriae*. <u>Id.</u>

### 4.    Citizenship

The Secretary goes on to argue that the Tribal Plaintiffs cannot advance a VRA claim because they are not "citizens" of the United States. In <u>Spirit Lake</u>, this Court held that this argument is a challenge to standing. 2020 WL 625279, at *4. As discussed above, because the individual Plaintiffs have standing, there is no standing issue as to the Tribal Plaintiffs. Nevertheless, this Court held in <u>Spirit Lake</u> that the Indian Tribes do have standing to protect the voting rights of its members. <u>Id.</u> The same analysis applies here, and the Secretary's argument is without merit.

### B.    Private Right of Action

With the standing issues resolved, the Court turns to the Secretary's argument that Section 2 of the VRA does not provide a private right of action, and as a result, the complaint fails to state

Appellate Case: 23-3655   Page: 82   Date Filed: 12/13/2023 Entry ID: 5344314

a claim (due to lack of subject matter jurisdiction) and the case must be dismissed. The Plaintiffs counter that their § 1983 claim provides the remedy necessary to enforce Section 2 of the VRA, and alternatively, the plain language of Section 2 implies a private right of action. The Court finds that § 1983 provides a private remedy for violations of Section 2 of the VRA, and therefore, it is not necessary for the Court to decide whether Section 2, standing alone, contains a private right of action.

### 1.   Relevant Legal Background

The question of whether Section 2 of the VRA contains a private right of action presents a novel legal question. In a recent United States Supreme Court decision involving a Section 2 case, Justice Gorsuch (joined by Justice Thomas) concurred with the majority opinion but wrote separately to "flag" an issue that was not before the Court. Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2350, 210 L. Ed. 2d 753 (2021). His concurrence stated, in relevant part:

> I join the Court's opinion in full, but flag one thing it does not decide. Our cases have assumed—without deciding—that the Voting Rights Act of 1965 furnishes an implied cause of action under § 2. Lower courts have treated this issue as an open question.

Id. Following Brnovich, the United States District Court for the Eastern District of Arkansas took notice of Justice Gorsuch's concurrence, and when presented with a case alleging voter dilution among African American voters, examined whether Section 2, standing alone, contains a private right of action. See generally Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment, No. 4:21-CV-01239-LPR, 2022 WL 496908 (E.D. Ark. Feb. 17, 2022). In what can only be described a thorough and well-reasoned—though admittedly, controversial—order, the district court found that Section 2 of the VRA, standing alone, does not provide a private right of action.[2]

---

[2] Notably, the district court explicitly states it did not consider whether Section 2 contains rights-creating language and that its decision was premised on the lack of a private remedy. Arkansas State Conf. NAACP, WL 496908, at *10.

Id. at 10. This lack of remedy inevitably led the district court to conclude that private individuals do not have a private right of action to enforce Section 2, and the case was dismissed for lack of subject matter jurisdiction after the Attorney General of the United States declined to join the lawsuit. Id. at 23. Here, the Secretary encourages this Court to follow Arkansas State Conf. NAACP and find that the Plaintiffs do not have a private right of action under Section 2 of the VRA—leading to dismissal of the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

### 2.    Applicable Law

"Subject matter jurisdiction refers to the court's power to decide a certain class of cases." LeMay v. United States Postal Serv., 450 F.3d 797, 799 (8th Cir. 2006) (citing Continental Cablevision of St. Paul, Inc. v. United States Postal Serv., 945 F.2d 1434, 1437 (8th Cir. 1991)). "It is axiomatic that the federal courts lack plenary jurisdiction." Southwestern Bell Tel. Co. v. Connect Communications Corp., 225 F.3d 942, 945 (8th Cir. 2000). Rather, "[t]he inferior federal courts may only exercise jurisdiction where Congress sees fit to allow it." Id. Put simply, federal courts cannot hear cases that fall outside of the limited jurisdiction granted to them. Bhd. of Maint. of Way Emps. Div. of Int'l Bhd. of Teamsters v. Union Pac. R. Co., 475 F. Supp. 2d 819, 831 (N.D. Iowa 2007).

