# United States Court of Appeals for the Eighth Circuit

TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, SPIRIT LAKE TRIBE, WESLEY DAVIS, ZACHERY S. KING, COLLETTE BROWN,

*Plaintiffs-Appellees*,

v.

MICHAEL HOWE, in his official capacity as Secretary of State of North Dakota,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NORTH DAKOTA
(No. 3:22-cv-00022)

## BRIEF OF DEFENDANT-APPELLANT

David H. Thompson
Peter A. Patterson
Athanasia O. Livas
Special Assistant Attorneys General
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
alivas@cooperkirk.com
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036

Philip Axt (ND Bar No. 09585)
Solicitor General
pjaxt@nd.gov
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505

David R. Phillips (ND Bar No. 06116)
Special Assistant Attorney General
dphillips@bgwattorneys.com
300 West Century Ave., P.O. Box 4247
Bismarck, ND 58502

*Counsel for Defendant-Appellant*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

In this action, the district court recognized a novel theory for private plaintiffs to sue state officials over election maps under 42 U.S.C. § 1983 and, applying that theory, struck down North Dakota's duly enacted election map. As an apparent matter of first impression, the district court found § 1983 provides a backdoor for private plaintiffs to sue for "vote dilution" under Section 2 of the Voting Rights Act, despite the VRA providing no such cause of action itself. This creative claim construction is foreclosed by precedent, text, and structure.

The Supreme Court has held a plaintiff can only use § 1983 to bring a claim under another statute if the other statute: (1) unambiguously confers an individual right; and (2) does not foreclose using § 1983 through its own enforcement scheme. Neither condition is met here. "Vote dilution" is a collective concept analyzed in collective terms, not an individual right. And the VRA already provides for its own enforcement—establishing criminal liability and empowering a political actor, the Attorney General of the United States, to enforce the statute.

Even if the district court were right that § 1983 provides an end-run around Section 2 of the VRA, the district court erred in striking down North Dakota's map. Plaintiffs' preference for reshaped districts is unlawful racial gerrymandering, and the district court's findings were inadequate to strike down the State's election map.

The Secretary respectfully requests oral argument.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ..................................................5

STATEMENT OF THE ISSUES.........................................................5

STATEMENT OF THE CASE.............................................................6

    I. Factual and Procedural Background ............................................6

    II. Statutory Background .............................................................11

        A. Section 2 of the Voting Rights Act ...............................11

        B. 42 U.S.C. § 1983 ..........................................................14

SUMMARY OF ARGUMENT ...........................................................15

ARGUMENT .....................................................................................16

    I. Standard of Review ..................................................................16

    II. Section 1983 Does Not Provide a Backdoor for a Private Right of Action for Vote Dilution Claims Under Section 2 of the Voting Rights Act ......17

        A. The *Gonzaga* Test Determines Whether § 1983 Provides a Private Cause of Action for Plaintiffs' Claims...........................................17

        B. Section 1983 Does Not Provide a Private Cause of Action for Plaintiffs' Claims Under Section 2 of the VRA.............................24

            1. Section 2 of the Voting Rights Act does not unambiguously confer new individual rights .....................................................24

            2. The VRA's comprehensive enforcement scheme for Section 2 claims also precludes lawsuits by private plaintiffs ..............31

            3. The district court erred in reaching a contrary conclusion. ..35

III. Even If § 1983 Provides a Private Right of Action for Claims Brought Under Section 2 of the VRA, the District Court Erred in Striking Down North Dakota's Redistricting Plan ........................................................38

    A. The District Court Improperly Presumed Plaintiffs' Remedial Maps Could Be Racial Gerrymanders and Refused to Consider the Fact the State's Map Performed Better on Traditional Districting Criteria ........................................................................................................38

    B. Plaintiffs Did Not Offer Sufficient Statistical Evidence of Political Cohesion and Racially Polarized Voting in Subdistricts 9A and 9B ........................................................................................................44

CONCLUSION .......................................................................................47

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ........................................................................19

*Allen v. Milligan*,
    599 U.S. 1 (2023) ................................................................. passim

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
    86 F.4th 1204 (8th Cir. 2023),
    *pet. for reh'g filed* (Dec. 11, 2023) ............................................. passim

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ........................................................................19

*Bethune-Hill v. Virginia State Bd. of Elections*,
    580 U.S. 178 (2017) ........................................................................40

*Blessing v. Freestone*,
    520 U.S. 329 (1997) ...................................................... 19, 20, 29, 30

*Bone Shirt v. Hazeltine*,
    461 F.3d 1011 (8th Cir. 2006) .................................... 5, 38, 39, 44, 45

*Buckley v. Hennepin Cnty.*,
    9 F.4th 757 (8th Cir. 2021) ............................................................16

*Burnett v. Grattan*,
    468 U.S. 42 (1984)..........................................................................14

*Bush v. Vera*,
    517 U.S. 952 (1996) ................................................................. 40, 43

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979) ........................................................................30

*City of Mobile v. Bolden*,
    446 U.S. 55 (1980) ................................................................... 13, 23

*City of Rancho Palos Verdes, Cal. v. Abrams*,
    544 U.S. 113 (2005) ................................................ 14, 20, 21, 22, 32

*Clay v. Bd. of Educ.*,
  90 F.3d 1357 (8th Cir. 1996) ............................................................38

*Comm. for a Fair and Balanced Map v. Ill. Bd. of Elections*,
  No. 1:11-CV-5065, 2011 WL 5185567 (N.D. Ill. Nov. 1, 2011) ....................29

*Cooper v. Harris*,
  581 U.S. 285 (2017)................................................................ 39, 40, 41

*Cottier v. City of Martin*,
  445 F.3d 1113 (8th Cir. 2006),
  *vacated on reh'g en banc*, 604 F.3d 553 (8th Cir. 2010)............................ 45, 46

*Does v. Gillespie*,
  867 F.3d 1034 (8th Cir. 2017) .................................................... 19, 36

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002).................................................................. passim

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
  599 U.S. 166 (2023).................................................................. passim

*Kaplan v. Mayo Clinic*,
  847 F.3d 988 (8th Cir. 2017) ............................................................16

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ................................................................38, 44

*McCready v. White*,
  417 F.3d 700 (7th Cir. 2005) ..........................................................22

*McConchie v. Scholz*,
  567 F. Supp. 3d 861 (N.D. Ill. 2021) .................................................34

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) ..................................................................34

*MHANY Mgmt. Inc. v. Cnty. of Nassau*,
  843 F. Supp. 2d 287 (E.D.N.Y. 2012) ..............................................22

*Midwest Foster Care and Adoption Ass'n v. Kincade*,
  712 F.3d 1190 (8th Cir. 2003) ....................................................20, 29

*Miller v. Johnson*,
515 U.S. 900 (1995) ................................................................13, 42

*Pennhurst State School and Hospital v. Halderman*,
451 U.S. 1 (1981) ...............................................................26

*Roemmich v. Eagle Eye Dev., LLC*,
526 F.3d 343 (8th Cir. 2008) ..............................................17

*Shaw v. Reno*,
509 U.S. 630 (1993) ...........................................................13, 40

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) ...........................................................6, 12

*Thornburg v. Gingles*,
478 U.S. 30 (1986) .............................................................passim

*Upham v. Seamon*,
456 U.S. 37 (1982) ............................................................. 11, 47

*Walen v. Burgum*,
---F.Supp.3d---, 2023 WL 7216070 (D.N.D. Nov. 2, 2023) .............................7

*Webster v. Fall*,
266 U.S. 507 (1925) ...........................................................36

## U.S. Constitution

U.S. CONST. amend. XV, § 1 .......................................................6, 12, 27

## N.D. Constitution

N.D. CONST., art. IV, § 1 ...........................................................7

N.D. CONST., art. IV, § 2. ...........................................................7

## Statutes

28 U.S.C. § 1291 .......................................................................5

28 U.S.C. § 1331 ...................................................................................5

42 U.S.C. § 1983 ........................................................................... passim

52 U.S.C. § 10301 .............................................................…..13, 25

52 U.S.C. § 10301(a) ..........................................................................31

52 U.S.C. § 10301(b) ..........................................................6, 27, 30, 31

52 U.S.C. § 10310(e) ..........................................................................37

52 U.S.C. § 10308(d) ........................................................................6, 33

Voting Rights Act Amendments of 1982,
    Pub. L. No. 97-205, § 3, 96 Stat. 131 (1982),
    *codified at* 52 U.S.C. 10301 ...............................................13

## Other

Elmendorf & Spencer, *Administering Section 2 of the Voting Rights Act After Shelby County*,
    115 COLUM. L. REV. 2143, 2157–58 (2015) …………………………..……34

# INTRODUCTION

This litigation involves allegations of "vote dilution" under Section 2 of the Voting Rights Act. The basis for Plaintiffs' "dilution" allegation is a preference for racially gerrymandering the election map to join two distinct Native American tribal reservations in a single elongated district—despite the fact those different tribal reservations have never been joined in one legislative district in State history.

