No. 23-3655

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

◆

TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *et al.*,
*Plaintiffs-Appellees*,

v.

MICHAEL HOWE, in his official capacity as
Secretary of State of North Dakota,
*Defendant-Appellant*.

◆

On Appeal from the United States District Court for the
District of North Dakota, Case No. 3:22-CV-00022

## BRIEF OF ALABAMA AND 14 OTHER STATES AS
## *AMICI CURIAE* SUPPORTING APPELLANT AND REVERSAL

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
Soren Geiger
  *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES ............................................................ ii

INTEREST OF AMICI CURIAE .................................................... 1

SUMMARY OF THE ARGUMENT .................................................. 2

ARGUMENT .................................................................................. 4

    I.    Section 2 Does Not Unambiguously Confer New Individual Rights ...... 4

        A.    The "Gonzaga Test" Governs ........................................... 4

        B.    Section 2, as an Exercise of Congress's Remedial Authority to Enforce the Fifteenth Amendment, Does Not Confer Substantive Rights on Private Individuals ....................................... 7

        C.    Section 2 Does Not Unambiguously Confer New Rights ............. 12

        D.    Section 2 Does Not Unambiguously Confer Individual Rights ........................................................................ 14

        E.    The VRA's Express Method of Enforcement is Additional Evidence that Section 2 Confers No New Individual Rights ........ 17

    II.    Plaintiffs Did Not Prove A Section 2 Violation .................................... 19

CONCLUSION .............................................................................. 27

CERTIFICATE OF SERVICE ......................................................... 30

CERTIFICATE OF COMPLIANCE ................................................. 31

Appellate Case: 23-3655    Page: 2    Date Filed: 02/07/2024    Entry ID: 5361165

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018)....................................................................1, 16

*Alexander v. Sandoval*,
  532 U.S. 290 (2001).......................................................................7, 20

*Allen v. Milligan*,
  599 U.S. 1 (2023)........................................................ 3, 20, 21, 24-27

*Arkansas State Conference NAACP v. Arkansas Board of Apportionment*,
  86 F.4th 1204 (8th Cir. 2023) ................................... 3, 6, 7, 15, 16, 18

*Armstrong v. Exceptional Child Ctr.*,
  575 U.S. 320 (2015)............................................................................5

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
  531 U.S. 356 (2001).........................................................................10

*Blessing v. Freestone*,
  520 U.S. 329 (1997)......................................................................4, 12

*California v. Sierra Club*,
  451 U.S. 287 (1981)......................................................................2, 16

*Carey v. Throwe*,
  957 F.3d 468 (4th Cir. 2020) ...........................................................16

*Chapman v. Houston Welfare Rights Org.*,
  441 U.S. 600 (1979).....................................................................1, 16

*Chelentis v. Luckenbach S.S. Co.*,
  274 U.S. 372 (1918).........................................................................10

*Chisom v. Roemer*,
  501 U.S. 380 (1991)................................................................... 10, 19

Appellate Case: 23-3655     Page: 3     Date Filed: 02/07/2024 Entry ID: 5361165

*City of Boerne v. Flores*,
521 U.S. 507 (1997)..................................................................... 7-11

*City of Mobile v. Bolden*,
446 U.S. 55 (1980)...........................................................................10

*City of Rancho Palos Verdes v. Abrams*,
544 U.S. 113 (2005)...........................................................................5

*Civil Rights Cases*,
109 U.S. 3 (1883)..........................................................................9, 12

*Cooper v. Harris*,
581 U.S. 285 (2017)..................................................................... 22, 26

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999)...........................................................................13

*Diaz v. Silver*,
978 F. Supp. 96 (E.D.N.Y. 1997) ....................................................24

*Does v. Gillespie*,
867 F.3d 1034 (8th Cir. 2017) ................................................ 2, 3, 12

*Fitzpatrick v. Bitzer*,
427 U.S. 445 (1976)............................................................................6

*Frison v. Zebro*,
339 F.3d 994 (8th Cir. 2003) ............................................................6

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998)...........................................................................13

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002)................................................................. *passim*

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)...........................................................................17

iii

*Gumber v. Fagundes*,
2021 WL 4311904 (N.D. Cal. July 3, 2021) .......................................................14

*Health and Hosp. Corp. of Marion Cnty. v. Talevski*,
599 U.S. 166 (2023) ...........................................................................................5

*Johnson v. De Grandy*,
512 U.S. 997 (1994) ..........................................................................................22

*Johnson v. Hous. Auth. of Jefferson Par.*,
442 F.3d 356 (5th Cir. 2006) .............................................................................5

*Jones v. City of Lubbock*,
727 F.2d 364 (5th Cir. 1984) ...........................................................................11

*Kimel v. Fla. Bd. of Regents*,
528 U.S. 62 (2000) ..................................................................................... 11, 13

*Lane v. Wilson*,
307 U.S. 268 (1939) ..........................................................................................9

*Maine v. Thiboutot*,
448 U.S. 1 (1980) ..............................................................................................9

*Malecki v. Christopher*,
No. 4:07-CV-1829, 2008 WL 11497819 (M.D. Pa. May 27, 2008) ..................14

*Midwest Foster Care and Adoption Ass'n v. Kincade*,
712 F.3d 1190 (8th Cir. 2013) .........................................................................17

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982) ............................................................................................8

*Nev. Dep't of Hum. Res. v. Hibbs*,
538 U.S. 721 (2003) ........................................................................................11

*Pennhurst State Sch. and Hosp. v. Halderman*,
451 U.S. 1 (1981) ............................................................................................15

iv

*Reno v. Bossier Par. Sch. Bd.*,
520 U.S. 471 (1997)......................................................................11

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003) ......................................................6

*SFFA v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)......................................................................27

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966)................................................... 1, 8-12

*Suter v. Artist M*,
503 U.S. 357  (1992)......................................................................15

