# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

————————————

TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS,
SPIRIT LAKE TRIBE, WESLEY DAVIS, ZACHERY S.
KING, COLLETTE BROWN,

*Plaintiffs-Appellees,*

v.

MICHAEL HOWE, in his official capacity as Secretary of
State of North Dakota,

*Defendant-Appellant.*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NORTH DAKOTA
(No. 3:22-cv-00022)

## BRIEF OF PLAINTIFFS-APPELLEES

Michael S. Carter
Matthew Campbell
Allison Neswood
NATIVE AMERICAN
  RIGHTS FUND
250 Arapahoe Ave
Boulder, CO 80302
(303) 447-8760

Samantha B. Kelty
NATIVE AMERICAN RIGHTS
  FUND
950 F Street NW, Ste. 1050
Washington, DC 20004
(202) 785-4166

Mark P. Gaber
Molly E. Danahy
Melissa Neal
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200

Bryan L. Sells
THE LAW OFFICE OF
  BRYAN L. SELLS
P.O. Box 5493
Atlanta, GA 31107
(404) 480-4212

*Counsel for Appellees*

Timothy Q. Purdon*
ROBINS KAPLAN, LLP
1207 West Divide Ave., Ste 200
Bismarck, ND 58501
(701) 255-3000

*\* Counsel for Appellees Turtle
Mountain Band of Chippewa
Indians and Spirit Lake Nation*

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

The Voting Rights Act ("VRA") is the foremost civil and equal rights statute enacted under Congress's Reconstruction Amendment enforcement powers. Plaintiffs are entitled to enforce the right to vote in non-dilutive state legislative districts, as guaranteed by Section 2 of the VRA, under the KKK Act of 1871, codified as 42 U.S.C. § 1983.

Section 1983 was enacted primarily to provide a cause of action for Reconstruction Amendment enforcement statutes, like the VRA. Thus, courts should presume Reconstruction Amendment enforcement statutes are privately enforceable under Section 1983 unless those statutes evince an unambiguous intent to preclude individual enforcement. Section 2 easily clears that hurdle. But even if the Court applies the more stringent test adopted to limit the reach of Section 1983 to statues enacted under the Spending and Commerce Clauses, Section 2 clearly protects individual rights, and enforcement by individuals is not incompatible with enforcement by the Attorney General.

Moreover, the district court did not err in finding that Plaintiffs established the first and second *Gingles* preconditions.

Plaintiffs respectfully request oral argument.

# TABLE OF CONTENTS

INTRODUCTION ................................................................ 1

STATEMENT OF THE CASE .......................................... 2

   I.  Factual Background ................................................ 2

  II.  Procedural Background .......................................... 6

SUMMARY OF ARGUMENT ........................................ 17

ARGUMENT ................................................................... 21

   I.  Section 1983 provides a cause of action for VRA Section 2 claims ................................................................. 21

     A.  Reconstruction Amendment enforcement statutes are the core focus of § 1983 and are presumed enforceable absent an unambiguous intent from Congress not to create an individual right. ........................................................ 23

     B.  The Secretary's assertion that *Gonzaga* must apply to Reconstruction Amendment enforcement statutes is unavailing. ........................................................ 31

     C.  Even if *Gonzaga* is the correct test, Section 2 easily satisfies it. ........................................................ 35

        1.  Section 2 enforces an unambiguous individual right. .... 35

        2.  Section 2's enforcement scheme is not incompatible with § 1983 enforcement. ................................ 44

  II.  The district court did not clearly err in its *Gingles* 1 and 2 factual findings. ................................................ 52

     A.  The district court's *Gingles* 1 finding was not clearly erroneous. ........................................................ 52

     B.  The district court's *Gingles* 2 finding was not clearly erroneous. ........................................................ 60

CONCLUSION ................................................................ 67

# TABLE OF AUTHORITIES

**Cases**                                                    **Page**

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ........................................... 36

*Allen v. Milligan*, 599 U.S. 1 (2023) ................................. 52, 53, 55, 58, 59

*Alsbrook v. City of Maumelle*, 184 F.3d 999 (8th Cir. 1999) ................... 34

*Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (2023) ..................................... 37-38, 39

*Blessing v. Freestone*, 520 U.S. 329 (1997) ............................................. 47

*Boaz v. United States*, 884 F.3d 808 (8th Cir. 2018) .............................. 38

*Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004) ................. 61

*Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) .................... 60, 64

*Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989) ........................................ 60

*Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001) .............................. 51

*Bush v. Vera*, 517 U.S. 952 (1996) ......................................................... 59

*Chisom v. Roemer*, 501 U.S. 380 (1991) ................................................. 36

*City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547 (11th Cir. 1987) ......................................................... 60

*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) ................................................................. 31, 32, 47

*Cooper v. Harris*, 581 U.S. 285 (2017) .............................................. 55, 57

*Dennis v. Higgins*, 498 U.S. 439 (1991) ................................................. 27

*Dillard v. City of Greensboro*, 213 F.3d 1347 (11th Cir. 2000) ............... 51

*Garden v. Central Nebraska Housing Corporation*, 719 F.3d 899 (8th Cir. 2013) ............................................................. 49

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) .............. 6, 25, 26, 36, 44

*Health & Hospital Corporation of Marion County v. Talevski*,
599 U.S. 166 (2023) .................................................. *passim*

*Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000) ......................... 33

*Maine v. Thiboutot*, 448 U.S. 1 (1980) ............................ 21, 23, 24, 30, 48

*McCready v. White*, 417 F.3d 700 (7th Cir. 2005) .................................. 32

*MHANY Management Inc. v. County of Nassau*,
843 F. Supp. 2d 287 (E.D.N.Y. 2012) .................................................. 32

*Midwest Foster Care & Adoption Association v. Kincade*,
712 F.3d 1190 (8th Cir. 2013) ............................................................. 41

*Missouri State Conference of NAACP v. Ferguson-Florissant School District*, 894 F.3d 924 (8th Cir. 2018) ................................................. 54

*Osher v. City of St. Louis, Mo.*, 903 F.3d 698 (8th Cir. 2018) ................ 36

*Pennhurst State School & Hospital v. Halderman*,
451 U.S. 1 (1981) ............................................................................... 25

*Pope v. County of Albany*, 94 F. Supp. 3d 302 (N.D.N.Y. 2015) ............. 61

*Sanchez v. Bond*, 875 F.2d 1488 (10th Cir. 1989) .................................. 60

*Shaw v. Hunt*, 517 U.S. 899 (1996)............................................. 40, 41, 42

*Tennessee v. Lane*, 541 U.S. 509 (2004) ........................................... 34, 51

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ................................. 42, 60, 64

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) ........................... 42

*Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) ............................... 39

*Wisconsin Legislature v. Wisconsin Elections Commission*,
142 S. Ct. 1245 (2022)....................................................................... 62

*Wisniewski v. Rodale, Inc.*, 510 F.3d 294 (3d Cir. 2007)........................ 36

**Constitutional Provisions, Statutes, and Rules**

42 U.S.C. § 1983........................................... 1, 21, 28, 32, 33, 43

52 U.S.C. § 10301(a) ............................................... 19, 36, 37, 41

52 U.S.C. § 10301(b) ...................................................... 30

52 U.S.C. § 10308(f) ................................................... 37, 41

52 U.S.C. § 10310(e) ................................................... 50, 51

Fed. R. App. P. 4 ............................................................ 17

U.S. Const. amend. XIV, § 1 ......................................... 28

U.S. Const. amend. XV, § 1 ........................................... 28

Voting Rights Act of 1965,
    Pub. L. No. 89-110, 79 Stat. 437 (1965) ...................... 30, 51

## Other Authorities

S. Rep. No. 97-417 (1982) ............................................. 30

## INTRODUCTION

In 1871, Congress enacted one of the most important civil rights laws in the United States—the Ku Klux Klan Act. Enacted pursuant to the Fourteenth Amendment enforcement powers, Section 1 of that law is known today as 42 U.S.C. § 1983. Section 1983 was enacted primarily to provide a cause of action for civil and equal rights statutes enacted pursuant to Congress's Reconstruction Amendment enforcement powers. Over time, § 1983 has been extended to provide a cause of action for certain Spending and Commerce Clause statutes that create individual rights—notwithstanding the objection of justices seeking to confine its reach to statutes enacted to enforce the Reconstruction Amendments.

Congress's most significant Reconstruction Amendment enforcement statute is the Voting Rights Act ("VRA"). Plaintiffs proved at trial that North Dakota's enacted legislative map dilutes Native American voting strength in violation of Section 2 of the VRA. The Secretary only cursorily challenges that conclusion on appeal. His unpersuasive arguments on the merits are insufficient to show that the district court clearly erred in finding for Plaintiffs below. Instead, the Secretary devotes most of his appeal to contending that there is no § 1983

1

cause of action to enforce Section 2. Accepting this audacious and unprecedented argument would turn § 1983 on its head—authorizing causes of action for social security and nursing home reform statutes while withholding a cause of action from the most significant Reconstruction Amendment enforcement statute of the last century.

The Court should decline to adopt this radical argument aimed at neutralizing the VRA. Rather, the Court should affirm the district court's ruling that the 2021 state legislative map for North Dakota dilutes the votes of Native Americans living in the northeastern part of the state.

## STATEMENT OF THE CASE

## I.    Factual Background

From 1990 to 2022, Native American voters in northeastern North Dakota were able to elect their candidates of choice from state legislative district 9—one state senator and two state representatives. Pls.App.44, 50.[1] During that time, district 9 was wholly contained within Rolette County, and by the time of the 2020 Census it had a Native American

---

[1] "App." and "Add." refer to the Secretary's Appendix and Addendum. "Pls.App." refers to Plaintiffs' Appendix, which contains four trial exhibits: Plaintiffs' Exhibits 1, 42, 59, and 80. The trial exhibits were not scanned to the district court's docket, but all four exhibits were admitted into evidence. *See* App.50, 53;R.Doc.115 at 6, 9.

Voting Age Population ("NVAP") of roughly 74%. Add.30;App.458; R.Doc.125 at 4. The 2020 Census reported a sizeable decrease in district 9's population, requiring the district to expand beyond Rolette County to meet population equality requirements. Add.34;App.462;R.Doc.125 at 8.

