**Case No. 23-3655**

---

**UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT**

TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, SPIRIT LAKE TRIBE, WESLEY DAVIS, ZACHERY S. KING, COLLETTE BROWN,

*Plaintiffs-Appellees,*

v.

MICHAEL HOWE, in his official capacity as Secretary of State of North Dakota,

*Defendant-Appellant.*

On Appeal from the United States District Court for the District of North Dakota
District Judge: Honorable Peter D. Welte, Chief Judge
(No. 3:22- cv-00022)

# BRIEF OF AMICUS CURIAE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW IN SUPPORT OF PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE

Jon M. Greenbaum
Ezra D. Rosenberg
Pooja Chaudhuri*
*Counsel of Record*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Ste. 900
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**


TABLE OF CONTENTS ... i

TABLE OF AUTHORITIES ... ii

CORPORATE DISCLOSURE STATEMENT ... 1

INTEREST OF AMICUS CURIAE ... 2

ARGUMENT ... 4

- I. PLAINTIFFS' SECTION 2 CLAIM SHOULD BE ALLOWED TO PROCEED UNDER SECTION 1983. ... 5
  - A. Section 1983 Was Designed to Encourage Private Enforcement of the Reconstruction Amendments. ... 5
  - B. Section 2, Itself a Reconstruction Amendment Statute, Clearly Falls Within the Ambit of Section 1983. ... 12
- II. SECTION 2 CONTAINS RIGHTS-CONFERRING LANGUAGE WITHIN THE MEANING OF *GONZAGA* AND *TALEVSKI*. ... 16
  - A. The Very Purpose of Section 1983 Is to Provide a Remedy for Certain Statutes that Do Not Provide a Private Remedy. ... 18
  - B. To Meet the Standards for a Remedy Under Section 1983, the Right Conferred Under the Underlying Statute Need Not Be a Right Other than that Created by the Constitution and Need Not Be Limited to an Individual Person. ... 19
  - C. Section 2 Unambiguously Confers a Private Federal Right Within the Meaning of *Gonzaga*. ... 25

CONCLUSION ... 27

CERTIFICATE OF COMPLIANCE ... 29

CERTIFICATE OF SERVICE ... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan*,
599 U.S. 1 (2023) .......... 25

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 20, 21, 24

*Ariz. v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 2

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
86 F.4th 1204 (8th Cir. 2023) .......... 2, 18, 25, 26

*Blessing v. Freestone*,
520 U.S. 329 (1997) .......... 21

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021) .......... 2, 23

*Buchanan v. Warley*,
245 U.S. 60 (1917) .......... 6

*Cannon v. Univ. of Chi.*,
441 U.S. 677 (1979) .......... 21

*Cent. Bank of Denver v. First Interstate Bank of Denver*,
511 U.S. 164 (1994) .......... 10

*Chapman v. Hous. Welfare Rights Org.*,
441 U.S. 600 (1979) .......... 9

*City of Boerne v. Flores*,
521 U.S. 507 (1997) .......... 25

*City of Rancho Palos Verdes v. Abrams*,
544 U.S. 113 (2005) .......... 15

*City of Rome v. U.S.*,
446 U.S. 156 (1980) .......... 13, 25

*Comm. For a Fair and Balanced Map v. Ill. Bd. of Elections*,
2011 WL 5185567, (N.D. Ill. Nov. 1, 2011) .......... 23

*Gonzaga v. Doe*,
536 U.S. 273 (2002) .......... 14, 16, 17, 19, 20–22, 24, 26

*Health and Hosp. Corp. Marion Cnty. v. Talevski*,
599 U.S. 166 (2023) .......... 14, 16, 19, 25–27

*Maine v. Thiboutot*,
448 U.S. 1 (1980) .......... 9, 10, 13, 15, 16, 18

*McCready v. White*,
417 F.3d 700 (7th Cir. 2005) .......... 15

*MHANY Mgmt. Inc. v. Cnty. of Nassau*,
843 F. Supp. 2d 287 (E.D.N.Y. 2012) .......... 15

*Pennhurst State Sch. and Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 14, 20

*Poor Bear v. Cnty. of Jackson*,
2016 WL 3435181 (D.S.D. June 17, 2016) .......... 23

*Shelby Cnty. v. Holder*,
570 U.S. 529 (2013) .......... 2

*Slaughter-House Cases,*
83 U.S. 36 (1872) .......... 6

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) .......... 7, 12, 25

*Spirit Lake Tribe v. Benson Cnty.*,
2010 WL 4226614 (D.N.D. Oct. 21, 2010) .......... 23

*Suter v. Artist M.*,
503 U.S. 347 (1992) .......... 22

*Thornburg v. Gingles*,
478 U.S. 30 (1986)....................2, 23

*U.S. v. Price*,
383 U.S. 787 (1996)....................7

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016)....................2, 23

*Wilder v. Va. Hosp. Ass'n*,
496 U.S. 498 (1980)....................14

*Wright v. Roanoke Redevelopment and Hous. Auth.*,
479 U.S. 418 (1987)....................14, 18, 24

