# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-3655

_____

Turtle Mountain Band of Chippewa Indians; Spirit Lake Tribe; Wesley Davis; Zachery S. King; Collette Brown

*Plaintiffs - Appellees*

v.

Michael Howe, in his official capacity as Secretary of State of North Dakota

*Defendant - Appellant*

North Dakota Legislative Assembly; William R. Devlin, Representative also known as Bill Devlin; Senator Ray Holmberg, Representative; Senator Richard Wardner, Representative; Senator Nicole Poolman, Representative; Michael Nathe, Representative; Terry Jones, Representative; Claire Ness, Senior Counsel at the North Dakota Legislative Council

*Movants*

------------------------------

State of Alabama; State of Florida; State of Georgia; State of Iowa; State of Kansas; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of South Carolina; State of South Dakota; State of Texas; State of Utah; State of West Virginia

*Amici on Behalf of Appellant(s)*

National Congress of American Indians; Lawyers' Committee for Civil Rights Under Law; United States of America; NAACP Legal Defense and Educational Fund, Inc.

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of North Dakota - Eastern
————————

Submitted: October 22, 2024
Filed: May 14, 2025
————————

Before COLLOTON, Chief Judge, GRUENDER and KOBES, Circuit Judges.
————————

GRUENDER, Circuit Judge.

In *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. 2023), *reh'g denied*, 91 F.4th 967 (8th Cir. 2024), we held that § 2 of the Voting Rights Act ("the Act") does not provide for an implied private right of action to remedy certain voting guarantees contained in the Act. The question before us today is whether private plaintiffs can instead maintain a private right of action for alleged violations of § 2 through 42 U.S.C. § 1983. We answer this question in the negative and vacate the judgment of the district court.

## I.

In 2021, Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, and three individual Native American voters sued North Dakota's Secretary of State ("the Secretary") under § 2 of the Act and 42 U.S.C. § 1983, alleging that the State's 2021 redistricting diluted Native American voting strength in violation of § 2 of the Act. Section 2 prohibits "vote dilution," which occurs when the voting strength of a politically cohesive minority group is diluted by either (1) unlawfully packing one district with a supermajority of the minority or (2) dividing the minority group among several districts so that the majority bloc outnumbers the minority group in each of the districts. *See Voinovich v. Quilter*, 507 U.S. 146, 153-54 (1993). Specifically, § 2 provides that:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).[1]

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

The Secretary filed a motion to dismiss the complaint, asserting that the private plaintiffs lacked a cause of action. The Secretary argued that § 2 did not permit a private right of action and that the private plaintiffs could not use § 1983 as an end around to bring claims for alleged § 2 violations. The district court declined to decide whether § 2, standing alone, contained an implied private right of action.[2] Instead, the district court concluded that the plaintiffs could enforce § 2 of the Act through § 1983 and, on that basis, denied the motion to dismiss.

---

[1] Section 10303(f)(2) states that "[n]o voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group."

[2] At the time of the district court's decision, we had not yet considered whether § 2 of the Act is privately enforceable. We have since held that private plaintiffs do not have the ability to sue under § 2. *See Ark. State Conf.*, 86 F.4th 1204.

After denying the Secretary's motion to dismiss, the case proceeded to a bench trial. On November 17, 2023, the district court ruled that the 2021 redistricting map violated § 2 and permanently enjoined the Secretary from "administering, enforcing, preparing for, or in any way permitting the nomination or election" of candidates in several legislative districts. The district court ordered that a remedial map be drawn and gave North Dakota's Legislative Assembly ("the Assembly") approximately one month to adopt one. After the Assembly failed to adopt a remedial map by the court-imposed deadline, the district court ordered that the Assembly adopt the plaintiffs' proposed map for the November 2024 election. The plaintiffs' map combined two distinct Native American tribal reservations into a single, elongated district that stretched diagonally across northeast North Dakota.

The Secretary appeals, arguing that the district court erred in finding that private plaintiffs could enforce § 2 of the Act through § 1983. In addition, the Secretary argues that the district court erred in finding that the 2021 redistricting map violated § 2.

## II.

To understand the context of § 2, we must examine the Act's historical background. We begin with the Fifteenth Amendment, which was ratified in 1870. It guarantees that the right to vote "shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," and gives to Congress the "power to enforce [the Amendment] by appropriate legislation." U.S. Const. amend. XV.

Despite its enactment, some States flagrantly disregarded the Fifteenth Amendment by instituting measures that disenfranchised minority voters. *South Carolina v. Katzenbach*, 383 U.S. 301, 310-11 (1966). Congress attempted to cure the problem of racial discrimination in voting by enacting new laws. *Id.* at 313. One such law was the Civil Rights Act of 1871. That statute "created the federal cause of action now codified as § 1983." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 177 (2023). In relevant part, § 1983 states that:

-4-

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Thus, § 1983 provides a cause of action for private plaintiffs seeking to enforce the Fifteenth Amendment. *See, e.g.*, *United States v. Raines*, 172 F. Supp. 552, 556 (M.D. Ga. 1959), *rev'd on other grounds*, 362 U.S. 17 (1960) ("[T]he self executing ban of the Fifteenth Amendment proscribes certain conduct and Section 1983 provides a remedy therefor." (internal quotation marks omitted)). Another law that Congress enacted to cope with the problem of racial discrimination was the Civil Rights Act of 1964, which outlawed certain tactics used by States to disqualify minorities from voting in federal elections. *Katzenbach*, 383 U.S. at 313.

Congress's new laws, however, did little to protect voters prior to disenfranchisement, and after the fact litigation proved to be too costly and time consuming. *Id.* at 314. As a result, "Congress felt itself confronted by an insidious and pervasive evil which had been perpetuated in certain parts of [the] country through unremitting and ingenious defiance of the Constitution," and it "concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment." *Id.* at 309.

