**No. 23-3655**

**IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT**

TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *et al.*,
*Plaintiffs-Appellees*,

v.

MICHAEL HOWE, in his official capacity as
Secretary of State of North Dakota,
*Defendant-Appellant*.

On Appeal from the United States District Court for the District of North Dakota, No. 3:22-cv-00022

# BRIEF OF VOTING RIGHTS HISTORIANS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES' PETITION FOR REHEARING EN BANC

Charles A. Rothfeld
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
crothfeld@mayerbrown.com

*Attorney for Amici Curiae*

## TABLE OF CONTENTS

**Page**


STATEMENT OF INTEREST .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 3

A. Practice under Section 2 from 1965 to 1982 demonstrates the congressional intent to provide a private right of action. .......... 3

B. The history of the 1982 Amendment of Section 2 reveals that Congress intended to authorize a private cause of action. .......... 5

C. Litigation following passage of the 1982 Amendments confirms that Congress meant to preserve the private right of action. .......... 10

CONCLUSION .......... 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arkansas State Conference NAACP v. Arkansas Board of Apportionment*,
86 F.4th 1204 (8th Cir. 2023) .................................................... 12, 13

*Armour v. State of Ohio*,
775 F. Supp. 1044 (N.D. Ohio 1991 ................................................. 12

*Baker v. Cuomo*,
58 F.3d 814 (2d Circ. 1995)............................................................. 12

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020).............................................................................. 3

*Brnovich v. Democratic National Committee*,
141 S. Ct. 2321 (2021)......................................................................... 12

*City of Mobile v. Bolden*,
446 U.S. 55 (1980)........................................................... 5, 6, 7, 8, 13

*Hibbs v. Winn*,
542 U.S. 88 (2004)............................................................................... 13

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)............................................................................. 12

*United States v. Post*,
297 F. Supp. 46 (W.D. La. 1969)........................................................... 5

*Zimmer v. McKeithan*,
485 F.2d 1297 (5th Cir. 1973) .............................................................. 5

**Statutes**

42 U.S.C. § 1973l(e)............................................................................ 9

42 U.S.C. § 1983 .................................................................................... 2

## TABLE OF AUTHORITIES
## (continued)


**Page**

42 U.S.C. § 1988 .......... 9

**Other Authorities**

111 CONG. REC. 10037-38 (1965) .......... 4

Carol Anderson, ONE PERSON, NO VOTE (2018) .......... 3

Orville Vernon Burton & Armand Derfner, JUSTICE DEFERRED: RACE AND THE SUPREME COURT (2021) .......... 5

Chandler Davidson & Bernard Grofman, *The Voting Rights Act and the Second Reconstruction,* in QUIET REVOLUTION (Davidson & Grofman, eds., 1994) .......... 11

*Executive Session Considering Voting Rights Act, Hearings Before the S. Comm. On the Judiciary*, 97th Cong. (1982) .......... 7, 9

*Extension of the Voting Rights Act, Hearings before the Subcomm. On Civil and Constitutional Rights of the H. Comm. On the Judiciary*, 97th Cong. (1982) .......... 6, 7, 8

H.R. REP. NO. 89-439 (1965) .......... 4

H.R. REP. NO. 97-205 (1981) .......... 9

Alexander Keyssar, THE RIGHT TO VOTE (2000) .......... 3

J. Morgan Kousser, *How Judicial Action Has Shaped the Record of Discrimination in Voting Rights*, for the H. Comm. on the Judiciary (2021) .......... 4

J. Morgan Kousser, *Do The Facts of Voting Rights Support Chief Justice Roberts's Opinion in Shelby County?*, 1 TRANSATLANTICA 1 (2015) .......... 11

S. REP. NO. 97-417 (1982) .......... 9

## TABLE OF AUTHORITIES
## (continued)

**Page**

S. REP. NO. 162 (1965) .......... 4

## STATEMENT OF INTEREST[1]

*Amici Curiae* are historians who are authorities in the field of minority voting rights. They have published on the subject extensively. In addition, certain of the *amici* have served as expert witnesses or consultants in voting rights cases and have testified before Congress on the subject, including on the renewal of the Voting Rights Act ("VRA"). In light of their deep experience with the Act and its history, *amici* submit this brief to assist the Court in the resolution of this case.

*Amici* are:

Carol Anderson, Emory University.

Orville Vernon Burton, Clemson University and the University of Illinois.

Alexander Keyssar, Harvard University.

J. Morgan Kousser, California Institute of Technology.

[1] No counsel for a party authored this brief in whole or in part, and no person or entity aside from *amici curiae* or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs explain in the petition for rehearing that the key consideration in determining the existence of a private right of action—under both 42 U.S.C. § 1983 and directly under a substantive federal statute—is the intent of Congress. *Amici* file to emphasize that Congress assuredly intended to create a right to private enforcement of the VRA.

