Case No. 23-3655

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS,
SPIRIT LAKE TRIBE, WESLEY DAVIS, ZACHERY S.
KING, COLLETTE BROWN,

*Plaintiffs-Appellees,*

v.

MICHAEL HOWE, in his official capacity as Secretary of
State of North Dakota,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NORTH DAKOTA (No.
3:22-cv-00022)

## MOTION TO STAY THE ISSUANCE OF THE MANDATE

Leonard R. Powell
Samantha Blencke
NATIVE AMERICAN RIGHTS FUND
950 F Street NW, Ste. 1050
Washington, DC 20004
(202) 785-4166

Matthew Campbell
Allison Neswood
NATIVE AMERICAN
RIGHTS FUND
250 Arapahoe Ave
Boulder, CO 80302
(303) 447-8760

Mark P. Gaber
Anna M. Baldwin
Melissa Neal
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200

Bryan L. Sells
THE LAW OFFICE OF
BRYAN L. SELLS, LLC
PO Box 5493
Atlanta, GA 31107
(404) 480-4212

*Counsel for Respondents*

Timothy Q. Purdon*
ROBINS KAPLAN, LLP
1207 West Divide Ave., Ste 200
Bismarck, ND 58501
(701) 255-3000

* *Counsel for Respondents Turtle
Mountain Band of Chippewa
Indians and Spirit Lake Nation*

# INTRODUCTION

This Court has held that Section 2 of the Voting Rights Act is not privately enforceable under either an implied right of action or pursuant to 42 U.S.C. § 1983, which provides a cause of action to challenge deprivations of rights secured by the Constitution and laws of the United States. Together, these decisions place this Circuit in conflict with the Fifth, Sixth, and Eleventh Circuits as well as every three-judge district court to consider whether Section 2 is privately enforceable. These decisions are also inconsistent with prior decisions and practice of the Supreme Court.

Plaintiffs intend to file a petition for a writ of certiorari with the Supreme Court to resolve this circuit split on a question of exceptional importance. In light of the circuit split, there is a reasonable probability that at least four Justices will agree to grant Plaintiffs' petition for certiorari. And for the reasons stated in the dissenting opinions of Chief Judge Colloton in this case and Judge Smith in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. 2023) ("*Arkansas NAACP*"), and the uniform disagreement with this Court's dispositions in these cases by every other circuit and three-judge district court to consider the issue, there is a fair prospect that the Supreme Court will reverse this Court's judgment.

Plaintiffs therefore respectfully move the Court to stay the issuance of the mandate pending the filing of Plaintiffs' petition for a writ of certiorari. A stay is necessary to prevent Plaintiffs from suffering irreparable harm, and the equities support a stay. The map currently in effect is one the district court imposed to remedy a Section 2 violation, which it found after a full trial on the merits. The Secretary neither objected to the imposition of that map nor appealed the district court's order imposing it. The only appellate judge to reach the issue, Chief Judge Colloton, concluded that the district court's Section 2 finding should be affirmed.

The Secretary has taken the position in this case that *Purcell* concerns arise if a map is not in place by December 31 of the year preceding a general election. Because it is unlikely that the Supreme Court could resolve Plaintiffs' certiorari petition and issue a merits decision before December 31, 2025, a stay is warranted to maintain the status quo while the Supreme Court adjudicates Plaintiffs' case. This is especially so considering the undisturbed finding of a Section 2 violation by the district court and the Secretary's decision to neither oppose nor appeal the district court's order imposing the remedial map.

**ARGUMENT**

This Court may stay the mandate pending the filing of a petition for certiorari upon a showing "that the petition would present a substantial question and that there is good cause for a stay." Fed. R. App. P. 41(d)(1). To make this showing, a movant

must demonstrate: "(1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010); *see also John Doe I v. Miller*, 418 F.3d 950, 951 (8th Cir. 2005). "In close cases . . . the Court will balance the equities and weigh the relative harms to the applicant and to the respondent." *Perry*, 558 U.S. at 190. This case meets all these requirements and warrants a stay of the mandate to prevent irreparable harm to Plaintiffs while the Supreme Court considers and resolves the questions that will be presented in their petition for certiorari.