Federal Rule of Civil Procedure 8(a) requires a pleading only to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Nevertheless, a complaint may be dismissed for "failure to state a claim upon which relief can be granted," and a party may raise that defense by motion. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A plaintiff must show that success on the merits is more than a "sheer possibility." Id.

### 3.    Section 1983

Whether the VRA contains a private right of action is significant because, without it, the Court does not have subject matter jurisdiction to decide a Section 2 claim that is not joined by the United States Attorney General. At first blush, the Secretary's argument, and the decision in Arkansas State Conf. NAACP, are compelling. However, unlike the complaint in Arkansas State Conf. NAACP, the Plaintiffs here seek relief under § 1983 and Section 2 of the VRA. So, the Plaintiffs argue they have a private right of action to support their Section 2 claim because the complaint seeks to enforce Section 2 in conjunction with § 1983. The Secretary, for his part, argues that Congress effectively shut the door to a § 1983 remedy. However, the Court is not persuaded.

Section 1983 provides a remedy for violations of federal rights committed by state actors. Gonzaga Univ. v. Doe, 536 U.S. 273, 284, 122 S. Ct. 2268, 2276 (2002). Rights are enforceable through § 1983 only if it is clear that Congress intended to establish an individual right. Gonzaga Univ., 536 U.S. 273, at 284. "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." Id. This presumption of enforceability is only overcome in cases where Congress intended to foreclose any § 1983 remedy. Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19–20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); see also Alexander v. Sandoval, 532 U.S. 275, 290, 121 S. Ct. 1511, 1521, 149 L. Ed. 2d 517 (2001).

Prior to Gonzaga University, the United States Supreme Court's case law regarding what rights are enforceable through § 1983, in the Court's words, "may not [have been] models of clarity." Gonzaga Univ., 536 U.S. 273, at 278. As such, the Gonzaga University Court sought to

clarify the test for what rights can be enforced through § 1983. The Supreme Court held that the initial inquiry—determining whether a statute confers any right at all—is no different from the initial inquiry in an implied right of action case, the express purpose of which is to determine whether or not a statute confers a right on a particular class of person. Id. at 258. Accordingly:

> A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context. Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries.

Id. at 285 (cleaned up). In sum, § 1983 can create a remedy for a plaintiff when one does not already exist. When a statute does not provide an explicit right of action, the analysis of whether a plaintiff may bring a § 1983 claim is dependent on whether the statute sought to be enforced through § 1983 confers rights on a particular class of people.

Importantly (and likely not coincidentally), Arkansas State Conf. NAACP, which is the only factually similar case cited by the Secretary in support of his motion, specifically notes that § 1983 was not alleged in the complaint at issue in that case, and that because Section 2 lacked a private right of action, there was no need to consider whether the text of the statute conferred a right. 2022 WL 496908, at *10. Stated another way, the analysis in Arkansas State Conf. NAACP ended because there was no private remedy available, and no other claims were alleged. However, here, because a § 1983 claim was alleged, there is a presumption of a private remedy, should Section 2 create a right. This fact is significant and undoubtably distinguishes Arkansas State Conf. NAACP. So, the questions this Court is left with, then, is whether Section 2 confers rights on a particular class of people, and if so, whether the Secretary can rebut the presumption that § 1983 provides a remedy.

### 4.    Text of Section 2

Turning to the first question, it is undisputed that Section 2 of the VRA does not explicitly contain a private right of action, making the Plaintiffs' claim contingent on the existence of an implied private right of action. As alluded to in <u>Gonzaga University</u>, to enforce a statute under an implied private right of action, the Plaintiffs must satisfy two requirements: (1) the statute's text must contain language that confers a right, and (2) the party must demonstrate the availability of a private remedy. <u>Sandoval</u>, 532 U.S. at 286–88, 121 S.Ct. 1511. As noted above, § 1983 provides a private remedy. The Court now turns to whether the text of Section 2 confers a right. As relevant here, Section 2 states:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . ..