This Court has held Section 2 of the Voting Rights Act does not directly permit private parties to sue state officials over "vote dilution" claims. But the district court found, as a matter of apparent first impression, that 42 U.S.C. § 1983 provides an end-run around that limitation. On that theory, the district court accepted Plaintiffs' invitation to engage in their preferred form of racial gerrymandering and strike down North Dakota's duly enacted election map. That finding of a private right of action cannot be reconciled with statutory text and structure, nor with precedent from the Supreme Court and this Circuit. And even if it could, the district court's decision to strike down the State's map was error.

Plaintiffs' theory for a private right of action requires splicing the substantive provisions of Section 2's prohibition on disparate-impact-type "vote dilution" with § 1983's private cause of action for certain individual rights. The combination does not work. And it violates the Supreme Court's restriction on using § 1983 to provide a private right of action for other statutes _only_ when those other statutes

unambiguously (1) confer an individual right and (2) don't already have an enforcement mechanism that precludes enforcement by private suits.

Plaintiffs' strained theory also has serious real-word consequences. Placing enforcement authority into the hands of private individuals for "vote dilution" claims despite the VRA's delegation of power to the Attorney General—based on nothing more than ambiguity and statutory silence—raises serious separation of powers concerns, reminiscent of the days when courts implied private rights of action from vague language and congressional silence. Those concerns are all the more heightened in the fraught political context of federal lawsuits to enjoin state election maps. Congress left enforcement for "vote dilution" claims to a politically accountable actor who would be capable of making centralized judgments about a collective concept and would be attuned to the complicated realities of administering elections around the nation. The VRA's enforcement scheme, properly understood, makes sense. What does not make sense is bypassing Congress's plan by ramming "vote dilution" claims into an individual-rights cause of action under § 1983.

\* \* \*

Examining Plaintiffs' claims makes clear the incompatibility between "vote dilution" and an individual-rights cause of action. Section 2 of the VRA provides the substance of Plaintiffs' "dilution" claims. Section 2 prohibits disparate-impact-like "dilution" by comparing the collective voting power of one minority group

against the collective voting power of other racial groups. As applied here, the district court found North Dakota's election map resulted in less collective voting power for Native Americans in one part of the State when compared against the collective voting power of other racial groups. A vote dilution claim does not allege discriminatory intent or any abridgment of individual rights.

Meanwhile, Plaintiffs brought their "vote dilution" claim under § 1983, an entirely separate federal statute which provides a private cause of action for asserting certain violations of unambiguously conferred individual rights.

The district court, as an apparent matter of first impression, found Plaintiffs' "vote dilution" claim under Section 2 of the VRA qualifies as an unambiguously conferred individual right under § 1983. But to reach its result, the district court misapplied the test for determining when § 1983 can step in to provide a private cause of action for another statute, relied on inapposite statutory provisions, and followed the unexamined assumptions—not holdings—of other courts.

The district court recognized the correct test for applying § 1983 as the one laid down in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002). There, the Supreme Court held that § 1983 can only provide a cause of action for a different statute when that statute: (1) unambiguously confers an individual right, rather than an aggregate right or a prohibition focused on the regulated parties; and (2) does not demonstrate an intent to foreclose private litigation through its own enforcement scheme.

3

Applying that test to the VRA, it is clear Section 2 does not unambiguously create an individual right. Section 2 speaks in terms of prohibited conduct, not the creation of new rights. To the extent Section 2 mentions the right to vote, it merely parrots the pre-existing protection of the Fifteenth Amendment. And even if Section 2 could be read to create new rights, they are aggregate protections, not individual ones. Moreover, even if Section 2 could be read to create new individual rights, the statute's comprehensive enforcement scheme precludes any congressional intent to leave the enforcement of the statute in private hands.

What the text requires, structure and common sense confirm. Redistricting is a political process and vote dilution is a complex, collective concept. Congress therefore put enforcement in the hands of a politically-accountable actor capable of making complex, collective judgments—the Attorney General of the United States. But under Plaintiffs' interpretation, the Courts become the primary battleground for contested election maps, and private plaintiffs are the primary enforcers. Plaintiffs' interpretation has resulted in litigation chaos every time redistricting occurs— including, as happened here, different lawsuits simultaneously alleging the exact same election map both bolstered Native American voting strength too much and didn't bolster it enough. Congress did not legislate that chaos into the VRA, and the Court should not go out of its way to infer it. Congress does not undermine federalism and the separation of powers in such an oblique, round-about way.

In short, the plain reading of the statutes is also the most logical one. Section 2 of the VRA, which created, at most, a *collective* protection against "vote dilution"—cannot be jammed to fit within § 1983's provision for a private cause of action for asserting individual rights. And even if it could, the district's decision to invalidate North Dakota's election map was in error for multiple reasons.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. The district court entered final judgment on November 1, 2023, and the Secretary filed a timely notice of appeal on December 4, 2023. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding 42 U.S.C. § 1983 provides a private right of action to sue for alleged vote dilution under Section 2 of the Voting Rights Act. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023); *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002); *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023), *pet. for reh'g filed* (Dec. 11, 2023); Add.1-12, App.33-44, R.Doc.30.

2. Whether the district court erred in finding that North Dakota's 2021 legislative redistricting plan violates Section 2 of the Voting Rights Act. *Thornburg v. Gingles*, 478 U.S. 30 (1986); *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006); Add.27-65, App.455-493, R.Doc.125.

## STATEMENT OF THE CASE

### I.  Factual and Procedural Background.

In 1965, Congress enacted the Voting Rights Act, which "outlawed some of the tactics" recalcitrant states had used to deny the right to vote. *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 313 (1966).  As originally enacted, the VRA simply implemented the Fifteenth Amendment, which guarantees the right to vote "shall not be denied or abridged … by any state on account of race, color, or previous condition of servitude."  U.S. CONST. amend. XV, § 1.  The VRA's key contribution to the Fifteenth Amendment's declaration of rights was providing a means to enforce the Amendment's guarantees through various federal enforcement mechanisms.

Relevant here, Section 2 the Voting Rights Act, as amended in 1982, prohibits what has become known as "vote dilution," a type of disparate-impact theory where "the political processes leading to [a] nomination or election … are not equally open to participation by members of a class of citizens … in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).  The VRA provides its own remedies for Section 2 violations—creating criminal liability and empowering the Attorney General to bring a civil suit for injunctive and other relief against State and local officials.  *Id.* § 10308(d).

The North Dakota Constitution requires the State Legislative Assembly to redraw State legislative districts following every census. N.D. CONST., art. IV, § 2. The North Dakota Constitution imposes several constraints on this redistricting. For example, the Legislative Assembly is required to "fix the number of senators and representatives and divide the state into as many senatorial districts of compact and contiguous territory as there are senators." N.D. CONST., art. IV, § 1. The State Legislative Assembly enacted the challenged legislative redistricting map in 2021, with broad bipartisan support. *See* N.D. HB 1504 (2021).[1]

Unhappy with the State's 2021 redistricting—and with no lawsuit initiated by the U.S. Attorney General—Plaintiffs sued North Dakota's Secretary of State ("the Secretary") alleging the redistricting map "diluted" Native American voting strength in violation of Section 2. Plaintiffs asserted a private right of action through two methods: first, through an implied right of action under Section 2 of the VRA itself, and second, through 42 U.S.C. § 1983. At the same time, in a separate lawsuit, the State was sued by other private plaintiffs who alleged the exact same redistricting plan unlawfully bolstered Native American voting strength too much. *See Walen v. Burgum*, ---F.Supp.3d---, 2023 WL 7216070 (D.N.D. Nov. 2, 2023) (three-judge court), *direct appeal to U.S. Supreme Court filed* (Jan. 3, 2024).

---

[1] *See also, e.g.*, Rob Port, *If the redistricting map was racist, why did so many Democrats and Native Americans vote for it?*, INFORUM (Nov. 27, 2023), https://bit.ly/3Ofk0xE.

In this action, the substance of Plaintiffs' "vote dilution" claim is a preference for a racially gerrymandered election map that bolsters Native American voting power by combining two distinct Native American tribal reservations into a single, elongated district that stretches diagonally across the northeast of the State. These different tribal reservations had never been joined in a single legislative district in the history of the State. Yet, "[i]n order to comply with the VRA," Plaintiffs alleged, "North Dakota must implement a redistricting plan in which Native American voters on the Turtle Mountain and Spirit Lake Reservations comprise [a] … majority in a single legislative district." App.3, R.Doc.1 at ¶ 9.

The district court denied the Secretary's motion to dismiss for lack of a private cause of action. On that threshold question, the district court declined to "decide whether Section 2 of the VRA, standing alone, contains an implied private right of action." Add.12, App.44, R.Doc.30 at 12. This Court has since answered that question in the negative. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1214-15 (8th Cir. 2023), *pet. for reh'g filed* (Dec. 11, 2023).