*Spectra Commc'ns Grp. v. City of Cameron*,
806 F.3d 1113 (8th Cir. 2015) ......................................................6

*Taggart v. Lorenzen*,
139 S. Ct. 1795 (2019)......................................................................19

*Thornburg v. Gingles*,
478 U.S. 30 (1986)................................................... 19-22, 24

*United States v. Cruikshank*,
92 U.S. 542 (1875)......................................................................9

*United States v. Georgia*,
546 U.S. 151 (2006)......................................................................6

*United States v. Reese*,
92 U.S. 214 (1875)......................................................................9, 12

*Vote.Org v. Callanen*,
89 F.4th 459(5th Cir. 2023) ......................................................6

*Whitcomb v. Chavis*,
403 U.S. 124 (1971)......................................................................19

v

*White v. Regester*,
412 U.S. 755 (1973) ...................................................................................19

*Wilder v. Virginia Hospital Association*,
496 U.S. 498 (1990) ...................................................................................18

*Williams v. Pa. Hum. Rel. Comm'n*,
870 F.3d 294 (3d Cir. 2017) .........................................................................7

*Wright v. Roanoke Redevelopment and Housing Authority*,
479 U.S. 418 (1987) ...................................................................................17

**Statutes**

18 U.S.C. §241 ...........................................................................................10

20 U.S.C. §1681(a) .....................................................................................13

34 U.S.C. §12601(a) ...................................................................................14

34 U.S.C. §12601(b) ...................................................................................14

42 U.S.C. §1983 ...............................................................................2-15, 17

42 U.S.C. §2000d .................................................................................13, 15

52 U.S.C. §10301 .......................................................................................15

52 U.S.C. §10301(a) ................................................................3, 16, 19, 22

52 U.S.C. §10301(b) ...................................................................................19

52 U.S.C. §10308 .......................................................................................18

**Acts**

Americans with Disabilities Act ..................................................................6

Appellate Case: 23-3655     Page: 7     Date Filed: 02/07/2024 Entry ID: 5361165

Civil Rights Act of 1957 ..........................................................................10

Civil Rights Act of 1960 ..........................................................................10

Civil Rights Act of 1964 ......................................................................6, 10

Telecommunications Act of 1996 .............................................................6

Violent Crime Control and Law Enforcement Act of 1994 ...................13

Voting Rights Act of 1965 ............................................................... *passim*

**Rules**

Federal Rule of Appellate Procedure 29(a) ..............................................1

**Other Authorities**

Erwin Chemerisnky, *The Assumptions of Federalism*,
  58 STAN. L. REV. 1763 (2006) ...........................................................8

Michael W. McConnell, *Institutions and Interpretation: A Critique of City of Boerne v. Flores*,
  111 HARV. L. REV. 153 (1997) ...........................................................8

Tracy A. Thomas, *Congress' Section 5 Power and Remedial Rights*,
  34 U.C. DAVIS L. REV. 673 (2001) ....................................................8

Voting Section Litigation, *Cases Raising Claims Under Section 2 of the Voting Rights Act*, https://www.justice.gov/crt/voting-section-litigation#sec2cases (last visited Jan. 25, 2024) ................................................................18

Appellate Case: 23-3655    Page: 8    Date Filed: 02/07/2024 Entry ID: 5361165

# INTEREST OF *AMICI CURIAE*

The States of Alabama, Florida, Georgia, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, South Carolina, South Dakota, Texas, Utah, and West Virginia respectfully submit this brief under Federal Rule of Appellate Procedure 29(a) as *amici curiae* in support of North Dakota. "Redistricting is primarily the duty and responsibility of the State, and federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). So as not to "subject to judicial oversight" the shape of every state redistricting map "at the behest of a single citizen," *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 645 (1979) (Powell, J., concurring), Congress gave to the United States Attorney General alone the authority to enforce the "stringent new remedies" of the Voting Rights Act, *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 315 (1966). Despite the text's clarity, the District Court allowed private plaintiffs to challenge North Dakota's redistricting plan. Worse still, the court then misapplied §2 on the merits, adopting a theory of "vote dilution" that is unpredictable for States and that cannot be squared with the text of §2, precedent, or the Constitution. *Amici* have an interest in ensuring the law is not misconstrued to enable unauthorized "intrusion[s] on the most vital of local functions." *Abbott*, 138 S. Ct. at 2324.

1

## SUMMARY OF THE ARGUMENT

The District Court held that even if Plaintiffs can't bring their §2 claim directly under the Voting Rights Act, they can just as easily bring it under 42 U.S.C. §1983. That's wrong for at least one fundamental reason: §2 does not create "new individual rights" "in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286, 290 (2002). Thus, "there is no basis for a private suit." *Id.* at 286. "Where structural elements of the statute and language in a discrete subsection give mixed signals about legislative intent, Congress has not spoken with a 'clear voice' that manifests an 'unambiguous intent' to confer individual rights." *Does v. Gillespie*, 867 F.3d 1034, 1043 (8th Cir. 2017) (internal citation omitted).

Here, the text, structure, and history of the VRA give, at best, "mixed signals" that Congress intended to confer new federal rights in §2. First, the VRA created new remedies enforceable by the Attorney General, not new rights enforceable by millions of private plaintiffs. Second, the right to vote free from discrimination recognized and protected by §2 is not a *new* right; in other words, it was not created or conferred by the VRA. Finally, §2 does not have "an *unmistakable* focus on the benefited class," *Gonzaga*, 536 U.S. at 284, in lieu of a "general proscription" of "discriminatory conduct." *California v. Sierra Club*, 451 U.S. 287, 294 (1981).

This Court recently stated that it "is unclear whether § 2 creates an individual right" because the statute appears to focus on both the "individuals protected" and

2

"the person regulated." *See Ark. NAACP*, 86 F.4th at 1209-10. "Conflicting textual cues are insufficient" to "show unambiguous intent." *Gillespie*, 867 F.3d at 1045. For that reason, and those that follow, §2 is not enforceable under §1983.