At its September 28 and 29, 2021 meetings, the North Dakota legislative management redistricting committee ("redistricting committee") released proposed redistricting maps to the public that substantially reconfigured district 9 and the surrounding districts. Add.32;App.460;R.Doc.125 at 6. The proposed plan stretched district 9 into parts of two counties to the west, Towner and Cavalier Counties. Add.32;App.460;R.Doc.125 at 6. The added territory was almost entirely composed of white residents, with the Towner County portion having just a 2.7% NVAP and the Cavalier County portion of the proposed district having a 1.8% NVAP. Add.34;App.462;R.Doc.125 at 8. This proposed district reflected a 20-point decrease from the then-existing district's NVAP. Pls.App.47. The redistricting committee also proposed subdividing district 9 into two state house districts, Districts 9A and 9B. Add.32;App.460;R.Doc.125 at 6. With an NVAP of roughly 80%, proposed subdistrict 9A was overwhelmingly Native American and contained all of

the Turtle Mountain Band of Chippewa Indians ("Turtle Mountain")
reservation and part of its off-reservation trust lands. Add.34;App.462;
R.Doc.125 at 8. Proposed subdistrict 9B, with an NVAP of just 32.2%,
contained the remainder of the Turtle Mountain off-reservation trust
lands, as well as the portions of Towner and Cavalier Counties appended
to district 9. Add.34;App.462;R.Doc.125 at 8. The nearby Spirit Lake
Tribe ("Spirit Lake"), which is primarily located in Benson County, was
assigned in the proposal to district 15, which had an NVAP of 23.1%.
Add.34;App.462;R.Doc.125 at 8. The configuration is shown below:



Add.34;App.462;R.Doc.125 at 8.

Following the release of this proposed plan, the chairmen of the
Turtle Mountain and Spirit Lake Tribes sent the redistricting committee

a letter on November 1, 2021, requesting that the plan be revised to unify Turtle Mountain and Spirit Lake in district 9 by extending the district south into Benson County rather than westward to Towner and Cavalier Counties. Add.32-33;App.460-61;R.Doc.125 at 6-7. The letter contained an analysis showing that voting in the region was starkly racially polarized and noted that the redistricting committee's proposal would reduce the opportunity for Native American voters to elect their preferred candidates. Add.32-33;App.460-61;R.Doc.125 at 6-7. The chairmen, along with then-district 9 Senator Richard Marcellais—a Native American—and then-district 9 Representative Marvin Nelson, spoke in favor of the Tribes' proposal at a November 8, 2021, committee meeting. Add.33;App.461;R.Doc.125 at 7.

The committee rejected the Tribes' proposal, instead voting to advance House Bill 1504, which reflected the committee's originally proposed configuration for district 9, 9A, 9B and 15. Add.33;App.461;R.Doc.125 at 7. The House debated and passed House Bill 1504 on November 9, 2021, and the Senate did the same on November 10, 2021—defeating Senator Marcellais' amendment to adopt

the Tribes' proposed configuration of district 9. Add.33;App.461; R.Doc.125 at 7.

## II.    Procedural Background

In February 2022, Turtle Mountain and Spirit Lake, along with three individual Native American voters (collectively, "Plaintiffs"), filed suit against the North Dakota Secretary of State ("the Secretary") under 42 U.S.C. § 1983 and Section 2 of the Voting Rights Act ("VRA"). App.1; R.Doc.1 at 1. The suit alleged that the configuration of districts 9, 9A, 9B, and 15 dilutes Native American voting strength in northeastern North Dakota by reducing from three to one the number of legislators Native American voters had an equal opportunity to elect.

The Secretary moved to dismiss, arguing, *inter alia*, that there is no implied private right of action to enforce Section 2 of the Voting Rights Act. Add.5-6;App.37-38;R.Doc.30 at 5-6. The district court did not reach that question because Plaintiffs' claim was also plead under 42 U.S.C. § 1983, which the court found to provide Plaintiffs a cause of action to enforce Section 2. Add.6;App.38;R.Doc.30 at 6. Applying the test articulated in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the district court first concluded that Section 2 creates individual rights. Second, the

district court concluded that "nothing in [Section 2's enforcement provisions are] incompatible with private enforcement." Add.11;App.43; R.Doc.30 at 11. For these reasons, the district court ruled that "the Secretary has not rebutted the presumption that § 1983 may provide a remedy for the Plaintiffs in this case." Add.12;App.44;R.Doc.30 at 12.

The district court held a four-day bench trial from June 12-15, 2023. Three experts and five fact witnesses testified for Plaintiffs. Add.36; App.464;R.Doc.125 at 10. Dr. Loren Collingwood testified regarding the presence of the three Section 2 *Gingles* preconditions, Add.37;App.465; R.Doc.125 at 11, while Drs. Daniel McCool and Weston McCool testified regarding the presence of the totality of circumstances factors, Add.38-39;App.466-67;R.Doc.125 at 12-13. Among the fact witnesses, Turtle Mountain Tribal Chairman Jamie Azure and former Spirit Lake Chairman Douglas Yankton testified, *inter alia*, about the shared representational interests of the two Tribes, the similar socioeconomic statuses of their citizens, and the similar "cultural and political values of Turtle Mountain Tribal members and Spirit Lake Tribal members." Add.36, 39-40;App. 464, 467-68;R.Doc.125 at 10, 13-14. Former Senator Richard Marcellais and former Representative Marvin Nelson testified

about the shared representational needs of the Tribes, Add.38-39; App.466-67;R.Doc.125 at 12-13, and Plaintiff Collette Brown—the Executive Director for the Spirit Lake Gaming Commission and a 2022 state senate candidate for district 15—testified about her campaign and the need for representation for Native American communities in the legislature, Add.38;App.466;R.Doc.125 at 12.

The Secretary presented testimony from one expert regarding the *Gingles* preconditions, Dr. M.V. Hood, III, Add.40;App.468;R.Doc.125 at 14, and two employees from the Secretary's office regarding election administration issues related to redistricting, Add.41;App.469; R.Doc.125 at 15.

On November 17, 2023, the district court ruled in Plaintiffs' favor, concluding that Plaintiffs had established the three *Gingles* preconditions and had proved, under the totality of circumstances, that the configuration of districts 9, 9A, 9B, and 15 violated Section 2. The court enjoined further implementation of the affected districts and gave the legislature and the Secretary more than a month to submit a proposed remedial map. Add.64-65;App.492-93;R.Doc.125 at 38-39.

**Gingles Prong 1.** With respect to the first *Gingles* precondition, the court reasoned that Plaintiffs proffered two demonstrative districts in which Native Americans would be a majority of eligible voters. Add.44; App.472;R.Doc.125 at 18. Plaintiffs' demonstrative plan 1 is shown below, with district 9—which connects Rolette and Benson Counties—shown in maroon.

**Plaintiffs' Demonstrative Plan 1**

Add.35;App.463;R.Doc.125 at 9. The court determined that "[t]he evidence at trial shows that the Tribes' proposed plans comport with traditional redistricting principles, including compactness, contiguity,

respect for political boundaries, and keeping together communities of interest." Add.44-45;App.472-73;R.Doc.125 at 18-19. Citing the trial evidence, the court observed that the demonstrative districts "did not appear more oddly shaped than other districts" and were "reasonably compact." Add.45;App.473;R.Doc.125 at 19. This was so whether compared to other enacted districts or using mathematical "compactness scores." Add.45;App.473;R.Doc.125 at 19. The district court specifically found, based on the testimony of Chairman Azure and former Chairman Yankton, that nonracial interests motivated the unification of Benson and Rolette Counties (and thus the two Tribes), including "shared representational interests, socioeconomic statuses, and cultural values." Add.45;App.473;R.Doc.125 at 19. In particular, the court credited testimony of the Chairmen that "the Tribes often collaborate to lobby the Legislative Assembly on their shared issues, including gaming, law enforcement, child welfare, taxation, and road maintenance, among others." Add.45;App.473;R.Doc.125 at 19. The district court noted that the first *Gingles* precondition "is not a 'beauty contest' between plaintiffs' maps and the state's districts," Add.44;App.472;R.Doc.125 at 18 (quoting *Allen v. Milligan*, 599 U.S. 1, 21 (2023)), and concluded that Plaintiffs'

had established *Gingles* 1 by a preponderance of the evidence, Add.46; App.474;R.Doc.125 at 20.

The Secretary's expert, Dr. Hood, conceded as much in his testimony. First, he agreed that a reasonably configured district in which Native Americans constitute the majority of eligible voters could be drawn in the region, such that an evaluation of Plaintiffs' demonstrative districts was "more of a remedial question than it is necessarily a *Gingles* 1 question." App.357-58;R.Doc.117 at 110-11. Dr. Hood testified that all of the enacted legislative districts were compact, and that because Plaintiffs' demonstrative versions of district 9 were *more compact* than other enacted districts, they too were compact. App.362;R.Doc.117 at 115. He testified that district 9 in Plaintiffs' demonstrative plan 1 split the same number of counties as the enacted version of district 15, App.369; R.Doc.117 at 122, and resolved the enacted plan's split of Towner County, App.370;R.Doc.117 at 123. Indeed, Dr. Hood testified that Plaintiffs' demonstrative plan 2 split *fewer* counties in the region than the enacted plan and had the same number of statewide county splits as the enacted plan. App.371;R.Doc.117 at 124. Dr. Hood likewise testified that Plaintiffs' demonstrative plans improved on the enacted plan with

respect to communities of interest by unifying the Turtle Mountain reservation with its off-reservation trust lands. App.377;R.Doc.117 at 130.

Although the Secretary's counsel at first suggested that unifying the two Tribes could result in a racial gerrymander, Dr. Hood testified that he had no evidence to indicate that racial considerations predominated in the drawing of Plaintiffs' demonstrative districts and reaffirmed his deposition testimony that Plaintiffs' demonstrative districts did not subordinate traditional districting criteria to racial considerations. App.410-11;R.Doc.117 at 163-64. Moreover, Dr. Hood agreed that "Native American tribes can have shared interests other than the race of their members," and testified that he had no basis to dispute the testimony of the tribal chairmen regarding the Tribes' nonracial shared interests, and conceded that he "ha[d] no evidence that plaintiffs' demonstrative plans are a racial gerrymander." App.414-15; R.Doc.117 at 167-68.

**_Gingles Prong 2._** The district court also found that Plaintiffs established the second _Gingles_ precondition—that Native American voters are politically cohesive. Add.46-47;App.474-75;R.Doc.125 at 20-21.