**Statutes**

52 U.S.C. § 10301....................12

28 U.S.C. § 1343(3)....................10

28 U.S.C. § 1343(4)....................10

42 U.S.C. § 1983....................*passim*

**Legislative Materials**

Cong. Globe, 42nd Cong., 1st Sess. 78 (1871)....................8, 11

Ku Klux Klan Act., 42nd Cong., 17 Stat. 13 (1871)....................9

Ku Klux Klan Act., Rev. Stat. § 563(12) (1874)....................9

Ku Klux Klan Act., Rev. Stat. § 629(16) (1874)....................9, 10

Ku Klux Klan Act., Rev. Stat. § 1979 (1874)....................9

**Federal Rules**

Fed. R. of App. P. 29(a)(4)(E)....................3

**Constitutional Amendments**

U.S. Const. amend. XIII........................................................................6, 7

U.S. Const. amend. XIV. .......................................................................6, 7

U.S. Const. amend. XV.........................................................................6, 7

**Secondary Sources**

David Achtenberg, *A "Milder Measure of Villainy": The Unknown History of 42 U.S.C. § 1983 and the Meaning of "Under Color of Law,"* 1999 Utah L. Rev. 1 (1999).......................................................8

Douglas A. Blackmon, *Slavery by Another Name, The Re-enslavement of Black Americans from the Civil War to World War II* (2008) .........................5

Eric Foner, *The Story of American Freedom* (1998) ................................................7

Robert J. Kaczorowski, *Federal Enforcement of Civil Rights During the First Reconstruction,* 23 Fordham Urb. L.J. 155 (1995)............................7, 8

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1(A), Amicus Curiae the Lawyers' Committee for Civil Rights Under Law is a 501(3)(c) nonprofit organization that has no parent corporations in which any person or entity owns stock.

## INTEREST OF AMICUS CURIAE

The Lawyers' Committee for Civil Rights Under Law is a nonpartisan, nonprofit organization, formed in 1963 at the request of President John F. Kennedy to enlist the leadership and resources of the private bar in combating racial discrimination. The Lawyers' Committee has actively participated in the voting rights arena, fighting to ensure that all Americans have an equal opportunity to participate in the electoral process. Section 2 of the Voting Rights Act ("VRA") of 1965 has been a major weapon used by the Lawyers' Committee in that fight.

The Lawyers' Committee has litigated significant voting rights cases including *Shelby County v. Holder*, 570 U.S. 529 (2013), *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013), and *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016). On behalf of private plaintiffs, the Lawyers' Committee has filed dozens of cases under Section 2 of the VRA in the last decade and currently has several active Section 2 cases.

Additionally, the Lawyers' Committee has participated as amicus curiae in significant voting rights cases before the United States Supreme Court, such as *Thornburg v. Gingles*, 478 U.S. 30 (1986), and *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), cases that have defined the contours of Section 2. The Lawyers' Committee also filed an amicus brief in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. 2023).

Amicus has a direct interest in this case because it raises important voting rights issues central to the organization's mission that includes representing private plaintiffs that have suffered voting rights discrimination. Amicus has requested and obtained the consent of all parties to file this brief.[1]

[1] Under Federal Rule of Appellate Procedure 29(a)(4)(E), the undersigned counsel certifies that no counsel for a party authored this brief in whole or in part or made a monetary contribution intended to fund the preparation or submission of this brief.

## ARGUMENT

Defendant and the supporting amici, the attorney generals of fifteen states (hereinafter, "state amici"), argue, for a number of unsupported reasons, that Plaintiffs may not proceed with their Section 2 claim under Section 1983. This brief addresses a subset of those arguments.

First, Defendant provides no compelling reason as to why Section 1983, which was intended to enforce the provisions of the Reconstruction Amendments, does not apply to Section 2 of the Voting Rights Act, itself a Reconstruction Amendment statute, enacted to guarantee the rights secured by the Fifteenth Amendment. The history and purpose of both Section 1983 forcefully demonstrate that Congress intended statutes such as Section 2 to fall within Section 1983's ambit.

Next, Defendant characterizes Section 1983 as a "backdoor" method for enforcing statutes that do not contain a private right of action. To the contrary, an essential purpose of Section 1983 is to provide a mechanism for private parties to enforce statutes that do not contain private causes of action.

Defendant and state amici further argue that for Section 1983 to apply, a statute must create a "new" right conferred on only an "individual." There is no such requirement. Rather the focus of the inquiry is on Congress's intent to confer an *enforceable* right via Section 1983, regardless of whether a single individual or a group enforces that right.

Ultimately, as demonstrated below, applying the correct standard, claims to vindicate the right conferred by Section 2 easily qualify for a remedy under Section 1983. For these reasons as well as others raised by Plaintiffs, this Court should affirm the judgment of the district court.