Congress responded by passing the Voting Rights Act in 1965 to "banish the blight of racial discrimination in voting." *Id.* at 308. The Act "create[d] stringent new remedies for voting discrimination where it persist[ed] on a pervasive scale," and "Congress assumed the power to prescribe these remedies from . . . the Fifteenth Amendment." *Id.* As originally enacted, § 2 stated: "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." Section 2 "had little independent force because it was a mirror image of the Fifteenth Amendment: each prohibited

-5-

intentional discrimination." *Ark. State Conf.*, 86 F.4th at 1208 (internal quotation marks omitted).  However, § 2 paired with § 12 did something new: together, the provisions granted the Attorney General the power to bring civil suits for injunctive and other relief against State and local officials who violated § 2.  52 U.S.C. § 10308(d).  Accordingly, private plaintiffs maintained the ability to bring a § 1983 lawsuit to enforce the Fifteenth Amendment, while the Attorney General was invested with authority under § 12 of the Act to enforce the rights guaranteed by the Fifteenth Amendment.

Fifteen years later, the Supreme Court considered in *City of Mobile v. Bolden*, 446 U.S. 55 (1980), whether a § 2 violation required discriminatory purpose or intent.  Private plaintiffs claimed that the City of Mobile had a practice of unfairly diluting the voting strength of minorities in violation of § 2 of the Act, the Fourteenth Amendment, and the Fifteenth Amendment.  *Id.* at 58 (plurality opinion).  The plurality opinion for four Justices declined to address the § 2 claim as separate from the Fifteenth Amendment claim because, even "[a]ssuming . . . that there exist[ed] a private right of action[,] . . . it [was] apparent that the language of § 2 no more than elaborate[d] upon that of the Fifteenth Amendment."  *Id.* at 60.  "The plurality then observed that prior decisions had made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose."  *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 658 (2021) (internal quotation marks and alteration omitted).  Thus, *Bolden* "confirmed what many already thought: without purposeful exclusion of voters from the political process, there was no § 2 or Fifteenth Amendment violation."  *Ark. State Conf.*, 86 F.4th at 1208 (internal quotation marks omitted).

In 1982, Congress amended § 2 in response to *Bolden*.  *See Chisom v. Romer*, 501 U.S. 380, 393 (1991).  Congress replaced the language "to deny or abridge" with "in a manner which results in a denial or abridgement," and added subsection (b).  *Id.* at 393-94.  "The two purposes of the amendment are apparent from its text."  *Id.* at 395; *Brnovich*, 594 U.S. at 658 ("The oft-cited Report of the Senate Judiciary Committee accompanying the 1982 Amendment stated that the amendment's purpose was to repudiate *Bolden* and establish a new vote-dilution test.").  The

amended version of subsection (a) "adopts a results test, thus providing that proof of discriminatory intent is no longer necessary to establish *any* violation of that section." *Chisom*, 501 U.S. at 395. And subsection (b) "provides guidance about how the results test is to be applied." *Id.* In changing the evidentiary bar required to prove a § 2 violation, Congress made it easier to prevail under § 2 than under the Fifteenth Amendment. "Congress took no action, however, to clarify *who* [could] sue under § 2." *Ark. State Conf.*, 86 F.4th at 1208.

For decades, courts assumed that an implied private right of action existed under § 2 to enforce alleged violations of the Act. *See id.* at 1219 n.8 (Smith, J., dissenting) ("[S]ince 1982, more than 400 Section 2 cases have been litigated in federal court [under an assumed private right of action]."). In *Arkansas State Conference*, this court considered a challenge to that assumption. After reviewing the text, history, and structure of the Act, we concluded that § 2 does not permit an implied private right of action. *Id.* at 1207 (majority opinion). We declined to address whether the private plaintiffs could instead maintain a private right of action for alleged violations of § 2 through § 1983, as "the plaintiffs did *not* plead a § 1983 claim, brief it [in the district court], or request leave to add it, even after being put on notice of the possible deficiency in their original complaint." *Ark. State Conf.*, 91 F.4th at 967 (Stras, J., concurring in the denial of rehearing) (internal quotation marks and alterations omitted). The private plaintiffs in this case, however, properly brought the § 1983 issue before the court, and it is this issue which we address today.

### III.

We review *de novo* whether a plaintiff has a cause of action. *Buckley v. Hennepin Cnty.*, 9 F.4th 757, 760 (8th Cir. 2021). Section 1983 provides a cause of action to any citizen deprived by a person acting under color of state law of "any rights . . . secured by the Constitution and laws." A cause of action does not exist under § 1983 merely because a state official has violated a federal statute. *Frison v. Zebro*, 339 F.3d 994, 998 (8th Cir. 2003). "This is because in order to seek redress through § 1983, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Id.* (internal quotation marks and alterations omitted); *see*

-7-

*Talevski*, 599 U.S. at 183 ("Although federal statutes have the potential to create § 1983-enforceable rights, they do not do so as a matter of course.").

In *Gonzaga University v. Doe*, 536 U.S. 273, 283-84 (2002), the Supreme Court set forth a two-step process for determining whether a cause of action exists under § 1983. The first step requires a court to determine whether Congress intended to create "new rights enforceable under § 1983." *Id.* at 290. The Court has stated that nothing short of an "unambiguously" conferred individual right would support a cause of action brought under § 1983. *Id.* at 283. This is a "stringent" standard and only the "atypical case" will surmount the "significant hurdle." *Talevski*, 599 U.S. at 183-84, 186. The "touchstone" for determining whether a provision unambiguously confers a new individual right is "congressional intent," which we discern from the text and structure of the statute. *Frison*, 339 F.3d at 999.