Congress understood that private litigation would be the principal means of VRA enforcement. During the 1965-1982 period, the overwhelming majority of VRA enforcement actions were brought by private plaintiffs. At this time, *all* parties litigating under the VRA recognized the availability of a private right of action, which is powerful evidence of what Congress intended. When Congress subsequently amended the VRA in 1982, it was well aware of this history of private enforcement activity—yet far from disapproving that practice, Congress took steps sought by private litigants to make private actions more effective and, in authoritative legislative history, endorsed the private right of action. The same practice of private enforcement has continued with undiminished force since the amendment of the VRA in 1982, as Section 2 enforcement by private plaintiffs has accounted for over 90% of voting rights litigation.

That literally everyone involved in voting rights enforcement over a period spanning many decades—on both sides of VRA litigation—recognized the validity of private actions is exceedingly powerful evidence that this understanding properly reflects Congress's intent: a statute's "ordinary public meaning" should be assessed from the perspective of the law's intended audience. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-55 (2020).

## ARGUMENT

### A. Practice under Section 2 from 1965 to 1982 demonstrates the congressional intent to provide a private right of action.

When Congress enacted the VRA in 1965, *lack* of a private enforcement mechanism in the then-existing voting-rights laws was understood to be a fatal flaw in the existing mechanisms for safeguarding voting rights. The Civil Rights Acts of 1957 and 1960 allowed the federal government to pursue certain remedies, but gave Black voters little direct opportunity to protect their rights. *See* Alexander Keyssar, THE RIGHT TO VOTE 260-263 (2000). Yet Justice Department litigation under these statutes proved slow and ineffective. *See* Carol Anderson, ONE PERSON, NO VOTE 19 (2018). As resistance to voting rights increased despite these initial legislative interventions, Congress's clear intent in enacting the VRA

was to remedy this enforcement deficiency. *See* H.R. REP. NO. 89-439, at 11 (1965); 111 CONG. REC. 10037-38 (1965) (remarks of Sen. Douglas); *see also* S. REP. NO. 162, pt. B, at 8 (1965) (criticizing ineffectiveness of voting rights litigation in Selma).

That intent was reflected in the uniform practice under the newly enacted VRA, a practice that must be understood to reflect the congressional intent. *First*, the private civil rights bar quickly put Section 2 into operation. We identified 85 Section 2 cases brought between 1965 and 1982. Of these, the vast majority—66 cases—were brought by private plaintiffs, not the Justice Department. Thus, as one of *amici* here has documented, "[i]t was not the U.S. government with 'vast resources,' but private lawyers or civil rights organizations that received the vast majority of [VRA] settlements." J. Morgan Kousser, *How Judicial Action Has Shaped the Record of Discrimination in Voting Rights*, for the H. Comm. on the Judiciary at 2 n.1 (2021).

*Second*, it is telling that *no* court even hinted between 1965 and 1982 that a private right of action was unavailable under Section 2. Indeed, defendant jurisdictions *themselves* assumed the existence of a private right of action. A thorough search of published decisions from 1965-

1982 reveals that no defendant even contended that Section 2 failed to include a private cause of action.

*Third*, during this period, voting rights plaintiffs—including the United States—had no doubt about the existence of a private cause of action. In some cases, private plaintiffs and the Justice Department litigated side by side, with neither party questioning the arrangement. *See, e.g.*, *United States v. Post*, 297 F. Supp. 46, 47 (W.D. La. 1969); *Zimmer v. McKeithan*, 485 F.2d 1297 (5th Cir. 1973) (en banc). Thus, the uniform understanding of the VRA's original intended audience was that Section 2 included a private right of action.

### B. The history of the 1982 Amendment of Section 2 reveals that Congress intended to authorize a private cause of action.

This same understanding is clearly visible in the lead-up to the amendment of the VRA's Section 2 in 1982. In that year, Congress overturned the Supreme Court's decision in *City of Mobile v. Bolden*, 446 U.S. 55 (1980), which had held that a facially neutral state law violates Section 2 "only if motivated by a discriminatory purpose." *Id.* at 62; *see also* Orville Vernon Burton & Armand Derfner, JUSTICE DEFERRED: RACE AND THE SUPREME COURT 284-85 (2021).