**I.     There is a reasonable probability that the Supreme Court will grant certiorari and a fair prospect that it will reverse this Court's decision.**

   **A.     There is a reasonable probability the Supreme Court will grant certiorari.**

A "conflict among the lower courts on [an] important and recurring issue" in the enforcement of federal law is a significant indicator that a petition for certiorari will present a substantial question that at least four Justices will consider worthy of Supreme Court review. *California v. Am. Stores Co.*, 492 U.S. 1301, 1306 (1989) (O'Connor, J., in chambers). That division exists here on the question of private enforcement of Section 2.

3

Since 1965, Congress and the Supreme Court have repeatedly made clear that private actors can enforce the VRA generally, and Section 2 specifically. *See Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996); *Allen v. State Bd. of Elections*, 393 U.S. 544, 556-57 (1969). Outside of this circuit, every American citizen can rely on an unbroken line of Supreme Court and circuit precedent to enforce the individual rights conferred by Section 2. But two years ago, this Court held that Section 2 lacks an implied private right of action. *Arkansas NAACP*, 86 F.4th 1204. And it further deepened the departure from the precedent of other circuits and three-judge district courts in this case by holding that Section 2 is not enforceable through Section 1983. For decades, private plaintiffs have vindicated their rights in Section 2 cases filed in every circuit, litigating many of those cases to the Supreme Court. *Arkansas NAACP* and the decision below ended that uniformity.

There is no other circuit in the country in which private plaintiffs are unable to enforce their rights under Section 2 through either Section 1983 or an implied right of action under Section 2 itself. The Fifth, Sixth, and Eleventh Circuits have each specifically held that Section 2 is privately enforceable, as has every three-judge court to consider the issue. *Robinson v. Ardoin*, 86 F.4th 574, 587-88 (5th Cir. 2023) ("Section 2 provides for a private right of action."); *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 651–54 (11th Cir. 2020) (holding VRA's text "unmistakably" makes clear Section 2 provides for a private right of action), *vacated*

4

*as moot by* 141 S. Ct. 2618 (2021); *Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999) ("An individual may bring a private cause of action under Section 2[.]"); *see also Singleton v. Allen*, No. 2:21-cv-01291-AMM, 2025 WL 1342947 (N.D. Ala. May 8, 2025) (three-judge court); *League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00529-DCG-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court); *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-CV-5338-ELB-SCJ-SDG, 2022 WL 18780945, at *7 (three-judge court).

As a result, American citizens in the states of this circuit have fewer enforceable voting rights than the citizens in every other state in the country. There is thus a reasonable probability that the Supreme Court will grant certiorari to address this sharp, one-to-all circuit split on a question of exceptional importance.

Moreover, there are no procedural barriers in this case that would counsel against certiorari, as the question of Section 2's private enforceability is directly presented and has been thoroughly litigated in this case and circuit. In addition, given the unavoidably recurring nature of the injury caused by this Court's decisions—depriving citizens in this circuit from ever challenging any practice or procedure that impairs their right to vote on the basis of race or color—there is a reasonable probability that the Supreme Court will grant review in this case.

5

## B. There is a fair prospect the Supreme Court will reverse.

A stay of the mandate is warranted because there is a "fair prospect" that the Supreme Court will reverse this Court's judgment on the merits. *Hollingsworth*, 558 U.S. at 190. This Court's decisions in both *Arkansas NAACP* and this case were divided, with Judge Smith and Chief Judge Colloton dissenting. Those dissenting opinions are consistent with the uniform decisions of every other circuit and three-judge district court to consider the issue. The considered views of Chief Judge Colloton and Judge Smith, together with the views of all other circuits and three-judge district courts to confront the question of private enforceability of Section 2, demonstrate that there is a fair prospect that the Supreme Court will similarly disagree with this Court's decisions.

Indeed, the Supreme Court has repeatedly concluded that Section 2 is privately enforceable. *See Morse*, 517 U.S. 186; *id.* at 230-34, (Stevens, J.); *id.* at 240 (Breyer, J., concurring); *Allen*, 393 U.S. at 556-57; *see also Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 91 F.4th 967, 970 (8th Cir. 2024) ("*Arkansas NAACP II*") (Colloton, C.J., dissenting from denial of petition for reh'g en banc) ("*Morse* [is] controlling precedent for an inferior court."). Even under the *Arkansas NAACP* majority's conception of *Morse* as *dicta* rather than binding precedent, *see Arkansas NAACP*, 91 F.4th at 1215-16, the existence of such *dicta* certainly suffices to provide a "fair prospect" that the Supreme Court will follow it.