52 U.S.C. § 10301(a). The plain language of Section 2 mandates that no government may restrict a citizen's right to vote based on an individual's race or color. It is difficult to imagine more explicit or clear rights creating language. It cannot be seriously questioned that Section 2 confers a right on a particular class of people. And indeed, the Secretary does not argue that Section 2 does not contain rights creating language. When this right is taken collectively with the remedy available through § 1983, an implied private right of action is present, and the motion to dismiss must be denied, unless the Secretary can show that the VRA's enforcement scheme demonstrates congressional intent to preclude a § 1983 remedy. <u>See generally</u> <u>Gonzaga Univ.</u>, 536 U.S. 273.

### 5.    The VRA's Enforcement Scheme

To that end, a party can rebut the presumption that a federal right is enforceable through § 1983 by demonstrating congressional intent to foreclose a § 1983 remedy. <u>See</u> <u>id.</u> at 284 n.4. Congressional intent may be found directly in the statute creating the right or inferred from the

10

statute's creation of a "comprehensive enforcement scheme that is incompatible with individual enforcement." City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 120 (2005). An express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a remedy under § 1983. Blessing v. Freestone, 520 U.S. 329, 341 (1997).

Section 2 does not contain any language creating a private remedy distinct from § 1983. In fact, Section 2 proscribes no remedy at all. As a result, the Court cannot conclude that anything in Section 2 indicates congressional intent to specifically prevent enforcement through § 1983 by providing a separate private remedy.

Now to the enforcement scheme. The Secretary argues Section 12 of the VRA ("Section 12"), 52 U.S.C. § 10308, provides a comprehensive scheme to enforce Section 2 that is incompatible with private enforcement. Admittedly, Section 12 contains no express, private remedies and provides the right to the Attorney General to seek an injunction and potential fines and imprisonment for violations of the VRA. See 52 U.S.C. § 10308. Critically, though, there is also nothing in Section 12 that is incompatible with private enforcement, as there can be collective and private remedies available for the same federal statute. See Cannon v. Univ. of Chicago, 441 U.S. 677, 717 (1979) (collective and private remedies available for violation of Title IX). Tellingly, the VRA itself seems to anticipate private litigation, as it contains a provision allowing for court-ordered attorneys' fees for "the prevailing party, other than the United States." 52 U.S.C. § 10310(e).

Further, there has been private enforcement of Section 2 since the VRA's inception. See Allen v. State Bd. of Elections, 393 U.S. 544, 555 (1969); Ala. State Conf. of NAACP v. Alabama, 949 F.3d 647, 652 (11th Cir. 2020); Mixon v. Ohio, 193 F.3d 389, 398–99 (6th Cir. 1999); Singleton v. Merrill, No. 2:21-cv-1530-AMM, 2022 WL 265001, at *79 (N.D. Ala. Jan. 24, 2022).

11

These private enforcement actions have co-existed with collective enforcement brought by the United States for decades. See, e.g., Allen, 393 U.S. 544, at 555.

Given the lack of evidence that Congress intended to provide an explicit private remedy, and the robust history of the private and collective rights co-existing, the Court cannot conclude that private enforcement of Section 2 is incompatible with the enforcement scheme in Section 12. As a result, the Secretary has not rebutted the presumption that § 1983 may provide a remedy for the Plaintiffs in this case, the Court has subject matter jurisdiction to entertain this private claim, and the complaint does not fail to state a claim upon which relief can be granted. Accordingly, the motion to dismiss is denied.  Because this Court finds that Section 2 may be enforced through § 1983, the Court need not decide whether Section 2 of the VRA, standing alone, contains an implied private right of action.