Instead, the district court held—as an apparent matter of first impression—that 42 U.S.C. § 1983 provides a backdoor to bring claims under Section 2 of the VRA. The district court acknowledged "[t]he question of whether Section 2 of the VRA contains a private right of action presents a novel legal question," Add.6, App.38, R.Doc.30 at 6, and "without it, the Court does not have subject matter

jurisdiction to decide a Section 2 claim that is not joined by the United States Attorney General." Add.8, App.40, R.Doc.30 at 8. The district court also noted "[a]t first blush, the Secretary's argument"—that Plaintiffs cannot bring their Section 2 claims through § 1983—was "compelling." *Id.* Nonetheless, the district court found § 1983 provides a private right of action for claims under Section 2 of the VRA. Add.12, App.44, R.Doc.30 at 12.

In analyzing this critical question, the district court applied the Supreme Court's test from *Gonzaga*, 536 U.S. at 284. Add.8-9, App.40-41, R.Doc.30 at 8-9. Quoting from *Gonzaga*, the district court acknowledged that "discerning whether personal rights exist in the § 1983 context should … not differ from [the Court's] role in discerning whether personal rights exist in the implied right of action context." Add.9, App.41, R.Doc.30 at 9. But after correctly identifying the test, the district court's analysis went astray.

In stating the *Gonzaga* test, the district court noted that § 1983 only applies where a statute confers an "individual" right. Add.8, App.40, R.Doc.30 at 8 ("Rights are enforceable through § 1983 only if it is clear that Congress intended to establish an individual right."). But in applying the *Gonzaga* test, the district court only considered whether Section 2 "confers a right." Add.10, App.42, R.Doc.30 at 10. The district court did not analyze whether any right allegedly conferred by Section 2 was individual or collective. *Id.* That was error.

On the second step of the *Gonzaga* test—whether the other statute forecloses the § 1983 private remedy by providing other enforcement remedies—the district court acknowledged "Section 2 does not contain any language creating a private remedy." Add.11, App.43, R.Doc.30 at 11. The district court also acknowledged the VRA contains a comprehensive enforcement scheme for alleged Section 2 violations, which empowers "the Attorney General to seek an injunction and potential fines and imprisonment." *Id*. But the district court nonetheless stated it "cannot conclude that private enforcement of Section 2 is incompatible with the enforcement scheme." Add.12, App.44, R.Doc.30 at 12. That was also error.

After denying the Secretary's motion to dismiss, the district court held a bench trial in June of 2023. There was then silence from the court for months. Finally, on November 17, 2023—more than five months after the bench trial, and mere weeks before the 2024 election map had to be fixed with finality—the district court issued a judgment concluding the State's redistricting plan "prevents Native American voters from having an equal opportunity to elect candidates of their choice" and enjoining the Secretary from "administering, enforcing, preparing for, or in any way permitting the nomination or election" of candidates in several legislative districts. Add.64-65, App.492-93, R.Doc.125 at 38-39. That was also error.

The Secretary timely appealed. Given the exigency caused by the timing of the district court's order, the Secretary moved for a stay of the district court's

judgment pending appeal.  The Secretary explained that changing the election map

at the eleventh hour risked substantial confusion, hardship, and unfairness for

candidates, voters, and election administrators.  The district court denied the

Secretary's motion for a stay.  App.496-501, R.Doc.153. The Secretary moved for a

stay and an expedited ruling in this Court on December 13, 2023.  This Court entered

a docket order without opinion granting the motion to expedite and denying the stay

on December 15, 2023.  The district court subsequently entered a remedial order

imposing an election map preferred by the Plaintiffs.  App.502-504, R.Doc.164.  The

Secretary will comply with that remedial order for the 2024 elections.[2]

## II.     Statutory Background.

### A. Section 2 of the Voting Rights Act.

In 1965, Congress passed the VRA as an enforcement mechanism for the

voting rights guaranteed in the Fifteenth Amendment.  That Amendment provides:

"The right of citizens of the United States to vote shall not be denied or abridged by

_____

[2] The Secretary maintains that the district court made multiple errors in striking down
the State's election map, and that its judgment should have been stayed through the
2024 election so that the State could receive a meaningful opportunity for appellate
review before its duly enacted election map was replaced by the decree of a federal
judge.  Nonetheless, the Secretary's motions for a stay have been denied, and the
State needs finality on what map will be used for the 2024 elections.  *Cf. Upham v.
Seamon*, 456 U.S. 37, 44 (1982) (even if it is determined on appeal the district court
improperly struck a state's redistricting plan and imposed its own remedial plan, the
realities of administering an upcoming election may require "allow[ing] the election
to go forward in accordance with the [court-imposed] schedule").

the United States or by any state on account of race, color, or previous condition of servitude." U.S. CONST. amend. XV, § 1. In passing the VRA, "Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment." *Katzenbach*, 383 U.S. at 309.

"The heart of the Act is a complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant." *Id.* at 315. To achieve those ends, the VRA created an extensive remedial scheme with several prohibitions and administrative protections, most of which are not at issue here. To provide just a few examples: Section 4(a) suspended literacy tests, Section 5 created an administrative preclearance system for federally reviewing new voting regulations in certain jurisdictions, Section 8 authorized the appointment of federal poll-watchers, and Section 10(d) addressed poll taxes. *Id.* at 315–16.

At issue here is Section 2 of the VRA, which the Supreme Court has summarized as "prohibit[ing] the use of voting rules to abridge exercise of the franchise on racial grounds." *Id*. at 316. Also relevant are Sections 11 and 12(a)-(d), which "authorize civil and criminal sanctions" by the Attorney General and other government officials against violators of Section 2's prohibition. *Id.*

The original Section 2 did not cover what are now known as "vote dilution" claims, that is, claims that only allege discriminatory results without any showing of

discriminatory intent or motivation. In *City of Mobile v. Bolden*, the Supreme Court's first Section 2 case, the Court considered claims (brought directly under the Fifteenth Amendment and under Section 2 of the VRA) alleging a race-neutral election procedure produced discriminatory outcomes. 446 U.S. 55, 58 (1980). The Court held that a facially race-neutral electoral procedure "violates the Fifteenth Amendment *only* if motivated by a discriminatory purpose." *Id.* at 62 (emphasis added). Because Section 2 was then co-extensive with the Fifteenth Amendment, the same was true of claims brought under Section 2. *Id.*

Congress was unhappy with the Supreme Court's *Bolden* decision. Although Congress could not abrogate the Court's *constitutional* holding, Congress abrogated the Court's statutory holding in 1982 by amending Section 2 to include so-called "vote dilution" claims. The amended statute functionally created disparate-impact liability, prohibiting any electoral practice that "results" in a minority group having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, § 3, 96 Stat. 131 (1982), *codified at* 52 U.S.C. 10301.[3]

---

[3] Section 2 of the VRA is of course not the only means to challenge a redistricting plan on race-discrimination grounds. Plaintiffs can also bring claims under the Equal Protection Clause for racial gerrymandering. *See Miller v. Johnson*, 515 U.S. 900, 916–917 (1995); *see also id.* at 903 ("In *Shaw v. Reno*, 509 U.S. 630 [] (1993), we held that a plaintiff states a claim under the Equal Protection Clause by alleging that a state redistricting plan, on its face, has no rational explanation save as an effort to separate voters on the basis of race.").

## B. 42 U.S.C. § 1983.

Congress enacted 42 U.S.C. § 1983 as part of the Civil Rights Act of 1871 to enforce the individual-rights guarantees of the Fourteenth Amendment. Section 1983 provides a federal cause of action for violations of individual federal rights by state actors under certain conditions. In relevant part, the text covers: "Every person who … subjects … any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. "The central objective" of § 1983 "is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief." *Burnett v. Grattan*, 468 U.S. 42, 55 (1984).

Section 1983 does not create new rights; it "merely provides a mechanism for enforcing individual rights 'secured' elsewhere." *Gonzaga*, 536 U.S. at 284–85. "[T]he text of § 1983 permits the enforcement of '*rights*, not the broader or vaguer 'benefits' or 'interests.'" *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 122 (2005) (quoting *Gonzaga*, 536 U.S. at 283) (emphasis original). Those rights must be individual, not aggregate. *Gonzaga*, 536 U.S. at 275 (where statutes "have an 'aggregate' focus, they are not concerned with … any particular person … and they cannot give rise to individual rights"). And plaintiffs cannot assert claims through § 1983 when "the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983." *Talevski*, 599 U.S. at 187.

# SUMMARY OF ARGUMENT

As a threshold matter, the district court erred in finding § 1983 provides a private cause of action for a claim of collective vote dilution under Section 2 of the VRA. The district court's finding is erroneous in multiple respects.