The District Court fared no better on the merits of Plaintiffs' claim. Section 2 requires a showing that the challenged practice "results in a denial or abridgment of the right … to vote *on account of race*." 52 U.S.C. §10301(a) (emphasis added). The Supreme Court has required §2 plaintiffs challenging a redistricting plan to produce an alternative map that comports with traditional districting principles as well as the State's map because "[d]eviation from that [alternative] map shows it is *possible* that the State's map has a disparate effect on account of race." *Allen v. Milligan*, 599 U.S. 1, 26 (2023). Plaintiffs failed to carry their burden here because their alternatives sacrificed compactness to hit racial goals. Deviation from those maps suggests, at most, that the State's map has a disparate effect on account of *compactness*, not on account of race. North Dakota's decision not to sacrifice compactness for race did not deny or abridge anyone's vote on account of race.

Appellate Case: 23-3655     Page: 11     Date Filed: 02/07/2024 Entry ID: 5361165

## ARGUMENT

**I.**    **Section 2 Does Not Unambiguously Confer New Individual Rights.**

    **A. The "*Gonzaga* Test" Governs.**

As a preliminary matter, Plaintiffs' idea that the "*Gonzaga* test" does not apply outside of the Spending Clause context must be dispelled. *See* R.Doc.142 at 4-9. Section 1983 permits civil suits against anyone who, acting under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." The Supreme Court has interpreted "and laws" as "safeguard[ing] certain rights conferred by federal statutes." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). Thus, "to seek redress through § 1983, … a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Gonzaga*, 536 U.S. at 282.

The question has always been whether the "statute creates a privately enforceable right." *Blessing*, 520 U.S. at 338. In *Blessing*, the Court articulated a three-factor test for identifying such rights. *Id.* at 340-41. When applying this test, however, some lower courts allowed "plaintiffs to enforce a statute under §1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U.S. at 283. That practice was put to rest in *Gonzaga*, which held that nothing "short of an unambiguously conferred right [can] support a cause of action brought under § 1983." *Id.* With this test, the Supreme Court "plainly

4

repudiate[d] the ready implication of a § 1983 action" that earlier cases "exemplified." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 330 n.* (2015).

The "*Gonzaga* test" is *the* "established method for ascertaining unambiguous conferral" of "individual rights upon a class of beneficiaries to which the plaintiff belongs." *Health and Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023). The critical question is "whether Congress *intended to create a federal right.*" *Gonzaga*, 536 U.S. at 283. As with any question of statutory interpretation, that inquiry requires careful analysis of "the text and structure of a statute." *Id.* at 286. No longer do federal "courts apply a multifactor balancing test to pick and choose which federal requirements may be enforced by § 1983 and which may not." *Id.* Ultimately, "very few statutes are held to confer rights enforceable under § 1983." *Johnson v. Hous. Auth. of Jefferson Par.*, 442 F.3d 356, 360 (5th Cir. 2006).

Plaintiffs' argued below that the *Gonzaga* test applies only to Spending Clause legislation, and thus "does not apply to determining whether Reconstruction Amendment enforcement statutes … fall within § 1983's ambit." R.Doc.142 at 5. No federal court, including the District Court here, has read *Gonzaga* so narrowly. *See* R.Doc.30 at 8. Indeed, the Supreme Court has applied the *Gonzaga* test to Commerce Clause legislation and found it unenforceable under §1983. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119-20 (2005). Lower courts have done the same. For example, both the Fifth Circuit in *Vote.Org v. Callanen*, 89 F.4th 459, 474

5

(5th Cir. 2023), and the Eleventh Circuit in *Schwier v. Cox*, 340 F.3d 1284, 1296-97 (11th Cir. 2003), applied the *Gonzaga* framework to determine whether Section 1971 of the Civil Rights Act of 1964, which was passed pursuant to Congress's Fifteenth Amendment enforcement power, was privately enforceable under §1983. Even more on point, this Court in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204, 1209 (8th Cir. 2023), recently employed the *Gonzaga* test on its way to holding that Section 2 of the VRA contains no private right of action. Elsewhere, this Court has used the *Gonzaga* test outside of the Spending Clause context. *See, e.g.*, *Spectra Commc'ns Grp. v. City of Cameron*, 806 F.3d 1113, 1118 (8th Cir. 2015) (holding that §253 of the Telecommunications Act of 1996, which is Commerce Clause legislation, creates no privately enforceable rights). This Court has even applied the *Gonzaga* test to determine whether a criminal law can give rise to a civil claim under §1983. *Frison v. Zebro*, 339 F.3d 994, 998-99 (8th Cir. 2003).

To take Plaintiffs' position to its logical conclusion, Title VII of the Civil Rights Act of 1964 and Title II of the Americans with Disabilities Act, both Reconstruction Amendment enforcement statutes, should be *automatically* enforceable against state actors under §1983. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 447 (1976) (Title VII); *United States v. Georgia*, 546 U.S. 151, 154 (2006) (ADA). But they aren't. In fact, every Court of Appeals, including this one, to have considered the

6

issue has refused to permit private plaintiffs to sue state officials under §1983 for violations of these two important civil rights statutes. *See Williams v. Pa. Hum. Rel. Comm'n*, 870 F.3d 294, 300 n.33 (3d Cir. 2017) (collecting Court of Appeals cases).

Plaintiffs turn the law on its head by suggesting that when it comes to the VRA, "a violation of a federal *law*," not the "violation of a federal *right*," is enough to get into court through the §1983 door. *Gonzaga*, 536 U.S. at 282. That is fundamentally wrong. Plaintiffs want this Court to skip the searching inquiry into the VRA's text, structure, and history mandated by the text of §1983 and the Supreme Court. Instead, the Court should again "start with the text, apply first principles, and use the interpretive tools the Supreme Court has provided" "to figure out the right answer." *Arkansas NAACP*, 86 F.4th at 1216 n.7.