The district court observed that "[t]he parties and their experts agree that voting in districts 9 and 15 (when voting at large) is racially polarized, with Native American voters cohesively supporting the same candidates." Add.46;App.474;R.Doc.125 at 20. Although subdistricts 9A and 9B had too few precincts to run a full ecological inference statistical analysis, the district court concluded that Plaintiffs had shown by a preponderance of the quantitative and qualitative evidence that Native Americans within subdistricts 9A and 9B were politically cohesive, just as the statistical evidence showed with respect to the full district 9. Add.47;App.475;R.Doc.125 at 21. Citing Dr. Collingwood's report showing that subdistrict 9A contained 68.5% of district 9's total Native American population, Pls.App.15, the district court noted that this fact coupled with the "undisputed political cohesiveness of district 9 at-large" sufficed to prove Native American political cohesion in subdistrict 9A, Add.47;App.475;R.Doc.125 at 21.

Dr. Collingwood also presented evidence showing that there was a strong correlation between the election results and demographic makeup of each precinct within subdistricts 9A and 9B. Add.15-17;App.193-95; R.Doc.115 at 149-51;Pls.App.15-16. Moreover, subdistrict 9A contained a

homogenous Native American precinct showing a high level of political cohesion among Native American voters. App.193-94;R.Doc.115 at 149-50;Pls.App.15. Indeed, given the extreme level of Native American cohesion in the full district 9 established through ecological inference analysis, Dr. Collingwood testified that "[i]t's not mathematically possible for there not to be racially polarized voting" in both subdistricts. Add.16;App.194;R.Doc.115 at 150. In sum, Dr. Collingwood concluded that the clear statistical evidence of racially polarized voting in the full district 9 together with the "correlation observable between the subdistricts' precincts' demographics and election results" meant that "it is clear that the subdistricts both feature [racially polarized voting]." Add.17;App.195;R.Doc.115 at 151;Pls.App.16.

The Secretary's expert, Dr. Hood, reached the same conclusion. "Dr. Hood agreed that Native American voters are politically cohesive in subdistricts 9A and 9B" and he "assumed that the vote distribution within [] each subdistrict mirrors the overall district." Add.47;App.475; R.Doc.125 at 21 (internal quotation marks omitted). Dr. Hood testified that he "felt comfortable making that conclusion and that inference," Add.26;App.388;R.Doc.117 at 141, and that he "stand[s] by that

conclusion," Add.25;App.387;R.Doc.117 at 140. Dr. Hood observed, with respect to Dr. Collingwood's conclusion that Native Americans within both subdistricts 9A and 9B were politically cohesive, that "I don't think we disagree on that point." Add.25;App.387;R.Doc.117 at 140; *see also* App.389;R.Doc.117 at 142 (Dr. Hood agreeing to the presence of *Gingles* 2 in Districts 9, 9A, 9B, and 15).

The district court likewise found that the qualitative evidence supported a finding of Native American political cohesion in both subdistricts. *See* Add.47;App.475;R.Doc.125 at 21 ("Testimony from Chairman Azure and former Chairman Yankton confirms the statistical data."); *see* App.265-67;R.Doc.117 at 18-20 (Chairman Azure testifying about political cohesion of Native Americans in both subdistricts).

***Gingles Prong 3***. The district court considered at length the electoral evidence and found that Plaintiffs had likewise proven *Gingles* 3—that white voters usually defeat the candidates of choice of Native American voters in all three relevant districts—district 9, 15, and subdistrict 9B. Add.47-60;App.475-488;R.Doc.125 at 21-34. This was especially clear from the most probative contests—the November 2022 endogenous state legislative elections in the affected districts, more

recent elections, and elections featuring Native American candidates. Add.59-60;App.487-88;R.Doc.125 at 33-34.

*Totality of Circumstances*. The district court assessed the evidence related to the totality of circumstances factors—finding that the "two most critical Senate Factors (2 and 7) weigh heavily towards finding a Section 2 violation." Add.64;App.492;R.Doc.125 at 38. Additionally, the district court found a history of voting-related discrimination, that the effects of discrimination in areas like education, employment, and healthcare led to unequal access to the political process, and that there was a large departure from proportionality in representation in the legislature. Add.62-64;App.490-92;R.Doc.125 at 36-38. The court thus concluded that Plaintiffs proved a violation of Section 2 under the totality of the circumstances. Add.64;App.492;R.Doc.125 at 38.

*Injunction and Subsequent Proceedings*. The district court permanently enjoined further implementation of districts 9, 9A, 9B, and 15, provided the Legislative Assembly and the Secretary until December 22, 2023, to adopt and file a proposed remedial plan, and ordered that a remedial district be used in the November 2024 election. Add.65; App.493;R.Doc.125 at 39.

Both the district court and this Court denied the Secretary's subsequent motions for a stay pending appeal. The district court likewise denied the Legislative Assembly's post-judgment motion to intervene, and this Court subsequently denied the Assembly's motion to intervene in this appeal. The Legislative Assembly failed to adopt a proposed remedial plan by the district court's deadline, and on January 8, 2024, the district court granted Plaintiffs' motion to impose Plaintiffs' Demonstrative Plan 2 as the remedial plan. App.502-04;R.Doc.164 at 1-3. The Secretary did not appeal the district court's remedial order, and the time to do so has passed. *See* Fed. R. App. P. 4.

## SUMMARY OF ARGUMENT

The district court correctly ruled that Plaintiffs have a cause of action to enforce Section 2 of the VRA through 42 U.S.C. § 1983 and that the enacted legislative district configuration in northeastern North Dakota dilutes the voting strength of Native Americans in violation of Section 2.

*First*, § 1983 provides a cause of action to enforce Section 2. Congress enacted § 1983 pursuant to its Fourteenth Amendment enforcement powers primarily to provide a cause of action to enforce

17

statutes, like the VRA, enacted pursuant to Congress's Reconstruction Amendment enforcement powers. Even those litigants and justices skeptical of expanding § 1983 actions to Spending or Commerce Clause statutes have agreed that it applies to civil and equal rights statutes. The Secretary's audacious argument that § 1983 does not apply to Congress's most significant Reconstruction Amendment enforcement statute—the VRA—is unprecedent and meritless. The Secretary's contention that the *Gonzaga* test should apply in this context is also misplaced. The Supreme Court developed that test specifically to limit § 1983's application to Spending Clause statutes because it is atypical that Congress intends to confer individual rights when legislating under its spending power. By contrast, that is the typical purpose of Congress in enforcing the Reconstruction Amendments. For that reason, an unambiguous showing that Congress intended to create individual rights should not be the standard for determining whether Congress intended a Reconstruction Amendment enforcement statute to be enforceable under § 1983. Rather, such statutes should be presumptively enforceable under § 1983 unless

(1) Congress unambiguously *declined* to confer individual rights or (2) private enforcement is incompatible with the statutory scheme.

But even if the *Gonzaga* test designed for Spending Clause statutes applies in this context, Section 2 easily satisfies that test because Section 2 enforces an unambiguously conferred individual right and § 1983 enforcement is not incompatible with the statutory scheme. The text of Section 2 is directed at "any citizen['s]" right to be free from voting discrimination on account of race. 52 U.S.C. § 10301(a). The Secretary's contention that it protects collective, rather than individual, rights is foreclosed by the statutory text and binding Supreme Court precedent. Moreover, the Secretary does not even contend that § 1983 enforcement is incompatible with Section 2's enforcement scheme—rather he contends only that Section 2 has comprehensive enforcement by the Attorney General. But the Supreme Court has held that *incompatibility* must be shown to overcome the presumption that § 1983 applies.

*Second*, the district court did not clearly err in concluding that Plaintiffs satisfied the first *Gingles* precondition. Indeed, the Secretary's expert conceded that a reasonably configured district in which Native Americans constitute the majority of eligible voters could be drawn,

making it unnecessary to even reach the Secretary's *Gingles* 1 arguments. In any event, the Secretary's *ipse dixit* contention that placing two Indian reservations in a single district automatically constitutes racial gerrymandering finds no support in fact or law. The *Secretary's* expert testified that he had no evidence to support a racial gerrymandering contention, that Plaintiffs' illustrative districts do not subordinate traditional redistricting principles in favor of race, and that they were reasonably configured in relation to other enacted districts.

*Third*, the district court did not clearly err in finding that Plaintiffs satisfied the second *Gingles* precondition. The Secretary agrees that Plaintiffs proved that Native American voters were politically cohesive in district 9, and his *own expert* concluded that Native Americans were politically cohesive at the subdistrict level. The Secretary nonetheless contends that Plaintiffs were required to re-prove that the same Native American voters who were politically cohesive in district 9 were separately cohesive within each subdistrict according to a particular statistical analysis. The district court appropriately credited the quantitative and qualitative evidence offered by Plaintiffs proving

cohesion at the subdistrict level. The district court did not clearly err by crediting the conclusions of *both* parties' experts.

## ARGUMENT

## I. Section 1983 provides a cause of action for VRA Section 2 claims.[2]

Plaintiffs properly invoked § 1983's cause of action to enforce Section 2 of the VRA. Section 1983 was enacted as the Civil Rights Act of 1871, pursuant to Congress's Fourteenth Amendment enforcement power, to provide individuals with a cause of action against state actors who subject them to a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Nearly all Supreme Court precedent surrounding the scope of § 1983 has arisen in the context of statutes enacted pursuant to Congress's Spending Clause power—with challengers (and dissenting justices) contending that its cause of action is limited to civil rights and equal rights statutes—such as Section 2 of the VRA. *See Maine v. Thiboutot*, 448 U.S. 1, 6 (1980); *id.* at 25 & n.15 (Powell, J., dissenting); *Health & Hosp. Corp.*

---

[2] Plaintiffs also invoked their implied private right of action under Section 2 itself and preserve for any further appellate proceedings their contention that Section 2 contains such a right. *Contra Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023).

*of Marion Cnty. v. Talevski*, 599 U.S. 166, 179-80 (2023); *id.* at 225 n.12 (Thomas, J., dissenting). Indeed, even those with the narrowest view of § 1983's scope contend that it applies to civil rights statutes, like the VRA, enacted pursuant to Congress's Reconstruction Amendment enforcement powers—the same powers Congress exercised to enact § 1983 itself. *See, e.g.*, *Talevski*, 599 U.S. at 225 n.12 (Thomas, J., dissenting) (noting that § 1983 is more properly "confined to laws enacted under Congress' Reconstruction Amendments enforcement powers").