## I. PLAINTIFFS' SECTION 2 CLAIM SHOULD BE ALLOWED TO PROCEED UNDER SECTION 1983.

Defendant and state amici make no mention of the history or the purpose of Section 1983. This history demonstrates that Section 1983 of the Civil Rights Act and Section 2 of the VRA were cut from the same cloth: to enforce the guarantees of the Reconstruction Amendments. And both statutes were enacted pursuant to the authority delegated to Congress under the enforcement clauses of those Amendments. In light of this history, their argument—that Section 1983, which, in its original incarnation, was expressly designed to provide a cause of action for enforcing the Amendments does not apply to one of the most significant statutes enacted to effectuate the very same Amendments—makes no sense.

### A. Section 1983 Was Designed to Encourage Private Enforcement of the Reconstruction Amendments.

As the Civil War neared its end, the United States faced a reckoning. When the war ended in 1865, more than four million enslaved people remained in bondage. Douglas A. Blackmon, *Slavery by Another Name, The Re-enslavement of Black Americans from the Civil War to World War II* 4–5 (2008). Yet it was not until the

ratification of the Thirteenth Amendment, the first of the three Reconstruction Amendments, that slavery was officially abolished. U.S. Const. amend. XIII, § 1.

The second of the three Reconstruction Amendments, the Fourteenth Amendment, granted citizenship to "[a]ll persons born or naturalized in the United States," thereby extending citizenship to formerly enslaved people. U.S. Const. amend. XIV, § 1. The language of the next three clauses of the Fourteenth Amendment placed restrictions on states' powers, prohibiting states from enacting or enforcing any law that abridged the "privileges or immunities" of citizens; deprives "any person" of life, liberty, or property without due process of law; or denies any person the equal protection of the law. *Id.* §§ 2–4. The last Reconstruction Amendment, the Fifteenth, adopted in 1870, expressly banned racial discrimination in voting: "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.

The Reconstruction Amendments emanated from the need to guarantee the rights that had been categorically denied to Black Americans because of the institution of slavery and to establish Black Americans as free and equal persons. *See Slaughter-House Cases*, 83 U.S. 36, 71–73 (1872); *Buchanan v. Warley*, 245 U.S. 60, 74–80 (1917). Thus, all three Reconstruction Amendments delegated to Congress the power to enforce their terms, "the Congress shall have power to enforce

this article by appropriate legislation." Const. amend. XIII, § 2; Const. amend. XIV, § 5; Const. amend. XV, § 2. Indeed, Congress has invoked its enforcement powers under these clauses to enact watershed civil rights statutes such as the Civil Rights Act of 1964 and the Voting Rights Act of 1965. *See South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966).

Despite the enactment of the Reconstruction Amendments, rampant efforts were undertaken in many Southern states to deny Black people their newly granted constitutional rights. The "Black Codes," a series of such discriminatory laws passed by such states, imposed on Black citizens mandatory year-long labor contracts, coercive apprenticeships, and criminal penalties for breach of contract. Eric Foner, *The Story of American Freedom* 103–104 (1998). At the same time, the Ku Klux Klan became a formidable paramilitary force dedicated to undoing the gains of the Reconstruction era by undertaking a systematic and brutal campaign of terror against Black Americans. In the lead-up to the presidential election of 1868, the Klan committed murder and other horrifying atrocities to deter Black citizens from the polls. *See* Robert J. Kaczorowski, *Federal Enforcement of Civil Rights During the First Reconstruction*, 23 Fordham Urb. L. J. 155, 156–157 (1995); *see also U.S. v. Price*, 383 U.S. 787, 803–804 (1966).

Over the following years, the Klan ruthlessly perpetrated the "outrages"—beatings, whippings, lynchings, shootings, rapes, and torture of Black Americans.

*See* Kaczorowski at 157; David Achtenberg, *A "Milder Measure of Villainy": The Unknown History of 42 U.S.C. § 1983 and the Meaning of "Under Color of Law,"* 1999 Utah L. Rev. 1, 46–7 & n.23 (1999). Victims of Klan violence could rarely turn to local officials for justice or protection, as those officials were often unwilling or unable to enforce the law against the Klan and sometimes even conspiring with the Klan. *See* Kaczorowski at 157; *see also* Cong. Globe, 42nd Cong., 1st Sess. 78 (1871).

In direct response to Klan violence, Congress passed the Ku Klux Klan Act of 1871, which contained the original incarnation of what is now Section 1983. The original text included language that addressed both jurisdiction and remedy for deprivation of rights secured by the Constitution within the same Section of the statute:

> Any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled "An act to protect

> all persons in the United States in their civil rights, and to furnish the means of their vindication"; and the other remedial laws of the United States which are in their nature applicable in such cases.

Ku Klux Klan Act, § 1, 17 Stat. 13, 42nd Cong. Apr. 20, 1871; *see Maine v. Thiboutot*, 448 U.S. 1, 6–7 (1980).

In 1874, Congress revised the statute in a few ways. First, Congress tweaked the language of the statute to clarify that it protected the "rights, privileges, or immunities secured by the Constitution and laws." 1874 Rev. Stat., Section 1 of KKK Act; *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 608, n.16 (1979). In the same 1874 amendments, Congress also dispersed the remedial and jurisdictional portions of the 1871 version of Section 1 (above) into separate sections, namely Section 1979 of the Revised Statutes included the remedial language and Sections 563(12) and 629(16) included the jurisdictional provisions. 1874 Rev. Stat., §§ 1979, 563(12), 629(16); *see Thiboutot*, 448 U.S. at 6.