A statute unambiguously confers an individual right when it is phrased "with an *unmistakable focus* on the benefited class." *Gonzaga*, 536 U.S. at 284. Conversely, a plaintiff asserts only a violation of federal law when the statute "focus[es] on the person regulated" or "the agencies that . . . regulat[e]," rather than on the "individuals protected." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001). In the latter case, a plaintiff merely "falls within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U.S. at 283. If a plaintiff demonstrates that the statute at issue confers a federal right, then that "right is presumptively enforceable by § 1983." *Id.* at 284. *Gonzaga*'s second step allows a defendant to "rebut this presumption by showing that Congress specifically foreclosed a remedy under § 1983." *Id.* at 284 n.4 (internal quotation marks omitted).

In *Arkansas State Conference*, we carefully examined the text and structure of the Act and determined that § 2 did not satisfy the first step of *Gonzaga*. 86 F.4th at 1209-10. The question in *Arkansas State Conference* was whether § 2 contained an implied private right of action, which is admittedly a different inquiry than whether a statutory violation may be enforced through § 1983. *See Gonzaga*, 536 U.S. at 283. "But the inquiries overlap in one meaningful respect—in either case we must *first* determine whether Congress *intended to create a federal right*." *Id.* (first

-8-

emphasis added); *see id.* at 290 ("[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action."). The Supreme Court has emphasized that, in both the implied right of action context and the § 1983 context, the "*initial* inquiry" is determining whether the statute confers any right at all. *Id.* at 285 (emphasis added); *see City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (referring to *Gonzaga*'s first step as the "threshold" inquiry). It is thus unnecessary to undertake an independent analysis of *Gonzaga*'s first step given that *Arkansas State Conference* has already decided the issue.[3] We need only recite and elaborate upon our decision there.

We recognized in *Arkansas State Conference* that certain language in § 2 "unmistakably focuses on the benefited class" in that the very first sentence refers to the "right of any citizen." 86 F.4th at 1210 (alterations omitted). In this fashion, § 2 contains elements similar to those statutes which the Supreme Court has held unambiguously confer individual rights. Take, for example, Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 ("No person . . . shall . . . be subjected to discrimination"), which contain "explicit right- or duty-creating language" in that they focus on the "individuals protected."

---

[3]The plaintiffs contend that the relevant statements in *Arkansas State Conference* are *dicta* because the court went on to address the private remedy issue. The court discussed the private remedy issue to bolster the conclusion it had already reached with respect to the first step of *Gonzaga*—that § 2 does not provide for an implied private right of action. *See Osher v. City of St. Louis*, 903 F.3d 698, 703 (8th Cir. 2018) (discussing the private remedy issue even though the court had already concluded that the first step of *Gonzaga* was not met). In addition, the United States as *amici* argues that the statements are *dicta* because the court declined to address the § 1983 issue. The court did not address the § 1983 issue because "the plaintiffs did *not* plead a § 1983 claim, brief it [in the district court], or request leave to add it, even after being put on notice of the possible deficiency in their original complaint." *Ark. State Conf.*, 91 F.4th at 967 (Stras, J., concurring in the denial of rehearing) (internal quotation marks and alterations omitted). Even on appeal, "only a single footnote in one of the briefs mention[ed] the possibility." *Ark. State Conf.*, 86 F.4th at 1218.

Appellate Case: 23-3655     Page: 9     Date Filed: 05/14/2025 Entry ID: 5516423

*Gonzaga*, 536 U.S. at 284 n.3, 287 (internal quotation marks omitted). However, we also found that the gravamen of § 2 is a proscription of discriminatory conduct, with the very subject of its prohibition being "any State or political subdivision." 52 U.S.C. § 10301(a); *see Ark. State Conf.*, 86 F.4th at 1209 (noting that the opening passage of § 2 "is a general proscription of discriminatory conduct, not a grant of a right to any identifiable class" (internal quotation marks and citations omitted)). Provisions that focus on the persons or entities regulated do "not confer the sort of *individual* entitlement that is enforceable under § 1983." *Gonzaga*, 536 U.S. at 287 (internal quotation marks omitted).

In *Gonzaga*, the Supreme Court examined the nondisclosure provisions of the Family Educational Rights and Privacy Act of 1974 ("FERPA"). *Id.* In relevant part, FERPA directs the Secretary of Education to enforce that: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents to any individual, agency or organization." 20 U.S.C. § 1232g(b)(1). Even though FERPA as a whole contains numerous references to "rights," the Court held that FERPA's nondisclosure provisions "lack the sort of rights-creating language critical to showing the requisite congressional intent to create new rights." *Gonzaga*, 536 U.S. at 287 (internal quotation marks omitted); *see* 20 U.S.C. § 1232g. This is because a "focus on the states as regulated entities evinces . . . a degree of removal from the interests of the [individuals]." *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1199 (8th Cir. 2013). Here, § 2's prohibition prevents "any State or political subdivision" from imposing an improper voting qualification or prerequisite, while in *Gonzaga*, the prohibition prevented the Secretary of Education from disbursing funds under certain conditions.

We thus determined that § 2 "focuses on both" the individuals protected and the entities regulated. *Ark. State Conf.*, 86 F.4th at 1210. Given this dual focus on the individuals protected and the entities regulated, we concluded that "[i]t is unclear whether § 2 creates an individual right." *Id.* at 1209. The parties spar over the meaning of this particular language. However, the court's conclusion naturally

-10-

follows from the recognition that Congress did not speak with a "clear voice" that manifests an "unambiguous" intent to confer individual rights. *Gonzaga*, 536 U.S. at 280. As this court has previously held, "[w]here structural elements of the statute and language in a discrete subsection give mixed signals about legislative intent, Congress has not spoken—as required by *Gonzaga*—with a clear voice that manifests an unambiguous intent to confer individual rights." *Does v. Gillespie*, 867 F.3d 1034, 1043 (8th Cir. 2017) (internal quotation marks and citation omitted); *see id.* at 1045 ("Conflicting textual cues are insufficient."); *see also Carey v. Throwe*, 957 F.3d 468, 483 (4th Cir. 2020) ("To the extent [the *Gonzaga*] standard permits a gradation, we think it sound to apply its most exacting lens when inferring a private remedy would upset the usual balance of state and federal power."). Accordingly, we conclude that the plaintiffs are within the general zone of interest that the statute is intended to protect, without the statute having unambiguously conferred an individual right.[4]