Nothing in the VRA's amended text changed the means of enforcement, and the extensive debates about differing substantive standards reveal no dispute over whether private litigation should remain the primary tool for enforcing Section 2. To the contrary, the 1982 debates show that Congress was keenly aware of the importance of private Section 2 enforcement and amended the governing standard, in part, precisely because it was concerned that private enforcement would be weakened by *City of Mobile*'s intent standard, which was proving difficult for under-resourced private plaintiffs to satisfy. There is no need to speculate about congressional awareness of the prevalence of private VRA litigation prior to 1982: the 1982 congressional debates reveal recognition that the suit in *City of Mobile itself* was brought by private plaintiffs, as Congress invited and heard testimony from James Blacksher, the lawyer who represented the class of Black Mobile citizens. *Extension of the Voting Rights Act, Hearings before the Subcomm. On Civil and Constitutional Rights of the H. Comm. On the Judiciary* [hereinafter *H. Comm. Hearings*], 97th Cong. 2035-36 (1982).

Moreover, the effects of *City of Mobile* on Section 2 litigation brought by private plaintiffs were highlighted by both sides of the debate

over amending Section 2, as proponents and opponents of the amendment each focused on the proposed new standard's effect on private litigation—with neither side suggesting that private litigation was unavailable. *See*, *e.g.*, *Executive Session Considering Voting Rights Act, Hearings Before the S. Comm. On the Judiciary* [hereinafter *S. Comm. Hearings*], 97th Cong. 46 (1982) (Sen. Leahy, favoring the revised standard, expressing concern about private plaintiffs' capacity to satisfy an intent test); *id.* at 55 (Sen. Denton, opposing the amendment, expressing the view that private plaintiffs could establish discriminatory intent).

Congress thus carefully considered concerns raised by voting-rights advocates, who testified regarding the difficulty faced by private plaintiffs facing an intent standard.[2] The testimony of academics studying voting rights similarly relied on the real-world experiences of minority plaintiffs and their lawyers who were struggling to meet the intent standard. *See id.* at 300 (1982) (statement of Chandler Davidson, Chairman, Department of Sociology, Rice University). *Amicus* Kousser warned that if

[2] *See*, *e.g. S. Comm. Hearings*, 97th Cong. 196 (1982) (statement of John E. Jacob, President of the National Urban League); *id.* at 369 (testimony of Laughlin McDonald); *id.* at 2032 (testimony of David F. Walbert); *H. Comm. Hearings*, 97th Cong. 2072-73 (1982) (testimony of Joseph E. Lowery, President, Southern Christian Leadership Conference).

Congress failed to act, "organizations [would] respond with a spate of lawsuits, but have difficulty locating the carefully hidden smoking guns [demonstrating discriminatory intent]." *H. Comm. Hearings*, 97th Cong. 2009 (1982). Congress therefore was well aware that, in amending Section 2, it was intervening to make more effective a system where private litigants played the key role in enforcing the Act.

Because Congress was responding to *City of Mobile* and its impact on private-party litigation, the testimony of James Blacksher, the lawyer for plaintiffs in the case, is particularly significant. He explained that the amended Section 2 "would restore to black Southerners the opportunities to challenge racially discriminatory election schemes which were developing before *City of Mobile v. Bolden*." *H. Comm. Hearings*, 97th Cong. 2035-36 (1982). This statement highlighted the importance of Black southerners themselves challenging discriminatory election schemes under Section 2 as private plaintiffs. Blacksher went on to detail how the pre-*City of Mobile* landscape of private litigation "*presented a real opportunity for black plaintiffs on their own, as I have indicated, without substantial assistance from the Department of Justice, to seek self-help relief*." *Id.* at 2049-50 (emphasis added).

Had Congress rejected the existence of private VRA litigation, it surely would have done so in 1982, when the issue of private litigation was squarely before it. Instead, Congress took the private-remedy-enhancing action recommended by the civil rights community by creating a results standard under Section 2.

Finally, the key congressional committees that approved the 1982 amendments left no doubt that they understood, and approved, the practice of private VRA enforcement.

The House Committee on the Judiciary stated unambiguously: "It is intended that citizens have a private cause of action to enforce their rights under Section 2. ... If they prevail they are entitled to attorneys' fees under 42 U.S.C. §§ 1973l(e) and 1988." H.R. REP. NO. 97-205, at 32 (1981). Similarly, the Senate Committee on the Judiciary explained: "[T]he Committee reiterates the existence of a private right of action under Section 2, as has been clearly intended by Congress since 1965." S. REP. NO. 97-417, at 30 (1982).[3] Congress's intent in 1982 could not have

[3] There are innumerable other references in the legislative history to the importance of preserving a right of action for private voting rights plaintiffs. *See, e.g.*, *S. Comm. Hearings*, 97th Cong. 131 (1982) (statement of Timothy G. O'Rourke); *S. Comm. Hearings*, 97th Cong. 191 (1982) (statement of Howard University School of Law Student Bar Association); *S.*

been clearer: it meant both (1) to reaffirm the existence of a private right of action under Section 2, and (2) to strengthen the effectiveness of the Section 2 private remedy through the results standard.