Indeed, every Section 2 case that the Supreme Court has decided was brought by private plaintiffs. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30 (1986); *Voinovich v. Quilter*, 507 U.S. 146 (1993); *Growe v. Emison*, 507 U.S. 25 (1993); *Johnson v. De Grandy*, 512 U.S. 997 (1994); *Holder v. Hall*, 512 U.S. 874 (1994); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006); *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021); *Allen v. Milligan*, 599 U.S. 1 (2023).

There is likewise a fair prospect that the Supreme Court will view the panel majority's decision as conflicting with *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 183 (2023). The panel majority reasoned that Section 2 focuses on the conduct of States and localities rather than "the right of any citizen . . . to vote" free of racial discrimination. 52 U.S.C. § 10301(a). But for the reasons set forth in Chief Judge Colloton's dissenting opinion, there is a fair prospect that the Supreme Court will disagree with the panel majority's reasoning in this case and conclude that *Talevski* compelled the conclusion that Section 2's reference to the entities that are prohibited from infringing the "right of any citizen . . . to vote," *id.*, "is not a material diversion" from Section 2's focus on individual rights, *Talevski*, 599 U.S. at 185. This is so because there is a fair prospect that the Supreme Court will conclude that a statute unambiguously confers rights regardless of whether its conferral of rights comes before or after its identification of the regulated entities.

7

Moreover, after the panel decision here (but prior to this Court denying en banc rehearing), the Supreme Court issued another decision regarding Section 1983. *See Medina v. Planned Parenthood South Atlantic*, No. 23-1275, 606 U.S. __ (2025). The Court's reasoning in *Medina* further supports the conclusion that there is a fair prospect that it will reverse this Court's decision for at least three reasons.

First, the Court emphasized that Congress's use of the word "right" in statutory language and title headings carries great weight. *Medina* slip op. at 15-17. "[A] title may underscore that the statutory text creates a right[.]" *Medina* slip op. at 21. The Court provided an example from the Federal Nursing Home Reform Act, 42 U.S.C. § 1396r(c), at issue in *Talevski*, as containing rights-creating language on its face:

> "**(c) Requirements relating to residents'** *rights*
>
> "**(1) General** *rights*
>
> "**(A) Specified** *rights*
>
> "A nursing facility must protect and promote the *rights of each resident*, including each of the following *rights*:
>
> "**(i) Free choice**
>
> "The *right* to choose a personal attending physician . . . ."

*Medina* slip op. at 16 (emphasis in opinion).

This reasoning applies with greater strength to Section 2. Start with the law's title, *i.e.*, the "**Voting Rights Act.**" That Congress made "Rights" one of just three words in the law's title "underscore[s] that the statutory text creates a right." *Medina*, slip op. at 21. Section 2 thus starts at a stronger rights-creating posture than the Federal Nursing Home Reform Act. Moreover, Congress explained that the Voting Rights Act was "[a]n Act . . . [t]o enforce the fifteenth amendment to the Constitution of the United States . . . ." Pub. L. No. 89-110, 79 Stat. 437, 437 (1965). Section 2 thus enforces the Fifteenth Amendment's guarantee that "[t]he *right* of citizens of the United States to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude[.]" U.S. Const. amend. XV (emphasis added).

There are more statutory titles to consider as well, each brightly flashing "rights creating" signals. Section 2 is contained in Chapter 103 of Title 52. *See* 52 U.S.C. § 10301. Chapter 103's title? "**Enforcement of Voting Rights.**" Section 2 is codified at Section 10301 of Chapter 103. Section 10301's title? "**Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation**."

From there, the text explicitly confers a "*right* of any citizen of the United States to vote" which cannot be denied or abridged "on account of race." 52 U.S.C. § 10301(a) (emphasis added). And Congress again expressly referred to the "right

9

secured by section 10301 (*i.e.*, Section 2)" later in the Act. *See* 52 U.S.C. § 10308(a). That reference would be wholly superfluous if Section 2 in fact secured no right at all and demonstrates that Congress detected no ambiguity in whether Section 2 secures individual rights.

Second, given the decision in *Medina*, there is also a fair prospect that the Supreme Court will hold that the *Gonzaga* test's "unambiguous conferral" requirement—developed in the context of a spending power statute—does not apply to statutes enacted to enforce Reconstruction Amendment enforcement statutes. As the Supreme Court explained in *Medina*, "'*Gonzaga* sets forth our established method' for determining whether a spending-power statute confers individual rights." *Medina*, slip op. at 14 (quoting *Talevski*, 599 U.S. at 183); *id.* at 15 (explaining that the *Gonzaga* test "measure[s] whether spending-power legislation confers a privately enforceable right"); *id.* at 24 (same).

As Chief Judge Colloton has explained, "*Gonzaga* involved a statute enacted under Congress's spending power, and '§ 1983 actions are the exception—not the rule—for violations of Spending Clause statutes.'" *Turtle Mountain*, 137 F.4th 710, 722 (8th Cir. 2025) (Colloton, C.J., dissenting) (quoting *Talevski*, 599 U.S. at 193-94 (Barrett, J., concurring)). "But the federalism concerns that animated the Court's decisions on § 1983 and the Spending Clause do not have the same force here,

because the Reconstruction Amendments already altered the constitutional balance by limiting the power of the States and enlarging the power of Congress." *Id.*

The limiting construction the Supreme Court has applied to ensure Section 1983 enforcement is not improperly expanded in the context of spending power statutes thus makes little sense in the context of statutes that enforce the Reconstruction Amendments—the very purpose of which were to create individual rights. As Chief Judge Colloton observed, "[w]hy not simply implement the statute as written based on traditional tools of statutory interpretation?" *Id.* There is a fair prospect the Supreme Court will decline to extend *Gonzaga*'s judicially created rule of construction to Reconstruction Amendment enforcement statutes.

Third, it is notable that Justice Thomas's *Medina* concurrence restates his view that statutory Section 1983 enforcement should be limited to Reconstruction Amendment legislation. Thus, under even his most restrictive understanding, Section 1983 clearly applies to the Voting Rights Act, the most significant such legislation. *Medina*, slip op. at 6-7 n.3, 10-11; (Thomas, J., concurring); *see also Holder v. Hall*, 512 U.S. 874, 917-23 (1994) (Thomas, J. concurring) (expressing the view that Section 2 confers rights on affected voters).

For these reasons, there is a fair prospect that the Supreme Court will reverse this Court's judgment and thus the mandate should be stayed while the Supreme Court considers this case.

## II. The irreparable harm Plaintiffs face and the balance of equities weigh in favor of a stay of the mandate.

Finally, there is eminently good cause for a stay because Plaintiffs will suffer irreparable harm without one and the balance of equities further favors a stay. After Plaintiffs in this case proved at trial that North Dakota's legislative districts unlawfully dilute Native American voting strength in violation of Section 2 of the VRA, this Court denied the Secretary's motion for a stay of the district court's judgment while the Secretary's appeal moved forward. Amended Order, *Turtle Mountain*, No. 23-3655 (8th Cir. Dec. 15, 2023). Thereafter, on January 8, 2024, the district court ordered into place the current remedial map—an order the Secretary did not appeal. The district court's remedial map was used in the 2024 election cycle and resulted in Plaintiff Collette Brown's election to the North Dakota Legislature for District 9. Order, *Turtle Mountain*, No. 3:22-cv-22 (D.N.D. Jan. 8, 2024). Plaintiffs would suffer significant harm if the remedial map were discarded, especially given that the only judges to consider the merits of Plaintiffs' suit have either found in their favor or concluded that finding should be affirmed.

This is not one of the "close cases" requiring the Court to balance the equities in adjudicating Plaintiffs' motion for a stay, given the reasonable probability of Supreme Court review and the fair prospect of reversal. *Perry*, 558 U.S. at 190. But the equities favor granting a stay. There will be minimal harm to the Secretary if the mandate does not issue and the status quo is maintained, but there will be great harm

to Plaintiffs and the public if that status quo is uprooted. *Id.* "'[O]nce the election occurs, there can be no do-over and no redress' for voters whose rights were violated." *Singleton v. Allen*, 691 F. Supp. 3d 1343, 1355 (N.D. Ala. 2023) (three-judge court) (quoting *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

The candidate qualifying period for the 2026 election will begin in January 2026. N.D. Cent. Code §§ 16.1-11-06, 16.1-11-15. The Secretary has previously contended, citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006), that the legislative map should be set by December 31 of the year proceeding an election. *See* Secretary's Mot. for Stay, Doc. 5344314 (Dec. 13, 2023). Given the Supreme Court's calendar and practice, it is highly unlikely it would resolve Plaintiffs' petition and issue a merits decision before that time. Absent a stay, North Dakota will proceed to conduct elections using the 2021 legislative map that a federal court has found unlawfully dilutes the voting strength of Native American voters. Altering the legislative districts prematurely before the disposition of Plaintiffs' certiorari petition further harms the public by causing unnecessary voter confusion and waste of government resources when the current remedial maps are likely to be upheld following Supreme Court review. In contrast, the Secretary will merely see a delay in the adoption of the State's preferred legislative map if a stay is granted and Plaintiffs are not

meritorious in the Supreme Court.[1] Staying the mandate and maintaining the current map until certiorari proceedings resolve will avoid any risk of irreparable harm to Plaintiffs and will not unfairly prejudice the Secretary.

**CONCLUSION**

A stay of the mandate is necessary to preserve the status quo and prevent the disenfranchisement of Native American voters whose rights have already been vindicated by the district court. Without it, Plaintiffs and their communities will lose hard-won representation and face another election cycle under a map that a federal court has found unlawfully discriminatory.

For the foregoing reasons, the Court should stay the mandate pending the disposition of a timely filed petition for a writ of certiorari, and if such a petition is granted, pending resolution on the merits, to allow the Supreme Court to determine

---

[1] To the extent that the Secretary asserts that the state will suffer irreparable harm if it is unable to enforce its preferred map, that interest is only relevant when the map is not (or likely not) unlawful. *Singleton v. Allen*, 691 F. Supp. 3d 1343, 1356 n.1 (N.D. Ala. 2023) (three-judge court). Here, in contrast, the district court found that the map unlawfully diluted the voting power of Native American citizens, *Turtle Mountain v. Howe*, No. 3:22-cv-22, 2023 WL 8004576 (D.N.D. Nov. 17, 2023), and the Secretary did not effectively dispute this finding on appeal. *See* R.Doc.123 at 27 (The Secretary's proposed legal conclusions stating that the first *Gingles* precondition was satisfied); R.Doc.158-3 at 13-16 (The North Dakota Legislative Council confirming that "[t]he compactness [of Plaintiffs' maps] meets the standards used by the committee when drawing the existing district map"); App.387-89; R.Doc.117 at 140-42 (The Secretary's expert testifying that the second *Gingles* precondition was satisfied).

whether Native voters can continue to rely on the Voting Rights Act to protect their most basic democratic rights.

July 9, 2025

Leonard R. Powell
Samantha Blencke
NATIVE AMERICAN RIGHTS FUND
950 F St. NW, Ste. 1050
Washington, DC 20004
(202) 785-4166
powell@narf.org
blencke@narf.org

Matthew Campbell
Allison Neswood
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
(303) 447-8760
mcampbell@narf.org
neswood@narf.org

Bryan L. Sells
THE LAW OFFICE OF BRYAN
 L. SELLS, LLC
P.O. Box 5493
Atlanta, GA 31107
(404) 480-4212
bryan@bryansellslaw.com

Respectfully submitted,

*/s/ Mark P. Gaber*
Mark P. Gaber
Anna M. Baldwin
Melissa Neal
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org
abaldwin@campaignlegal.org
mneal@campaignlegal.org

Timothy Q. Purdon*
ROBINS KAPLAN, LLP
1207 West Divide Ave., Ste. 200
Bismarck, ND 58501
(701) 255-3000
tpurdon@robinskaplan.com

*Counsel for Appellees*
**Counsel for Appellees Turtle Mountain Band of Chippewa Indians and Spirit Lake Nation*

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure because it contains 3,436 words, excluding the parts of the petition exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This motion complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using version 2402 of Microsoft Word in 14-point Times New Roman font.

As required by Eighth Circuit Rule 28A(h), this motion has been scanned for viruses and is virus-free.

Dated: July 9, 2025

*/s/ Mark P. Gaber*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Mark P. Gaber*