## III.   CONCLUSION

The Court has carefully reviewed the record, the parties' filings, and the relevant legal authority. For the reasons above, the Secretary's motion to dismiss for lack of jurisdiction and failure to state a claim (Doc. No. 17) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 7th day of July, 2022.

/s/ Peter D. Welte
Peter D. Welte, Chief Judge
United States District Court

12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

Turtle Mountain Band of        )
Chippewa Indians, et al.,      )
                               )
              Plaintiffs,      )
                               )      File No.
         vs.                   )      3:22-cv-00022-PDW-ARS
                               )
Michael Howe, in his           )
official capacity as           )
Secretary of State of the      )
State of North Dakota,         )
                               )
              Defendant.       )


TRANSCRIPT OF BENCH TRIAL
Volume III
Pages 1 - 206


Taken at
United States Courthouse
Fargo, North Dakota
June 14, 2023


BEFORE THE HONORABLE PETER D. WELTE
-- UNITED STATES DISTRICT COURT JUDGE --


Ronda L. Colby, RPR, CRR, RMR
U.S. District Court Reporter
220 East Rosser Avenue
Bismarck, ND  58501
701-530-2309
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

**Exhibit 5**

1  **A.**    Sure.  So there would be a lot of work from the counties

2  from a street-master perspective updating the boundaries.

3  **Q.**    And then I'm sorry to interrupt you, but street master, we

4  didn't talk about that before.  What's that?

5  **A.**    Yes, the street master is part of our central voter file

6  that -- it ties an address to a precinct and a ballot style and

7  ultimately the voter to ensure that the voter is receiving the

8  right ballot style at the polling location, voting for proper

9  candidates, contests, ballot measures.

10          So that's -- the street master is -- there -- it

11  really is assigning, you know, the voter to a specific ballot

12  style, and it has to be accurate because we don't want voters

13  voting on candidates that aren't going to be representing them

14  or voting on bond measures, for instance, that they won't be

15  paying for.  So ensuring that that street master is up to date

16  so voters are receiving the correct ballot style is of utmost

17  importance.

18  **Q.**    Sure.  Are you able to determine anything about precincts,

19  precinct changes, if something like LD9 is enacted in North

20  Dakota?

21  **A.**    I would assume that there would be precinct changes just

22  looking at -- the legislative district boundaries are changing

23  significantly, so I would -- I would venture to guess that the

24  precinct boundaries are definitely changing and would create a

25  lot of work for the counties involved.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


Turtle Mountain Band of          )
Chippewa Indians, et al.,        )
                                 )
          Plaintiffs,            )
                                 )   File No.
          vs.                    )   3:22-cv-00022-PDW-ARS
                                 )
Michael Howe, in his             )
official capacity as             )
Secretary of State of the        )
State of North Dakota,           )
                                 )
          Defendant.             )


<u>TRANSCRIPT OF BENCH TRIAL</u>
Volume IV
Pages 1-73


Taken at
United States Courthouse
Fargo, North Dakota
June 15, 2023



BEFORE THE HONORABLE PETER D. WELTE
-- UNITED STATES DISTRICT COURT JUDGE --




Ronda L. Colby, RPR, CRR, RMR
U.S. District Court Reporter
220 East Rosser Avenue
Bismarck, ND  58501
701-530-2309
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1   would need to vote and to keep our process secure.

2   **Q.**   Sure.  I think you talked about some of the election

3   systems, and that's kind of your specialty, right?

4   **A.**   It is.

5   **Q.**   Can you go into what those systems are, what they're

6   called -- a little bit -- to educate the Court and the folks in

7   this room?

8   **A.**   In our central voter file we have a listing of all voters

9   and nonvoters within the state, whether they -- we keep a list

10   of where they -- what address they are, date of birth, and we

11   keep track of their voting history.  And within that we also

12   know what precincts, what ballot styles, and what districts

13   that they are aligned to.  That's part of our central voter

14   file database.

15        Along with that, every street in our central voter

16   file is tied to a -- part of the program is called the Street

17   Master.  The Street Master identifies highways, roads, lanes,

18   boulevards within a precinct that will allow -- determine

19   whether this house number resides within this precinct, and we

20   must update that whenever there's a change or update to the

21   process -- to the system.  That way we can add a house number

22   if there needs to be a house number added so that particular

23   voter that lives at that address is assigned to that particular

24   precinct.

25   **Q.**   Sure.  And we can get into that in a little more depth

1  later, but let's go a little more generally into the databases
2  you've talked about.  Is that something the Secretary of State
3  has created?
4  **A.**   Correct.
5  **Q.**   But is that something that they purchase through a
6  license?
7  **A.**   We purchased -- we purchased the program from our vendor
8  called vPro.  It's our central voter file software.  It's
9  called ND Voices.
10 **Q.**   And how long has that been in use in North Dakota?
11 **A.**   Since 2015.
12 **Q.**   Do any other jurisdictions utilize that type of vendor, if
13 you know?
14 **A.**   I believe South Dakota and New Mexico use the same
15 software platform.  It would obviously be different based upon
16 their state codes and regulations.
17 **Q.**   Is that state-of-the-art software, to your mind?
18 **A.**   It is nearing its end of life.  It is -- we are looking at
19 procuring new software within the next few -- next few years.
20 **Q.**   Is that type of software expensive?
21 **A.**   We asked for $5 million in funding in this last
22 legislative cycle.
23 **Q.**   Okay.  Can you break down for us the various -- you know,
24 what's the system called and the various types of subsystems
25 that are located within this database software, et cetera?

  1  **A.**   Well, the Street Master -- in regards to the Street
  2  Master?
  3  **Q.**   What's the overall Secretary of State voting
  4  administration system called?
  5  **A.**   ND Voices.
  6  **Q.**   Okay.  And within ND Voices, are there some subsystems?
  7  **A.**   So the central voter file is one piece of that.  That's
  8  the database of all the voters there.  There's also the
  9  election management software.  That's what uses -- the system
 10  uses to create the ballots, contests, add candidates to that
 11  ballot.  Also it exports that file to a vendor to print those
 12  ballots for us and program our software for the election
 13  equipment, as well as maintaining our streets and precincts and
 14  jurisdictions within that -- within that software.
 15  **Q.**   Sure.  And is there some interaction between North Dakota
 16  agencies to create that central voter file with the
 17  voter-specific information?
 18  **A.**   There is.  We work with the Department of Transportation.
 19  We receive a file from them of any new -- new voters, per se,
 20  and as well as any address updates for any voters within North
 21  Dakota.
 22          Department of Corrections will send a file of all
 23  incarcerated felons that are being -- in the prison system or
 24  being released from Department of Corrections so we can update
 25  our files to allow the voting rights to be restored.

1          And then Vital Records updates us for any death

2    records that they -- have been received so we can update our

3    records as well.

4    Q.    Sure.  So let's talk about now who has access to these --

5    these election voting systems that are maintained at the

6    Secretary of State.  I'm assuming you have access.

7    A.    Correct.

8    Q.    Who else has access to the system?

9    A.    The Secretary of State's Office within the elections

10   department has access to all counties' information, but then

11   each individual county has their own access to their own

12   counties' worth of information.  But they do have the

13   capability to search the entire voter database for voters, if

14   necessary; the county auditor within that agency, as well as

15   any deputies or assistants that they have within their own

16   agency.

17   Q.    Sure.  And then we've heard quite a bit of testimony in

18   this case about data that was taken from the Secretary of

19   State's website.  Is there access for the public information

20   there?

21   A.    On our website -- for example, election night reporting is

22   information so you can see the election results on that night.

23   You can also go into our website to see where you are -- where

24   you are aligned to vote, look up your districts.  You can even

25   see a sample ballot, if you have questions about voting,

1   different types of information, what ID's are appropriate, what

2   ID's you can use, supplemental documentation, just general

3   information questions on our vote.nd.gov website.

4   Q.   Sure.  Is it common for outside parties to access the

5   Secretary of State and obtain that information?

6   A.   All the time, yes.

7   Q.   Sure.  And do you personally get requests for information

8   from time to time?

9   A.   Mm-hmm.  Yes.  I'm sorry.

10  Q.   Thanks.  Let's talk specifically a little bit more about

11  the auditor training.  It sounds like there will be some

12  training upcoming, after you talk to the auditors this summer,

13  but what types of things are the auditors trained on, and who

14  does that?

15  A.   It -- many people.  In particular, myself, I will go over

16  the election software in particular, how to create an election,

17  how this -- how to input different parts to create your own

18  election.  But we also bring in vendors to use -- that we use

19  their equipment for, so we bring them in for training purposes

20  as well.  Anyone within our elections department will help

21  provide guidance and training on a particular area, as

22  necessary.

23  Q.   Did you do any of that prior to the newly-enacted map that

24  came out in November of 2021?

25  A.   I did.  I worked with the county auditors on how to

1  proceed through the process of redistricting, how to update
2  their maps accordingly to get that information into the system,
3  how to use the Street Master, and what to look for through
4  processing that -- those address updates to define those new
5  precincts and boundaries.
6  Q.   So in your current position, you went through a few
7  election cycles before 2022, correct?
8  A.   Correct.
9  Q.   Was the training and the involvement with the auditors
10 more or less in 2021 or thereabouts?
11 A.   It was -- I would say it would be more because there was
12 new -- new boundaries, new precincts.  And as always, there's
13 new auditors that are being -- being brought in from turnover,
14 so --
15 Q.   Yeah.  And auditors, are they all elected in North Dakota?
16 A.   There -- there are some auditors that are appointed.  For
17 example, in Cass County, the auditor here is appointed.  Across
18 the state they can be elected.  Usually the larger
19 jurisdictions tend to appoint, but that's not -- it's up to the
20 individual county to decide how they wish to elect or appoint
21 their auditor.
22 Q.   So for appointments, do those last for a certain term?
23 A.   It does not.  It lasts the entirety of the contract with
24 the county.  They would stay as at-will of the county
25 commissioners.

**Q.**   Have you done specific auditor training of auditors that
have county -- or are in counties where there are tribal
reservations?

**A.**   I have.

**Q.**   What are some examples of those auditors and that type of
training?

**A.**   So, for example, in Sioux County there's auditor -- they
lost their longstanding auditor.  There's a brand-new auditor.
Went through their training program with them, helped them
identify mapping issues that they have, helped them understand
the jurisdictions that they have within their county, helped
them identify house numbers within certain streets that they
were having issues with looking at their maps.

**Q.**   And you were able to assist that auditor with those
issues?

**A.**   We do.  I did.

**Q.**   So, Brian, let's talk more specifically about the -- kind
of the nitty-gritty of those systems and what some of the terms
are that the auditors and yourself use when there are deadlines
and there are requirements set by law.  I know that Erika
talked yesterday, and I think you were here for that testimony,
right?

**A.**   I was.

**Q.**   Talked about December 31st, and I think you mentioned it
today as well.  December 31st is one of the drivers because

1   why?

2   **A.**   By Century Code the county auditor -- or, I'm sorry -- the

3   county commissioners must approve the precincts that will be

4   established for the upcoming election year, and then they must

5   remain in place for the remainder of that election year.

6   **Q.**   Okay.  So assuming, you know, a new map is enacted and the

7   auditors need to look at what they need to do because there are

8   changes in districts, what are some of the things those

9   auditors look at and have to do with the automated systems at

10   the Secretary of State's Office?

11   **A.**   So the first thing that the auditor would have to do is

12   review the map that was -- that's previously in place and

13   compare it against the map that is enacted or that is the

14   newest map, determine where those changes are.  They would need

15   to work with their emergency management coordinator, 911 person

16   or a GIS person, as well as their county commissioners to

17   decide if there's going to be changes to their precinct

18   boundaries within those legislative districts.

19   **Q.**   And have you been involved with those discussions and

20   those types of changes at the county auditor level?

21   **A.**   I have, to advise them of what it would take to make those

22   changes happen.

23   **Q.**   So yesterday Erika talked about jurisdictions, and I think

24   she rattled off a whole host of jurisdictions that the county

25   auditor works with and needs to account for in doing county

1   auditor work.  She also talked about precincts, and then she
2   talked about streets, and I'd like to ask you just a few
3   questions about the streets.  And I think you talked about
4   Street Master being kind of one of the subsystems that those
5   auditors and yourself works with when there's an upcoming
6   election.  So just explain to the Court what a street is and
7   why a street is important for this process.
8   A.    So in our software, we call it a Street -- Street Master,
9   and it keeps a log of all the roads, highways, streets that
10  there would be houses aligned to.  And we would create a
11  segment for a particular street within a precinct so we can
12  define what precinct that they are tied to to know what
13  jurisdictions are available to that one particular voter.
14          The Street Master has a line-by-line-by-line of the
15  street that will align from this house number range -- the
16  lowest number to the highest house number range within that
17  street will be defined, and then that voter would then be
18  assigned to that street segment that is tied to that precinct.
19  Q.    So Street Master is kind of a -- like a spreadsheet or a
20  database?
21  A.    It's a database that can be exported into a spreadsheet to
22  be used, but it is -- it is software.
23  Q.    Sure.  And then, like, at the county level in Street
24  Master, is it going to be a long spreadsheet?
25  A.    I would say on average the counties that we were

1  discussing in the Rolette area, there's roughly about 700

2  street segments per county, and --

3  **Q.**   And so --

4  **A.**   I'm sorry.  And it would also be larger -- like in the

5  Cass County range, it'd be exponentially larger.  The more

6  roads, the more divisions, the more processes that there are

7  within that precinct, the more street segments you have.

8  **Q.**   Why would a street be an appropriate boundary for a

9  precinct?

10  **A.**   Because the house numbers -- or houses are tied to a

11  street within that precinct.  Everything within that street is

12  often used as a boundary in the first place, so as a precinct

13  is aligned to a highway, we would be able to use that street,

14  say, from this house number range to this house number range,

15  this particular boundary, and then we would align every street

16  within that precinct to that precinct.

17  **Q.**   Is it fair to say that using a street as a boundary is

18  simpler for the auditor and for your office than, say, just

19  going through the country somewhere?

20  **A.**   It is.

21  **Q.**   And why is that?

22  **A.**   Simply because we can identify the lowest house number

23  range or even-odd-numbered house in a particular situation for

24  whether it's in this jurisdiction or that jurisdiction.

25  **Q.**   So when there are changes to the legislative districting

1  map, that Street Master for each county is going have to be

2  updated by the auditor, right?

3  **A.**    Correct.

4  **Q.**    And that's quite a bit of work?

5  **A.**    It is extensive, depending on circumstances.

6  **Q.**    And then GIS folks are involved in that process typically?

7  **A.**    Yes, because we would want to identify the house numbers

8  that are within a particular street to identify what the starts

9  and stops of a boundary would be.

10  **Q.**    Kind of switching gears to that central voter file of

11  voters, Brian, I think you said -- well, I don't know what you

12  said now.  You talked about each voter is assigned certain

13  information in the central voter file that I think ties back to

14  a street address, correct?

15  **A.**    Correct.

16  **Q.**    How does a voter change address in North Dakota,

17  typically?

18  **A.**    So the simplest way that can be done is, if you have a

19  North Dakota driver's license or non-driving ID, you can

20  contact -- by their website or by phone -- DOT, and they will

21  update their address.  We receive a file every day from

22  Department of Transportation, and it will update our system.  A

23  non-driving ID or a driver's ID from North Dakota, as long as

24  the plastic is there, the address that we have on file is what

25  matters; so you would not need to receive a new piece of

1  plastic in that situation.

2  **Q.**  So a North Dakota voter can change address without going

3  into a DOT office?

4  **A.**  Correct.

5  **Q.**  How long has that been in place, if you know?

6  **A.**  As long as I've known, 2018, since I -- since I've been

7  aware of it, so --

8  **Q.**  Since you've been employed with the Secretary of State --

9  **A.**  Correct.

10  **Q.**  -- since 2018?

11  **A.**  Yes.

12  **Q.**  Specifically in relation to auditor training, Brian, can

13  you recall any times where you've assisted auditors where they

14  have part of the county located next to reservations or

15  reservations are within that county, either in whole or in

16  part?

17  **A.**  We have.  I have, I should say.

18  **Q.**  And what do you recall about some of those situations,

19  Brian?

20  **A.**  Making -- well, for all auditors, making them aware that

21  tribal ID's are acceptable across the state, not just at -- on

22  tribal lands and tribal areas, to ensure that that

23  misconception isn't used, but teaching them about the tribal

24  ID's, what ID's are available.

25  **Q.**  Sure.  That was a bad question.  Specifically with regard

1  to kind of Street Master and reservation lands, have you

2  encountered any difficulties that you've assisted with in that

3  regard?

4  **A.**  Correct.  In Sioux County, for example, there was

5  situations where house numbers were being aligned differently

6  than what is expected in non-tribal areas.  So, for example,

7  they might have a house range from 100 to 500 on a particular

8  street, and then all of a sudden there would be a house number

9  5000 in the middle of the street.

10          And what that -- what we have learned is that

11  indicates that that house has been remodelled and the Bureau of

12  Indian Affairs Housing has reassigned that number, so they're

13  aware of that difference of housing number where they've

14  remodelled.

15          And so we had to work with the county auditor when

16  this situation happens, that they basically have to create a

17  second line segment in the Street Master to account for that

18  difference of house numbers; so instead of just 100 to 500,

19  they have a 5100 to 5500, for example.

20  **Q.**  Did you have to work with any GIS folks for that

21  particular issue?

22  **A.**  In Sioux County they hired a GIS contractor, and at that

23  time the auditor was fairly new, and she had questions about

24  how to proceed through this process, and they were able to work

25  through a mapping situation.  And then they -- the county

1  auditor often would use that map to help update their own

2  Street Master.

3  **Q.**   Okay.  Thanks, Brian.  Kind of moving on to the last topic

4  here is -- is the -- some programs that are available -- and I

5  don't know if "programs" is the right word -- to assist tribal

6  and Native Americans with voting and identification and

7  addressing issues.  Are you aware of any such programs that are

8  available through the State of North Dakota?

9  **A.**   I am.

10 **Q.**   What are those?  Just describe those briefly.

11 **A.**   One of the topics -- or one of the items is the -- for

12 Department of Transportation to go out to tribal lands to

13 provide mobile driver's license access to the tribes free of

14 charge.  There's also -- we provided supplemental documentation

15 forms, as well as alternative ID forms on our website.  There's

16 also on tribal -- or in counties where there are tribal lands,

17 they can use a map to identify -- if a voter is unaware of

18 where they live, that they could use to vote.

19        And there's also grants -- or not grants, but there's

20 funds available from the Secretary of State's Office to the

21 tribes to help off -- to assist with any tribal ID costs or

22 addressing issues that they would have within their county.

23        And then the other item we have is the desire to work

24 with the tribes to have an interactive file where the tribal --

25 the tribes would send a file of their tribal members to us with