First, under the Supreme Court's *Gonzaga* test, Section 2 does not *unambiguously* create an *individual* right. Section 2's text, structure, and application are all unmistakably *aggregate* in nature—not individual. Moreover, Section 2 does not create *rights* focused on the beneficiary, but rather creates *prohibitions* focused on the regulated party, not the intended beneficiary.

Second, even if Section 2 could be read to unambiguously create a new individual right, the statute's enforcement scheme precludes any congressional intent to sweep in a private right of action through § 1983. Enforcement of the prohibition against vote dilution by the Attorney General makes good sense and is consistent with the broader statutory scheme and other protections of the VRA.

And third, the district court's analysis reaching a contrary conclusion demonstrably erred in at least three important ways. First, the district court only analyzed whether Section 2 "conferred a right" not whether it conferred an *individual* right, a critical factor for any § 1983 analysis. Second, the district court looked to cases in which other courts had assumed, *but did not decide*, Section 2 claims can be brought by private plaintiffs. And third, the district court relied on an

inapposite fees provision which refers to VRA claims brought to remedy direct discrimination, *not* disparate-impact vote dilution claims under Section 2.

Finally, even if § 1983 could provide a private right of action for collective "vote dilution" claims, the district court was wrong to take Plaintiffs up on their invitation to engage in racial gerrymandering, and its findings were insufficient to strike down the State's election map for multiple reasons. For one, the district court presumed it was irrelevant whether Plaintiffs' proposed remedial maps were racial gerrymanders predominantly drawn along racial lines, improperly analyzing the first precondition for a vote dilution claim. And for another, Plaintiffs' expert admitted there was not statistically sufficient evidence to establish racial political cohesion in the challenged subdistricts, failing the second precondition for a vote dilution claim.

## ARGUMENT

### I. Standard of Review.

The Court reviews whether a plaintiff has a cause of action for its claims de novo. *Buckley v. Hennepin Cnty.*, 9 F.4th 757, 760 (8th Cir. 2021). "After a bench trial, this court reviews legal conclusions de novo." *Kaplan v. Mayo Clinic*, 847 F.3d 988, 991 (8th Cir. 2017). Factual findings are reviewed for clear error and reversed if "(1) the findings are not supported by substantial evidence in the record, (2) the findings are based on an erroneous view of the law, or (3) the court is left with the definite and firm conviction that an error has been made." *Id.* The Court

reviews "mixed questions of law and fact de novo." *Roemmich v. Eagle Eye Dev., LLC*, 526 F.3d 343, 353 (8th Cir. 2008).

## II. Section 1983 Does Not Provide a Backdoor for a Private Right of Action for Vote Dilution Claims Under Section 2 of the Voting Rights Act.

### A. The *Gonzaga* Test Determines Whether § 1983 Provides a Private Cause of Action for Plaintiffs' Claims.

"Although federal statutes have the *potential* to create § 1983-enforceable rights, they do not do so as a matter of course." *Talevski*, 599 U.S. at 183 (emphasis added). The Supreme Court's *Gonzaga* decision provides the test for assessing the applicability of § 1983 to another statute. *Id*. at 183 ("*Gonzaga* sets forth our established method …"). Were there no such threshold inquiry, the entire body of caselaw on implied rights of action would be irrelevant; § 1983 could simply provide a wide-open backdoor for a private cause of action. But that's not the law.

The test for whether a claim from a different statute can be brought under § 1983 proceeds in two steps. The first step requires the Court to find that the other statute unambiguously creates a federal individual right. "To seek redress through § 1983, a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*" *Gonzaga*, 536 U.S. at 282 (cleaned up). The Supreme Court's "precedent sets a demanding bar: Statutory provisions must *unambiguously* confer individual federal rights." *Talevski*, 599 U.S. at 180 (emphasis original). This threshold inquiry is a "significant hurdle." *Id*. at 184*; see also Gonzaga*, 536 U.S.

at 283 ("We [] reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983.").

The requirement that the other statute unambiguously create an individual right follows directly from the text of § 1983. "Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States. Accordingly, it is *rights,* not the broader or vaguer 'benefits' or 'interests' that may be enforced under the authority of that section." *Gonzaga*, 536 U.S. at 283 (emphasis original). For that reason, the Court has expressly held that "implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983." *Id.*

For a statute to create an individual right, several factors must be satisfied. "[R]ights-creating language" is "critical to showing the requisite congressional intent to create *new* rights." *Gonzaga*, 536 U.S. at 287 (emphasis added). And Courts look for "individually focused terminology." *Id.* For example, the Court in *Gonzaga* compared the rights-creating language of Titles VI and IX ("No person … shall … be subjected to discrimination") with the non-rights creating language of FERPA: "directing that '[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'" *Id.* FERPA's focus on the regulated party, even if it confers a benefit on a protected class, "clearly

does not confer the sort of '*individual* entitlement' that is enforceable under § 1983." *Id.* (quoting *Blessing v. Freestone*, 520 U.S. 329, 343 (1997)) (emphasis original).

The statute must also create a right held by the person *protected*, as distinct from a prohibition aimed at the person *regulated*. *Gonzaga*, 536 U.S. at 287 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'") (quoting *Alexander v. Sandoval,* 532 U.S. 275, 289 (2001)). And a statute that simply establishes a prohibited "policy or practice" is not sufficient. *Id.* at 288–89. For example, in *Armstrong v. Exceptional Child Ctr., Inc.*, the Supreme Court held that a statute lacked rights-creating language where it was "phrased as a directive to the federal agency charged with approving state Medicaid plans[.]" 575 U.S. 320, 331 (2015); *see also Does v. Gillespie*, 867 F.3d 1034, 1041–42 (8th Cir. 2017) ("a statute that speaks to the government official" empowered by a statute "'does not confer the sort of *individual* entitlement that is enforceable under § 1983'") (quoting *Gonzaga*, 536 U.S. at 287) (emphasis original).

Similarly, statutes that have an "aggregate" focus "cannot give rise to individual rights." *Gonzaga*, 536 U.S. at 275 (citation omitted). Where the statute directs an enforcing authority to look to "aggregate services provided by the State, not to whether the needs of any particular person have been satisfied," the statute "confer[s] no individual rights and thus could not be enforced by § 1983." *Id.* at 282

(citation omitted); *see also Midwest Foster Care and Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1200 (8th Cir. 2003) ("we discern an aggregate focus" for a statute when the statute is "not concerned with '[] the needs of any particular [person]'") (citing *Gonzaga*, 536 U.S. at 288).

Moving to step two, even if a plaintiff meets the "demanding bar" of demonstrating the other statute unambiguously created individual rights, *Talevski*, 599 U.S. at 180, that is not the end of the inquiry. The second step for any § 1983 analysis requires the Court to find Congress did not foreclose private enforcement through the statute's *own* enforcement regime. The State may show Congress "shut the door to private enforcement … 'impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Gonzaga*, 536 U.S. at 285 n.4 (quoting *Blessing*, 520 U.S. at 341).

"[T]he *sine qua non* of a finding that Congress implicitly intended to preclude a private right of action under § 1983 is incompatibility between enforcement under § 1983 and the enforcement scheme that Congress has enacted." *Talevski*, 599 U.S. at 187; *see also Rancho Palos Verdes*, 544 U.S. at 120–21 ("The critical question … is whether Congress meant the judicial remedy expressly authorized by [the other statute] to coexist with [the private] remedy available in a § 1983 action.").

In summary, the Supreme Court has established that private plaintiffs may invoke § 1983 to assert individual rights created under other federal statutes. But

the two-part test established by *Gonzaga* and its progeny lays out the stringent conditions that must be met before a cause of action can be asserted under § 1983.

Perhaps recognizing the difficulty of satisfying the Supreme Court's test, Plaintiffs argued before the district court that the *Gonzaga* test doesn't apply to their claims. *See* R.Doc.142 at 5-10. Specifically, Plaintiffs argued the *Gonzaga* test only applies to statutes enacted pursuant to the Spending Clause and does not apply to statutes implementing the Reconstruction Amendments. *See* R.Doc.142 at 5 (asserting, without any citation, that § 1983 "necessarily applies to Reconstruction Amendment statutes unless expressly exempted by the statutory text").

This is a limitation of Plaintiffs' own invention. The Supreme Court has established no exemption to the *Gonzaga* test for certain types of statutes, and in fact has repeatedly stated the *Gonzaga* test in broad terms applicable to *all* federal statutes. *E.g.*, *Talevski*, 599 U.S. at 175 ("[W]e have crafted a test for determining whether a particular *federal law* actually secures rights for § 1983 purposes.") (emphasis added); *id.* at 183 (discussing the test as to "federal statutes" and then specifying an additional point "[f]or Spending Clause legislation *in particular*") (emphasis added). Indeed, the Supreme Court has applied the *Gonzaga* test in cases that did *not* implicate the Spending Clause at all. *See Rancho Palos Verdes*, 544 U.S. at 119–20 (stating "§ 1983 does not provide an avenue for relief every time a

state actor violates a federal law" and applying the two-step *Gonzaga* test to the Telecommunications Act of 1996).

Consequently, other courts have expressly rejected Plaintiffs' contention that the *Gonzaga* framework is applicable only to Spending Power statutes. *See McCready v. White*, 417 F.3d 700, 703 (7th Cir. 2005) ("Any possibility that *Gonzaga* is limited to statutes that rest on the spending power ... has been dispelled by *Rancho Palos Verdes v. Abrams*, 544 U.S. 113 [] (2005), which treats *Gonzaga* as establishing the effect of § 1983 itself."); *MHANY Mgmt. Inc. v. Cnty. of Nassau*, 843 F. Supp. 2d 287, 335 (E.D.N.Y. 2012) ("Courts have interpreted [the Supreme Court's decision in *Rancho Palos Verdes*] as confirmation that *Gonzaga* is not limited to violations of laws passed pursuant to the spending power."), *aff'd in part, vacated in part*, 819 F.3d 581 (2d Cir. 2016).

And for good reason. Carving out certain types of statutes is impossible where the *Gonzaga* test arises from the very *text* of § 1983 itself. As the Supreme Court has explained, "Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States. Accordingly, it is *rights*, not the broader or vaguer 'benefits' or 'interests' that may be enforced under the authority of that section." *Gonzaga*, 536 U.S. at 283 (emphasis in original). That text constrains not only Spending Clause statutes, but any statute which a putative plaintiff may wish to enforce under § 1983.

In any event, before the district court, Plaintiffs provided no alternative to the *Gonzaga* test for their claims, besides to assert that any statutes enacted pursuant to the Reconstruction-Era Amendments automatically qualify. That plainly cannot be the test. "Although federal statutes have the *potential* to create § 1983-enforceable rights, they do not do so as a matter of course." *Talevski*, 599 U.S. at 183.

Finally, even if Plaintiffs were right about the test—that any statute enacted to enforce the Reconstruction-Era Amendments falls within § 1983's coverage regardless of the statute's text—Plaintiffs' claims would fail their own test. "Vote dilution" claims under Section 2's 1982 amendment go beyond the scope of the Reconstruction-Era Amendments, as this Court and the Supreme Court have made clear. *See Ark. State Conf. NAACP*, 86 F.4th at 1213 n.3 ("By focusing solely on the discriminatory impact [under Section 2], not intentional discrimination, the advocacy groups are not attempting to 'enforce the voting guarantees of the fourteenth or fifteenth amendment.'"); *see also Allen v. Milligan*, 599 U.S. 1, 10–13 (2023) (explaining the current form of Section 2 was enacted in response to the Supreme Court's holding in *Bolden* that the Fifteenth Amendment only applies to discriminatory intent, not discriminatory effect).

Thus, even if Plaintiffs were correct that there is a hidden exemption to the *Gonzaga* test for statutes enforcing Reconstruction-Era Amendments—which there

is not—Plaintiffs' "vote dilution" claims still would not qualify. But the *Gonzaga* test applies, and Plaintiffs cannot satisfy it for the reasons discussed *infra*.

**B. Section 1983 Does Not Provide a Private Cause of Action for Plaintiffs' Claims Under Section 2 of the VRA.**

**1. Section 2 of the Voting Rights Act does not unambiguously confer new individual rights.**

Plaintiffs cannot satisfy the "demanding" and "significant hurdle" of demonstrating Section 2's prohibition on collective vote dilution "unambiguously" creates an "individual" right. *Talevski*, 599 U.S. at 180, 184.

This Court's recent precedent has already established as much. In *Arkansas State Conf. NAACP*, this Court held "[i]t is *unclear* whether § 2 creates an individual right." 86 F.4th at 1209 (emphasis added). Given Plaintiffs must show the _unambiguous_ creation of an individual right to invoke the § 1983 cause of action, ambiguity precludes the use of § 1983. *See Gonzaga*, 536 U.S. at 280 (statute is not enforceable under § 1983 "unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights") (citation omitted).

That this Court in *Arkansas State Conf. NAACP* made that finding of ambiguity when analyzing whether Section 2 provides its own implied cause of action makes no difference whatsoever. The Supreme Court established in *Gonzaga* that the first steps of both inquiries—whether a statute creates an individual right—are one and the same. *Gonzaga*, 536 U.S. at 285 ("A court's role in discerning

whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context."). Thus, this Court's finding of ambiguity in the context of whether Section 2 creates an individual implied right of action necessarily forecloses there being an *unambiguous* individual right that could be asserted in the § 1983 context. The question has already been resolved by a published decision of this Court.

But even if this Court's earlier analysis were not binding, it is plainly correct. Section 2 is far from "unambiguous" in creating a federal individual right.

> Section 2 of the VRA states:
>
> **(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> **(b)** A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301 (formerly codified at 42 U.S.C. § 1973). The text of Section 2 does not unambiguously create an individual right for several reasons.

***First***, Section 2 of the VRA does not create an *individual* right. At first blush, subsection (a) of Section 2 may appear to contain rights-creating language. Indeed, the district court largely began and ended its analysis by simply pointing to subsection (a)'s prohibition on practices that "result[] in a denial or abridgement of the *right* of any citizen of the United States to vote on account of race or color" as provided in subsection (b). *See* Add.10, App.42, R.Doc.30 at 10 (emphasis added).

But mere use of the word "right" in a statute is not sufficient to find congressional intent to create an individual right. The Supreme Court rejected that very proposition in *Gonzaga.* Justice Stevens, in dissent, suggested "that any reference to 'rights,' even as a shorthand means of describing standards and procedures imposed on funding recipients, should give rise to a statute's enforceability under § 1983." 536 U.S. at 289 n.7. The Court disagreed, stating "[t]his argument was rejected in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 18–20 [] (1981)," which rejected a "presumption of enforceability merely because a statute speaks in terms of rights." *Id.* (cleaned up). Rather than ending the inquiry whenever a statute contains the word "right," the Supreme Court has explained courts "must not be guided by a single sentence … but look to the provisions of the whole law." *Pennhurst*, 451 U.S. at 8, 13, 18.

Moreover, subsection (a) does not speak in terms of any *new* rights. It merely (1) repeats the very same protection already secured by the Fifteenth Amendment—

"[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude," U.S. CONST. amend. XV, § 1—and (2) makes unlawful certain additional conduct—namely, the conduct "provided in subsection (b)." The only *new* guarantee in sub-section (a) is protection against the conduct referenced in sub-section (b). And sub-section (b) provides the basis for a "vote dilution" claim. Section 2 of the VRA did not create the right to vote free from abridgement on the basis of race. The Fifteenth Amendment did that. What Section 2 of the VRA did do (when amended in 1982) is create a new statutory prohibition based on a disparate impact theory for what has become known as "vote dilution."

Subsection (b), in turn, explains the new prohibition that subsection (a) references. Subsection (b) provides:

> A violation of subsection (a) is established if … the political processes leading to nomination or election … are not equally open to participation by members of a *class of citizens* protected by subsection (a) in that *its members* have less opportunity than *other members* of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. 10301(b) (emphasis added). A close reading of the statute makes plain that Section 2 only contains prohibitions related to the *collective* impact on "class[es] of citizens"—not any new creation of rights for *individuals*. At most, Section 2 guarantees certain protected "class[es] of citizens" the chance to elect candidates preferred by the majorities of those protected classes. 52 U.S.C. 10301(b).

This straightforward reading of Section 2 comports with how Section 2 claims are analyzed. Under the Supreme Court's governing caselaw for "vote dilution" claims, it is irrelevant whether any particular individual minority voter is able to select the candidate of his or her choice. Instead, Section 2 plaintiffs must prove that a collective "minority group" has "distinctive minority group interests" in the form of collectively favored candidates, and that a collective group of racial majority voters similarly vote in a bloc to defeat the group's preferred candidates. *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). By contrast, under a statute conferring an individual right, any single instance of a violation is sufficient to establish a violation of the statute. In an employment discrimination suit, for example, a single plaintiff can come to Court and prevail if she can prove her rights were violated. Not so for Section 2 claims. Unlike a rights-based case, proving that an individual voter suffered individual discrimination does not establish a Section 2 violation.

Consider an example in which an individual minority voter has a preferred candidate who is usually defeated by racial bloc voting. In that scenario, if the individual minority voter's preferred candidate is not *also* the preferred candidate of the collective "minority group" to which the individual belongs, there is no Section 2 violation. *See Gingles*, 478 U.S. at 51. Even where an individual voter is a *plaintiff* in a Section 2 case, Courts do not ask whether that individual's own preferred candidate is defeated by the bloc voting of another race. All that matters is whether

the individual "(1) is registered to vote and resides in the district where the discriminatory dilution occurred; and (2) is a *member of the minority group* whose voting strength was diluted." *Comm. for a Fair and Balanced Map v. Ill. Bd. of Elections*, No. 1:11-CV-5065, 2011 WL 5185567, *1 n.1 (N.D. Ill. Nov. 1, 2011) (three-judge court) (collecting cases) (emphasis added).

In Section 2 cases, what the Court must ultimately determine is whether—in the aggregate—"the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Gingles*, 478 U.S at 48 n.15. Consequently, what Section 2 ultimately protects is the electoral opportunity of *political majorities in racial minority groups* when compared to political majorities in racial majority groups. Section 2 does not protect the rights of any particular individual.

This defeats any implication § 1983 can provide a cause of action for Section 2 claims. "Statutes with an aggregate, rather than an individual, focus cannot give rise to individual rights." *Midwest Foster Care*, 712 F.3d at 1200 (cleaned up) (quoting *Gonzaga*, 536 U.S. at 288). For good reason. A statute with an "aggregate" focus differs fundamentally from an individual rights-based statute. For example, an aggregate statute is usually subject to a "substantial compliance regime," *id.* at 1200, in which a State can comply even if "any individual plaintiff," *Blessing*, 520 U.S. at 343–44, or even a "sizeable minority," *Midwest Foster Care*, 712 F.3d at

1201, of individuals covered by the statute do not receive the promised protection. And that is precisely the case for Section 2 claims.

Based on the substance and structure of Section 2—as well as the Supreme Court's governing precedent in *Gingles*—courts analyzing Section 2 claims are not "concerned with 'whether the needs of any particular person have been satisfied.'" *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 343). Thus, to the extent Section 2 creates any rights at all, it does not create individual rights.

***Second***, even if Section 2 were individualized, the statute does not create a new "right" but instead imposes a new *prohibition*. Supreme Court precedent firmly establishes that a *ban* on discriminatory conduct is not sufficient to create an individual right. "There would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting [the statute] with an unmistakable focus on the benefited class, had written it simply as a ban on discriminatory conduct ...." *Gonzaga*, 536 U.S. at 287 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 (1979)). Indeed, even the *dissent* in *Gonzaga* believed that a mere ban on conduct would not create an individual right. *See id.* at 295 (Stevens, J., dissenting). Just so here. Section 2 of the VRA speaks in terms of what may *not* be done in terms of policy or practice. *See* 52 U.S.C. § 10301(b) (prohibiting "political processes" that are "not equally open").

***Third***, and relatedly, Section 2 expressly focuses on the regulated parties—States and political subdivisions—not the persons granted an alleged individual right. For a statute to unambiguously create new rights, it must be "phrased in terms of the persons benefitted" with "rights-creating language" that has an "unmistakable focus on the benefitted class." *Gonzaga*, 536 U.S. at 284, 290. But, by the plain text of Section 2, it is expressly States and localities—not individuals—who are the *subject* of the statute. 52 U.S.C. § 10301(a) ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied ***by any State or political subdivision*** …"); *id.* § 10301(b) ("A violation of subsection (a) is established if . . . it is shown that the political processes leading to nomination or election in the ***State or political subdivision*** are not equally open …").

For any of those independent reasons, Plaintiffs have failed to meet their "demanding" burden to establish that Section 2 of the VRA unambiguously establishes a new individual right capable of enforcement under § 1983.

### 2. The VRA's comprehensive enforcement scheme for Section 2 claims also precludes lawsuits by private plaintiffs.

Even assuming Plaintiffs could demonstrate Section 2 unambiguously created a new individual right, the second step of the *Gonzaga* framework would still preclude finding a private right of action under § 1983. "The critical question" for this part of the analysis is "whether Congress meant [the statute's remedial scheme] to coexist with a § 1983 action." *Talevski*, 599 U.S. at 187 (cleaned up) (quoting

31

*Rancho Palos Verdes*, 544 U.S. at 120–121). The question is not whether it is impossible for the statute's enforcement scheme and private enforcement through § 1983 to coexist. Rather, the question goes to congressional intent. *Id.*

The Supreme Court has recognized several ways in which Congress can impliedly preclude the enforcement of a statute under § 1983. One way—though not the only way—is if that statute has its own express private cause of action. *Talevski*, 599 U.S. at 188; *see also id.* at 195 (Barrett, J., concurring) ("[A]n actual clash—one private judicial remedy against another …—is not required to find that a statute forecloses recourse to § 1983."). Another way is through "any other provision that might signify [Congress's] intent" to preclude § 1983 enforcement. *Id.* Consequently, where § 1983 enforcement would "thwart the operation of the administrative remedial scheme," *id.* at 188, that also qualifies. Even showing that a statute's own enforcement scheme is "comprehensive" can be enough to preclude a private right of action under § 1983. *Id.* at 189 ("To be clear, a defendant *can* discharge its burden of showing that the presumption is rebutted by pointing to a comprehensive scheme."). Finally, if the statute expressly authorizes a government actor to "deal with violations" of the statute, that too can suffice. *Gonzaga*, 536 U.S. at 289–90; *see also Talevski*, 599 U.S. at 195 (Barrett, J., concurring) ("Our cases have looked to a wide range of contextual clues, like 'enforcement provisions' that 'confe[r] authority to sue … on government officials[.]'").

Section 2's enforcement regime falls within several of these categories, and overall evinces Congress's intent to leave enforcement of Section 2 in the hands of the government official expressly charged with enforcing it—the Attorney General.

Section 12 of the VRA provides that "Whenever any person has engaged … in any act or practice prohibited by section [2]," or seven other listed provisions of the VRA, "the Attorney General may institute … in the name of the United States, an action for preventive relief."  52 U.S.C. § 10308(d).  The statute expressly authorizes the Attorney General to seek broad relief, including "an application for a temporary or permanent injunction, restraining order, or other order … directed to … State or local election officials[.]" *Id.*  The Act also establishes criminal penalties for violating Section 2, including fines and a prison sentence of up to five years.  *See* 52 U.S.C. § 10308(a)–(c).  As this Court has noted, "[t]he fact that § 12 lists criminal penalties among the potential remedies is strong evidence that it cannot provide a private right of action …  After all, private parties cannot seek prison time against violators." *Ark. State Conf. NAACP*, 86 F.4th at 1210 n.2.

This comprehensive enforcement regime designates the Attorney General to fully "deal with violations," *Gonzaga*, 536 U.S. at 289–90, and "confers authority to sue on government officials." *Talevski*, 599 U.S. at 195 (Barrett, J., concurring) (cleaned up).  Indeed, "[i]f the text and structure of § 2 and § 12 show anything, it is that 'Congress intended to place enforcement in the hands of the [Attorney General],

rather than private parties.'" *Ark. State Conf. NAACP*, 86 F.4th at 1211 (quoting *Freeman v. Fahey*, 374 F.3d 663, 665 (8th Cir. 2004)).

This enforcement regime makes sense, and tracks what Section 2 did in substance. Congress left the decision of whether to bring a federal challenge to a State's election maps for a "vote dilution" claim—a political exercise fraught with federalism and separation of powers concerns—to a politically-accountable actor sensitive to those judgments and more attuned to the practical and administrative realities of conducting state-wide elections. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) ("Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges.").

Private plaintiffs have little cause to be sensitive to those concerns, as evidenced by the perennial chaos surrounding redistricting litigation on the eve of elections. *Cf. McConchie v. Scholz*, 567 F. Supp. 3d 861, 892 (N.D. Ill. 2021) (noting that around the country "[c]hallenges to redistricting maps are routine" and "occur every ten years, like clockwork"); Elmendorf & Spencer, *Administering Section 2 of the Voting Rights Act After Shelby County*, 115 COLUM. L. REV. 2143, 2157–58 (2015) (noting "litigating section 2 cases [has become] expensive and unpredictable," and that "well-funded actors" can "finance section 2 cases when the political stakes are high"). To illustrate that point, the Court need look no further

than North Dakota's recent experience—where the State was simultaneously sued by two different groups of private plaintiffs who alleged the exact same election map both unlawfully bolstered Native American voting power *too much* and unlawfully bolstered Native American voting power *too little*.

Because Congress created Section 2 claims to be aggregate by their very nature, it logically left their enforcement to a centralized actor. Private enforcement may make sense for statutes in which a single individual can prevail by showing that his or her own rights were violated. But, as discussed *supra*, a single plaintiff's claim that his or her preferred candidate was defeated cannot a Section 2 claim make. *Gingles*, 478 U.S. at 51. When Congress created a disparate-impact-theory of liability for "vote dilution" claims in Section 2 of the VRA, it struck a careful balance in Section 12, matching a centralized enforcement mechanism with the collective nature of Section 2 prohibitions. Lawsuits by private plaintiffs for vote dilution claims are incompatible with that careful balance.

### 3. The district court erred in reaching a contrary conclusion.

In finding Plaintiffs could invoke § 1983 to bring a "vote dilution" claim under the Section 2 of the VRA, the district court erred in at least three critical ways.

*First*, although the district court properly recognized *Gonzaga* provides the applicable test, it then misapplied the *Gonzaga* test. Most notably, the district court's order only considered whether Section 2 of the VRA "confers a right." *See* Add.10,

App.42, R.Doc.30 at 10. But as discussed *supra*, *Gonzaga* requires the district court to go further and determine whether Section 2 of the VRA creates an *individual*, non-aggregated right that could be enforced through § 1983. *See Gonzaga*, 536 U.S. at 284–85; *Gillespie*, 867 F.3d at 1041–42. The district court failed to do so. Failing to engage in that analysis was error. The individual versus aggregate nature of Section 2 is dispositive in this case, and, as explained *supra*, Section 2 of the VRA *does not* unambiguously confer individual rights.

*Second*, the district court's finding relied on the fact Section 2 VRA claims have previously been successfully brought by private litigants, mostly in out-of-Circuit cases. *See* Add.11-12, App.43-44, R.Doc.30 at 11-12. But, as this Court recently explained, none of those cases actually *analyzed* if a private right of action exists to enforce Section 2 violations (whether directly under Section 2 itself, or through the backdoor of Section 1983), and such unexamined assumptions do not control in a case where the question is actually presented. *See Ark. State Conf. NAACP*, 86 F.4th at 1215 (noting previous decisions involving a private right of action for Section 2 claims were "*just* background assumptions—mere dicta at most") (emphasis original). "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). The district court's reliance on those authorities was error.

*Third*, the district court's finding relied on an inapposite attorneys' fee provision to conclude Section 2 envisions litigation by private plaintiffs. *See* Add.11, App.43, R.Doc.30 at 11 (citing 52 U.S.C. § 10310(e)). The district court referenced a provision that, by its text, only covers attorney's fees for actions to "enforce the Fourteenth and Fifteenth Amendments." But as explained above, and as held by both this Court and the Supreme Court, "vote dilution" claims under Section 2 are *not* actions to enforce the Fourteenth and Fifteenth Amendments. *Ark. State Conf. NAACP*, 86 F.4th at 1213 n.3 ("By focusing solely on the discriminatory impact [under Section 2], not intentional discrimination, the advocacy groups are not attempting to 'enforce the voting guarantees of the fourteenth or fifteenth amendment.'"); *Milligan*, 599 U.S. at 10–13 (explaining the current form of Section 2 was enacted in response to the Court's holding that the Fifteenth Amendment only applies to discriminatory intent, not discriminatory effect). The district court's reliance and reasoning on this point was again in error.

\* \* \*

In summary, "vote dilution" under Section 2 of the VRA is a collective concept that is analyzed in collective terms. And it is a concept the VRA directly provides its own enforcement mechanism for—establishing criminal liability and empowering the Attorney General of the United States to enforce the statute. Section 2 of the VRA did not unambiguously create a new individual right capable of private

enforcement through 42 U.S.C. § 1983, and the district court's conclusion to the contrary was based on multiple significant errors.

## III. Even If § 1983 Provides a Private Right of Action for Claims Brought Under Section 2 of the VRA, the District Court Erred in Striking Down North Dakota's Redistricting Plan.

Under *Thornburg v. Gingles*, 478 U.S. 30 (1986), "vote dilution" claims require establishing three preconditions: "(1) [T]he racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006) (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006)). Failure to prove any of the *Gingles* preconditions defeats a Section 2 claim. *Bone Shirt*, 461 F.3d at 1018 (citing *Clay v. Bd. of Educ.*, 90 F.3d 1357, 1362 (8th Cir. 1996)). In this case, Plaintiffs failed to prove at least two of them. The district court erred by endorsing Plaintiffs' preferred form of racial gerrymandering without subjecting it to strict scrutiny, and its findings were not sufficient to strike down North Dakota's duly enacted redistricting plan.

### A. The District Court Improperly Presumed Plaintiffs' Remedial Maps Could Be Racial Gerrymanders and Refused to Consider the Fact the State's Map Performed Better on Traditional Districting Criteria.

The first significant error in the district court's analysis invalidating the State's election map is that it presumed, in a footnote, that it would be a non-issue

for Plaintiffs' proposed remedial maps to be unlawful racial gerrymanders, and it compounded that error by affirmatively refusing to consider the fact that the State's duly enacted election map performs better on traditional districting criteria.

*Gingles* precondition 1 requires Plaintiffs to establish that a racial minority is "sufficiently large and geographically compact to constitute a majority in a proposed single member district[.]" *Bone Shirt*, 461 F.3d at 1018 (cleaned up). Plaintiffs typically satisfy this precondition by submitting their own proposed remedial maps, and "[t]he ultimate end of the *first* Gingles precondition is to prove that a solution is possible." *Id*. at 1019 (citation omitted); *see also Milligan*, 599 U.S. at 18 (the plaintiff's proposed remedial maps must be "reasonably configured" and "comport[] with traditional districting criteria").

However, a proposed remedial map that is racially gerrymandered—i.e., where race was the *predominant* factor in drawing the map—cannot provide a possible "solution" because such a "solution" would violate the Constitution's Equal Protection clause. "[R]ace may not be 'the predominant factor in drawing district lines unless [there is] a compelling reason.'" *Milligan*, 599 U.S. at 31 (plurality) (quoting *Cooper v. Harris*, 581 U.S. 285, 291 (2017)); *see also Bone Shirt*, 461 F.3d at 1019 ("A redistricting plan violates the equal protection clause [] if race is the predominant factor"). Therefore, "to satisfy the first step of *Gingles*[,]" the plaintiff must produce a remedial map where race isn't the "predominan[t]" motivation for

how the lines are drawn.  *Milligan*, 599 U.S. at 33 (plurality).

It requires suspending disbelief to look at Plaintiffs' proposed remedial maps and conclude race was not the predominant factor in drawing them—as both of their proffered maps stretch diagonally across the state for the sole purpose of joining two Native American reservations; the only difference is the size of the land bridge.  *See* Add.35, App.463, R.Doc.125 at 9; *see also Milligan*, 599 U.S. at 31 ("Race predominates in the drawing of district lines … when 'race-neutral considerations [come] into play only after the race-based decision had been made.'") (quoting *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189 (2017)); *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (a map violates Equal Protection when so "irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles ….").

Consequently, for Plaintiffs' proposed maps to be possible "solutions," the district court would need to find that either: (a) they were not predominantly based on considerations of race; or (b) if they were predominantly based on race, they survive strict scrutiny.  *Bush v. Vera*, 517 U.S. 952, 972–73 (1996) (strict scrutiny required when "the contours of [a] Congressional District [] are unexplainable in terms other than race"); *Cooper*, 581 U.S. at 292 ("if racial considerations predominated over others, the design of the district must withstand strict scrutiny").

But the district court did not make any finding that race wasn't the

40

predominate reason for the shape of Plaintiffs' maps in this case, nor did it subject their maps to strict scrutiny. Instead, the district court hand-waived those concerns away in a footnote, stating that "even assuming race was the predominate motivating factor in drawing [Plaintiffs'] districts, establishing (and then remedying) a Section 2 violation provides a compelling justification for … the proposed plans." Add.46, App.474, R.Doc.125 at 20 n.3 (citing *Cooper*, 581 U.S. at 292).[4]

The district court's cursory invocation of *Cooper* in this context was mistaken. *Cooper* assumed, in the context of an Equal Protection challenge, that if a *State*'s consideration of race predominates over other considerations when drawing an election map, the State *may* have a "compelling interest" to consider race if the State has "good reason" to believe doing so is necessary to comply with the VRA. 581 U.S. at 292–93. *Cooper* did not hold that when a plaintiff proffers remedial maps during a *Gingles* precondition 1 analysis, blatant racial gerrymandering is permissible so long as the plaintiff believes the VRA requires it.[5]

---

[4] The district court's failure to consider whether Plaintiffs' proposed maps were predominantly based on racial considerations—let alone make a finding they were not—is a sharp distinction from the district court order that was upheld by the Supreme Court in *Milligan*. *Cf.* 599 U.S. at 32 ("The District Court did not err in finding that race did not predominate in [the plaintiff's proposed] maps.").

[5] In fact, in *Cooper*, the Supreme Court held the state's predominant consideration of race when drawing district lines was **not** a compelling justification in that case, notwithstanding invocation of the VRA. *See* 581 U.S. at 322–23 ("§ 2 of the VRA gave North Carolina no good reason to reshuffle voters because of their race"). *Cooper* noted that compliance with the VRA *may* provide a state with compelling

To the contrary, the Supreme Court recently reaffirmed that a plaintiff's proffered remedial maps may satisfy the *Gingles* precondition 1 inquiry when "race did not predominate in [the plaintiff's proposed] maps." *Milligan*, 599 U.S. at 32; *see also id*. at 33 (in the context of a *Gingles* precondition 1 inquiry, "[t]he line that we have long drawn is between [race] consciousness and [race] predominance").

"Racial gerrymandering, even for remedial purposes, … threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire. It is for these reasons that race-based districting … demands close judicial scrutiny.'" *Miller v. Johnson*, 515 U.S. 900, 912 (1995). The district court failed to give such scrutiny to Plaintiff's remedial maps, and presumed it would be of no concern if blatant racial line-drawing was the predominating reason for the crafting of Plaintiffs' proposed districts. That was significant error.

Moreover, after presuming in a footnote that it would be a non-issue for Plaintiffs' proffered maps to be predominantly based on explicit racial line-drawing, the district court refused to even consider whether the State's duly enacted map

---

justification for considering race when drawing district lines, but it did not treat the VRA a panacea for racial gerrymandering, and it devoted significant attention to analyzing whether the state's invocation of the VRA provided compelling justification for crafting districts predominantly based on reasons of race—and held it **did not**. *See id*. at 299–323. *Cooper* treated racial gerrymandering as the serious problem it is, and subjected it to a concomitant level of scrutiny. *Cooper* was not a waive-this-away-in-a-footnote sort of decision.

comports better with traditional districting criteria—such as being compact and respecting political boundaries. Add.43-44, App.471-72, R.Doc.125 at 17-18. The district court reasoned it did not have to engage in a "beauty contest." *Id.* (citing *Milligan*, 599 U.S. at 21). But the district court misunderstood that language from *Milligan* and failed to appreciate the import of comparing the Plaintiffs' proffered remedial maps against the State's duly enacted map.

*Milligan* did not hold that comparing a plaintiff's proffered remedial maps against the State's duly enacted map was meaningless. To the contrary, the *Milligan* court, in its *Gingles* precondition 1 analysis, affirmatively noted the plaintiff's proffered maps "perform[ed] generally better on average" than the State's maps, and that fact was relevant to whether the plaintiff had proffered reasonably configured alternative maps. *Milligan*, 599 U.S. at 20. Furthermore, for the "beauty contest" language, *Milligan* cites to *Bush v. Vera*, 517 U.S. 952, 977–78 (1996). And in *Vera*, the Court held that if a *state's* duly-enacted map comports with traditional districting criteria, the *state* does not have to defeat the plaintiff's preferred maps "in endless 'beauty contests.'" 517 U.S. at 977. In other words, the language about a "beauty contest" protects *states* whose duly-enacted maps comport with traditional districting criteria from endless challenges by plaintiffs that may be predisposed to engage in perpetual nitpicking. That language does not preclude a district court from undertaking its duty to compare the plaintiff's proffered maps' performance against

the State's duly enacted map when assessing if the plaintiff has put forward a reasonably configured alternative—as the Supreme Court itself did in *Milligan*.

In short, the district court erred by presuming that racial gerrymandering by the Plaintiffs would be a non-issue, and it compounded that error by affirmatively refusing to even consider how the State's duly enacted map performed better on traditional districting criteria than did the Plaintiffs' proposed maps.

### B. Plaintiffs Did Not Offer Sufficient Statistical Evidence of Political Cohesion and Racially Polarized Voting in Subdistricts 9A and 9B.

Another error of the district court's analysis invalidating North Dakota's election map is that it relied upon conclusions for which Plaintiffs' own expert testified there was insufficient data to reach.

The second *Gingles* precondition requires establishing the minority population in the relevant districts is politically cohesive and racially polarized, which Plaintiffs generally prove through statistical and non-statistical evaluations of recent elections. *See Bone Shirt*, 461 F.3d at 1020–21 (citing *League of United Latin Am. Citizens,* 126 S.Ct. at 2614). "Evidence of political cohesiveness is shown by minority voting preferences, distinct from the majority, demonstrated in actual elections, and can be established with the same evidence plaintiffs must offer to establish racially polarized voting …'" *Id.* (citation omitted).

The statistical method generally used in Section 2 cases to evaluate political cohesion and racial polarization is known as "ecological inference," which is a

statistical tool used to make inferences about how members of certain racial groups voted in elections. Add.13, 18, App.168, 237, R.Doc.115 at 124, 193; Add.21-22, App.326-27, R.Doc.117 at 79-80. Ecological inference has been recognized as a reliable statistical method of analysis for the second *Gingles* precondition. *E.g., Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004); *Cottier v. City of Martin*, 445 F.3d 1113, 1118–19 (8th Cir. 2006), *vacated on reh'g en banc*, 604 F.3d 553 (8th Cir. 2010). Plaintiffs' own expert referred to ecological inference as "the go-to method for conducting racially polarized voting studies in voting 'rights' cases[,]" and testified that he knows of "very few cases at least since the nineties that don't use ecological inference." Add.18, App.237, R.Doc. 115 at 193.

Nonetheless, no ecological inference was done for the relevant subdistricts in this case. Plaintiffs' expert admitted he did not rely on that technique to reach his conclusions for the challenged subdistricts because there was insufficient precinct-level data to perform the analysis. Add.19-20, App.238-39, R.Doc.115 at 194-95. And he did not rely on any other recognized statistical methods to support his conclusion either—such as bivariate ecological regression analysis or homogenous precinct analysis. *Cf. Bone Shirt*, 461 F.3d at 1020. Instead, he "logically infer[red] that there's racially polarized voting" in the challenged subdistricts based on what he would expect to see if there was racially polarized voting. Add.14-17, App.192-95, R.Doc.115 at 148-51. That should have been the end of it. It is the plaintiff's

burden to establish the *Gingles* preconditions, *Cottier*, 604 F.3d at 558, and Plaintiffs failed to meet that burden by failing to proffer statistically sufficient evidence of political cohesion and racially polarized voting in the challenged subdistricts.

The district court recognized that Plaintiffs had failed to make a statistically sufficient showing of political cohesion and racial polarization in the challenged subdistricts. *See* Add.47, App.475, R.Doc.125 at 21 (noting "subdistricts 9A and 9B do not contain enough precincts for a full statistical analysis…."). Nonetheless, the district court claimed the insufficient statistical analysis, when "combined with lay witness testimony"—meaning testimony from the tribal chairmen that voters living on the different reservations "vote similarly"—was sufficient to "show[] that the Native American minority is politically cohesive." *Id.*[6]

---

[6] The district court's order also incorrectly stated the Secretary's expert agreed Native American voters are politically cohesive in Subdistricts 9A and 9B. Add.47, App.475, R.Doc.125 at 21. To the contrary, the Secretary's expert testified there is _not_ enough precinct-level data to produce reliable estimates of racially polarized voting using ecological inference in Subdistricts 9A and 9B. Add.23, App.380, R.Doc.117 at 89. The district court's order then cited to a report prepared by the Secretary's expert in a separate redistricting lawsuit, involving different claims and allegations, where the Secretary's expert *assumed* voting in the subdistricts may mirror voting in the overall district. *See* Add.47, App.475, R.Doc.125 at 21 (citing Pl. Ex. 80 at 4-6 and R.Doc.117 at 139-40). Regardless of any assumptions made in different litigation, the testimony in this litigation was that there is insufficient data to conduct an ecological inference of racially polarized voting in the challenged subdistricts. Add.23, 25-26, App.336, 387-88, R.Doc.117 at 89, 140-41. It was Plaintiffs' burden to establish political cohesion in the challenged subdistricts, and they failed to do so with any recognized statistical method.

The district court cited no authority for the proposition a plaintiff's failure to provide a statistically sufficient showing of political cohesion and racial polarization is excused so long as they put forward lay testimony that a racial minority "vote[s] similarly." If the available data does not support a statistically significant finding of racially polarized voting using a recognized statistical method, *Gingles* precondition 2 is not satisfied. The district court erred by concluding otherwise.

## CONCLUSION

The district court's judgment should be reversed, and this action should be remanded for further proceedings. *Cf. Upham v. Seamon*, 456 U.S. 37, 44 (1982) ("Having indicated the legal error of the District Court, we leave it to that court … to determine whether to modify its judgment … or, in spite of its erro[r] … to allow the election to go forward in accordance with the present schedule.").

Dated: January 29, 2024

Respectfully submitted,

*/s/ Philip Axt*

David H. Thompson
Peter A. Patterson
Athanasia O. Livas
Special Assistant Attorneys General
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
alivas@cooperkirk.com
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036

Philip Axt (ND Bar No. 09585)
Solicitor General
pjaxt@nd.gov
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505

David R. Phillips (ND Bar No. 06116)
Special Assistant Attorney General
dphillips@bgwattorneys.com
300 West Century Ave., P.O. Box 4247
Bismarck, ND 58502

*Counsel for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,191 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionately spaced typeface using the 2016 version of Microsoft Word in 14-point Times New Roman font.

As required by Eighth Cir. R. 28A(h), this brief and the addendum have been scanned for viruses and are virus-free.

Date: January 29, 2024

*/s/ David Phillips*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *David Phillips*