### B. Section 2, as an Exercise of Congress's Remedial Authority to Enforce the Fifteenth Amendment, Does Not Confer Substantive Rights on Private Individuals.

Unless a federal statute creates "substantive private rights," *Alexander v. Sandoval*, 532 U.S. 290 (2001), it does not secure "rights enforceable under § 1983." *Gonzaga*, 536 U.S. at 285. Congress does not create substantive rights when enforcing the provisions of the Fourteenth and Fifteenth Amendments. *City of Boerne v. Flores*, 521 U.S. 507, 527 (1997) ("Any suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case

7

law.").[1] The VRA is an exercise of Congress's power to enforce the "constitutional prohibition against racial discrimination in voting" guaranteed by the Fifteenth Amendment. *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). As such, it created only "new remedies," not new rights. *Id.* at 308, 315, 329-31.[2] Therefore, Section 2—one of its "remedial portions"—is not privately enforceable under §1983. *Id.* at 316.

Congress's "parallel" enforcement powers under Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment are "corrective or preventive, not definitional." *City of Boerne*, 521 U.S. at 518, 525. As the Supreme Court explained long ago, the Fourteenth Amendment invests Congress with the power only "to provide modes of relief against State legislation[] or State action" "when these are subversive of the fundamental rights specified in the amendment." *Civil*

---

[1] *See also* Erwin Chemerisnky, *The Assumptions of Federalism*, 58 STAN. L. REV. 1763, 1770 (2006) (recognizing that "Congress may not use its Section 5 powers to expand the scope of rights or to create new rights"); Michael W. McConnell, *Institutions and Interpretation: A Critique of City of Boerne v. Flores*, 111 HARV. L. REV. 153, 189 (1997) (Congress "cannot create new rights" when enforcing the Fourteenth Amendment.).

[2] "Constitutional remedies, unlike statutory remedies, cannot be authorized as a derivative power based on the legislature's power over the substantive law because Congress has no power over the substance of constitutional rights." Tracy A. Thomas, *Congress' Section 5 Power and Remedial Rights*, 34 U.C. DAVIS L. REV. 673, 701 (2001); *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 83-84 (1982) (plurality opinion) (contrasting Congress's broad power to define and prescribe remedies for statutory rights with Congress's limited power to enforce constitutional rights, *i.e.*, rights "not of congressional creation").

*Rights Cases*, 109 U.S. 3, 11 (1883); *see also City of Boerne*, 521 U.S. at 524-25 (discussing *Civil Rights Cases*). "Positive rights and privileges are undoubtedly secured by the Fourteenth Amendment; but they are secured by way of prohibition against State laws and State proceedings affecting those rights and privileges." *Civil Rights Cases*, 109 U.S. at 11.

One such right is the right to vote free from discrimination. "The right to vote in the States comes from the States; but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the Constitution of the United States; but the last has been." *United States v. Cruikshank*, 92 U.S. 542, 556 (1875); *see also United States v. Reese*, 92 U.S. 214, 217-18 (1875) (describing Fifteenth Amendment as securing a "new constitutional right"). From the ratification of the Fifteenth Amendment up until the passage of the Voting Rights Act of 1965, Congress attempted to secure the right to vote free from discrimination in myriad ways. *See Katzenbach*, 383 U.S. at 310-14 (chronicling Congress's "unsuccessful remedies" prescribed "to cure the problem of voting discrimination"). One remedy was §1983 and its statutory predecessor, which have allowed private parties to seek redress for violations of their Fifteenth Amendment rights. *See, e.g.*, *Lane v. Wilson*, 307 U.S. 268, 269 (1939); *cf. Maine v. Thiboutot*, 448 U.S. 1, 26-29 (1980) (Powell, J., dissenting) (relaying history of §1983 and noting that "cases dealing with purely statutory civil rights claims remain nearly as rare

9

as in the early years"). Criminal prohibitions were another enforcement mechanism. *See, e.g.*, 18 U.S.C. §241.

Despite these measures, many States persisted in "unremitting and ingenious defiance of the Constitution." *Katzenbach*, 383 U.S. at 309. Something more was needed—more than the Enforcement Act of 1870, more than the Civil Rights Acts of 1957, 1960, and 1964, and more than §1983. Consistent with the scope of its enforcement power, Congress passed in 1965 a "complex scheme" of "stringent new remedies" necessary to "banish the blight of racial discrimination in voting." *Katzenbach*, 383 U.S. at 308, 315; *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 (2001) (Congress promulgated "in the Voting Rights Act a detailed but limited remedial scheme."). With these "new, unprecedented remedies," Congress enforced the provisions of the Fifteenth Amendment without making "a *substantive* change in the governing law." *City of Boerne*, 521 U.S. at 519, 526.

The "fundamental" "distinction between rights and remedies" is on full display in §2. *Chelentis v. Luckenbach S.S. Co.*, 274 U.S. 372, 384 (1918). As originally enacted, "the coverage provided by § 2 was unquestionably coextensive with the coverage provided by the Fifteenth Amendment." *Chisom v. Roemer*, 501 U.S. 380, 392 (1991); *see also City of Mobile v. Bolden*, 446 U.S. 55, 61 (1980). Section 2 obviously made no "substantive change in the governing law." *City of Boerne*, 521 U.S. at 519. As such, its inclusion in the VRA, by itself, would have done

10

nothing to redress violations of the underlying right to vote free from discrimination that wasn't already being done through §1983 actions to enforce the Fifteenth Amendment. But §2 paired with §12 did a new thing: grant the federal government the power to bring civil and criminal actions to secure Fifteenth Amendment rights. *Katzenbach*, 383 U.S. at 316.

In 1982, Congress amended §2 by replacing the language "to deny or abridge" with the language "in a manner which results in a denial or abridgement" to reflect its determination "that a 'results' test was necessary to enforce the fourteenth and fifteenth amendments." *Jones v. City of Lubbock*, 727 F.2d 364, 375 (5th Cir. 1984). Consequently, "a violation of § 2 is no longer *a fortiori* a violation of the Constitution." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 482 (1997). But changing the evidentiary bar for proving a Section 2 claim did not confer new substantive rights. Instead, it created at most a prophylactic remedy to protect the underlying constitutional right. *See City of Boerne*, 521 U.S. at 518 (collecting examples of similar remedies promulgated to protect voting rights). Crucially, such "prophylactic legislation" may not "substantively redefine the States' legal obligations." *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 722 (2003) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 88 (2000)).

In sum, *City of Boerne v. Flores* holds that Congress does not confer new individual rights when enforcing the Reconstruction Amendments. 521 U.S. at 527.

Appellate Case: 23-3655     Page: 19     Date Filed: 02/07/2024 Entry ID: 5361165

Instead, Congress provides "modes of relief against … State action" that violates preexisting constitutional "rights and privileges." *Civil Rights Cases*, 109 U.S. at 11. The VRA is enforcement legislation. Thus, as the Supreme Court has recognized from day one, the VRA contains "new remedies" for violations of constitutional rights. *Katzenbach*, at 308, 315, 329-31. The notion that §2—one of its "remedial portions"—creates new rights misunderstands Congress's enforcement power. *Id.* at 316.

### C. Section 2 Does Not Unambiguously Confer *New* Rights.

Even if Congress can confer private rights through its remedial powers, only "*new* rights" are enforceable under §1983. *Gonzaga*, 536 U.S. at 287 (emphasis added). Neither Plaintiffs nor the District Court identified "with particularity the rights" they claim Congress created in §2. *Blessing*, 520 U.S. at 342; *see also Does v. Gillespie*, 867 F.3d 1034, 1046 (8th Cir. 2017) ("We conclude only that Congress did not unambiguously confer the *particular right* asserted by the [plaintiffs] in this case.") (emphasis added). Plaintiffs stated that §2 "protects the 'right of any citizen . . . to vote' free from discrimination." R.Doc.142 at 10. But protecting an existing right is not creating a new one, and the right to vote free from discrimination was enshrined more than 150 years ago in the Fifteenth Amendment. *See Reese*, 92 U.S. at 217-18. Section 2 protects that preexisting right by delineating how States might violate it and by giving the Attorney General the tools and authority he needs to

enforce more effectively the guarantees of the Fifteenth Amendment. Because §2 conferred no "new rights," it cannot be privately enforceable under §1983.

Compare §2 with provisions of Titles VI and IX, which the Supreme Court has cited as statutes containing "explicit rights-creating terms" and which conferred *new* rights never before articulated in federal law. *Gonzaga*, 536 U.S. at 284. Title VI, for example, conferred the new right not to be "excluded [on the ground of race, color, or national origin] from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.[3] And Title IX established the new right not to be "subjected to discrimination [on the basis of sex] under any educational program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a). These stand in stark contrast to Section 2, which largely "parrot[ed] the precise wording" of the Fifteenth Amendment when enacted, *Kimel*, 528 U.S. at 81, and which did no more than change the evidentiary bar when amended in 1982. *See supra*, at 10-11.

Instead, §2 is like other statutes enacted to enforce preexisting rights. The Violent Crime Control and Law Enforcement Act of 1994, for example, declared it

_____

[3] Harkening back to the point made about Congress's enforcement authority, *supra*, at 7-8, it is worth noting that Titles VI and IX are Spending Clause legislation, not legislation enforcing the Reconstruction Amendments. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998). As such, Titles VI and IX are not purely "remedial" in nature.

13

"unlawful for any governmental authority" or agent "to engage in a pattern or practice of conduct by law enforcement officers … that deprives persons of rights, privileges, or immunities secured or protected by the Constitution" or federal law. 34 U.S.C. §12601(a). That provision references "rights," but the text makes clear that no new right is being created. And structure confirms it too, where the following subsection empowers the Attorney General to bring civil actions when he has "has reasonable cause to believe that a violation of" §12601(a) has occurred. §12601(b). Courts interpreting this statute have concluded that it "confers no such express right upon a benefitted class. Instead, the statute only prohibits certain governmental conduct without conferring an unambiguous private right of action to a particular class." *Malecki v. Christopher*, No. 4:07-CV-1829, 2008 WL 11497819, at *3 n.6 (M.D. Pa. May 27, 2008); *see also Gumber v. Fagundes*, 2021 WL 4311904, at *5 (N.D. Cal. July 3, 2021).

Section 2 does not unambiguously confer new rights.

### D. Section 2 Does Not Unambiguously Confer *Individual* Rights.

Furthermore, unless a federal statute confers "individual rights," *Gonzaga*, 536 U.S. at 285-86, it does not secure "rights enforceable under § 1983." *Id.* at 285. Statutes that "have an aggregate focus," in that "they are not concerned with whether the needs of any particular person have been satisfied … cannot give rise to individual rights." *Id.* at 288 (internal quotation marks omitted). Similarly, "[s]tatutes that

14

focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (internal quotation marks omitted).

Section 2(a) references "a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." But there is no presumption of §1983 enforceability just because a statute "speaks in terms of 'rights.'" *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 18-20 (1981) (holding that the "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act was not enforceable under §1983). Rather, courts must take "pains to analyze the statutory provisions in detail, in light of the entire legislative enactment, to determine whether the language in question created enforceable rights, privileges, or immunities within the meaning of § 1983." *Suter v. Artist M*, 503 U.S. 357 (1992) (internal quotation marks omitted).

This Court in *Arkansas NAACP* thought it "unclear whether § 2 creates an individual right." 86 F.4th at 1209. The court first compared §2 to Title VI, but it noticed some important dissimilarities. 86 F.4th at 1209-10. Section 601 of Title VI begins, "[n]o person … shall … be subjected to discrimination." 42 U.S.C. §2000d. The "unmistakable focus" is "on the benefited class," not the regulated party. *Gonzaga*, 536 U.S. 286. But §2 begins, "No voting qualification … shall be imposed … by any State." 52 U.S.C. §10301. The focus here is on the conduct prohibited and

Appellate Case: 23-3655    Page: 23    Date Filed: 02/07/2024 Entry ID: 5361165

the party regulated. "It is a 'general proscription' of 'discriminatory conduct, not a grant of a right 'to any identifiable class.'" *Arkansas NAACP*, 86 F.4th at 1209 (quoting *Sierra Club*, 451 U.S. at 294, *Gonzaga*, 536 U.S. at 284). But a phrase or two later Section 2 adjusts its focus to the person benefited—"any citizen." 52 U.S.C. §10301(a). The majority decided that it "is unclear what to do when a statute focuses on both" the person regulated *and* the individual protected.

If unmistakable clarity and unambiguity is the standard for conferring individual rights enforceable, §2 does not meet it. "Basic federalism principles confirm" this. *Carey v. Throwe*, 957 F.3d 468, 483 (4th Cir. 2020) ("To the extent [the *Gonzaga*] standard permits a gradation, we think it sound to apply its most exacting lens when inferring a private remedy [that] would upset the usual balance of state and federal power."). "Redistricting is primarily the duty and responsibility of the State, and federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Abbott*, 138 S. Ct. at 2324. To scrutinize §2 with anything less than the "most exacting lens," *Carey*, 957 F.3d at 483, for the presence of a privately enforceable federal right would "subject to judicial oversight" every state redistricting map "at the behest of a single citizen," *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 645 (1979) (Powell, J., concurring). Section 2's text does not make unmistakably clear Congress's intent to "upset the usual

16

constitutional balance of federal and state powers" in that way. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

### E. The VRA's Express Method of Enforcement is Additional Evidence that Section 2 Confers No New Individual Rights.

Finally, where a statute provides a "federal review mechanism," the Supreme Court has been less willing to identify "individually enforceable private rights." *Gonzaga*, 536 U.S. at 289-90; *see also Midwest Foster Care and Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1202 (8th Cir. 2013) (same).[4] For example, the *Gonzaga* Court held that the Family Educational Rights and Privacy Act's nondisclosure provisions created no rights enforceable under §1983. *Id.* at 290-91. The Court's conclusion was "buttressed by the mechanism that Congress chose to provide for enforcing those provisions. Congress expressly authorized the Secretary of Education to '*deal with violations*' of the Act …." *Id.* at 289.

The Court contrasted FERPA's authorization of federal enforcement with provisions in the Public Housing Act and the Medicaid Act that lacked a "federal review mechanism." *Id.* at 280, 290. In *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418 (1987), the Court held that the rent-ceiling provision of the Public Housing Act was enforceable under §1983 in "significant" part because "the

---

[4] This argument is distinct from the second prong of the §1983 enforceability inquiry, which asks whether Congress, *after* conferring new individual rights, "specifically foreclosed a remedy under § 1983." *Gonzaga*, 536 U.S. at 284 n.4; *see also* Blue Br. at 39-43 (making a "second prong" argument).

Appellate Case: 23-3655     Page: 25     Date Filed: 02/07/2024 Entry ID: 5361165

federal agency charged with administering the Public Housing Act had never provided a procedure by which tenants could complain to it about the alleged failures of state welfare agencies to abide by the Act's rent-ceiling provision." *Gonzaga*, 536 U.S. at 280 (internal quotation marks omitted and alterations adopted). And in *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990), the Court also held that a reimbursement provision of the Medicaid Act was privately enforceable in part because there was "no sufficient administrative means of enforcing the requirement against States that failed to comply." *Gonzaga*, 536 U.S. at 280-81.

Here, like in FERPA, Congress expressly provided for federal enforcement of the VRA's provisions. Pursuant to his powers granted under §12 of the VRA, the Attorney General can and does enforce Section 2 against the States. *See* 52 U.S.C. §10308; *see also* Voting Section Litigation, *Cases Raising Claims Under Section 2 of the Voting Rights Act*, https://www.justice.gov/crt/voting-section-litigation#sec2cases (last visited Jan. 25, 2024). "If the text and structure of § 2 and § 12 show anything, it is that Congress intended to place enforcement in the hands of the Attorney General, rather than private parties." *Arkansas NAACP*, 86 F.4th at 1211. This inclusion of a robust and express "federal review mechanism" suggests further that Congress did not confer privately enforceable rights.

Appellate Case: 23-3655     Page: 26     Date Filed: 02/07/2024 Entry ID: 5361165

## II.     Plaintiffs Did Not Prove A Section 2 Violation.

Since it was amended in 1982, §2 has barred States from applying any voting practice "in a manner which results in a denial or abridgement of the right … to vote on account of race." 52 U.S.C. §10301(a). To establish a violation, the challenger must prove "that the political processes leading to nomination or election in the State … are not equally open to participation by members of a" racial group "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* §10301(b). The statute makes clear that it does not "establish[] a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

The Supreme Court has explained that the 1982 amendments to "§ 2 [were] intended to 'codify' the results test employed in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and *White v. Regester*, 412 U.S. 755 (1973)." *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 83-84 (1986) (O'Connor, J., concurring in the judgment)). Those two decisions supplied §2(b)'s key language, and because the phrase "is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (internal quotation marks omitted). Thus, "it is to *Whitcomb* and *White* that [courts] should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2."

19

*Gingles*, 478 U.S. at 97 (O'Connor, J., concurring in the judgment). And *Whitcomb* made it clear that the "failure of" a minority group "to have legislative seats in proportion to its populations" is not vote dilution when it "emerges more as a function of losing elections than of built-in bias." *Whitcomb*, 403 U.S. at 153. The assertion that "voting power" has "been 'cancelled out'" is often a mere "euphemism for political defeat at the polls," which does not warrant judicial intervention. *Id.*

Accordingly, in *Gingles* the Supreme Court laid out three preconditions any plaintiff must satisfy to proceed with a §2 challenge to a redistricting scheme. These "exacting requirements … limit judicial intervention," and help ensure that "§ 2 never requires adoption of districts that violate traditional redistricting principles." *Allen v. Milligan*, 599 U.S. 1, 30 (2023) (cleaned up). "[T]he *Gingles* framework … imposes meaningful constraints on proportionality," which is critical because "[f]orcing proportional representation is" not only inconsistent with §2, it is "unlawful." *Id.* at 26, 28.

This brief focuses on the first *Gingles* precondition: Whether Plaintiffs produced an alternative map in which the "minority group … constitute[d] a majority in a reasonably configured district." *Id.* at 18. For an alternative to be "reasonably configured," it must "comport[] with traditional districting criteria." *Id.* And because the §2 inquiry is "an intensely local appraisal," the relevant traditional districting criteria are those embedded in the challenged plan. *Id.* at 19-20. The inquiry

therefore is necessarily comparative; for example, it makes no sense to judge North Dakota's 2021 legislative plan based on the redistricting priorities of Alabama's 2011 board of education plan.

In *Allen v. Milligan*, the Court held that the plaintiffs satisfied *Gingles* I because, in the Court's view, plaintiffs' plans performed as well as Alabama's 2021 congressional plan on traditional criteria the Court has repeatedly recognized in the *Gingles* context. *See id.* at 20-21; *see also id.* at 44 n.2 (Kavanaugh, J., concurring) ("it is important that at least some of the plaintiffs' proposed alternative maps respect county lines at least as well as Alabama's redistricting plan"). On compactness, the Court affirmed the finding that plaintiffs' maps "perform[ed] generally better on average" or were "roughly as compact" as the challenged plan. *Id.* at 20. On political subdivisions, "some of plaintiffs' proposed maps split the same number of county lines as (or even fewer county lines than)" Alabama's 2021 plan. *Id.* On communities of interest, plaintiffs' maps were "reasonably configured because," while they split one community of interest, "they joined together a different community of interest" that Alabama's plan had split. *Id.* at 21. Crucially, there would "be a split community of interest in both" the challenged plan and plaintiffs' alternatives. *Id.*

The *Allen* Court then explained the purpose of "illustrative maps that a plaintiff adduces. Deviation from that map shows it is *possible* that the State's map has a disparate effect on account of race." *Id.* at 26. In other words, if the plaintiff can

21

produce a map with an additional majority-minority district that performs as well as the challenged plan on traditional criteria, then the plaintiff has raised an inference of discriminatory effects "on account of race." 52 U.S.C. §10301(a). Such an alternative bolsters "would-have, could-have, and (to round out the set) should-have arguments," which "are a familiar means of undermining a claim that an action was based on a permissible, rather than a prohibited, ground." *Cooper v. Harris*, 581 U.S. 285, 317 (2017).

By the same token, an alternative map that creates an additional majority-minority district while *sacrificing* adherence to traditional districting principles doesn't cut it. A State's deviation from that underperforming map doesn't show anything relevant to the §2 inquiry other than perhaps that disparate impacts from the challenged plan are on account of traditional principles, rather than "on account of race." *Cf. Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994) ("[S]ome dividing by district lines and combining within them is virtually inevitable and befalls any population group of substantial size.").

Plaintiffs offered two similarly configured alternative maps, and neither satisfied *Gingles* I. The case turned on the configuration of Senate District 9. Below on the left is the enacted plan, in which District 9 is shown in its two parts—9A (in pink) and 9B (in tan). The district is close to rectangular. Contrast that with the Plaintiffs' proposed District 9, shown on the right (in maroon). Starting at the State's

northern border, it expands then contracts then expands and contracts again as it makes its way south before hooking east.

**2021 Enacted Plan** (R.Doc.65-3 at 30)     **Plaintiffs' Plan 1** (R.Doc.65-3 at 31)



The State's plan is clearly superior in terms of traditional districting principles and numbers bear this out. The State's expert calculated the compactness of the different versions of District 9 based on three common compactness metrics. Of the 47 districts in North Dakota, enacted District 9 was one of the most compact and plaintiffs' proposed versions were among the worst[5]:

---

[5] *See* R.Doc.60-35 at 8-10 (higher scores mean more compact).

Appellate Case: 23-3655     Page: 31     Date Filed: 02/07/2024 Entry ID: 5361165

| Compactness Test | Reock | Polsby-Popper | Schwartzberg-Adjusted |
|---|---|---|---|
| Enacted District 9 | .39 (33rd) | .59 (5th) | .59 (6th) |
| Plaintiffs' Plan 1 District 9 | .25 (45th) | .22 (44th) | .28 (45th) |
| Plaintiffs' Plan 2 District 9 | .20 (45th) | .19 (46th) | .24 (46th) |

That Plaintiffs can point to one or two (out of 47) districts that are arguably less compact than their District 9 "does not abrogate the gross non-compactness of" their proposed district "for *Gingles* purposes." *Diaz v. Silver*, 978 F. Supp. 96, 130 (E.D.N.Y.), aff'd, 522 U.S. 801 (1997). Compactness was subordinated to racial goals in Plaintiffs' plans, and that should have ended the case. Section 2 "never requires adoption of districts that violate traditional redistricting principles." *Allen*, 599 U.S. at 30.[6]

The District Court, however, concluded that Plaintiffs' claim was "not defeated simply because the challenged plan performs better on certain traditional redistricting criteria than the proposed plan." R.Doc.125 at 18. Appealing to *Allen*, the court concluded that a plan could be "reasonably configured, even where the enacted plan arguably performed better on certain traditional redistricting criteria than the demonstrative plans," lest *Gingles* I become a "beauty contest." *Id.* The court,

---

[6] The proposed versions of District 9 also have higher population deviations from the ideal population per district than enacted District 9, R.Doc.117 at 94, 103, and Plaintiffs' Plan 1 splits more county lines than the enacted plan, while Plaintiffs' second plan splits the same number. R.Doc.65-2 at 35, 42.

Appellate Case: 23-3655    Page: 32    Date Filed: 02/07/2024 Entry ID: 5361165

however, misread *Allen*. As explained above, *Allen*'s holding rested on the premise that plaintiffs' plans met-or-beat Alabama's plan on compactness, county lines, and communities of interest.

The District Court likewise misunderstood *Allen*'s line about beauty contests. The reason for bypassing the so-called "beauty contest" in *Allen* was precisely because plaintiffs' alternatives were on par with the challenged plan's application of traditional criteria. *See, e.g.*, *Allen*, 599 U.S. at 21 ("[t]here would be a split community of interest in both"). As such, the challenged plan's "[d]eviation from" plaintiffs' plans could "show[] it is *possible* that the State's map has a disparate effect on account of race." *Id.* at 26. But in this case, there is no "beauty contest," not because of problems with North Dakota's plan, but because Plaintiffs' plans don't even qualify. They reveal nothing about North Dakota's plan because they sacrifice traditional principles given effect in that plan.

The District Court nevertheless blessed Plaintiffs' proposed plans because they "contain[ed] no obvious irregularities" and "did not appear more oddly shaped than other districts." *See* R.Doc.125 at 19. But that close-enough-is-good-enough approach cannot be squared with §2's text or *Allen*, and it leaves Legislatures with no meaningful guidance when it's time to redistrict. Just look at this case. Even the District Court found it "evident that the Secretary and the Legislative Assembly did carefully examine the VRA and believed that" its "boundaries of districts 9 and 15

25

would comply with the VRA." *Id.* at 38. "But unfortunately," the court concluded, "those efforts did not go far enough to comply with Section 2." *Id.* How far is far enough? Apparently, as far as the State can go towards proportionality, including sacrificing compactness and embracing odd shapes, without crossing the line into more-oddly-shaped-than-warranted territory.

That "test" provides no predictability to the States, is anything but "exacting," *Allen*, 599 U.S. at 30, and reveals nothing about whether the State's plan produces discriminatory effects "on account of race." That test paradoxically allows federal courts to replace enacted plans with alternatives that clearly perform worse on racially neutral criteria, all in the name of treating people equally. Under that test "traditional districting criteria" do no work to "limit[] any tendency of the VRA to compel proportionality." *Id.* at 28.

Constitutional avoidance also requires that the District Court's test be rejected. Nothing in *Allen* "diminish[ed] or disregard[ed]" the persistent concern "that § 2 may impermissibly elevate race in the allocation of political power within the States." *Id.* at 42. Instead, the Court made clear that "[f]orcing proportional representation is *unlawful* and inconsistent with this Court's approach to implementing § 2." *Id.* at 28 (emphasis added). Yet, the District Court, citing *Cooper v. Harris*, concluded that using "race" as "the predominate motivating factor in drawing" new districts was constitutional because the court was "remedying … a Section 2

Appellate Case: 23-3655    Page: 34    Date Filed: 02/07/2024 Entry ID: 5361165

violation." R.Doc.125 at 20 n.3. But the Court in *Cooper* merely "assumed" that complying with §2 could be a "compelling interest" sufficient to justify "race-based sorting of voters" before *rejecting* a race-predominant plan. *Cooper*, 581 U.S. at 292. The Supreme Court has "never applied this assumption to *uphold* a districting plan that would otherwise violate the Constitution, and the slightest reflection on first principles should make clear why it would be problematic to do so." *Allen*, 599 U.S. at 79 (Thomas, J., dissenting).

The Supreme Court recognizes "only two compelling interests that permit resort to race-based government action"—(1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and (2) "avoiding imminent and serious risks to human safety in prisons." *SFFA v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023). But the District Court here never identified any specific, identified instances of past discrimination against Native Americans that needed to be remediated through race-based districting. Rather, in the District Court's view, North Dakota "sought input from the Tribes and other Native American representatives," but simply "did not go far enough" to draw their preferred districts. R.Doc.125 at 38. It should go without saying, however, that failure to discriminate in favor of a racial group is not discrimination against it.

## CONCLUSION

The Court should reverse.

February 6, 2024

Respectfully submitted,

Steve Marshall
  *Attorney General*

<u>/s/ Edmund G. LaCour Jr.</u>
Edmund G. LaCour Jr.
  *Solicitor General*

Soren Geiger
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Amici Curiae*

28

## ADDITIONAL COUNSEL

ASHLEY MOODY
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

SEAN D. REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

29

## CERTIFICATE OF SERVICE

On February 6, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

I further certify that, within five days of receipt of the notice that the brief has been filed by this Court, the foregoing brief will be sent by Federal Express next-day mail to the Clerk of the Court (ten copies). Because all parties have consented to service through the Notice of Docket Activity pursuant to Local Rule 25A(e), paper copies of this brief will not be sent to party counsel of record.

Dated: February 6, 2024

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.

Appellate Case: 23-3655     Page: 38     Date Filed: 02/07/2024 Entry ID: 5361165

**CERTIFICATE OF COMPLIANCE**

1.     I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,500 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

3.     This brief complies with Local Rule 28A(h)(2) because it has been scanned with the most recent version of Cisco Secure Client (5.0.00837) and is free of viruses according to that program.

Dated: February 6, 2024

                                        /s/ Edmund G. LaCour Jr.
                                        Edmund G. LaCour Jr.

Appellate Case: 23-3655     Page: 39     Date Filed: 02/07/2024 Entry ID: 5361165