The Secretary invites this Court to radically depart from precedent and hold that although § 1983 provides causes of action to enforce Spending Clause statutes like the Federal Nursing Home Reform Act ("FNHRA"), *see Talevski*, 599 U.S. at 179-80, it somehow does not provide a cause of action for Congress's landmark voting rights statute. No court has ever reached such an illogical conclusion.

First, the Secretary's reliance on the *Gonzaga* test is misplaced because its framework is tailored to limiting inappropriate expansion of § 1983 causes of action to enforce Spending or Commerce Clause statutes. Because it is "atypical" for Congress to enact such statutes for the protection of individual rights, the *Gonzaga* test requires an individual

seeking to enforce Spending or Commerce Clause statutes to establish that Congress unambiguously conferred an individual right before courts will presume that § 1983 enforcement is available. *Talevski*, 599 U.S. at 183. Where, as here, a Reconstruction Amendment enforcement statute is at issue, the statute should be presumed enforceable under § 1983 unless it unambiguously *does not* confer any individual right. In either case, the presumption may be rebutted if the defendant shows that § 1983 enforcement is incompatible with the statutory scheme, such Congress precluded § 1983 enforcement. Second, even if the *Gonzaga* test applies, Section 2 easily satisfies it.

**A. Reconstruction Amendment enforcement statutes are the core focus of § 1983 and are presumed enforceable absent an unambiguous intent from Congress not to create an individual right.**

Reconstruction Amendment enforcement statutes should be presumed enforceable under § 1983 absent an unambiguous congressional intent *not* to confer individual rights. As originally enacted in 1871, the predecessor of § 1983 applied only to rights secured by "the Constitution of the United States." *Thiboutot*, 448 U.S. at 6-7. In 1874, Congress amended the statute to apply to rights secured by "the Constitution *and laws* of the United States." *See id.* (emphasis added).

"[A] principal purpose of the added language was to 'ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute.'" *Id.* at 7 (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 637 (1979) (Powell, J., concurring)). In the same 1874 amendment, Congress revised the accompanying jurisdictional statute—today codified at 28 U.S.C. § 1343(3)—to apply to "deprivations of rights secured by 'the Constitution of the United States or of any right secured by any law providing for equal rights.'" *Thiboutot*, 448 U.S. at 7.

In *Thiboutot*, the Court rejected the petitioners' argument that "the phrase 'and laws' [in § 1983] should be read as *limited* to civil rights or equal protection laws." 448 U.S. at 6 (emphasis added). Although the Court acknowledged that extending § 1983 to laws securing civil rights and equal protection was "a principal purpose" of Congress, the Court reasoned that there were "other . . . purpose[s]" too, permitting a broader interpretation of the statute's reach. *Id.* at 7. The Court thus held that "the plain language of the statute undoubtedly embraces" claims asserting violations of the Social Security Act. *Id.* at 4. Justice Powell, joined by Chief Justice Burger and Justice Rehnquist, dissented and

would have held that § 1983 only provides a cause of action for statutes "providing for the equal rights of citizens." *Id.* at 21-22 (Powell, J., dissenting).

Following *Thiboutot*, the Supreme Court has cautioned that although § 1983 may provide a cause of action for statutes enacted pursuant to the Constitution's Spending Clause, greater hesitancy is required in that context. In *Pennhurst State School & Hospital v. Halderman*, the Court explained that "[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." 451 U.S. 1, 28 (1981). In *Gonzaga University v. Doe*, the Court considered whether the Family Educational Rights and Privacy Act ("FERPA"), which was enacted pursuant to Congress's spending power, could be enforced through § 1983. 536 U.S. 273, 276 (2002). In concluding that § 1983 did not apply to FERPA, the Court cited *Pennhurst* and explained that "[w]e made clear that unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, *federal funding provisions* provide no

basis for private enforcement by § 1983." *Id.* at 280 (quoting *Pennhurst*, 451 U.S. at 17, 28, & n.21) (second bracket in original) (emphasis added). Where Congress does provide a clear intent to confer individual rights in spending power statutes, the *Gonzaga* Court held, § 1983 presumptively applies unless Congress expressly said otherwise or if it impliedly did by "creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284 n.4.

In June of last year, the Supreme Court issued its most recent § 1983 decision. In *Talevski*, the Court addressed whether portions of FNHRA—enacted pursuant to the Spending Clause—were enforceable via § 1983. 599 U.S. at 171. The Court first rejected petitioners' invitation to overrule *Thiboutot* and hold that spending power statutes are categorically ineligible for § 1983 coverage. *Id.* at 180. The Court then noted that "[f]or Spending Clause legislation in particular," it will be the "atypical" statute that will "'unambiguously confe[r]' individual rights, making those rights 'presumptively enforceable' under § 1983." *Id.* at 183 (quoting *Gonzaga*, 536 U.S. at 283-84) (bracket in original). The Court held that the FNHRA provisions at issue cleared that hurdle and were enforceable under § 1983. *Id.* at 191.

Justice Barrett, joined by Chief Justice Roberts, concurred in *Talevski*, explaining that *Gonzaga* "sets the standard for determining when a *Spending Clause* statute confers individual rights," *id.* at 193 (Barrett, J., concurring) (emphasis added), and that "[c]ourts must tread carefully before concluding that Spending Clause statutes may be enforced through § 1983," *id.* at 195. In dissent, Justice Thomas noted that § 1983 was more appropriately "confined to laws enacted under Congress' Reconstruction Amendments enforcement powers." *Id.* at 225 n.12 (Thomas, J., dissenting); *see also Dennis v. Higgins*, 498 U.S. 439, 465 (1991) (Kennedy, J., dissenting) (reasoning that § 1983 should not apply to Commerce Clause statutes because "§ 1983 . . . [is] an extraordinary remedy passed during Reconstruction to protect basic civil rights against oppressive state action").

As the statutory history and caselaw surrounding § 1983 demonstrate, it is universally accepted that statutes enacted to enforce the Fourteenth and Fifteenth Amendments are presumptively enforceable through § 1983. Indeed, § 1983 *itself* was enacted pursuant to Congress's Fourteenth Amendment enforcement power, and its "prime focus . . . was to ensure a right of action to enforce the protections of the

Fourteenth Amendment and the *federal laws enacted pursuant thereto*." *Dennis*, 498 U.S. at 444-45 (internal quotation marks omitted) (emphasis added).

This presumptive application of § 1983 is clear from the text of the Reconstruction Amendments themselves. They necessarily prohibit state officials from "subject[ing] any citizen of the United States . . . to the deprivation of [] rights, privileges, or immunities secured by the Constitution and laws," 42 U.S.C. § 1983, because those are precisely the harms the Amendments and their enforcement statutes target. *See* U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . nor deny to any person within its jurisdiction the equal protection of the laws."); *id.* § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."); U.S. Const. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."); *id.* § 2 ("The Congress shall have power to enforce this article by appropriate legislation.").

Given Congress's primary purpose in amending § 1983 and the centrality of individual rights to the Reconstruction Amendments, § 1983's cause of action should presumptively apply to Reconstruction Amendment enforcement statutes unless Congress unambiguously *declined* to protect individual rights. This differs from the first prong of the *Gonzaga* test, which holds that "*federal funding* provisions provide no basis for private enforcement by § 1983" "unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights." 536 U.S. at 280 (quoting *Pennhurst*, 451 U.S. at 17, 28, & n.21) (bracket in original) (emphasis added). But this departure makes sense. As the Supreme Court has emphasized, *Gonzaga*'s "unambiguous conferral" requirement stems from "Spending Clause legislation in particular," where it is the "atypical case" that a statute will protect individual rights. *Talevski*, 599 U.S. at 183. The reverse is true for the Reconstruction Amendments, which on their face protect individual rights. Because the premise of Reconstruction Amendment statutes is to enforce individual rights, the first prong of *Gonzaga*'s standard should reverse—§ 1983 should presumptively apply unless Congress unambiguously intended *not* to protect individual rights. A

contrary standard would risk removing from § 1983's ambit statutes Congress presumed would be covered. Unlike in the Spending Clause context, where Reconstruction Amendment enforcement statutes are concerned, the risk is in *under-extending* § 1983's reach. Only the atypical Reconstruction Amendment enforcement statute will fail to protect individual rights.

Congress enacted Section 2 of the VRA pursuant to its Fourteenth and Fifteenth Amendment enforcement powers. *See* Pub. L. No. 89-110, 79 Stat. 437, 437 (1965) ("An Act . . . [t]o enforce the fifteenth amendment to the Constitution of the United States . . . ."); S. Rep. No. 97-417, at 27, 39 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 205, 217 (explaining that Section 2 is enacted pursuant to both Fourteenth and Fifteenth Amendment enforcement powers). The plain-text purpose of Section 2 is to guarantee "equality of rights." *Thiboutot*, 448 U.S. at 7; *see* 52 U.S.C. § 10301(b) (providing that a violation occurs where political process is not "equally open to participation"). The Secretary makes no argument that Congress unambiguously intended *not* to confer an individual right in Section 2, nor could he.

**B.     The Secretary's assertion that *Gonzaga* must apply to Reconstruction Amendment enforcement statutes is unavailing.**

The Secretary contends that Plaintiffs "invent[ed]" this departure from *Gonzaga* "without any citation." Br. at 21. Plaintiffs have offered plenty of citations, *see supra*, but the Secretary is correct that Plaintiffs are treading new ground—*because the Secretary is*. Before this case, no one—no litigant, no court, no justice—has ever concluded that § 1983— enacted by Congress specifically to provide a cause of action for Fourteenth and Fifteenth Amendment enforcement statutes—does not apply to Congress's most significant such statute, the VRA. It is the Secretary who seeks to turn § 1983 on its head in contending that it does not apply to the primary category of statutes Congress enacted it to cover. The Supreme Court did not design its *Gonzaga* standard with Reconstruction Amendment enforcement statutes in mind, thus any departure is due solely to the Secretary's attempt to extend that case beyond its context.

The Secretary cites *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), to contend that "the Supreme Court has applied the *Gonzaga* test in cases that did not implicate the Spending Clause at all." Br. at 21.

But *Abrams* did not involve a Reconstruction Amendment enforcement statute, but rather the Telecommunications Act of 1996—enacted pursuant to Congress's Commerce Clause power. The *Gonzaga* test sensibly applies to Commerce Clause statutes, which can confer individual rights but generally serve the Clause's "power-allocating" purpose. *Dennis*, 498 U.S. at 447. Moreover, in holding that § 1983 could apply to Commerce Clause statutes, the Supreme Court acknowledged that its central application was to Reconstruction Amendment enforcement statutes. *Id.* at 444-45.[3]

The Secretary next contends that "the *Gonzaga* test arises from the very *text* of § 1983 itself." Br. at 22 (emphasis in original). This is true insofar as § 1983 applies to "rights, privileges, or immunities," 42 U.S.C. § 1983, but the *Gonzaga* test's "unambiguous conferral" requirement is a

---

[3] The Secretary cites two other cases to contend that *Gonzaga* is not limited to Spending Clause statutes. Br. at 22 (citing *McCready v. White*, 417 F.3d 700 (7th Cir. 2005) and *MHANY Mgmt. Inc. v. Cnty. of Nassau*, 843 F. Supp. 2d 287 (E.D.N.Y. 2012)). But *McCready* evaluated a Commerce Clause statute and although *MHANY* involved the Fair Housing Act, it merely cited *Abrams*—a case involving the Commerce Clause. Notably, *Abrams* only applied the second prong of the *Gonzaga* test (whether the presumption of § 1983 enforcement had been rebutted), not the first (whether the presumption applied). Plaintiffs do not dispute that, as under the second *Gonzaga* prong, the presumption of § 1983 enforcement can be rebutted.

judicially-created standard of statutory interpretation to prevent overextension of § 1983 in a context—Congress's Spending Clause power—that "atypical[ly]" involves creating "individual rights." *See Talevski*, 599 U.S. at 183. Nothing in the text of § 1983 precludes a different standard of statutory interpretation to ascertain the existence of a right in a different context where protection of individual rights is Congress's *typical* purpose.

Finally, the Secretary contends that even if Plaintiffs are correct about § 1983's application to Reconstruction Amendment enforcement statutes, "Plaintiffs' claims would fail their own test" because Section 2 prohibits discriminatory results in redistricting, while the Fourteenth and Fifteenth Amendment only prohibit discriminatory intent. Br. at 23. But § 1983 applies to rights "secured by the Constitution *and laws*," 42 U.S.C. § 1983 (emphasis added). And those laws need not "parrot[] the precise wording of the Fourteenth Amendment." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000). "When Congress seeks to remedy or prevent unconstitutional discrimination, § 5 [of the Fourteenth Amendment] authorizes it to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out

the basic objectives of the Equal Protection Clause." *Tennessee v. Lane*, 541 U.S. 509, 520 (2004); *id.* at 518 (explaining that Congress may enforce the Fourteenth and Fifteenth Amendments by "prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text"). Were the Secretary correct, Congress's addition of "and laws" to § 1983 would have been superfluous because only laws that parroted the Constitution could be enforced through its cause of action.

The *Amici* States add another argument—that Plaintiffs' proposed test is inconsistent with the holdings of this and other Circuits that § 1983 does not apply to Title VII or Americans with Disability Act ("ADA") claims, which Congress enacted pursuant to its Fourteenth Amendment enforcement power. *Amici* Br. at 6-7. But those cases do not question whether Title VII or the ADA create individual rights, such that the presumption in favor of § 1983 enforcement applies, but rather hold, under the second *Gonzaga* prong, that those statutes contain express private rights of action that are incompatible with § 1983 enforcement. *See, e.g.*, *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011-12 (8th Cir. 1999) (en banc) (ADA). Plaintiffs take no issue with applying the second

*Gonzaga* prong to Reconstruction Amendment enforcement statutes, and Section 2 satisfies that test. *See infra* Part I.C.2.

Because Congress did not unambiguously decline to protect individual rights in enacting Section 2, Plaintiffs presumptively have a § 1983 cause of action.

## C. Even if *Gonzaga* is the correct test, Section 2 easily satisfies it.

Even if *Gonzaga*'s test applies without modification to Reconstruction Amendment enforcement statutes, Section 2 easily satisfies it because it enforces an unambiguous individual right and § 1983 enforcement is not incompatible with Section 2's enforcement scheme.[4]

### 1. Section 2 enforces an unambiguous individual right.

Section 2 enforces an unambiguously conferred individual right. Under the first prong of *Gonzaga*, courts "employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the

---

[4] If the Court agrees, it need not determine whether a different test applies in this context.

plaintiff belongs." *Talevski*, 599 U.S. at 183-84 (quoting *Gonzaga*, 536 U.S. at 283, 285-6). The Supreme Court recently confirmed that the test is satisfied where the provision in question is "phrased in terms of the persons benefited" and contains "rights-creating," individual-centric language with an "unmistakable focus on the benefited class." *Id*.

Section 2 contains distinctly rights-creating language. It protects the "right of any citizen . . . to vote" free from racial discrimination. 52 U.S.C. § 10301(a); *see also Chisom v. Roemer*, 501 U.S. 380, 392 (1991) (recognizing that Section 2 "grants [individual citizens] a right to be free from" voting discrimination). It explicitly refers to a citizen's "right" and is "phrased in terms of the persons benefitted"—the main criteria for whether a statute contains rights-creating language. *See Talevski*, 599 U.S. at 183-84; *Gonzaga*, 536 U.S. at 284; *Osher v. City of St. Louis, Mo.*, 903 F.3d 698, 702-03 (8th Cir. 2018). In focusing on the "individuals protected," Section 2's "right of any citizen" language creates an "implication of an intent to confer rights on a particular class of persons." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (citation omitted); *see also Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 302 (3d Cir. 2007) ("With an explicit reference to a right and a focus on the individual protected,

this language suffices to demonstrate Congress's intent to create a personal right."). Section 2 also identifies the "class of beneficiaries," *Talevski*, 599 U.S. at 183, to which plaintiffs belongs—individuals denied the right to vote "on account of race or color." 52 U.S.C. § 10301(a). Section 2 goes on to provide that a violation is established if political processes are not equally open to "members of a class of citizens" so protected. 52 U.S.C. § 10301(b). This is exactly the type of "rights-creating," individual-centric language with an "unmistakable focus on the benefited class" that the Supreme Court has held to satisfy the first prong of *Gonzaga. Talevski*, 599 U.S. at 183.

The Secretary contends that Section 2 does not create *individual* rights but rather focuses on the regulated government officials or alternatively creates collective rights for an aggregated class of citizens. Br. at 26-30. The Secretary is mistaken for several reasons.

*First*, the Secretary relies upon the *Arkansas State Conference NAACP* decision to contend that it is unclear whether Section 2 creates individual rights. In that case, this Court acknowledged the rights-creating language of Section 2, noting that it "unmistakabl[y] focus[es] on the benefited class": those subject to discrimination in voting. *Ark.*

*State Conf. NAACP v. Ark. Bd. of Apportionment* 86 F.4th 1204, 1209 (2023) (internal quotation marks omitted) (brackets in original). But in *dicta*,[5] the majority noted that the opening sentence of Section 2(a) "focuses on what states and political subdivisions cannot do, which is 'impose[] or appl[y]' discriminatory voting laws." *Id.* at 1209-10 (brackets in original). For this reason, the court observed that "[i]t is unclear whether § 2 creates an individual right," *id.* at 1209, because "[i]t is unclear what to do when a statute focuses on both" individual rights and what "states and political subdivisions cannot do," *id.* at 1209-10.

In *Talevski*, however, the Supreme Court expressly answered the question posed by the majority's *dicta* in *Arkansas State Conference NAACP*. The petitioners in *Talevski* contended that FNHRA did not create individual rights because it "establish[es] who it is that must respect and honor these statutory rights; namely, the Medicaid-participant nursing homes in which these residents reside." 599 U.S. at

---

[5] The *Arkansas State Conference NAACP* majority's discussion of whether Section 2 creates an individual right is *dicta* because the majority did not base its holding on the presence or absence of an individual right. 86 F.4th at 1209-10; *see also Boaz v. United States*, 884 F.3d 808, 810 (8th Cir. 2018) (explaining that statements not necessary to the court's holding are *dicta*).

185. The Supreme Court rejected the argument, reasoning that the statute's discussion of the regulated entities "is not a material diversion from the necessary focus on the nursing-home residents" and that "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held)." *Id.* The Court emphasized the point with an example: "[t]he Fourteenth Amendment hardly fails to secure § 1983-enforceable rights because it directs state actors not to deny equal protection." *Id.* at 185 n.12. *Talevski*—which the *Arkansas State Conference NAACP* majority did not cite—controls the § 1983 analysis in this regard and compels the conclusion that Section 2 protects an unambiguously conferred individual right. It likewise forecloses the Secretary's contentions that Section 2 imposes a prohibition instead of a right and that its focus is on "regulated parties." *See* Br. at 30-31; *see also Vote.Org v. Callanen*, 89 F.4th 459, 474-75 (5th Cir. 2023) (holding that a provision of the Civil Rights Act that is phrased in part as a prohibition on discrimination nevertheless creates individual rights, citing *Talevski*'s reasoning).

*Second*, the Supreme Court has expressly rejected the Secretary's "collective rights" argument. In *Shaw v. Hunt*, the Supreme Court rejected the argument that a Section 2 violation that is "proved for a particular area" of a state could be remedied by drawing a minority opportunity district elsewhere in the state, because Section 2 creates individual, not group, rights. 517 U.S. 899, 917 (1996).

> Arguing . . . that the State may draw the district anywhere derives from a misconception of the vote-dilution claim. To accept that the district may be placed anywhere implies that the claim, and hence the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members. It does not. *See* § 1973[6] ("the right of any citizen.").

*Id.* The Supreme Court has expressly interpreted the text of Section 2 as creating individual, not group, rights; this alone forecloses the Secretary's argument.

*Third*, the Secretary mistakenly cites Section 2(b)'s reference to "members of a class of citizens" to contend Section 2 protects only collective rights. The Supreme Court in *Talevski* held that statutes confer individual rights when they have an "unmistakable focus on the *benefited*

---

[6] Section 2 was recodified after *Hunt* from 42 U.S.C. § 1973 to 52 U.S.C. § 10301.

40

*class*." *Talevski*, 599 U.S. at 183 (emphasis added); *see also Gonzaga*, 536 U.S. at 284 (explaining that rights conferred to "any identifiable class" are enforceable under § 1983). That more than one citizen is vested with rights under Section 2 does not somehow alter its individual rights-creating character. Indeed, the statute focuses on the effect on *members* of the class in ascertaining whether "any citizen" has been denied voting rights. 52 U.S.C. § 10301(a) & (b).[7] It is unmistakably focused on individuals' rights.

*Fourth*, the Secretary contends that the *Gingles* test supports his position because its three preconditions focus on collections of voters—whether the minority group constitutes the majority of eligible voters in an alternative district, whether the minority group is politically cohesive, and whether the majority's bloc voting usually defeats the preferred candidates of the minority group. Br. at 28 (citing *Thornburg v. Gingles*,

---

[7] The Secretary's reliance on case law discussing "aggregate rights" is misplaced. Br. at 29. In *Midwest Foster Care & Adoption Ass'n v. Kincade*, the question before the court was whether a statute focused on aggregate services that are provided through spending clause legislation as opposed to individual rights. 712 F.3d 1190, 1196 (8th Cir. 2013). Section 2 is neither spending clause legislation nor focused on aggregate services, but rather is explicitly phrased in terms of individual rights, as the Supreme Court has held. *See Hunt*, 517 U.S. at 917.

478 U.S. 30, 51 (1986)). But the *Gingles* test does not serve to identify the nature of the *right*—the statutory text does that by defining it as an individual one. *See Hunt*, 517 U.S. at 917. Instead, the *Gingles* preconditions essentially test for the causation and redressability elements. *See Gingles*, 478 U.S. at 49-51 (explaining that three preconditions test for whether the challenged "electoral structure," as opposed to voter behavior, is "responsible for minority voters' inability to elect [their] candidates"). Section 2 vote dilution claims involve districts with many voters. In that context,[8] the plaintiff asserting the violation of her individual rights must first show that (1) it is the *district configuration*, and not merely the behavior of other voters, that is causing her preferred candidates to lose and (2) this harm is actually redressable through an alternative district configuration.[9] The *Gingles* preconditions

_____

[8] Section 2 prohibits both vote dilution and vote denial. The same Section 2 text indisputably prohibits the denial of an individual's right to vote on account of race. It makes no sense to contend that Section 2 creates an individual right in the vote denial context but not in the vote dilution context. Moreover, Section 2 prohibits episodic practices that result in the dilution of an individual's voting strength on account of race. *See, e.g.*, *United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009).

[9] For that reason, the Secretary's example of a minority voter whose preferred candidate both (1) loses and (2) is also not the preferred candidate of other minority voters is misplaced. Br. at 28. That voter is

serve that threshold purpose, but do not alter the nature of the statutory right.

The *Amici* States contend that Section 2 does not create "*new* rights" but rather enforces rights created by the Fifteenth Amendment, and thus § 1983 cannot apply. *Amici* Br. at 12-14 (emphasis in original). This is so, *Amici* say, because the *Gonzaga* Court referenced the need to establish Congress's intent to create "new rights." *Id.* at 12 (citing *Gonzaga*, 536 U.S. at 287). But the *Gonzaga* Court was focused on whether a Spending Clause statute created an individual right—a situation that definitionally involves a "new" right. The plain text of § 1983 applies to "*any* rights . . . secured by the *Constitution and laws*." 42 U.S.C. § 1983 (emphasis added). That the right against vote dilution is created and enforceable by a combination of the Fourteenth and Fifteenth Amendments as well as Section 2—*i.e.*, by the "Constitution and laws," 42 U.S.C. § 1983—cannot possibly remove it from § 1983's scope. *Amici's* argument—which amounts to out-of-context quotations and word-play—would, if accepted, completely defeat Congress's "prime

---

not experiencing racial vote dilution on account of the district configuration; rather her candidate preferences are merely unpopular.

focus" in enacting § 1983: "to enforce the protections of the Fourteenth Amendment and the federal laws enacted pursuant thereto." *Dennis*, 498 U.S. at 444-45 (internal quotation marks omitted) (emphasis added).

### 2. Section 2's enforcement scheme is not incompatible with § 1983 enforcement.

Private enforcement of Section 2 is not incompatible with enforcement by the Attorney General. Once it is established that a statute protects individual rights, a defendant cannot rebut the presumption that § 1983 provides a cause of action to enforce those rights unless it "demonstrate[s] that Congress shut the door to private enforcement either [1] expressly, through specific evidence from the statute itself" or "[2] impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Gonzaga*, 536 U.S. at 285 n.4 (quotation marks omitted); *see Talevski*, 599 U.S. at 186.

The Secretary does not contend that Congress expressly shut the door to private enforcement of Section 2 of the VRA under § 1983. As such, the Secretary must demonstrate that Congress impliedly foreclosed enforcement under § 1983 by creating a "comprehensive enforcement scheme *that is incompatible* with individual enforcement under § 1983."

*Talevski*, 599 U.S. at 186 (emphasis in original) (internal citations and quotation marks omitted). But the Secretary merely contends that Section 12 of the Voting Rights Act provides a comprehensive scheme to enforce Section 2 by the Attorney General and therefore that private enforcement under § 1983 is precluded. Br. at 32-33. The Secretary fails to demonstrate that private enforcement of Section 2 claims under § 1983 would be "incompatible" with public enforcement of those claims by the Attorney General under Section 12. This is fatal to the Secretary's claim. *See*, *e.g.*, *Talevski*, 599 U.S at 188 ("HHC's single-minded focus on comprehensiveness mistakes the shadow for the substance"); *see also id.* at 188-89 ("[Section] 1983 can play its textually prescribed role as a vehicle for enforcing [statutory] rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not incompatible with Congress's handiwork."); *id.* at 187 (describing the inquiry as whether § 1983 enforcement would be "incompatible," "inconsistent," or "thwar[t]" statutory enforcement scheme" (bracket in original)).

The Secretary relies upon Justice Barrett's *Talevski* concurrence to contend that it suffices to show that the statutory scheme is

comprehensive or that the statute assigns a governmental official to "deal with" the violation. Br. at 32. But the *Talevski* majority held that *incompatibility* is what defeats a § 1983 cause of action, expressly rejecting the contention that something less could suffice to defeat a presumption that § 1983 applies. 599 U.S. at 187-89. A two-justice concurrence that joins the majority opinion "in full," *Talevski*, 599 U.S. at 195 (Barrett, J., concurring), cannot overcome the seven-justice majority's holding.

The Secretary also characterizes Plaintiffs' § 1983 cause of action as a "backdoor" route to evade the absence of an express private right of action in Section 2 itself. Br. at 17. But Congress created a front door to the courthouse when it enacted § 1983, and the Secretary's characterization inverts the Supreme Court's precedent. The Court has found implicit preclusion of a cause of action under § 1983 in just three cases and has done so *only* where the rights-creating statute *contains* an express private right of action. *See Talevski*, 599 U.S. at 189 (finding that the "incompatibility evinced in our three prior cases finding implicit preclusion" turned on the fact that each statute had a "dedicated right of action" for private parties). Thus, the fact that Section 2 lacks an express

private right of action confirms that Congress did *not* intend to preclude enforcement under § 1983. *Cf. Abrams*, 544 U.S. at 121 ("[T]he existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not."); *see also Blessing v. Freestone*, 520 U.S. 329, 341 (1997). Absent its own express private enforcement scheme, the Secretary cannot show that Section 2 impliedly precluded private enforcement under § 1983.

This is because, as the Court recognized in *Talevski*, private enforcement under § 1983 is only "incompatible" with a statute's comprehensive enforcement scheme when it would allow plaintiffs to "circumvent[] . . . presuit procedures" and "give[] plaintiffs access to . . . remedies that were unavailable" under an express private right provided for in the underlying statute. 599 U.S. at 189 (internal quotation marks omitted).[10] Here, because there is no express private right of action under

---

[10] Notably, the VRA's enforcement provisions explicitly state that there are no mandatory administrative exhaustion requirements for persons suing to enforce the VRA. 52 U.S.C. § 10308(f) (authorizing suits "without regard to whether a person asserting rights under the provisions of chapters 103 to 107 of this title shall have exhausted any administrative or other remedies that may be provided by law.").

Section 2, there is no concern that § 1983 enforcement would supplant the "careful congressional tailoring" evidenced by "a private judicial right of action" or a "federal administrative remedy." *Id.* at 190 (internal quotation marks omitted). Because private enforcement under § 1983 merely "complement[s]" rather than "supplant[s]" the enforcement scheme set forth in the VRA, the Secretary cannot demonstrate that private enforcement is impliedly precluded. *Id.*

Moreover, when Congress amended Section 2 to cover discriminatory results claims in 1982, it would have been especially cognizant of § 1983's application to the law. The Supreme Court had just two years prior clarified that § 1983 applied to statutes—especially Reconstruction Act enforcement ones—and not just constitutional claims. *See Thiboutot*, 448 U.S. at 7. There would have been no reason to expressly provide for a cause of action in the Act itself.

The Secretary also notes that Section 12 of the VRA creates criminal penalties and cites the *Arkansas State Conference NAACP* majority's observation that this listing of criminal penalties "is strong evidence that [Section 2] cannot provide a private right of action" because "private parties cannot seek prison time against violators." Br. at 33

(quoting *Ark. State Conf. NAACP*, 86 F.4th at 1210 n.2). But this confuses the tests for ascertaining the presence of an implied right of action with the test for whether § 1983 provides a cause of action. Section 1983 does not purport to authorize citizens to prosecute criminal claims, and Section 12 of the VRA authorizes the exact same civil relief—temporary or permanent injunctions—that plaintiffs can obtain via § 1983. The two cannot plausibly be incompatible.

The Secretary next contends that it makes sense to preclude a § 1983 cause of action because enforcement of Section 2 is "a political exercise fraught with federalism and separation of powers concerns" and the Attorney General is "politically accountable." Br. at 34, 2. Aside from saying "federalism" and "separation of powers," the Secretary develops no such argument and has thus waived it. *See Garden v. Central Neb. Housing Corp.*, 719 F.3d 899, 905 n.2 (8th Cir. 2013). Moreover, a federal court's enforcement of Section 2 is a *legal* exercise, not a political one. And the Secretary's suggestion that enforcement of minority voting rights should be subject to the whims of the majority at the ballot box is antithetical to purpose of the Reconstruction Amendments and the Voting Rights Act. So too is the Secretary's suggestion that some

instances of minority vote dilution should go unremedied to be "sensitive" to vote dilution imposed by states. Br. at 34. The statutory text provides no such "sensitivity."

Finally, the Secertary faults the district court's conclusion that § 1983 provides a cause of action to enforce Section 2 for three reasons. First, he contends that the district court focused on whether Section 2 created a right, rather than an individual right. But, as discussed *supra*, it creates the latter. Second, the Secretary objects that the district court cited the decades of private enforcement because those courts did not "*analyze*[] if a private right of action exists to enforce Section 2 violations." Br. at 36 (emphasis in original). But this misses the point. That private Section 2 enforcement has coexisted for decades with enforcement by the Attorney General illustrates their compatibility—the question relevant to the § 1983 analysis. Third, he faults the district court for relying on the VRA's fee-shifting provision, 52 U.S.C. § 10310(e), as evidence that enforcement under § 1983 is not incompatible with enforcement by the Attorney General. Citing *Arkansas State Conference NAACP*, he contends that the VRA's fee-shifting provision applies only to Fourteenth and Fifteenth Amendment claims, not Section 2 claims. Br.

at 37. But even if that were so,[11] that does not establish any incompatibility between § 1983 enforcement and enforcement by the Attorney General. Plaintiffs who prevail in a § 1983 suit to enforce Section 2 are eligible for fees under 42 U.S.C. § 1988, and because both § 1988 and § 10310(e) confer fee awards on the "prevailing party," the two cannot be incompatible with each other. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources*, 532 U.S. 598, 603 & 620 n.4 (2001) (explaining that the Supreme Court has treated the phrase "prevailing party" consistently across the U.S. Code in fee-shifting provisions, citing in particular the VRA provision and § 1988).

The Secretary does not overcome the presumption that Section 2 is enforceable through § 1983 because he does not even attempt to establish, as he must, that the two are incompatible.

---

[11] It is not. The first sentence of the VRA shows why: Congress provided that it was "An Act . . . [t]o enforce the fifteenth amendment to the Constitution of the United States . . . " Pub. L. No. 89-110, 79 Stat. 437 (1965). The Supreme Court has affirmed that Congress enforces the Reconstruction Amendments through statutory prohibitions on discriminatory results in addition to discriminatory intent. *See, e.g.*, *Lane*, 541 U.S. at 520; *see also Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 n.6 (11th Cir. 2000) (holding that § 10310(e) applies to prevailing plaintiffs under Section 2 because that statute enforces the "voting guarantees of the Fourteenth and Fifteenth Amendments").

**II.    The district court did not clearly err in its *Gingles* 1 and 2 factual findings.**

**A.    The district court's *Gingles* 1 finding was not clearly erroneous.**

The district court did not clearly err in concluding that Plaintiffs satisfied the first *Gingles* precondition. Under the first *Gingles* precondition, "the 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.'" *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quoting *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (*per curiam*)). "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Id.* The Supreme Court has emphasized that the *Gingles* 1 inquiry is not a "beauty contest between plaintiffs' maps and the State's." *Id.* at 21 (internal quotation marks and citations omitted). In *Milligan*, the Court held that the plaintiffs had satisfied *Gingles* 1 where the plaintiffs proffered maps with districts that "contained equal populations, were contiguous, and respected existing political subdivisions, such as counties, cities, and towns." *Id.* at 20. Some of the maps had the same number of county splits as the enacted Alabama map,

*id.*, and both the enacted map and plaintiffs' illustrative maps split a community of interest, *id.* at 21.

After a detailed discussion of the evidence and testimony, the district court found that Plaintiffs' illustrative plans "comport with traditional redistricting principles, including compactness, contiguity, respect for political boundaries, and keeping together communities of interest." Add.46;App.474;R.Doc.125 at 20. Indeed, the Secretary's expert Dr. Hood conceded as much, testifying that Plaintiffs' illustrative districts were reasonably compact, covered a geographic distance nearly the same as the challenged districts, *eliminated* a split of a community of interest found in the enacted plan, and had the same number of county splits as the enacted map. Add.45;App.473;R.Doc.125 at 19;App.372-73; R.Doc.117 at 125-26.

The Secretary makes two arguments challenging the district court's finding that Plaintiffs' illustrative districts satisfy the first *Gingles* precondition: first, that the district court erred by "improperly presum[ing that] Plaintiffs' remedial maps could be racial gerrymanders, and second that the district court erred "by affirmatively refusing to consider the fact that the State's duly enacted election map performs

better on traditional districting criteria." Br. at 38-39. Both arguments fail as the Plaintiffs' demonstrative plans fit squarely within the first *Gingles* precondition, as admitted by the Secretary's own expert witness.

To begin, the Court need not even reach the Secretary's *Gingles* 1 argument because the Secretary's own expert conceded that the *enacted* version of district 9 *itself* establishes the first *Gingles* precondition. App.335, 357-58;R.Doc.117 at 88, 110-11. Although that district had an insufficient Native American population to provide an equal opportunity to elect that group's candidates of choice, the district did have a slight majority population of Native American voters—crossing the numerical *Gingles* 1 threshold.[12] Pls.App.47. And the Secretary does not contend that the State's own district was drawn predominantly on the basis of race or that it was not reasonably configured. Indeed, Dr. Hood conceded that his testimony about Plaintiffs' illustrative districts were not aimed at the first *Gingles* precondition, but rather whether those districts were

---

[12] An enacted district might itself establish the *Gingles* 1 requirement by surpassing the 50% minority threshold while having an insufficiently large minority population to provide an equal electoral opportunity for minority voters. *See Missouri State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 933 (8th Cir. 2018). The Secretary makes no argument on appeal that the district court erred on account of the enacted district's status as majority Native American district.

an appropriate *remedy* if a Section 2 violation was found. App.357-58; R.Doc.117 at 110-11. But the Secretary has not appealed the district court's order imposing a remedy in this case. Having failed to do so—and having conceded that Plaintiffs' illustrative maps were not even necessary for *Gingles* 1 to be established—the Secretary's arguments about Plaintiffs' proffered maps are irrelevant to this appeal.

But even if the Court reaches the Secretary's argument, it rests entirely on a mischaracterization of a single footnote in the district court's decision. The district court observed that "even assuming race was the predominate motivating factor in drawing the [illustrative] districts," strict scrutiny would be satisfied because remedying a Section 2 violation was a compelling justification. Add.46;App.474;R.Doc.125 at 20. That observation is consistent with Supreme Court precedent. *See Milligan*, 599 U.S. at 30-31; *Cooper v. Harris*, 581 U.S. 285, 292 (2017) ("[The Supreme] Court has long assumed that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965."). As such, the district court did not clearly err by simply making the observation.

More importantly, there is no evidence in the record—and the district court did not find—that race predominated in the configuration of Plaintiffs' illustrative maps. The Secretary's expert Dr. Hood testified that he "ha[d] no evidence that plaintiffs' demonstrative plans are a racial gerrymander." App.414-15;R.Doc.117 at 167-68. Moreover, he testified that Plaintiffs' illustrative districts did not subordinate traditional districting principles to racial considerations. App.410-11; R.Doc.117 at 163-64. Additionally, Dr. Hood agreed—and the district court found—that *nonracial* shared interests between the Turtle Mountain and Spirit Lake Tribes justified their proffered districts' design. App. 414-15;R.Doc.117 at 167-68;Add.45-46;App.473-74; R.Doc.125 at 19-20. These included "shared representational interests, socioeconomic statuses, and cultural values." Add.45;App.473;R.Doc.125 at 19. In particular, the court credited testimony of the Chairmen that "the Tribes often collaborate to lobby the Legislative Assembly on their shared issues, including gaming, law enforcement, child welfare, taxation, and road maintenance, among others." Add.45;App.473; R.Doc.125 at 19. The Secretary offers no argument for how the district court erred—let alone clearly—in finding that these *nonracial*

justifications gave rise to the design of Plaintiffs' illustrative districts. *See Cooper*, 581 U.S. at 293 ("[T]he court's findings of fact—most notably, as to whether racial considerations predominated in drawing district lines—are subject to review only for clear error.") (citations omitted).

In the absence of any *evidence*, the Secretary asks the Court to simply look at Plaintiffs' illustrative districts and deem them racial gerrymanders because they (1) contain two rather than one Native American reservation and (2) "stretch diagonally" across the state. Br. at 40. But as the district court found—and as merely *looking* at the map shows, *see supra* at 9—Plaintiffs' illustrative districts do "not appear more oddly shaped than other districts." Add.45;App.473;R.Doc.125 at 19. To the extent the Secretary—and the *Amici* States[13]—criticize the boundaries of Plaintiffs' illustrative versions of district 9, their objection is to the shape and appearance of *Benson County*—which is bounded by water. Plaintiffs did not racially gerrymander by following county boundaries—quite the opposite.

---

[13] *Amici* describe Plaintiffs' Map 1 illustrative district 9 as "expand[ing] and contract[ing] again as it makes its way south before hooking east." *Amici* Br. at 23. *Amici* either do not know—or obscure—that they are describing the configuration of a *county*.

In *Milligan*, the Supreme Court held that there was "exceedingly thin" evidence of racial predominance where the proffered maps adhered to traditional districting principles and where the State's expert admitted that his "analysis of any race predominance in [plaintiffs' maps] was pretty light." 599 U.S. at 31-32 (internal quotation marks omitted). Here, the Secretary cites no evidence that race was considered at all, let alone that it predominated, and his own expert testified that he had *no evidence* to suggest it had. App.414;R.Doc.117 at 167. The district court did not clearly err in rejecting the Secretary's unsupported racial gerrymandering objections.

The Secretary's next argument, that the district court "refus[ed] to consider the fact that the State's duly enacted election map performs better on traditional districting criteria," is unsupported by the record. Br. at 39. The Secretary's own expert testified that Plaintiffs' illustrative districts either perform just as well or outperform other districts in the challenged plan in traditional districting principles such as compactness, county splits, and maintaining communities of interest. App.360-63, 368-73, 376-77;R.Doc.117 at 113-16, 121-26, 129-30. Even if Plaintiffs' illustrative districts were found to be inferior to the challenged plan

under some traditional redistricting criteria, they are superior on others and the Secretary improperly asks this Court to adopt the "beauty contest" standard that the Supreme Court has explicitly rejected. *See Milligan*, 599 U.S. at 21.

The Secretary invokes *Bush v. Vera*, 517 U.S. 952, 977-78 (1996), to argue that not requiring a "beauty contest" between a state's enacted plan and a plaintiff's illustrative plan only accrues to the benefit of the state, not a plaintiff. Br. at 43. But the *Milligan* Court applied that standard to its assessment of *plaintiffs'* proffered maps and *Milligan* controls. In any event, applying the Secretary's misconstrued interpretation would have the effect of creating an additional precondition for plaintiffs to satisfy. Such an interpretation would mean that a dilution of minority voting strength that has otherwise been proven to violate Section 2 would be allowed to continue if a subjective "beauty contest" between districts happened to cut in the state's favor, even if, as here, a plaintiff's map were found to be reasonably configured. This is not the law and would result in outcomes that Section 2 and the Supreme Court explicitly prohibit.

**B.    The district court's *Gingles* 2 finding was not clearly erroneous.**

The district court did not clearly err in finding that Native American voters in subdistricts 9A and 9B are politically cohesive under the second *Gingles* precondition. The second *Gingles* precondition "requires a showing that the Native-American minority is politically cohesive." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1020 (8th Cir. 2006). This showing is "typically" made through "a statistical and non-statistical evaluation of the relevant elections." *Id.* But the inquiry is "intensely local," *Gingles*, 478 U.S. at 79, and will turn on the type of available evidence for a given locality. "[S]tatistical evidence is not a *sine qua non* to establishing cohesion" under *Gingles* prong 2. *Brewer v. Ham*, 876 F.2d 448, 454 (5th Cir. 1989); *Gingles*, 478 U.S. at 56 (explaining that elections data is "one way of proving . . . political cohesiveness"). Courts routinely rely upon lay testimony to establish *Gingles* 2 in addition to the available quantitative evidence. *See*, *e.g.*, *City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1558 (11th Cir. 1987) (citing lay testimony of cohesion as "clearly acceptable" evidence for *Gingles* 2); *Sanchez v. Bond*, 875 F.2d 1488, 1494 (10th Cir. 1989) ("The experiences and observations of individuals involved in the political process are

clearly relevant to the question of whether the minority group is politically cohesive."); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1004-08 (D.S.D. 2004) (citing historic evidence and lay testimony in finding political cohesion); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 334-35 (N.D.N.Y. 2015) (citing anecdotal evidence of cohesion).

The district court found, and the parties agreed, that Native American voters in district 9 are politically cohesive. For example, an ecological inference statistical analysis shows that across all statewide contests from 2014 to 2022, usually 75% to 90% (or more) Native American voters in district 9 cast their ballots for the same candidates. Pls.App.11-15. Plaintiffs' expert Dr. Collingwood and the Secretary's expert Dr. Hood likewise agreed that subdistricts 9A and 9B contained too few voting precincts to conduct a distinct ecological inference analysis within them separate from the district 9 analysis. App.192-93, 336; R.Doc.115 at 148-49;R.Doc.117 at 89. Yet both agreed that the available quantitative evidence was sufficient to conclude that Native American political cohesion was present in both subdistricts as well. App.193-95; R.Doc.115 at 149-51;Pls.App.15-16; *see also* App.387-89;R.Doc.117 at 140-42 (Dr. Hood testifying that he "stands by" his conclusion of Native

American political cohesion in both subdistricts). The district court agreed, relying on both quantitative and qualitative evidence of cohesion at the subdistrict level. Add.46-47;App.474-75;R.Doc.125 at 20-21. On appeal, the Secretary asks the Court to hold that the district court clearly erred by, *inter alia*, relying on *his own expert's conclusion*. The Court should reject that invitation.

To begin, the Secretary is wrong to contend that Plaintiffs were required to make a separate *Gingles* 2 showing at the subdistrict level after they proved—as the Secretary concedes—that the *same Native American population* was politically cohesive at the full district level. In *Wisconsin Legislature*, the Court held that it was insufficient to establish *Gingles* prongs 2 and 3 regarding certain Milwaukee legislative districts by proving racially polarized voting "in the Milwaukee area" without evaluating the data "at the district level." 142 S. Ct. at 1250. That stands in contrast to this case, where Plaintiffs did not merely prove that Native American voters in some nearby "area" were politically cohesive, but rather that the precise voters at issue were politically cohesive. A picture illustrates the point. Enacted district 9 and its subdistricts are shown below, with the Native American population shown in blue. The parties

agree, based on an ecological inference statistical analysis of electoral and demographic characteristics of district 9's precincts, that the Native American population shown in blue is highly politically cohesive.



Pls.App.76. Yet the Secretary contends that this conceded political cohesion somehow disappears by the addition of the red subdistrict line across the *same population*. Having proved that the *entire* population shown in blue is politically cohesive, Plaintiffs were under no legal obligation to re-prove that fact at the subdistrict level. Plaintiffs satisfied the burden described by the Court in *Wisconsin Legislature* because they proved cohesion for the precise voters within each subdistrict—not some nearby area's voters—even if statistical methods required that to be done at the full district level. Ecological inference is not required evidence for *Gingles* 2 at all, *see supra*, and the text of Section 2 contains no exception

authorizing vote dilution for jurisdictions containing too few precincts to run discrete statistical analyses within segments of a district.

But even if Plaintiffs were required to establish Native American political cohesion separately for each subdistrict, the district court did not clearly err in finding that they met that burden by a preponderance of the evidence. Add.46-47;App.474-75;R.Doc.125 at 20-21.

*First*, courts have routinely relied upon data from "homogeneous" or "extreme case" precincts—*i.e.*, voting precincts where a particular racial or ethnic group constitutes nearly all the eligible voters. *See, e.g.*, *Gingles*, 478 U.S. at 52 (relying upon extreme case precinct analysis for cohesion finding); *Bone Shirt*, 461 F.3d at 1020 (relying upon homogenous precinct analysis to show cohesion). Here, Dr. Collingwood reported that one of the three voting precincts in subdistrict 9A qualified as a homogonous Native American precinct: Rolette County Precinct 3 is 93.6% Native American, and in the two 2022 endogenous elections featuring Native American candidates, those candidates received 87% and 90% of the vote in Precinct 3. Pls.App.16. The Secretary acknowledges that homogeneous precinct analysis is a "recognized statistical method[]" for proving cohesion, but he incorrectly contends

that Dr. Collingwood "did not rely on that technique." Br. at 45. That is simply wrong and alone forecloses the Secretary's *Gingles* 2 argument.

*Second*, Dr. Collingwood analyzed the election results precinct-by-precinct within each subdistrict, along with each precinct's demographic characteristics, and found that each precinct's results—in both subdistrict 9A and 9B—strongly correlated with its demographics—indeed, that correlation is precisely what led to the district-wide ecological inference result. App.193-95;R.Doc.115 at 149-51. And, as the district court observed, the vast majority of district 9's Native American population was in subdistrict 9A—confirming cohesion in that subdistrict given the district-wide data. Add.47;App.475;R.Doc.125 at 21; Pls.App.15. Indeed, given the extreme district-wide cohesion, Dr. Collingwood testified that it was "mathematically impossible" for the two subdistricts not to likewise have politically cohesive Native American voting patterns. Add.16;App.194;R.Doc.115 at 150.

*Third*, the district court did not clearly err in relying upon lay testimony of Native American political cohesion in both subdistricts. "Testimony from Chairman Azure and former Chairman Yankton confirms the statistical data. Both testified that voters living on the

Turtle Mountain Reservation and Spirit Lake Reservation vote similarly." Add.47;App.475;R.Doc.125 at 21. Chairman Azure testified specifically about political cohesion among Native American voters in both subdistricts. App.265-66;R.Doc.117 at 18-19.

*Fourth*, the Secretary cites no case for the proposition that a district court can somehow clearly err by crediting the consistent conclusions of *both parties' experts*. Dr. Hood repeatedly testified that he agreed with Dr. Collingwood that Native American voters in both subdistricts were politically cohesive and stood by the conclusion even though a separate ecological inference analysis could not be conducted in each. App.387-89; R.Doc.117 at 140-42. Although the Secretary objects that Dr. Hood initially reached that conclusion about subdistricts 9A and 9B in his expert report in a related proceeding, Br. at 46 n.6, his reports from that case were admitted into evidence in this case and the Secretary claims no error in that outcome, App.50;R.Doc.115 at 6;Pls.App.83-84; *see also* R.Doc.107 at 3. The district court could not have clearly erred by relying on the consistent conclusions of both parties' experts.

*Fifth*, even if the district court somehow clearly erred in its *Gingles* 2 conclusion for the subdistricts, the Secretary does not challenge the

district court's findings regarding the second or third *Gingles* preconditions for district 9. Whether the subdistricts within district 9 independently violate the Voting Rights Act is irrelevant once a violation is shown in the full district. Indeed, the district court has ordered a remedial district that no longer contains any subdistricts and the Secretary has not—and now cannot—appeal that remedial decision. Any argument about the subdistricts is mooted by the Secretary's failure to appeal regarding the full district.

## CONCLUSION

The Court should affirm the judgment of the district court.

March 15, 2024

Respectfully submitted,

Michael S. Carter
Matthew Campbell
Allison Neswood
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
(303) 447-8760
carter@narf.org
mcampbell@narf.org
neswood@narf.org

Samantha B. Kelty
NATIVE AMERICAN RIGHTS FUND
950 F St. NW, Ste. 1050
Washington, DC 20004
(202) 785-4166
kelty@narf.org

Bryan L. Sells
THE LAW OFFICE OF BRYAN
 L. SELLS
P.O. Box 5493
Atlanta, GA 31107
(404) 480-4212
bryan@bryansellslaw.com

*/s/ Mark P. Gaber*
Mark P. Gaber
Molly E. Danahy
Melissa Neal
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
mdanahy@campaignlegal.org
mneal@campaignlegal.org

Timothy Q. Purdon*
ROBINS KAPLAN, LLP
1207 West Divide Ave., Ste. 200
Bismarck, ND 58501
(701) 255-3000
tpurdon@robinskaplan.com

*Counsel for Appellees*
*\*Counsel for Appellees Turtle Mountain Band of Chippewa Indians*
*and Spirit Lake Nation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,890 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using version 2402 of Microsoft Word in 14-point Century Schoolbook font.

As required by Eighth Circuit Rule 28A(h), this brief has been scanned for viruses and is virus-free.

Dated: March 15, 2024

*/s/ Mark P. Gaber*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Mark P. Gaber*