Section 563(12) granted jurisdiction to the district courts over deprivations of rights secured by "the Constitution of the United States, or of any right secured by any law of the United States." 1874 Rev. Stat., § 563(12). Section 629(16), the other jurisdictional section, provided that Section 1 of the KKK Act applied to "deprivations of rights secured by "the Constitution of the United States or of any right secured by any law providing for equal rights.'" 1874 Rev. Stat. § 629(16).

Section 629(16) was the precursor to the current jurisdictional provision codified at 28 U.S.C. § 1343(3); *see Thiboutot*, 448 U.S. at 8. That Section 1983 and Section 1343(3) have the same origins—the language pertaining to "civil rights" and "equal rights" in both come from the original text of Section 1 of the KKK Act and the subsequent Revised Statutes of 1874 that amended Section 1—demonstrates why courts have read the two provisions in consonance. *See Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 185 (1994) ("When Congress reenacts statutory language that has been given a consistent judicial construction, we often adhere to that construction in interpreting the reenacted statutory language.").

In 1957, Congress subsequently amended the jurisdictional statute again by adding subsection (4), which grants federal district courts jurisdiction over claims "[t]o secure damages or secure equitable or other relief under any Act of Congress providing for the protection of civil rights, <u>including the right to vote</u>." P.L. 85-315 (Sept. 9, 1957), 71 Stat. 637 (codified as 28 U.S.C. § 1343(4)). Taken together, these amendments to the companion statutes of Section 1983 and Section 1343(3) clearly reflect Congress's understanding that Section 1983 provided a cause of action not only for civil rights statutes at large, but also for statutes protecting the right to vote.

Thus, as it appears today, Section 1983 provides a mechanism for private citizens to sue state and local officials, local governmental entities, and those acting

in concert with them, for violating federal constitutional *and* statutory protections under the color of state law, including statutes protecting the right to vote.

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

Congressional debate from the time of its passage reveals, and the statute's plain text confirms, that Section 1983 created a sweeping cause of action for *any person* to file suit in federal court to prevent or redress the deprivation of any federal right by *anyone* acting under color of state law. Cong. Globe, 42d Cong., 1st Sess., App. 67 (1871) (Statement of Rep. Shellabarger describing Section 1983 as a measure "which does affect the foundations of the Government itself"); *id.* at 153 (Statement of Rep. Garfield, noting "even where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them"). The importance of this private right of action to realizing the rights granted

by the Reconstruction Amendments cannot be overstated: Congress passed the first iteration of Section 1983 as Section 1 of the KKK Act of 1871 a year after the ratification of the Fifteenth Amendment, the last Reconstruction Amendment. And in so doing, Congress intended Section 1983 to provide a cause of action for private persons seeking to use laws implementing the protections of those Amendments.

B. Section 2, Itself a Reconstruction Amendment Statute, Clearly Falls Within the Ambit of Section 1983.

The VRA, including Section 2, 52 U.S. Code § 10301, is precisely the type of civil rights statute that Congress had in mind when it enacted the "and laws" language of Section 1983 and the companion jurisdictional statutes. The history and purpose of the VRA illustrate that it was enacted to enforce the guarantees of the Reconstruction Amendments. In fact, its enactment was a necessity because, despite the adoption of the Reconstruction Amendments and the subsequent passage of Section 1983, discrimination in voting was unabated. Indeed, the Supreme Court deemed the VRA a necessary and proper exercise of congressional authority under the Fifteenth Amendment and an appropriate means by which to "banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century." *Katzenbach*, 383 U.S. at 308.

Section 2, including its prohibition against discriminatory "results" in voting is a constitutional exercise of Congress's power to enforce the right against racial

discrimination in voting guaranteed in Section 1 of the Fifteenth Amendment through the enforcement clause in Section 2 of that Amendment. "[U]nder § 2 of the Fifteenth Amendment, Congress may prohibit practices that, in and of themselves, do not violate § 1 of the Amendment, so long as the prohibitions attacking racial discrimination in voting are 'appropriate.'" *City of Rome v. U.S.*, 446 U.S. 156, 177 (1980). As such, it is precisely the sort of statute Congress envisioned would be subject to enforcement via Section 1983.

At various points in its Section 1983 jurisprudence, the Supreme Court has recognized the obvious: that the "principal purpose" of the "and laws" language of Section 1983 was to "ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute." *Thiboutot*, 448 U.S. at 8. Never has there been a hint of a debate as to whether Section 1983 applied to civil rights statutes such as the VRA. Indeed, this is gleaned from the fact that cases construing the applicability of Section 1983 have never involved civil rights laws. Largely these cases have addressed the issue as to whether Section 1983 should apply to statutes promulgated under Congress's Spending Clause powers. Indeed, in *Thiboutot*, where the Court broadened Section 1983's reach to the Social Security Act, it did so over the petitioners' argument that Section 1983 should be limited to civil rights statutes. *Id.* at 6–7.

Since *Thiboutot*, the Court has found Section 1983 applicable to some federal funding statutes and not to others. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 524 (1980) (finding Section 1983 remedy applied to Medicaid Act provision requiring states to submit reimbursement rates to HHS to continue receiving federal assistance); *Wright v. Roanoke Redevelopment and Hous. Auth*., 479 U.S. 418, 430 (1987) (finding Section 1983 remedy under HUD regulation requiring local housing entities receiving federal funding to bill reasonable amount of utilities to compute rent ceiling); *but see Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S.1, 26 (1981) (finding no Section 1983 remedy against state facilities under provision of Developmentally Disabled Assistance and Bill of Rights Act that terminated federal funds to non-compliant states); *Gonzaga v. Doe*, 536 U.S. 273, 290 (2002) (finding no Section 1983 remedy for violation of Family Educational Rights and Privacy Act ("FERPA"), which directed Secretary of Education's distribution of public funds to educational institutions); *Health and Hosp. Corp. Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (finding private right of action against state nursing home facilities receiving federal funding under Federal Nursing Home Reform Act for violation of right to be free of chemical restraints and to be discharged or transferred to another facility only when certain preconditions met).

Although, as Defendant notes, there are cases outside the funding context in which the Court declined to apply Section 1983, (Aplnt Br. 22), none of them deal

with civil rights statutes. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127 (2005) (Section 1983 did not provide private cause of action under Telecommunications Act of 1996); *McCready v. White*, 417 F.3d 700, 702 (7th Cir. 2005) (no Section 1983 remedy under Driver's Privacy Protection Act of 1994). One of the cases cited by Defendant is a federal funding statute case. *See MHANY Mgmt. Inc. v. Cnty. of Nassau*, 843 F. Supp. 2d 287, 335 (E.D.N.Y. 2012) (no Section 1983 remedy under federal funding statute conditioning receipt of HUD funds on agreement of recipients not to administer funds in discriminatory manner).

In short, Defendant and state amici cite no case and Lawyers' Committee is unaware of a single case where the Court declined a Section 1983 remedy to a Reconstruction Amendment statute like Section 2. The reason is obvious: No court or judge—not even those who espouse the most stringent view as to the scope of Section 1983—has ever suggested that it does not apply to statutes enacted pursuant to Congress's power under the Reconstruction Amendments.

For example, the dissenting Justices in *Thiboutot* (Justices Powell, Burger, and Rehnquist) relied on the "historical evidence" in support of the position against the expansion of Section 1983 to statutes that went beyond the civil rights context. 448 U.S. at 12. Most recently, in *Talevski*, Justice Thomas in dissent, arguing against the expansion of Section 1983 *beyond* the civil rights context, explained that Section 1983 was meant to be confined "to laws enacted under Congress' Reconstruction

Amendments enforcement powers" noting that the "civil rights connection [to Section 1983] was not arbitrary." 599 U.S. at 225 n.12 (Thomas, J., dissenting). Justice Thomas went on, "there is substantial reason to doubt that Congress fundamentally transformed a mechanism to enforce the Reconstruction Amendments into a freestanding right of action to remediate the violation of any federal statute, even those enacted beyond Congress' civil rights enforcement powers." *Id.* The basic premise of this portion of Justice Thomas's dissent—that Section 1983 clearly applies to civil rights laws enacted to implement the Reconstruction Amendments—is not at odds with the majority opinions in *Thiboutot* and *Talevski* that the Section 1983's scope is *broader* than the civil rights statutes. If anything, the dissenting Justices' sentiments in *Thiboutot* and *Talevski* support the point amicus makes here—that Section 2 is the epitome of the sort of statute that Congress contemplated would fall within the ambit of Section 1983.

## II. SECTION 2 CONTAINS RIGHTS-CONFERRING LANGUAGE WITHIN THE MEANING OF *GONZAGA* AND *TALEVSKI*.

In *Gonzaga*, the Court created a two-part test as to whether statutes such as the federal funding law before it created rights remediable under Section 1983: (1) the statute creates a private-right by conferring a right on individuals benefitted and (2) the presumption of enforcement under Section 1983 could be rebutted if the statute in question explicitly forbids recourse to Section 1983, or implicitly does so

if it contains a comprehensive remedial scheme incompatible with individual enforcement actions. 536 U.S. at 284. Amicus agrees with Plaintiffs that it is questionable whether the *Gonzaga* test applies to civil rights statutes enacted under the Reconstruction Amendments or, for that matter, to any statutes other than funding statutes. (Aplee Br. 31–35). One thing is clear: Defendant and state amici have not cited a single case—and amicus is unaware of any—where the Court deemed it appropriate to apply the *Gonzaga* test to determine whether a civil rights statute enacted pursuant to the Reconstruction Amendments could provide the basis for a private right of action under Section 1983. That such statutes are enforceable via Section 1983 has been appropriately taken as a given.

Amicus further relies on the arguments in Plaintiffs' brief to the effect that, assuming the *Gonzaga* test were applicable to enforcement of laws enacted pursuant to Congress's authority under the Reconstruction Amendments, Section 2 of the VRA meets that test. (Aplee Br. 35–51). Amicus agrees that Section 2 confers private rights on individuals and that the presumption of individual enforcement under Section 1983 is not rebutted. *See id.* Amicus further addresses certain discrete arguments raised by Defendant and state amici. The first is that Section 1983 does not provide a "backdoor" for private plaintiffs suing to enforce a statute that contains no private right of action. (Aplnt Br. 8, 17). The second is that for Section 1983 to apply, a statute must "create new rights" not "restate" constitutional rights, and these

"new rights" must not be "collective." (Aplnt. Br. 18, 26, 31); (States' Br. 8, 12–14). Each of these arguments is easily dispatched, and Section 2 equally easily meets the standard for remedy under Section 1983.

A. <u>The Very Purpose of Section 1983 Is to Provide a Remedy for Certain Statutes that Do Not Provide a Private Remedy</u>.

First, Defendant's argument that Section 1983 is a "backdoor" for private plaintiffs suing under a statute that "provides no such cause of action itself" is antithetical to the purpose of Section 1983. (Aplnt. Br. 8, 17). To the contrary, the purpose of Section 1983 is precisely to provide a private right of action where a rights-conferring statute does *not* contain one.[2] It was for that reason that the Court in *Thiboutot* explicitly noted that, although the Social Security Act did not contain an implicit private cause of action, it did confer a private right on individuals, and Section 1983 provided the remedy to enforce that right. 448 U.S. at 6. Indeed, the Supreme Court has repeatedly found that Section 1983 applies to rights-conferring statutes that do not in themselves create a private right of action. *See Wright*, 479 U.S. at 430 (where statute contained rights-conferring language and no mechanism

---

[2] Amicus respectfully disagrees with this Court's decision that Section 2 of the Voting Rights Act does not create a private right of action. *See Ark. State Conf. NAACP v. Ark. State Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023), en banc review denied, 91 F.4th 967 (8th Cir. 2024).

for private enforcement, Section 1983 provided remedy); *Talevski*, 599 U.S. at 190–91 (same).

B. <u>To Meet the Standards for a Remedy Under Section 1983, the Right Conferred Under the Underlying Statute Need Not Be a Right Other than that Created by the Constitution and Need Not Be Limited to an Individual Person.</u>

Second, Defendant and state amici attempt to establish new requirements for Section 1983 coverage—*i.e.*, that the underlying statute "create" a "new right"—relying on language taken out of context from *Gonzaga* and *Sandoval*. (Aplnt Br. 18, 26, 31); (States' Br. 8, 12–14). By "new," these parties seem to mean that the underlying right created in the statute must be something not already created by the Constitution. (Aplnt Br. 26–27); (States' Br. 12). Defendant and state amici then take the argument a step further, arguing again without a scintilla of support—that the "new right" cannot be claimed by a group or a class of persons, only by "individuals." (Aplnt Br. 27–30); (States' Br. 14–16). Finally, playing a game of constitutional "gotcha," state amici posit that if Section 2 is construed as having created such "new rights," then Section 2 is an unconstitutional exercise of Congress's enforcement power. (States' Br. 7–9). These arguments are based on a distortion of the case law and should be rejected by this Court.

The case law dealing with the creation of a right focuses on whether the statute in question evinces congressional intent to create "private" rights in the underlying

statute that could be enforced via Section 1983. For that reason, the Court in *Pennhurst* summarized the question as the "well-settled distinction between congressional 'encouragement' of state programs and binding obligations." 451 U.S. at 27. The *Gonzaga* Court expanded on this theme, describing the question of whether a statute creates a private right as divining congressional "intent for *private enforcement*," 536 U.S. at 280. In other words, *Gonzaga* directs us to look to whether the statute contains "*enforceable* rights," or "specific, *individually enforceable* rights," *id.* at 281, or "rights *enforceable* by § 1983." *Id.* at 282 (emphases added). *Gonzaga* does not say, as Defendant would have this Court believe, that congressional intent to create a right means that Congress must have intended to include a new, substantive right in a statute that was not otherwise enumerated in "the Constitution and laws." 42 U.S.C. § 1983.

In this context, "new," as used in *Gonzaga*, modifies "individual right," not "right." As the Court explains, "where the text and structure of a statute provide no indication that Congress intends to create new *individual* rights, there is no basis for a private suit. . . ." 536 U.S. at 287 (emphasis added).[3] That the *Gonzaga* Court's

---

[3] *Sandoval* uses the phrase "new rights" just once, in comparing one regulation with another for purposes of assessing whether the regulation, § 602, created rights for individuals or focused on the government. "Far from displaying congressional intent to create new rights, § 602 limits agencies to 'effectuat[ing] rights already created by§ 601," 532 U.S. at 289. The Court then directly proceeds to examine how far removed from "individuals" the focus of the regulation was. *Id.*

focus was on Congress's intent to confer a right of private enforcement is demonstrated by its approval of the construct set forth in *Blessing v. Freestone*, 520 U.S. 329 (1997). In *Blessing*, the Court articulated that a plaintiff seeking redress under Section 1983 must assert a "violation of a federal *right*, not merely a violation of federal *law*." 520 U.S. at 340 (emphasis in original.) The *Gonzaga* Court therefore relied on its previous rights-conferring language in *Blessing* to explain the distinction between the "*individual* entitlement to services," which would support a cause of action under Section 1983, as opposed to the "aggregate services provided by the state," which would not support a cause of action under Section 1983. *Gonzaga*, 536 U.S. at 282, 287 (emphasis in original). Thus, the Court continued, "[f]or a statute to create such private rights, its text must be 'phrased in terms of the person benefited.'" *Id.* at 284 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 692 n.13 (1979)).

Using this framework for determining whether Congress intended to confer a right, the *Gonzaga* Court concluded FERPA did not confer "new individual rights" because its "focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of '*individual* entitlement' that is enforceable under Section 1983." *Id.* at 274–75 (emphasis in original). Nowhere did the Court even hint that there had to be a heretofore unknown right created in the

statute for it to be enforced through Section 1983. That is not the sort of massive change in the law the Court undertakes sub silentio.

Further, from the above, it is also clear that nothing in *Gonzaga* limits access to Section 1983 to claims brought by groups or classes of individuals, as Defendant and state amici suggest. To the contrary, the *Gonzaga* Court made clear that it considered actions by a "class" of a statute's beneficiaries to be equivalent to the enforcement of individual rights. *Id.* at 284. Referring to the statute in *Suter v. Artist M.*, 503 U.S. 347, 357 (1992), which the Court previously found did not create a private cause of action under Section 1983, the Court observed, "[s]ince the Act conferred no specific, individually enforceable rights, there was no basis for private enforcement, even by a class of the statute's principal beneficiaries." *Gonzaga*, 536 U.S. at 281. Thus, the distinction the Court made was not between actions brought by more than one person and actions brought by a single person, but between actions brought by "private individuals" and enforcement by a government entity. *See Suter*, 503 U.S. at 363.

In further support of its "individual" versus "collective" argument, Defendant focuses only on Section 2 vote dilution suits and ignores vote denial suits, which have been routinely brought under Section 2 by individual plaintiffs, whether by individual persons, groups of persons, organizations, or both. *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) (vote denial claim brought by

organizations); *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (vote denial claim on behalf of individuals and organizations). Courts in this Circuit have permitted Section 2 vote denial claims brought by organizations and individuals to proceed under Section 1983. *Spirit Lake Tribe v. Benson Cnty.*, 2010 WL 4226614, at *1 (D.N.D. Oct. 21, 2010) (Section 2 vote denial suit on behalf of Tribe and individual plaintiff brought under Section 1983); Compl. ECF No. 1, Sept. 8, 2014, *Poor Bear v. Cnty. of Jackson*, 2016 WL 3435181 (D.S.D. June 17, 2016) (complaint on behalf of Tribe and individual voters alleging Section 2 vote denial claim under Section 1983).

But, even as to vote dilution cases, Defendant is wrong. Relying on a footnote dealing with standing in an unpublished district court opinion, *Comm. For a Fair and Balanced Map v. Ill. Bd. of Elections*, 2011 WL 5185567, at*1 n.1 (N.D. Ill. Nov. 1, 2011), Defendant argues that an individual need not establish that their rights were violated to prove a vote dilution claim under Section 2. (Aplnt Br. 29). Nothing in that footnote speaks to Defendant's point here. Individuals routinely bring vote dilution claims under Section 2. *Thornburg v. Gingles*, 478 U.S. 30 (1986), itself was brought by individuals. That is because the injury in a vote dilution claim is having one's vote being diluted on account of one's race. That the injury is shared with others of the person's racial group does not make the injury any less supportive of a private right of action under Section 1983. And no court has ever held to the contrary.

Finally, state amici's argument, that if Section 2 *did* create "new rights," it would be unconstitutional, should be given short shrift. (States' Br. 7–10). The whole cloth upon which this argument is premised is embedded in the first sentence of state amici's brief: "Unless a federal statute creates 'substantive private rights,' *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), it does not secure 'rights enforceable under §1983.' *Gonzaga*, 536 U.S. at 285." (States' Br. 7).[4] Nowhere does *Gonzaga* say this. Indeed, the phrase "substantive private rights" appears nowhere in the *Gonzaga* decision.[5] Moreover, amici's focus on "substantive," rather than on "private," misses the point, because, as demonstrated above, it is the issue of whether Congress intended to confer a "private" or "individual" or "individually enforceable" right that is the crux of the matter.

As the Court held in *Wright*, the "right" that is at the heart of this case is "the right to bring suit in federal court," 479 U.S. at 427, and the ultimate issue is whether "Congress intended to preclude petitioners' § 1983 claim against respondent," *id.* at

---

[4] "[T]he initial inquiry [under § 1983]—determining whether a statute confers any right at all—is no different from the initial inquiry in an implied right of action case, the express purpose of which is to determine whether or not a statute confers rights on a particular class of persons." *Gonzaga*, 536 U.S. at 284.

[5] The phrase "substantive private rights" appears only once in *Sandoval* in a discussion, not as a statement of the standard for the creation of a private right of action, but in distinguishing specific cases concerning statutes whose remedial schemes foreclosed a private right of action. 532 U.S. at 290. "And as our cases show, some remedial schemes foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights." *Id.*

429. Whether Section 2 creates such a "right" cannot, contrary to amici's argument, affect its constitutionality. The constitutionality of the VRA as a rational means of Congress's enforcement of the Fifteenth Amendment has been settled since *South Carolina v. Katzenbach*. 383 U.S. at 327. The Court's upholding of the constitutionality of Section 2 in *City of Rome*, 446 U.S. at 208–09, specifically, was reaffirmed by the Supreme Court in *Allen v. Milligan*, 599 U.S. 1, 41 (2023). That Congress saw fit in Section 2 to confer the right on private individuals to vindicate their constitutional rights guaranteed under the Fifteenth Amendment through Section 1983 cannot possibly alter this result.[6]

C. Section 2 Unambiguously Confers a Private Federal Right Within the Meaning of *Gonzaga*.

As the Court recently affirmed, the test is whether the law "*unambiguously* confer[s] individual federal rights." *Talevski,* 599 U.S. at 180 (emphasis in original) (citing *Gonzaga*, 536 U.S. at 280). This Court has already recognized that Section 2 of the VRA confers rights because it "unmistakabl[y] focus[es] on the benefited class": those subject to discrimination in voting." *Ark. NAACP*, 86 F.4th at 1209

[6] Contrary to state amici's argument, (States' Br. 8–9), Congress's conferral of a private right in Section 2 certainly does not raise the issue examined in *City of Boerne v. Flores*, 521 U.S. 507 (1997), under the Fourteenth Amendment (not the more-targeted Fifteenth Amendment which is the foundation of Section 2) as to whether the statute is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.*at 532.

(quoting *Gonzaga*, 536 U.S. at 284). This Court's characterization of the plain language of Section 2 was correct. *Id.* at 1209–10. Section 2's references to "the right of any citizen of the United States to vote on account or race or color," to "members of a class of citizens protected by subsection (a)," and to whether "members of the protected class]" have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" could hardly be construed otherwise. Indeed, any doubt that Congress intended to confer "rights" on specific individuals is dispelled by Congress's disclaimer in the last sentence of Section 2 to the effect that nothing in the section "establishes a right" to have "members of the protected class elected in numbers proportional to their share of the population." 52 U.S.C. § 10301(b).

Although this Court in *Arkansas NAACP*, 86 F.4th at 1210, in determining whether Section 2 contained rights-conferring language, went on to note that the language in Section 2 directed towards "any State or political subdivision" renders unclear whether Section 2 meets the *Gonzaga* standard, the rationale behind that dictum is at odds with the Supreme Court's decision in *Talevski* from last year. There, a nursing home resident had brought an action under Section 1983, alleging that a nursing home's use of chemical restraints and transfer attempts violated the Federal Nursing Home Reform Act. After finding that the Act conferred on nursing home residents "the right to be free" from certain restraints, the Court noted, "[t]o

be sure," provisions of the Act "also establish who it is that must respect and honor these statutory rights," namely, "the nursing homes." 599 U.S. at 185. The Court firmly rejected the argument that Defendant offers here, that if any portion of a statute focuses on those entities that are prohibited from taking certain actions, this would negate a conclusion that the statute also confers a right on individuals. *Id.* "Indeed, it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held)." *Id.*

Significantly, the *Talevski* Court dropped a footnote at this point in its opinion: "The Fourteenth Amendment hardly fails to secure § 1983-enforceable rights because it directs state actors not to deny equal protection." *Id*. 185 n.12. The same can be said as to Section 2. It hardly fails to secure Section 1983-enforceable rights simply because it also directs state and local actors not to deny voters the equal opportunity to participate in the political process on account of their race.

## CONCLUSION

For the foregoing reasons, the Court should allow Plaintiffs' Section 2 claims to proceed under Section 1983 and reject Defendant's and state amici's arguments to the contrary.

Date: March 21, 2024

Respectfully submitted,

s/ *Pooja Chaudhuri*
Pooja Chaudhuri
Ezra D. Rosenberg
Jon M. Greenbaum
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Suite 900
Washington, DC 20005
(202) 662-8600
pchaudhuri@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jgreenbaum@lawyerscommittee.org

## CERTIFICATE OF COMPLIANCE

1. This motion complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this motion contains 6,425 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman font in 14 point type.

/s/ *Pooja Chaudhuri*

Pooja Chaudhuri

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2024, I electronically filed this motion for leave with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. In addition, I certify that under Eighth Circuit Rule 28A(h) the electronic submission is an exact copy of the paper document, the PDF document file may be searched and copied, and the PDF document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ *Pooja Chaudhuri*
Pooja Chaudhuri