The plaintiffs raise several arguments against this conclusion, all of which we find unpersuasive. First, the plaintiffs argue that *Arkansas State Conference* is inconsistent with *Talevski*. Two statutory provisions were at issue in *Talevski*. One provision provides: "A nursing facility must protect and promote the rights of each resident, including . . . [t]he right to be free from . . . any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms." 42 U.S.C. § 1396r(c)(1)(A)(ii). The other provides: "A nursing facility must permit each resident to remain in the facility and must not transfer or discharge the resident from the facility" unless one of several enumerated exceptions is met. *Id.* § 1396r(c)(2)(A). The exceptions focus on the

---

[4]We do not decide the Secretary's additional arguments that § 2 does not unambiguously confer a new individual right because (1) it has an aggregate, rather than an individual, focus and (2) any right conferred is not "new." We also do not decide the fifteen States' argument as *amici* that § 2 creates new *remedies* enforceable by the Attorney General, not new *rights* enforceable by private plaintiffs. Furthermore, because we conclude that the statute at issue does not satisfy the first step of *Gonzaga*, we decline to address whether Congress specifically foreclosed a remedy under § 1983.

Appellate Case: 23-3655     Page: 11     Date Filed: 05/14/2025 Entry ID: 5516423

individual residents—for example, one exception allows for transfer or discharge when it is "necessary to meet the resident's welfare." *Id.* And even when a transfer or discharge is to be effected, the provision states that the nursing facility must give the residents at least thirty days' notice unless *inter alia* "the resident's health improves" or "the resident's urgent medical needs" necessitate an earlier discharge. *Id.* § 1396r(c)(2)(B). The Court determined that these provisions contain "rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Talevski*, 599 U.S. at 183 (internal quotation marks omitted).

The plaintiffs argue that *Talevski* mandates a contrary outcome because the Court there stated that "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights." *Id.* at 185. The plaintiffs' argument, however, fails to recognize that the Court's reference to regulated parties merely acknowledged that those regulated parties were not a focus of the statutory provisions at issue in that case. As the Court found in *Talevski*, a statute's reference to regulated parties does not undermine a statute's focus on individual rights when it does not cause a "material diversion" from that focus. *Id.*; *see also Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 165 (4th Cir. 2024), *cert. granted in part*, 145 S. Ct. 1000 (2024) (concluding that a statutory provision that focuses on "discrete beneficiaries"—and which does not also focus on the regulated entities—creates individual rights enforceable via § 1983). We did not suggest in *Arkansas State Conference* that § 2 of the Act fails to secure individual rights simply because it mentions States and political subdivisions. Rather, the plain text of § 2 "focuses" on the States and political subdivisions. *Ark. State Conf.*, 86 F.4th at 1210. Indeed, the subject of § 2's prohibition is "any State or political subdivision," rather than on the conferral of a right to "any citizen." 52 U.S.C. § 10301(a); *see Ark. State Conf.*, 86 F.4th at 1209 ("The opening passage [of § 2] focuses on what states and political subdivisions cannot do, which is impose or apply discriminatory voting laws." (internal quotation marks and alterations omitted)). And § 2's historical background suggests that the "right of any citizen" in § 2 merely parrots a preexisting right guaranteed by the Fifteenth Amendment. *See* U.S. Const. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the

United States or by any State on account of race, color, or previous condition of servitude."). *Arkansas State Conference* is therefore not inconsistent with *Talevski*.

Second, the plaintiffs suggest that § 2 must automatically confer an individual right because it contains the language "the right of any citizen . . . to vote" and "members of a class of citizens protected by subsection (a)." The Supreme Court has rejected the notion that the mere use of the word "right" in a statute is sufficient in and of itself to discern an unambiguous intent to confer individual rights. *See Gonzaga*, 536 U.S. at 289 n.7 (rejecting the dissent's suggestion that "any reference to 'rights,' . . . should give rise to a statute's enforceability under § 1983"). Instead, courts must "analyze the statutory provisions in detail, in light of the entire legislative enactment, to determine whether the language in question created enforceable rights . . . within the meaning of § 1983." *Suter v. Artist M.*, 503 U.S. 347, 357 (1992) (internal quotation marks omitted). We ask whether "Congress intended to create a federal right *for* the identified class, not merely that the plaintiffs fall within the general zone of interest that the statute is intended to protect." *Talevski*, 599 U.S. at 183 (internal quotation marks omitted). Section 2 focuses on both the entities regulated and "any citizen." 52 U.S.C. § 10301(a). And we have held that "[w]here structural elements of the statute and language in a discrete subsection give mixed signals about legislative intent, Congress has not spoken—as required by *Gonzaga*—with a clear voice that manifests an unambiguous intent to confer individual rights." *Gillespie*, 867 F.3d at 1043 (internal quotation marks and citation omitted). Thus, the mere reference to "right of any citizen" and "members of a class of citizens protected by subsection (a)" does not by itself unambiguously confer an individual right. 52 U.S.C. § 10301.

Third, the plaintiffs argue that *Gonzaga* only applies to statutes enacted under the Spending or Commerce Clauses. The Supreme Court, however, has not limited *Gonzaga*'s applicability to statutes enacted pursuant to the Spending or Commerce Clauses. *See McCready v. White*, 417 F.3d 700, 703 (7th Cir. 2005) ("Any possibility that *Gonzaga* is limited to statutes that rest on the spending power (as the law in *Gonzaga* did) has been dispelled by *Abrams*, 544 U.S. at 125, which treats *Gonzaga* as establishing the effect of § 1983 itself."). Rather, the Court has applied

-13-

the *Gonzaga* test in broadly applicable terms. For example, in *Talevski*, the Court cited *Gonzaga* for the proposition that it had "crafted a test for determining whether a particular federal law actually secures rights for § 1983 purposes." 599 U.S. at 175. The Court nowhere indicated that *Gonzaga*'s applicability was confined to the Spending or Commerce Clauses. Moreover, other circuits have applied *Gonzaga* outside of these two contexts. *See Vote.Org v. Callanen*, 89 F.4th 459, 474 (5th Cir. 2023) (applying *Gonzaga* to the Materiality Provision); *Schwier v. Cox*, 340 F.3d 1284, 1296-97 (11th Cir. 2003) (applying *Gonzaga* to § 1971 of the Voting Rights Act). Accordingly, we reject the plaintiffs' contention that *Gonzaga* only applies to statutes enacted under the Spending or Commerce Clauses.

Because § 2 does not unambiguously confer an individual right, the plaintiffs do not have a cause of action under 42 U.S.C. § 1983 to enforce § 2 of the Act. The district court erred in finding otherwise, and we need not decide whether the district court erred in concluding that the 2021 redistricting map violated § 2 of the Act.

## IV.

For the foregoing reasons, we vacate the judgment of the district court and remand with instructions that the case be dismissed for want of a cause of action.

COLLOTON, Chief Judge, dissenting.

The essence of a claim under § 2 of the Voting Rights Act "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Since 1982, private plaintiffs have brought more than 400 actions based on § 2 that have resulted in judicial decisions. The majority concludes that all of those cases should have been dismissed because § 2 of the Voting Rights Act does not confer a voting right. Consistent with all other courts to address the issue, I conclude that § 2 confers an individual right and that the enforcement scheme described in the Act is not incompatible with private enforcement under 42 U.S.C. § 1983. Because the

-14-

district court did not clearly err in ruling that the plaintiffs met their burden to establish a violation of § 2, I would affirm the judgment.

## I.

Section 1983 provides a cause of action for persons who are subjected to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." The reference to "and laws" encompasses any law of the United States. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 174-80 (2023). A principal purpose of including "and laws" in § 1983 was to "ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute." *Maine v. Thiboutot*, 448 U.S. 1, 7 (1980) (quoting *Chapman v. Hous. Welfare Rts. Org.*, 441 U.S. 600, 637 (1979) (Powell, J., concurring)).

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). We examine the text and structure of a statute to determine whether Congress intended to confer an individual right. The Secretary argues that § 2 confers no individual right, and that a remedy under § 1983 is not available.

In *Gonzaga*, which involved a statute enacted pursuant to Congress's spending power, the Court held that nothing short of an unambiguously conferred right is enforceable under § 1983. *Id.* at 283. The Court explained that the "typical remedy" for a State's noncompliance with federally imposed conditions in spending laws is not a private cause of action but termination of funding by the federal government. *Id.* at 280 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)). The Court also observed that where "Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Id.* at 286 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)).

Appellate Case: 23-3655     Page: 15     Date Filed: 05/14/2025 Entry ID: 5516423

The plaintiffs argue that the unambiguous conferral rule of *Gonzaga* should not apply to legislation like the Voting Rights Act that was enacted under Congress's power to enforce the Fifteenth Amendment. *Gonzaga* involved a statute enacted under Congress's spending power, and "§ 1983 actions are the exception—not the rule—for violations of Spending Clause statutes." *Talevski*, 599 U.S. at 193-94 (Barrett, J., concurring). But the federalism concerns that animated the Court's decisions on § 1983 and the Spending Clause do not have the same force here, because the Reconstruction Amendments already altered the constitutional balance by limiting the power of the States and enlarging the power of Congress. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 454 (1976). There is thus reason to question whether courts should apply a substantive canon requiring unmistakable clarity when interpreting laws enacted under the Fourteenth and Fifteenth Amendments. Why not simply implement the statute as written based on traditional tools of statutory interpretation?

It is unnecessary to pursue that inquiry further in this case, because even applying the unambiguous conferral rule of *Gonzaga*, it is clear that Congress in § 2 of the Voting Rights Act intended to confer a voting right. Subsection (a) of § 2 expressly forbids "a denial or abridgement of *the right of any citizen of the United States to vote* on account of race or color." 52 U.S.C. § 10301(a) (emphasis added). Subsection (b) then defines a violation of § 2 by reference to "members of a class of citizens protected by subsection (a)" and "members of a protected class." *Id.* § 10301(b). The statute explicitly uses the term "right" to describe duties that a defined party ("State or political subdivision") owes to a particular individual ("any citizen"). *See Talevski*, 599 U.S. at 231 (Alito, J., dissenting).

As a three-judge district court explained last year after comprehensive analysis, "every sentence of Section Two either refers to rights of the benefited class, contains rights-creating language that creates new rights for that specific class, or expressly focuses on the benefited class." *Singleton v. Allen*, 740 F. Supp. 3d 1138, 1158 (N.D. Ala. 2024). Other courts likewise have recognized that § 2 includes clear rights-creating language and is enforceable under § 1983. *Coca v. City of Dodge City*, 669 F. Supp. 3d 1131, 1141-42 (D. Kan. 2023) ("Not only does Section 2

-16-

contain clear rights-creating language—a legal position thus far unquestioned by any members of the Supreme Court—but it also does not contain a comprehensive enforcement scheme incompatible with individual enforcement."); *Turtle Mountain Band of Chippewa Indians v. Jaeger*, No. 3:22-CV-22, 2022 WL 2528256, at \*5 (D.N.D. July 7, 2022) ("It is difficult to imagine more explicit or clear rights creating language."); *League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2021 WL 5762035, at \*1 (W.D. Tex. Dec. 3, 2021) (three-judge court).

The Secretary resists this straightforward conclusion on several grounds. None is persuasive.

The Secretary contends that § 2 does not confer a voting right because it purportedly focuses on the entities regulated rather than the individuals protected. That § 2 forbids a State or political subdivision to impose certain voting procedures, however, does not negate the clear congressional intent to confer a voting right on members of what the statute describes as a protected class. The Supreme Court rejected the same argument in *Talevski*, where the statute at issue declared what a nursing facility must do to protect rights secured by the statute. *See* 42 U.S.C. § 1396r(c)(1)(A), (B), (2)(A), (B)(i) ("A nursing facility must . . . ."). The Court explained that "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights." *Talevski*, 599 U.S. at 185.

When the Supreme Court in an earlier case referred to statutes that "focus on the person regulated rather than the individuals protected," the Court described a provision that included no rights-creating language and was twice removed from the individuals who would benefit from the statutory protection. *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001). By contrast, § 2 explicitly uses the phrase "right of any citizen of the United States to vote" and repeatedly focuses on the benefited class. Unlike *Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017), where a statute's reference to an individual was "nested within one of eighty-three subsections" and "two steps

-17-

removed from the Act's focus on which state plans *the Secretary*" was required to approve, there are no "mixed signals" in § 2. *Id.* at 1042-43.

Congress manifested the same intent in another provision of the Voting Rights Act, often called the Materiality Provision. That subsection, structured like § 2, provides that "No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission . . . [that] is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Two circuits have rejected an argument comparable to the position advanced by the Secretary in this case: "although '[t]he subject of the sentence is the person acting under color of state law, . . . the focus of the text is nonetheless the protection of each individual's right to vote.'" *Vote.org v. Callanen*, 89 F.4th 459, 475 (5th Cir. 2023) (alterations in original) (quoting *Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003)). *Schwier* anticipated the Supreme Court's insight in *Talevski*; *Vote.org* followed *Talveski*'s example. 89 F.4th at 474 & n.3. For the same reasons, § 2 unambiguously confers an individual voting right despite Congress's identification of the regulating entities as the subject of the provision.

The majority concludes that no analysis of the statute is necessary because this court supposedly decided in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. 2023), that § 2 of the Voting Rights Act does not confer an individual voting right. This conclusion misreads dicta in *Arkansas State Conference*. That decision held only that § 2 does not provide a private remedy. *Id.* at 1210-17. The panel was agnostic about whether § 2 confers a private right.

The *Arkansas State Conference* opinion includes four inconclusive paragraphs in Part III.A about whether § 2 confers an individual right. *Id.* at 1209-10. The opinion makes plain that the court did not decide the issue. The first sentence of the discussion says it "is *unclear whether* § 2 creates an individual right." *Id.* at 1209 (emphasis added). The last sentence says it "is *unclear what to do* when a statute focuses on both" individuals who are protected and entities that are

-18-

regulated. *Id*. at 1210 (emphasis added). After declining to decide whether § 2 confers an individual right, the panel skipped over that non-jurisdictional question and decided the case on another ground.

*Arkansas State Conference* thus contains only indeterminate dicta about whether § 2 confers an individual right, and ill-considered dicta at that. In professing that it is "unclear what to do when a statute focuses on both" a rights-holder and a regulated entity, the decision ignored *Talevski*. Several months before the decision in *Arkansas State Conference*, the Supreme Court explained that where statutory provisions confer a right with an "unmistakable focus on the benefited class," but "also establish who it is that must respect and honor these statutory rights," there is no "material diversion from the necessary focus" on the rights-holders. 599 U.S. at 185-86 (internal quotation omitted). For the reasons discussed, § 2 confers an individual voting right, and dicta in *Arkansas State Conference* present no barrier to this panel reaching the correct conclusion.

The Secretary next contends that § 2 has an "aggregate focus" and protects only "collective" rights. But the statute protects the individual right of "any citizen," and "the right to an undiluted vote does not belong to the 'minority as a group,' but rather to 'its individual members.'" *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 437 (2006) (quoting *Shaw v. Hunt*, 517 U.S. 899, 917 (1996)). That a statute includes an "unmistakable focus on the benefited class" does not alter the individual rights-creating nature of the statute. *Talevski*, 599 U.S. at 186 (internal quotation omitted).

The Secretary also maintains that § 2 does not confer an individual right because it allegedly repeats the same protection already secured by the Fifteenth Amendment. The majority refutes that argument: "In changing the evidentiary bar required to prove a § 2 violation, Congress made it easier to prevail under § 2 than under the Fifteenth Amendment." *Ante*, at 7. In any event, potential overlap with the Fifteenth Amendment does not remove rights conferred by § 2 from the scope of "any rights . . . secured by the Constitution and laws." 42 U.S.C. § 1983. The plain language of § 1983 encompasses such a right, and the Supreme Court has recognized

Appellate Case: 23-3655     Page: 19     Date Filed: 05/14/2025 Entry ID: 5516423

that § 5 and § 10 of the Voting Rights Act confer individual rights (and rights of action) despite a comparable grounding in the Fifteenth Amendment. *Morse v. Republican Party of Va.*, 517 U.S. 186 (1996); *Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969); *see Singleton*, 740 F. Supp. 3d at 1161-62.

Where, as here, Congress conferred a right on individuals, there is a presumption that Congress intended for the right to be enforceable under § 1983. The Secretary next contends, however, that the Voting Rights Act includes a comprehensive enforcement scheme that implies a congressional intent to preclude private enforcement.

"[T]he *sine qua non* of a finding that Congress implicitly intended to preclude a private right of action under § 1983 is incompatibility between enforcement under § 1983 and the enforcement scheme that Congress has enacted." *Talevski*, 599 U.S. at 187. "[T]he inquiry boils down to what Congress intended, as divined from text and context." *Id.*

The Secretary argues that because § 12 of the Act, 52 U.S.C. § 10308(d), provides for enforcement actions by the Attorney General, Congress must have intended to preclude private actions under § 1983. This contention is unconvincing.

The Supreme Court has discerned congressional intent to preclude enforcement under § 1983 only where statutes included "self-contained enforcement schemes that included statute-specific rights of action." *Talevski*, 599 U.S. at 189 (citations omitted). In each of those cases, the statute at issue "required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies under the statute's enforcement scheme before suing under its dedicated right of action." *Id.* (internal quotation omitted). "And each statute-specific right of action offered fewer benefits than those available under § 1983." *Id.*

There are no equivalent indicia of congressional intent to preclude enforcement of the Voting Rights Act under § 1983. The Act includes no statute-specific right of action that might suggest an intent to make the § 1983 remedy

Appellate Case: 23-3655     Page: 20     Date Filed: 05/14/2025 Entry ID: 5516423

unavailable. The Act does confer authority to sue on a government official, but there is no "unusually elaborate" set of enforcement provisions applicable to both government officials and private citizens. *Cf. Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981). The authority of the Attorney General to bring enforcement actions in select cases comfortably coexists with the ability of private plaintiffs to sue under § 1983 to vindicate their own voting rights. The "presumption is that § 1983 can play its textually prescribed role as a vehicle for enforcing those rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not incompatible with Congress's handiwork." *Talevski*, 599 U.S. at 188-89.

For these reasons, the district court correctly concluded that the plaintiffs could sue under § 1983 to allege a violation of their rights under § 2 of the Voting Rights Act.

## II.

The Secretary argues alternatively that the district court erred by granting relief on the merits under § 2. The district court's decision is adequately supported by the record and should be affirmed.

To prove a violation of § 2, plaintiffs must establish three preconditions as described by the Court in *Gingles*:

> First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district. Second, the minority group must be able to show that it is politically cohesive. And third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.

*Allen v. Milligan*, 599 U.S. 1, 18 (2023) (internal citations omitted). If the three preconditions are established, plaintiffs "must then show, under the 'totality of the

-21-

circumstances,' that the political process is not 'equally open' to minority voters." *Id.* (quoting *Gingles*, 478 U.S. at 45-46).

The plaintiffs challenged North Dakota state legislative districts 9 and 15, which were created by the State's 2021 legislative redistricting plan. Under the plan, district 9 encompassed all of Rolette County and stretched eastward to include portions of Towner and Cavalier Counties. District 9 was divided into two subdistricts: 9A and 9B. The Turtle Mountain Reservation was placed in subdistrict 9A. Portions of the Tribe's trust lands located within Rolette County were placed in subdistrict 9B along with the portions of Towner and Cavalier Counties encompassed by district 9. The Spirit Lake Reservation was placed in district 15.

Under the 2021 plan, voters in district 9 and district 15 each elected one state senator. Voters in subdistricts 9A and 9B each elected one member of the state House of Representatives. Voters in district 15 elected two at-large members of the state House. According to the 2020 Census, the Native American voting age populations of Rolette County and the relevant portions of Towner and Cavalier Counties are 74.4 percent, 2.7 percent, and 1.8 percent, respectively. Subdistrict 9A, subdistrict 9B, and district 15 had Native American voting age populations of 79.8 percent, 32.2 percent, and 23.1 percent, respectively.

To support their vote dilution claim under § 2, the plaintiffs introduced two maps illustrating alternative configurations of district 9. The maps were offered to demonstrate that the Native American voting age population in northeast North Dakota is sufficiently large and geographically compact to constitute an effective majority in a single multimember district. Under both illustrative plans, the Turtle Mountain Reservation and trust lands and the Spirit Lake Reservation are encompassed by district 9. The Native American voting age population is 66.1 percent in the plaintiffs' first illustrative plan and 69.1 percent in the second illustrative plan.

After a four-day bench trial, the district court ruled that the plaintiffs had satisfied the three preconditions to establish § 2 liability under *Gingles*. The court

then concluded that under the totality of the circumstances, the State's 2021 legislative redistricting plan "deprive[d] Native American voters" in districts 9 and 15 and subdistricts 9A and 9B "of an equal opportunity to participate in the political process and to elect representatives of their choice, in violation of Section 2 of the VRA." Accordingly, the court enjoined the Secretary from implementing elections in the contested districts, and gave the Secretary and the North Dakota Legislative Assembly thirty-five days to submit a proposed remedial redistricting plan.

The Secretary and Legislative Assembly failed to submit a proposed remedial plan by the deadline, so the court ordered the Secretary to adopt and implement one of the plaintiffs' illustrative plans as the remedial map. The Secretary did not appeal the district court's remedial order.

On this appeal, the Secretary argues that the district court erred in finding that the plaintiffs met their burden to establish the first and second *Gingles* preconditions. He does not challenge the court's findings as to the third precondition or the totality of the circumstances.

Vote dilution claims are "peculiarly dependent upon the facts of each case," and require "an intensely local appraisal of the design and impact of the contested electoral mechanisms." *Gingles*, 478 U.S. at 79 (internal quotations omitted). To preserve "the benefit of the trial court's particular familiarity with the indigenous political reality," we apply a clear error standard of review to the predicate factual determinations and to the ultimate finding regarding vote dilution. *Id.*; *Abrams v. Johnson*, 521 U.S. 74, 91, 93 (1997). The plaintiffs bear the burden to show unlawful vote dilution. *Voinovich v. Quilter*, 507 U.S. 146, 155-56 (1993).

As to the first *Gingles* precondition, a district is "reasonably configured . . . if it comports with traditional districting criteria," including geographic contiguity and compactness, respect for existing political boundaries, and keeping together communities of interest. *Milligan*, 599 U.S. at 18, 20, 34. The district court found that the plaintiffs' illustrative maps satisfied these criteria.

-23-

The court first concluded that the illustrative districts do "not appear more oddly shaped than other districts" and "are reasonably compact" based on objective compactness scores and in comparison to other districts created by the State's 2021 redistricting plan. The court next found that the illustrative redistricting plans respect existing political boundaries by consolidating the Turtle Mountain Band's reservation and trust lands into one district. The court also determined that the Tribes represent a community of interest based on shared representational interests, socioeconomic statuses, education levels, and cultural practices and values, and found that the illustrative plans effectively keep this community of interest together in one district. The court found that the Native American voting age population is 66.1 percent in the plaintiffs' first illustrative plan and 69.1 percent in their second illustrative plan. These findings are supported by the record, and the court did not clearly err in ruling that the plaintiffs met their burden to establish the first precondition.

The Secretary urges reversal on two grounds. First, the Secretary argues that the court erred because the State's enacted version of district 9 apparently performs better than the plaintiffs' illustrative maps with respect to certain traditional districting criteria. But *Gingles* does not require a district court to conduct a "beauty contest" between the plaintiffs' illustrative maps and the State's districts as enacted. *Id.* at 21. The court did not clearly err in finding that the illustrative maps comported with traditional districting criteria. The court was not required to resolve whether the illustrative maps or the State's districts were in some sense superior as measured by those criteria. The illustrative maps satisfied the first precondition by establishing that the minority group was sufficiently large and geographically compact to constitute a majority in a reasonably configured district.

The Secretary also contends that the district court erred by omitting an explicit finding on whether race was the predominant factor motivating the plaintiffs' illustrative district lines. "Section 2 itself 'demands consideration of race,'" but "race may not be 'the predominant factor in drawing district lines unless there is a compelling reason.'" *Milligan*, 599 U.S. at 30-31 (plurality opinion) (first quoting *Abbott v. Perez*, 585 U.S. 579, 587 (2018), then quoting *Cooper v. Harris*, 581 U.S.

-24-

285, 291 (2017)).  "Race predominates in the drawing of district lines . . . when 'race-neutral considerations come into play only after the race-based decision had been made.'"  *Id.* (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017)).  But "race consciousness" in drawing a map "does not lead inevitably to impermissible race discrimination."  *Shaw v. Reno*, 509 U.S. 630, 646 (1993).

The Secretary asserts that race was the predominant factor in drawing the illustrative maps, and that the plaintiffs failed to establish the first precondition because their maps are impermissible racial gerrymanders.  The only evidence cited is that plaintiffs' illustrative districts stretch diagonally across the State and join two Native American reservations.  As the district court observed, however, the plaintiffs' illustrative districts do "not appear more oddly shaped than other districts."  Nor is the fact that the maps join two Native American reservations sufficient to undermine the district court's ruling.  Nonracial considerations—such as consolidating reservation and trust lands and keeping together tribal communities of interest—justify the district lines.  Insofar as race was considered in order to show that an additional majority-minority district could be drawn, that is "the whole point of the enterprise," *Milligan*, 599 U.S. at 33 (plurality opinion), and it is therefore permissible under the statute.  By rejecting the State's arguments, the district court implicitly found that race did not impermissibly predominate.

The plaintiffs' illustrative districts are not "so bizarre [on their] face that [they are] unexplainable on grounds other than race."  *Shaw*, 509 U.S. at 644 (internal quotation omitted).  Nor is this a case where the districts have "no integrity in terms of traditional, neutral redistricting criteria."  *Milligan*, 599 U.S. at 28 (quoting *Bush v. Vera*, 517 U.S. 952, 960 (1996) (plurality opinion)).  As in *Milligan*, "[w]hile the line between racial predominance and racial consciousness can be difficult to discern, it was not breached here."  *Id.* at 31 (plurality opinion) (citation omitted).  The Secretary cites no persuasive evidence of racial predominance, and his own expert testified that he had no evidence that the demonstrative plans are a racial gerrymander.  With no direct evidence of legislative purpose or compelling circumstantial evidence of impermissible race-based redistricting, remand for an

-25-

express finding on lack of racial predominance is not warranted. *See Bethune-Hill*, 580 U.S. at 190.

The second *Gingles* precondition requires the plaintiffs to show that the minority group is politically cohesive. *Milligan*, 599 U.S. at 18. This showing "typically requires a statistical and non-statistical evaluation of the relevant elections." *Bone Shirt*, 461 F.3d at 1020.

The parties and their experts agreed that voting in at-large elections in districts 9 and 15, as enacted by the State in 2021, is racially polarized, with Native American voters cohesively supporting the same candidates. Although subdistricts 9A and 9B of the State's 2021 redistricting plan did not contain enough precincts for a full statistical analysis, the court considered available population statistics, election data, and expert reports and testimony interpreting this information. The court reasonably inferred that the undisputed political cohesiveness at the district level was also present at the subdistrict level.

The court's statistical inference was buttressed by testimony from tribal leaders that voters who live on the Turtle Mountain Reservation and voters who live on the Spirit Lake Reservation vote similarly. *See Sanchez v. Bond*, 875 F.2d 1488, 1493-94 (10th Cir. 1989) ("The experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive."). Considering this statistical and non-statistical evidence, the district court did not clearly err in finding that Native American voters in the relevant districts and subdistricts are a politically cohesive group.

\* \* \*

In sum, § 2 of the Voting Rights Act confers an individual right, and the enforcement authority of the Attorney General is not incompatible with private enforcement of the right under § 1983. The district court did not clearly err in ruling

that the plaintiffs met their burden to establish the first two *Gingles* preconditions.  I would therefore affirm the judgment of the district court.

_____

Appellate Case: 23-3655     Page: 27     Date Filed: 05/14/2025 Entry ID: 5516423