### C. Litigation following passage of the 1982 Amendments confirms that Congress meant to preserve the private right of action.

This understanding is confirmed by litigation following the 1982 amendments: For 40 years, private litigants continued to bring VRA claims, courts continued to entertain them, and VRA defendants still made no suggestion that a private right of action is unavailable. That uniform practice is powerful evidence that this understanding reflects Congress's intent.

The vast majority of cases alleging Section 2 claims since 1982 have been brought by private plaintiffs, mostly alone but occasionally in concert with the Justice Department. A comprehensive analysis of all known cases involving a Section 2 claim filed in 1982 or later found that 1,328 cases, or 92.7% of all cases, were brought by private plaintiffs alone.[4] By

---

*Comm. Hearings*, 97th Cong. 399 (1982) (statement by Raymond Nathan). We are not aware of any contrary suggestion.

[4] This database was assembled by *amicus* Kousser, a voting rights historian and emeritus professor at the California Institute of Technology who has acted as an expert witness in over 35 federal and state voting rights

comparison, only 77, or 5.4% of all cases, were brought by the Justice Department. As scholars have noted: "[S]ection 2 litigation brought solely by the Department of Justice played only a minor role in effecting changes in local election systems. One of the most remarkable results of amended section 2, therefore, is its encouragement of the private bar to take a major role in enforcing public voting rights law." Chandler Davidson & Bernard Grofman, *The Voting Rights Act and the Second Reconstruction,* in QUIET REVOLUTION 385 (Davidson & Grofman, eds., 1994).

Twenty-seven cases, accounting for 1.9% of all cases, were brought jointly by private litigants and the Justice Department. The Department's joint litigation with private plaintiffs, including as an intervenor or as *amicus curiae* in existing cases brought by private plaintiffs, underscores the extent to which the private cause of action was an accepted,

---

cases. The database identifies 1,709 voting rights cases brought since 1982. This analysis focuses only on those cases that articulated a Section 2 claim, and identifies cases where the Government participated in any capacity. This means that, for example, a case might concern both Section 2 and Section 5 claims, as well as 14th and 15th Amendment claims. If the Government was party to any of those claims as the primary litigator, intervenor, or *amicus*, the case was identified as one brought at least in part by the Government. *See* J. Morgan Kousser, *Do The Facts of Voting Rights Support Chief Justice Roberts's Opinion in Shelby County?*, 1 TRANSATLANTICA 1, 24-25 (Appendix B) (2015).

standard practice, questioned neither by the Department nor by the private litigants in these cases.

In fact, until very recently, courts have not addressed any arguments against a private right of action, even as they discussed standing in ways relevant to other parts of the VRA analysis. *See*, *e.g.*, *Armour v. State of Ohio*, 775 F. Supp. 1044, 1075 (N.D. Ohio 1991) (Batchelder, J., dissenting); *Baker v. Cuomo*, 58 F.3d 814, 824 (2d Circ. 1995), *vacated in part sub nom. Baker v. Pataki*, 85 F.3d 919 (1996) (per curiam). So far as we are aware, no court suggested that a private VRA right of action is unavailable until this Court's decision in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. 2023). *See also Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J, concurring).

Thus, post-enactment litigation confirms what the legislative background and history demonstrate. The 1982 Amendments were intended to, and actually did, preserve a private right of action. Giving appropriate weight to this "actual practice of Government" (*NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014)), the VRA private right of action should be maintained.

Finally, as the 1982 amendment itself demonstrates, Congress has not hesitated to correct erroneous judicial interpretations of the VRA. *See, e.g.*, *Arkansas State Conference NAACP*, 86 F.4th at 1208 ("*Bolden* did not sit well with Congress, which jumped into action the following year."). But here, despite 42 years of litigation following the passage of the 1982 Amendments—and 60 years of litigation since enactment of the VRA in 1965—Congress has not even entertained a proposal to disapprove the private right of action. Accordingly, the en banc Court should grant rehearing and displace the panel's decision because, "[i]n statutory matters, judicial restraint strongly counsels waiting for Congress to take the initiative in modifying rules on which judges and litigants have relied." *Hibbs v. Winn*, 542 U.S. 88, 112 (2004) (Stevens, J., concurring).

## CONCLUSION

The petition for rehearing en banc should be granted.

Dated: June 4, 2025

Respectfully submitted,

MAYER BROWN LLP

*/s/ Charles A. Rothfeld*
Charles A. Rothfeld
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
crothfeld@mayerbrown.com

*Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of the Federal and Local Rules because it contains 2588 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: June 4, 2025

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld

## CERTIFICATE OF SERVICE

I certify that on this 4th day of June, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld